499. Bad Biz Finder published an article entitled, *"Two Vultures With One Stone: Parman PARsa Law Group + FeldMAN Law Center = Parman Law Group and Parman & Associates."*

500. Bad Biz Finder published an article entitled, *"Better Business Bureau Drops Nat'l Loan Modification Center to a 'C-' Rating."*

### April 28, 2009

501. Bad Biz Finder published an article entitled, *"Why is the CA State Bar's, Scott Drexel, Spending Time Shutting Down Document Preparation Services (that compete with attorneys) When He's Got His Own Members Breaking the Law on Loan Mod Scams?"*

502. Bad Biz Finder published an article entitled, *"Huffington Reports on 2nd Chance But Omits the Very Most Important Element in the Story"*

### April 29, 2009

503. In the ***Parsa Case***, in response to Defendant Judge Miller's court order, Time Warner Cable produced account information including Plaintiff's name, address, phone number, user name and length of service. However, Time Warner made the statement, "We do not make any representations as to the ***identity of any individual who actually used the above IP address on the date and time in question***." An I.P. address does not identify a person, it identifies a computer, and it certainly does not identify a defendant in a civil unlimited case for defamation. [Please recall that Plaintiff BKGG added Plaintiff into the action on ***March 19, 2011*** in its Second Amended Complaint when the only name they had was Beverly Sullivan.]

504. Bad Biz Finder published an article entitled, *"Step Aside Oleg, There's a New Sheriff In Town, Akbar Aly Bhamani of HIH Corp."*

505. Bad Biz Finder published an article entitled, *"The DRE's "No Objection Letter" List For Consumers Has Lost All Credibility."*

506. Bad Biz Finder published an article entitled, *"More DRE Corruption: Why Are There Brokers on the Dept. of Real Estate's 'No Objection Letter' List That Have Desist & Refrain Orders, Revoked Licenses and Suspensions??"*

### April 30, 2009

- 100 -

507.   Bad Biz Finder published an article entitled, *"We Checked Out Law Offices of Leland Moglen & M3 Legal Services."*

**May 1, 2009**

508.   Bad Biz Finder published an article entitled, *"Can We Get a Mentor for Sean Rutledge? He Sucks at Apologizing."*

509.   Bad Biz Finder published an article entitled, *"United Law Group Atty, Sean Rutledge, Needs a Little Help With His People Skills."*

**May 2, 2009**

510.   Bad Biz Finder published an article entitled, *"Breaking News!! CA State Bar Corruption & Incompetence is at An All Time High."*

**May 3, 2009**

511.   Bad Biz Finder published an article entitled, *"The CA State Bar Announces Today That They're Going to START 'Monitoring' Loan Mod Lawyer Advertising – 5 Months After Bad Biz Finder Alerted Them to This Travesty."*

512.   Bad Biz Finder published an article entitled, *"Your Last Solution.Net – It's a Family Affair at Fairon Group."*

**May 4, 2009**

513.   ***In the Second UDR Unlawful Detainer Case***, Plaintiff filed a Reply to Defendant UDR Villa Venetia's Opposition to Plaintiff's Demurrer to the Amended Complaint.

514.   ***In the Second UDR Unlawful Detainer Case***, Defendant UDR Villa Venetia filed a Notice of Ruling stating that Plaintiff must file an Answer to the Complaint.

515.   Bad Biz Finder published an article entitled, *"Http://badbizfinder.info/ Bad Biz Finder, Inc. Has Nothing to Do With Us."*

**May 5, 2009**

516.   Bad Biz Finder published an article entitled, *"Parsa Law Group Gets Dumped By the Better Business Bureau – Finally."*

**May 6, 2009**

- 101 -

517. *In the Second UDR Unlawful Detainer Case,* Plaintiff files an Answer to the Amended Complaint. Hearing scheduled for May 15, 2009.

518. *In the Second UDR Unlawful Detainer Case,* Plaintiff files a Petition for Writ of Mandate. Hearing scheduled for May 15, 2009.

519. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Compel Responses to Form Interrogatories. Hearing scheduled for May 15, 2009.

520. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Compel Responses to Form Interrogatories-General (Set Two). Hearing scheduled for May 15, 2009.

521. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Compel Responses to Form Interrogatories. Hearing scheduled for May 15, 2009.

522. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Compel Responses to Request for Production of Documents – Set One. Hearing scheduled for May 15, 2009.

522. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Compel Responses to Special Interrogatories – Set One. Hearing scheduled for May 15, 2009.

523. *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed a Motion to Deem Requests for Admissions as True." Hearing scheduled for May 15, 2009.

524. Bad Biz Finder published an article entitled, *"Mac Vanover of Your Last Solution Involved in Serious Motorcycle Accident."*

### May 7, 2009

525. *In the Parsa Case,* Defendant Parsa Law Group (through its attorneys, Defendant BKGG) filed an *Ex Parte* Application for Temporary Restraining Order and Issuance of an Order to Show Cause Re Preliminary/Permanent Injunction; Memorandum of Points & Authorities [filed concurrently with Declaration of James M. Parsa, Esquire;

- 102 -

1 | Declaration of David A. Berstein; Exhibits A-E; and [Proposed] Order. Hearing set for May 8,
2 | 2009.

3 |     526. **In the Second UDR Unlawful Detainer Case**, Minutes Finalized for Demurrer
4 | to the Amended Complaint.

5 |     527. Bad Biz Finder published an article entitled, *"Consumers Beware!! New*
6 | *Attorney, Richard Stinstrom, Joins Sean Rutledge at United Law Group."*

7 | **May 8, 2009**

8 |     528. **In the Parsa Case**, there is no record of the *Ex Parte* hearing taking place,
9 | Minutes were filed by the Court on BKGG's granting the Order and Issuance of an Order to
10 | Show Cause Re Preliminary/Permanent Injunction

11 |     529. Bad Biz Finder published an article entitled, *"Your Loan Mod Contract Must*
12 | *Include These Things According to California Law."*

13 |     530. Bad Biz Finder published an article entitled, *"Another Parsa Law Group Scam:*
14 | *National Legal Alliance."*

   | **May 10, 2009**

15 |     531. Bad Biz Finder published an article entitled, *"Your Last Solution: It's A Family*
16 | *Affair at The Fairon Group – Part II – The Honorary Fairon Family."*

17 |     532. Bad Biz Finder published an article entitled, *"Paul Molinaro Tries to Convince*
18 | *You He's The Good Guy When, In Fact, He Invented the Word 'Scumbagitis'."*

19 |     533. Bad Biz Finder published an article entitled, *"United Law Group Atty*
20 | *Embezzles Half a Million From Own Family."*

21 | **May 11, 2009**

22 |     534. **In the Parsa Case**, Defendant BKGG filed an Order to Show Cause Re
23 | Preliminary Injunction scheduled for May 19, 2009.

24 |     535. **In the Second UDR Unlawful Detainer Case**, Plaintiff filed Proof of Service
25 | By Mail (Answer/Writ of Mandate).

26 |     536. Bad Biz Finder published an article entitled, *"Oleg Artishuk Promises to Save*
27 | *Your Soul If He Can't Modify Your Loan."*

28 |

COMPLAINT FOR MONEY DAMAGES, DECLARATORY & INJUNCTIVE RELIEF FOR 42 U.S.C. §1983 CLAIMS, ETC. (AGTG)

1  537.   Bad Biz Finder published an article entitled, *"Parsa Gets Dumped Again By the*

2  *BBB: Now They Have a "D" Rating."*

3  538.   Bad Biz Finder published an article entitled, Bad Biz Finder: *"Dastmalchi's*

4  *Home ForeClosureFighter is Now Defunct At BBB."*

5  **May 12, 2009**

6  539.   Bad Biz Finder published an article entitled, *"Fairon's Equity Wealth*

7  *Insurance Services Claims to Build Wealth For Its Clients How?"*

8  **May 13, 2009**

9  540.   ***In the Second UDR Unlawful Detainer Case***, Defendant UDR Villa Venetia

10 filed a Request/Counter-Request to Set Case for Court Trial.

11 541.   Bad Biz Finder published an article entitled, *"Dastmalchi and Burkhalter Form*

12 *inKor Holdings to Save Parsa From Prosecution."*

13 **May 14, 2009**

14 542.   Bad Biz Finder published an article entitled, *"H.R. 123: Foreclosure Rescue*

15 *Fraud Act of 2009*

16 543.   Bad Biz Finder published an article entitled, *"Say Farewell to Apply 2 Save &*

17 *Derek Oberholtzer."*

18 544.   Bad Biz Finder published an article entitled, *"Hey Scott Drexel – Talk is Cheap*

19 *– Let's See Some Action."*

20 545.   Bad Biz Finder published an article entitled, *"HUD Announces New Options in*

21 *Its 'Making Home Affordable Program'."*

22 **May 15, 2009**

23 546.   ***In the Second UDR Unlawful Detainer Case***, Minutes Finalized for the

24 Motion to Compel Answers; Notice of Ruling Mailed. The Court ruled against Plaintiff and

25 ordered sanctions in the amount of $960.00, even though it knew Plaintiff was indigent.

26 547.   Bad Biz Finder published an article entitled, *"Part I of II: The Wacky, Rocky*

27 *World of Jeffrey A. Cancilla, Attorney at Law."*

28 **May 16, 2009**

- 104 -

548.   Bad Biz Finder published an article entitled, *"Bad Biz Finder Announces The Next 5 Companies to Be Reviewed."*

549.   Bad Biz Finder published an article entitled, *"Daughter of Deceased Mob Boss in Foreclosure: Who's Going to Volunteer?"*

### May 17, 2009

550.   Bad Biz Finder published an article entitled, *"Parsa Law Group Hits Rock Bottom – BBB Gives Them An "F."*

### May 18, 2009

551.   **In the Parsa Case,** Defendant Judge Miller entered a tentative ruling on the hearing scheduled for the next day in connection with the Defendant Parsa Law Group's Order to Show Cause Re Preliminary Injunction.

> *"Hear argument.  Reasoning: Determine whether plaintiff served the application on defendants; plaintiff shows reasonable likelihood of prevailing and irreparable harm; the problem is unconstitutional prior restraint (See Evans 162 A4 1157)."*

552.   It is shocking that Defendant Judge Miller would use this citation (Evans 162 A4 1157) in his tentative ruling, illuminating the possible presence of unconstitutional prior restraint as the reason for denying plaintiff's preliminary injunction, then less than two weeks later, issue a permanent injunction without taking into consideration the law for which he relied upon to make his earlier ruling.   In fact, the law established in his cited case was overlooked entirely.

553.   In *Evans v. Evans* (2008) 162 Cal.App.4th 1157, Cal.Rptr.3d the court opinion states:

> *"The right to free speech is . . . one of the cornerstones of our society," and is protected under the First Amendment of the United States Constitution and under an "even broader" provision of the California Constitution. (Hurvitz v. Hoefflin (2000) 84 Cal.App.4th 1232, 1241).*
>
> *An injunction that forbids a citizen from speaking in advance of the time the communication is to occur is known as a "prior restraint." (DVD Copy Control Assn., Inc. v. Bunner (2003) 31 Cal.4th 864, 889-890 [4 Cal.Rptr.3d 69, 75 P.3d 1]; Hurvitz v. Hoefflin, supra, 84 Cal.App.4th at p. 1241.)*

*"A prior restraint is the most serious and the least tolerable infringement on First Amendment [162 Cal.App.4th 1167] rights." (DVD Copy, supra, 31 Cal.4th at p. 886; Near v. Minnesota (1931) 283 U.S. 697, 713.) Prior restraints are highly disfavored and presumptively violate the First Amendment. (Maggi v. Superior Court (2004) 119 Cal.App.4th 1218, 1225; Hurvitz v. Hoefflin, supra, 84 Cal.App.4th at p. 1241.) This is true even when the speech is expected to be of the type that is not constitutionally protected. (See Near v. Minnesota, supra, 283 U.S. at pp. 704-705 [rejecting restraint on publication of any periodical containing "malicious, scandalous and defamatory" matter].) ...*

*"To establish a valid prior restraint under the federal Constitution, a proponent has a heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. (See Hobbs v. County of Westchester (2d Cir. 2005) 397 F.3d 133, 149; see also Nebraska Press Assn. v. Stuart (1976) 427 U.S. 539, 562-568.)*

*Further, any permissible order "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. . . . " (Carroll v. Princess Anne (1968) 393 U.S. 175, 183-184.)*

*"Even if an injunction does not impermissibly constitute a prior restraint, the injunction must be sufficiently precise to provide "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." (United States v. Harriss (1954) 347 U.S. 612, 617; see also People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1115.)*

*An injunction is unconstitutionally vague if it does not clearly define the persons protected and the conduct prohibited. ... "An order prohibiting a party from making or publishing false statements is a classic type of an unconstitutional prior restraint. (See Metropolitan [162 Cal.App.4th 1168] Opera Assn., Inc. v. Local 100 (2d. Cir. 2001) 239 F.3d 172, 176.) "While [a party] may be held responsible for abusing his right to speak freely in a subsequent tort action, he has the initial right to speak freely without censorship." (Gilbert v. National Enquirer, Inc. (1996) 43 Cal.App.4th 1135, 1145.)*

*"This portion of the order is also invalid as unconstitutionally vague and overbroad. The injunction broadly prohibited Linda from publishing any defamatory comments about Thomas. This sweeping prohibition fails to adequately delineate which of Linda's future comments might violate the injunction and lead to contempt of court. (See Balboa Island, supra, 40 Cal.4th at p. 1159.)*

*The fact that the court's prohibition on publishing false materials applied only to speech on the Internet does not affect our analysis. The courts have made*

- 106 -

*clear that speech on the Internet is accorded the same First Amendment protection as speech on other forums. (See Reno v. American Civil Liberties Union (1997) 521 U.S. 844, 870; Krinsky v. Doe 6 (2008) 159 Cal.App.4th 1154, 1164.)*

554. ***In the Second UDR Unlawful Detainer Case***, Plaintiff filed a Request/Counter-Request for a **Jury Trial** (as opposed to Defendant UDR Villa Venetia's request for a Court Trial.)

555. Bad Biz Finder published an article entitled, *"Feldman & Its IT Co., Gervais Group LLC, Steal Our Name Cuz Feldman's Name Stinks"*

556. Bad Biz Finder published an article entitled, *"A Little Help for Parsa's Atty, Eric Goodman, In Its Lawsuit Against Us."*

**May 19, 2009**

557. ***In the Parsa Case,*** Plaintiff informed the Court that she was indigent by way of a faxed submission of an "Application for Waiver of Court Fees and Costs." On the same date, Latesha in Civil Operations rejected the Application stating on the "Fax-Filing Reject Form":

> *"We are unable to file this fee waiver because a business can't file for a fee waiver so I will charge the credit card for $13.00. If you have any questions please call 714-834-4724 and ask for Latesha. Thank you."*

558. Latesha's statement about "charging the credit card for $13.00," referred to the Plaintiff's Opposition to the Preliminary Injunction filed via fax with the "Application for Waiver of Court Fees and Costs." Even though Defendants Miller, Parsa Law Group and BKGG claim to have added Plaintiff on to the action as a defendant, the Court did not recognize Plaintiff as a defendant and communicated to her that the only defendant of record was Bad Biz Finder. This is why Latesha made the statement, "We are unable to file this fee waiver ***because a business*** can't file for a fee waiver."

559. Latesha forwarded the rejected Application to Defendant Turner (Defendant Judge Miller's Clerk) along with Plaintiff's Opposition to the Preliminary Injunction. Latesha requested that Defendant Turner forward the "Fax-Filing Rejection" form to Plaintiff but that the fax filing fee had been charged on the document. However, Defendant Turner held on to

- 107 -

the rejected application ___and___ Plaintiff's Opposition to the Preliminary Injunction until June 2, 2009, the date of the Default Prove-up hearing, to intentionally prevent Plaintiff from filing a first pleading to avoid the Default.

560.     ***In the Parsa Case,*** Defendant Judge Miller denied Defendant Parsa Law Group's Request for a Preliminary Injunction and Defendant BKGG submitted a Request for Entry of Default on behalf of Defendant Parsa Law Group.

561.     ***In the Second UDR Unlawful Detainer Case***, a Jury Trial was set for June 1, 2009.

562.     Bad Biz Finder published an article entitled, *"Bad Biz Finder Wins in Court: Good Does Prevail Over Evil."*

563.     Bad Biz Finder published an article entitled, *"Hackers Invade Bad Biz Finder Blog."*

**May 20, 2009**

564.     ***In the Second UDR Unlawful Detainer Case,*** Defendant UDR Villa Venetia filed a Motion for Summary Judgment/Adjudication and the hearing was scheduled for May 29, 2009.

565.     ***In the Second UDR Unlawful Detainer Case,*** Defendant UDR Villa Venetia also filed a Separate Statement of Undisputed Material Facts and Supporting Evidence for Motion for Summary Judgment and the hearing was scheduled for May 29, 2009.

566.     ***In the Second UDR Unlawful Detainer Case***, Defendant UDR Villa Venetia also filed a Declaration of Karissa Harmon in Support of the Motion for Summary Judgment (herein referred to as "Defendant Harmon").

567.     ***In the Second UDR Unlawful Detainer Case***, Defendant UDR Villa Venetia also filed a Declaration of Cynthia S. Poer in Support of the Motion for Summary Judgment. (herein referred to as "Defendant Attorney Poer").

568.     ***In the Second UDR Unlawful Detainer Case***, Defendant UDR Villa Venetia also filed a Request for Judicial Notice (of First Amended Complaint, Notice of Motion and Motion to Deem Requests for Admissions as True).

- 108 -

569. Bad Biz Finder published an article entitled, *"Apply 2 Save's Oberholtzer Demonstrates How NOT to Treat Your Employees."*

### May 23, 2009

570. Bad Biz Finder published an article entitled, *"Consumer Writes: 'Steven Kop Stole Our Money & James Parsa Stole Our Time'."*

### May 24, 2009

571. Bad Biz Finder published an article entitled, *"United Law Group – "F" Rating with BBB – Took Less Than 2 Years."*

572. Bad Biz Finder published an article entitled, *"Bad Biz Finder Announces Merger With Tenant Advocate."*

### May 25, 2009

573. Bad Biz Finder published an article entitled, *"Attorney Steven Kop is Confronted & Reacts in a Very Predictable Manner."*

574. Bad Biz Finder published an article entitled, *"Rodis Law Group Scams Single Mom of 2 Kids & Forces Her Into Foreclosure."*

### May 26, 2009

575. Bad Biz Finder published an article entitled, *"Holly Fujie Leaves State Bar in Disgrace – Let's See What Howard Miller Can Do."*

576. Bad Biz Finder published an article entitled, *"Apply 2 Save Rapes Employees/Consumers & Parsa Hopes To Rape Them Again."*

### May 27, 2009

577. **In the Second UDR Unlawful Detainer Case,** the Court reassigned the Motion for Summary Judgment to H12 on May 29, 2009.

578. **In the Second UDR Unlawful Detainer Case,** the Court reassigned the Jury Trial to H12 on June 1, 2009.

579. **In the Second UDR Unlawful Detainer Case,** Defendant UDR Villa Venetia filed a Proof of Service of Summons & Complaint – Unnamed Occupants.

580. **In the Second UDR Unlawful Detainer Case,** Defendant UDR Villa Venetia filed a Request for Entry of Default.

581.   Bad Biz Finder published an article entitled, *"American Loan Modification Services LLC: Proceed With Caution."*

582.   Bad Biz Finder published an article entitled, *"Apply 2 Save Closes Its Doors But Oberholtzer Gets a Million?"*

583.   ***In the Parsa Case,*** Defendant Parsa Law Group dismissed all causes of action against defendant Beverly Sullivan and Does 1-10.

584.   ***In the Parsa Case,*** the Court filed Plaintiff's Motion for an Order Setting Aside Default, with the correct hearing date of May 29, 2009 as it was Plaintiff's intention to have the Motion considered prior to or in conjunction with the Default Prove-up Hearing. [Please note that Judge Miller also stated in his July 14, 2009 tentative ruling on the Motion, which said Motion was "timely brought."]

## May 28, 2009

585.   ***In the Second UDR Unlawful Detainer Case,*** Plaintiff filed an Opposition to Motion for Summary Judgment ***and a*** Request to Continue the Jury Trial.  The reason why Plaintiff did this is as follows:  Throughout the case, Defendant Commissioner Pacheco had denied Plaintiff's right to raise or to argue triable issues of fact, stating that Plaintiff must reserve those issues for trial.  However, the very essence of a Motion for Summary Judgment is that ***no triable issues of fact remain***.   In also requesting a continuance of the Jury Trial already scheduled for June 1, 2009, Plaintiff was attempting to resolve the Motion for Summary Judgment first because there were glaringly apparent pending triable issues of fact.

586.   ***In the Parsa Case,*** the Clerk of the Court (specifically, M. Nordman, Deputy Clerk) filed a "Notice to Filing Party" rejecting Defendant Parsa Law Group's Default Prove-Up Package.  Plaintiff inquired with the Clerk and she told Plaintiff that she had recommended to Defendant Parsa Law Group to continue the matter out several weeks in order to have time to notice Plaintiff and repair the errors. Those errors are:

> "a.    Statement of Damages has not been filed with the court.  It is required if requesting punitive damages.  Note that it also has to be served to each defendant.

> b.    Declaration of James Parsa:  no proof has been submitted to support your demand.  Please include some documentation how you have

- 110 -

*calculated the "economic loss of $206,250.00." Also, you have listed that you
have lost 300 clients between January and May, is there any documentation
that would support this? Note that the signature on the document is a copy.*

      *c.    Please submit a Judgment, you have submitted an Order.*

      *d.    Proof of Service is not in legal format; Clerk is not able to file it
as is.*

      *e.    Attorneys' fees requested exceed rule 366. If you wish to ask
more than the rule states, please submit a declaration explaining why you are
entitled to them. Also, no agreement is attached that would allow you to collect
any attorneys fees. Please refer a rule that gives you this right."*

587.    However, notice was never made by Defendant Parsa Law Group to Plaintiff, nor does the original hearing date (May 29, 2009) show up on the current court docket. Instead, it states that the Default Prove-up Hearing was originally scheduled for June 1, 2009 and was continued to June 2, 2009.

### May 29, 2009

588.    Bad Biz Finder published an article entitled, *"Bye Bye to Rodis Law-America's Law-Tax Relief ASAP: But Beware of Stragglers."*

589.    Bad Biz Finder published an article entitled, *"Consumer Warning for Orange County Renters: Landlord, UDR, is in Big Trouble."*

590.    Once again, the Court, ***In the Second UDR Unlawful Detainer Case,*** on its own Motion reassigned the Motion for Summary Judgement and Jury Trial to another Department, H-07.

591.    ***In the Second UDR Unlawful Detainer Case,*** Defendant Attorney Poer filed and served on Plaintiff personally in the courtroom the following documents on behalf of Defendant UDR Villa Venetia:

      a.    Reply to Plaintiff's Opposition to Defendant UDR Villa Venetia's Motion for Summary Judgment.

      b.    Motion in Limine No. 1

      c.    Motion in Limine No. 2

      d.    Motion in Limine No. 3

- 111 -

592. Also, in the **Second UDR Unlawful Detainer Case,** Defendant Judge Robison ordered parties to commence its scheduled jury trial on Monday, June 1, 2009. Plaintiff had demanded a jury trial due to the fact that none of the triable issues of fact had been raised. Judge Robison made it clear that the parties would begin to litigate the triable issues of fact that Plaintiff had been prevented from arguing throughout the case. However, Defendant Judge Robison refused to rule on the Motion for Summray Judgment and denied Plaintiff's request for a continuance on the trial. When Plaintiff asked, "But don't you have to determine whether triable issues of fact exist ***before trial*** and as such, wouldn't you need to rule on the Motion for Summary Judgment today?" Defendant Judge Robison got very angry and his bailiff went and stood behind Plaintiff with his handcuffs jiggling behind her.

593. **In the Parsa Case,** Plaintiff called and spoke with Defendant Turner in Department C-14 to find out the outcome of the Default Prove-Up Hearing and it was at that time that Defendant Turner informed Plaintiff that the Default Prove-Up Hearing had been continued to Tuesday, June 2, 2009. Defendant Parsa Law Group had not noticed Plaintiff.

594. Also, **in the Parsa Case**, Plaintiff contacted the Clerk to inquire as to the status of her Application for Waiver of Court Costs and Fees. It wasn't until then that Plaintiff found out that the Application had been rejected and her Opposition had not been considered. However, the Clerk did indicate that it had been sent back to the department on May 19, 2009, ten (10) days earlier.

595. **In the Parsa Case,** the Minute Order of this date stated:

> "Default Prove-Up Hearing continued to 06/02/09 at 11:30 a.m. in this department. Default Prove-up continued due to the unavailability of plaintiff."

596. Since "plaintiff" was Defendant Parsa Law Group and Defendant BKGG had been acting on its behalf since January of 2009, it is unclear how plaintiff was unavailable. The fact is that Defendant BKGG (on behalf of Defendant Parsa Law Group) had not complied with the terms of the May 28, 2009 Clerk's Rejection Notice because they could not quantify any part of the $604,515.66 Judgment that was eventually awarded.

597. In the Parsa Case, Defendant Judge Miller also states in the Minute Order:

> "8:34 AM, The Court conducts a chambers conference, <u>unreported</u>, with counsel present."

- 112 -

598.    This date was a Friday and at that time Defendant Judge Miller heard *ex parte* applications and then trials. However, on this date Defendant Judge Miller conducted an improper extrajudicial *ex parte* proceeding ***"in chambers unreported by a court reporter."*** Present were Defendant Judge Miller, Defendant Parsa who was "available" for this meeting, Defendant BKGG's attorneys, Defendant Attorneys Goodman and Berstein, and Defendant State Bar investigators, Defendants Layton and Noonen.

599.    Defendant State Bar was dedicated to the cause of permanently enjoining Plaintiff's speech because it was very concerned about Plaintiff's reports exposing its liability in loan modification fraud by its attorney members in collusion with the real estate and mortgage members of Defendant California DRE.   In addition, Plaintiff was encouraging loan modification fraud victims to file claims with Defendant State Bar's "Client Security Fund," and was forming an extensive group to participate in writing a Writ of Mandate mandating Defendant State Bar and Defendant California DRE to make restitution to consumers defrauded by its members via their consumer protection divisions, the "Client Security Fund" and the "Recovery Account," respectively.

600.    The in chambers conference held at 8:34 AM in chambers without a court reporter present but with counsel present, is the definition of an improper extrajudicial *ex parte* communication. During this conference, Defendant Judge Miller was offered and accepted a financial arrangement in exchange for entering a Permanent Injunction and Default Judgment against Plaintiff.   The financial arrangement was funded out of Defendant Parsa's client trust account which at that time amount to approximately $11 million of fee taken in advance from vulnerable consumers in foreclosure for services never performed.

601.    Plaintiff is aware of this arrangement because Defendant Parsa's ex-secretary worked for an attorney that is a friend of Plaintiff. Defendant Dastmalchi (Parsa's ex-partner) was referred to this attorney by way of Parsa's ex-secretary. Defendant Dastmalchi discussed with this attorney the fact that he knew where the money [$11 million client trust account] was located but he couldn't gain access to it. Defendant Dastmalchi wanted to hire this attorney to help him gain access to the money. The attorney was very cautious and requested that

- 113 -

1    Defendant Dastmalchi provide him documentation that he was entitled to said funds, but he

2    never heard from Defendant Dastmalchi again. However, Defendant Dastmalchi kept in

3    communication with the secretary who was very talkative and disclosed the facts contained,

4    supra, who then disclosed them to Plaintiff.

5    602.    In exchange for the funding of this arrangement, Defendant State Bar agreed to

6    "suspend" Defendant Parsa's law license for two years on crimes of moral turpitude (in

7    connection with the two convictions of statutory rape entered against Defendant Parsa in 2000

8    described, supra, that Defendant Parsa never reported to the California State Bar. The way that

9    the California State Bar found out about it was from Plaintiff. At the same time, the

10   California Attorney General's Office was investigating Defendant Parsa on violations of

11   Defendant State Bar Rules of Professional Conduct 1-320 (sharing attorneys fees with non-

     attorneys) and 1-400 (advertising and solicitation methods).

12   603.    When the California State Bar finally "suspended" Defendant Parsa on August

13   31, 2009, Benjamin Diehl, Assistant Attorney General, of the California Attorney General's

14   Office dropped his investigation against Defendant Parsa. The California State Bar suspended

15   Defendant Parsa for crimes of moral turpitude instead of violations of Defendant State Bar

16   Rules of Professional Conduct, so that Defendant Parsa would not be required to make

17   financial restitution to his victims and could retain the balance of the monies contained in his

18   client trust account after certain "distributions."

19   604.    In addition, Defendant State Bar agreed to reject any consumer claims made to

20   its Client Security Fund pertaining to Defendant Parsa. Plaintiff has first-hand knowledge of

21   this fact due to consumer letters shared with her directly. The way the California State Bar

22   handled this fraud was a letter to the consumer explaining that although Defendant Parsa had

23   been "suspended," the final judgment was still pending with the California Supreme Court and

24   until such time as the Court made a final judgment, it could not entertain an application for

25   restitution from its Client Security Fund.

26   605.    Two months from the filing of this Complaint, on October 16, 2011, it will have

27   been two years that Defendant Parsa's case has been "pending with no determination from the

28   California Supreme Court" and every single application for restitution against Defendant Parsa

- 114 -

1  has been rejected by Defendant State Bar's Client Security Fund, and in two months

2  Defendant Parsa will be free to return to the practice of law free of the requirement to make

3  restitution even though he still has the funds.

### May 30, 2009

606.   Bad Biz Finder published an article entitled, *"Consumer Advocate Exposes Landlord, UDR: Uses False Names in Leases."*

607.   Bad Biz Finder published an article entitled, *"Consumer Advocate Takes Landlord, UDR, To Task for Illegal Liquidated Damages Clauses."*

### June 1, 2009

608.   *In the Second UDR Unlawful Detainer Case,* Plaintiff had also prepared a Supplemental Opposition to Defendant UDR Villa Venetia's Motion for Summary Judgment which she filed that morning and which contained all outstanding triable issues of fact that Defendant Pacheco has denied her right to bring forth and argue.

609.   Also, *in the Second UDR Unlawful Detainer Case,* instead of commencing the jury trial as Defendant Judge Robison had ordered the Friday before, Plaintiff was ushered into a vacant courtroom (with black paper on the windows) where Defendant Judge Johnson granted UDR's Motion for Summary Judgment, <u>stating that there were NO triable issues of fact and that Defendant's right to litigate the triable issues of fact to a jury was denied.</u>   When Plaintiff questioned Defendant Judge Johnson as to his reasoning, he simply stated, "You might want to look that up for your appeal," and left the bench.  Plaintiff had spent the entire weekend preparing for her first day of a jury trial and said trial was denied arbitrarily and without notice.

610.   Defendant UDR Villa Venetia (through its attorneys of record, Defendant Brisco & Associates) filed the Order granting its Motion for Summary Judgment that was already prepared.  It also filed an Application for Writ of Possession and the Judgment signed by Defendant Judge Johnson.

### June 2, 2009

611.   *In the Second UDR Unlawful Detainer Case,* Defendant UDR Villa Venetia filed and served its Notice of Ruling.

612. Bad Biz Finder published an article entitled, *"Consumer Advocate Fights Landlord, UDR."*

613. Bad Biz Finder published an article entitled, *"Atty Steven Kop Floats Out to Sea Without His Paddles."*

614. ***In the Parsa Case***, Plaintiff obtained the Court Reporter's Transcript from June 2, 2009 from Evelyn Barnett, Defendant Judge Miller's ex-Court Reporter who retired shortly after these proceedings. There is a page in the transcript that lists the exhibits and there is only one document listed, entitled, "Document of Expenditures." However, this document cannot be found in the Court Reporter's transcript, in evidence, nor in the court file.

615. The words of Defendant Judge Miller capture the fact that he was arrogantly ambivalent about the "unconstitutional prior restraints of speech" he seemed so concerned about two weeks prior at the hearing on Defendant Parsa Law Group's "Request for Preliminary Injunction." In fact, at the end of this section, Defendant Judge Miller acknowledges that the injunction is vague (and therefore unconstitutional) and states:

> *"Now, if Ms. Baldwin chooses to seek the guidance of the Court as to what is permissible or not permissible under this injunction so as to fashion something that protects her free speech right while preventing her from making libelous defamatory statements, I would invite her to do so."*

616. Also, in the Court Reporter's Transcript Judge Miller acknowledges that Plaintiff filed an Opposition to The Order to Show Cause Re Preliminary Injunction, but disregarded it and took Plaintiff's default anyway:

> *"Okay. One thing – let me state for the record the Court received a missive from Bad Biz Finder essentially opposing these proceedings. Besides the fact that it was made in anonymous format, Bad Biz Finder has not posted any sort of appearance fee in this matter, so they are not eligible to appear."*

617. Please recall that Clerk of the Court sent the rejected Waiver of Court Fees & Costs to Defendant Judge Miller's Clerk, Defendant Turner, on May 19, 2009 and asked her to mail it to Plaintiff which she failed to do. Plaintiff finally received it on June 4, 2009 and it has a date stamp of June 2, 2009 on it next to Defendant Turner's note to Plaintiff. However, on June 2, 2009, Defendant Judge Miller claims:

- 116 -

> *"We mailed the rejection or notice of the rejection to Bad Biz Finder, Fremont, California, whatever zip code we had. Of course, there was no street address. We did also in – somewhere in the pleadings we had an address for Erin Baldwin, so we also out of courtesy mailed it to that address, since at least allegedly she is a principal or the principal of Bad Biz Finder. This matter, in any event, remains in default. The matter is here for a prove-up hearing."*

618.   Not only had Plaintiff fax-filed an Opposition to Defendant Parsa Law Group's Request for a Preliminary Hearing but she had also submitted a "Motion for Order Setting Aside Default as to all Defendants, Request for Dismissal with Prejudice, and Award of Monetary Damages" filed with the Court on May 27, 2009.  Defendant Judge Miller continues:

> *"Certainly free speech rights are possessed by individuals who chose to speak anonymously.  The question here, however, is whether or not Ms. Baldwin, in the guise of Bad Biz Finder knowingly made false statements about Parsa Law Group, and the Court finds besides the fact that Bad Biz Finder is clearly making great efforts or <u>Ms. Baldwin is making great efforts to remain anonymous allows the court to make the inference that she is knowingly making false statements with the intent to injure Parsa Law Group.</u>*

> *"I'm not going to hash it out statement by statement, but there are a number of the statements while they are not very nice might be posted as matters of opinion, but many of them purport to state facts <u>which Mr. Parsa has just testified, and I believe him, are untrue about alleged criminal acts, fraudulent business practices, et cetera,</u> and that's how the Court reaches its conclusion.*

> *"So. Ms. Baldwin, <u>having had the opportunity to come out of hiding and give the Court her opinion on this matter, opted not to,</u> which is her right, but on the face of the evidence here it's overwhelming that the statements were libelous both in the general sense and the trade libel sense. ...*

[Please recall that Plaintiff, in fact, did timely present an opposition, but Judge Miller refused to recognize it because an appearance fee had not been entered because his clerk, Defendant Turner never sent the fee application rejection to Plaintiff.]

> *"Now, if Ms. Baldwin chooses to seek the guidance of the Court as to what is permissible or not permissible under this injunction so as to fashion something that protects her free speech right while preventing her from making libelous defamatory statements, I would invite her to do so."*

[Please note that Defendant Judge Miller acknowledges that the Permanent Injunction is not clear, "void for vagueness," yet he signed it which means that he acted in excess of his jurisdiction and the order should be set aside.]

- 117 -

619.    Defendant Judge Miller states that he heard testimony from Defendant James Parsa and states:

> *"I'm not going to hash it out statement by statement, but there are a number of the statements while they are not very nice might be posted as matters of opinion, but many of them purport to state facts which Mr. Parsa has just testified, and I believe him, are untrue about alleged criminal acts, fraudulent business practices, et cetera, and that's how the Court reaches its conclusion."*

620.    However, the extent of Defendant Parsa's "testimony" as to the "alleged criminal acts, fraudulent business practices, et cetera… on which the Court reached its conclusion amount to:

| | |
|---|---|
| *Defendant Judge Miller:* | *Mr. Parsa, is everything you wrote in your Declaration of May 27, 2009, true and correct?* |
| *Defendant Parsa:* | *Yes, Your Honor.* |
| *Defendant Judge Miller:* | *Okay, Mr. Berstein, you may inquire further as you desire.* |
| *Defendant Atty Berstein:* | *Thank you, your honor.* |

621.    Furthermore, because Defendant Parsa Law Group could not comply with the terms outlined in the Clerk's Rejection Notice, *supra,* Judge Miller, instead, allowed Defendant Parsa to participate in direct examination by his attorney of record, Defendant Attorney Berstein to satisfy the requirement for a full evidentiary hearing and trial on the merits prior to entering a permanent injunction.  Defendant Judge Miller could have incorporated Plaintiff's pleadings but chose not to do so and as such, violated Plaintiff's constitutional rights on many levels.

622.    This was the sum total of the trial on the merits:

*Direct Examination*

| | |
|---|---|
| *Defendant Atty Berstein:* | *Mr. Parsa, with regard to the court's, I guess, request for some clarity, the 300 or so clients that we have indicated were lost by the law firm, were these clients refunded their money?* |
| *Defendant Parsa:* | *Yes, they were.* |
| *Defendant Atty Berstein:* | *Okay.  All of them?* |

- 118 -

| | | |
|---|---|---|
| 1 | *Defendant Parsa:* | *Every single one.* |
| 2 | *Defendant Atty Berstein:* | *Okay. And the $206,250.00 that reflects what* |
| 3 | | *Your profit would have been had those clients remained at Parsa Law Group?* |
| 4 | *Defendant Parsa:* | *That's correct.* |
| 5 | | |
| 6 | *Defendant Atty Berstein:* | *Okay. And what is your understanding as to why these clients left Parsa Law Group?* |
| 7 | *Defendant Parsa:* | *They were specifically concerned about the* |
| 8 | | *comments and points raised by the website "Bad Biz Finder," and essentially were not at all in the* |
| 9 | | *position of of the mood to accept an explanation. They simply wanted their money back. They felt* |
| 10 | | *there was a scam involved and that was the end* |
| 11 | | *of that. There was no dissuading them.* |
| 12 | *Defendant Atty Berstein:* | *And are these people that you personally spoke* |
| 13 | | *to?* |
| 14 | *Defendant Parsa:* | *The majority of them, yes. As far as their refunds, every single one was approved by myself.* |
| 15 | | |
| 16 | *Defendant Atty Berstein:* | *Now, in addition to the 206,250, you indicated to me that your firm had to take steps to correct* |
| 17 | | *what had been done by Bad Biz Finder.* |
| 18 | *Defendant Parsa:* | *Yes, that's correct.* |
| 19 | *Defendant Atty Berstein:* | *And what are we talking about there?* |
| 20 | *Defendant Parsa:* | *First of all, we did hire a PR firm in an attempt to* |
| 21 | | *counter what the Bad Biz Finder was spreading. That firm's name is Idea Hall. My contract with* |
| 22 | | *them began in April, April 1st, went through June 1, 2009. The contract is for $45,000. To date I* |
| 23 | | *have already paid them and they have earned $30,000. In addition to that, if you want me to* |
| 24 | | *continue?* |
| 25 | *Defendant Atty Berstein:* | *Yeah, are there any other expenses that have been* |
| 26 | | *directed toward correcting what has been done by Bad Biz Finder?* |
| 27 | *Defendant Parsa:* | *Since February of this year, 2009, we have* |
| 28 | | *increased our advertising budget in an effort to* |

- 119 -

*counter react the losses we were experiencing. I estimate that to be about 10% of our clientele, and that was an additional $10,000 a month, approximately, sometimes $12,000, for a total of $40,000 through the first of this month, June 1st.*

623.     On June 2, 2009, Defendant Turner mailed to Plaintiff the rejected "Application for Waiver of Court Fees and Costs and Resubmit Request" sent to her by Latesha on May 19, 2009.   In the same package she included Defendant's original "Motion for Order Setting Aside Default as to all Defendants, Request for Dismissal with Prejudice, and Award of Monetary Damages" date stamped on May 27, 2009.   Defendant Turner included a handwritten note (date stamped June 2, 2009) stating: *"Obtain legal counsel to properly file your motion, or a paralegal to assist."* Ms. Turner's unique penmanship on the handwritten note matched the unique penmanship on the the Default Judgment and Permanent Injunction allegedly signed by Defendant Judge Miller.

624.     Defendants Judge Miller and Turner, intentionally deprived Plaintiff of the right to be heard at this hearing and as a result, the Default Judgment must be set aside.

625.     In addition, Defendant Judge Miller permanently enjoined Plaintiff's speech without confirmation that Plaintiff was even a properly-named defendant in the action. Defendant Parsa Law Group's attorneys (Defendant BKGG) also admitted at the hearing that they did not know whether Plaintiff was a defendant, as stated in the Court Reporter's transcript of the June 2, 2009 hearing:

Judge Miller: "So, in any event, the court finds by a preponderance of the evidence that Bad Biz Finder and Erin K. Baldwin – *Oh, suggestions have been made, although I'm not sure under oath by anyone, that Beverly Sullivan is an aka of Erin Baldwin.*

Mr. Berstein: "*Yeah. We're not exactly sure.* We believe her to be an aka, but we know the real person to be Beverly – or Erin K. Baldwin."

Judge Miller:  Okay.  What I'm going to do is then enter judgment against Bad Biz Finder and Erin K. Baldwin aka Beverly Sullivan.  If, in fact, you find that - -- something to the effect that Beverly Sullivan is indeed a separate person, you can bring an action to amend your judgment accordingly.  If you find out later on that Beverly Sullivan is the real name, true name, of Erin K. Baldwin, again, I think you can probably amend, if necessary.  But at this point judgment will be

- 120 -

*against Bad Biz Finder and Erin K. Baldwin aka Beverly Sullivan for Trade Libel and Defamation."*

626.    This ambiguity as to the parties (and whether any legitimate defendants were ever included in this case) nonetheless, paved the road for two additional and identical defamation actions filed against Plaintiff within the next 45 days all of which ended up before Defendant Judge Miller as "related actions."  Both cases named Plaintiff as the sole defendant defined as "Erin K. Baldwin, aka Beverly Sullivan and Bad Biz Finder."

627.    Defendant Judge Miller held Plaintiff solely and personally liable for payment of the judgment and permanently enjoined her speech without ever properly naming her as a defendant in the action.  This was due to the fact that Bad Biz Finder was an unknown entity; and Beverly Sullivan (although dismissed from the action on May 27, 2009, as an individual) was resurrected as an alias of Plaintiff.  Why was this?

628.    Because on March 19, 2009, when Defendant Parsa Law Group amended its complaint it could not verify that Plaintiff was a defendant in the action.  It wasn't until April 29, 2009 that Defendant Parsa Law Group received Time Warner's documentation that (albeit vaguely) alleged that Plaintiff could be a defendant.  In order to have added Plaintiff, Defendant Parsa Law Group would have had to amend their Complaint again after April 29, 2009 but it failed to do so.

629.    The Permanent Injunction portion of the pleading states:

*"IT IS FURTHER ORDERED that Defendant BAD BIZ FINDER and ERIN K. BALDWIN, and those in active concert or participation with them, are from this day forward enjoined and restrained from:*

*1.      Publishing, transmitting, distributing or otherwise publicly displaying all previously-publicized or publicly available defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates,namely those blog entries/articles previously and/or currently available at the websites www.badbizfinder.wordpress, www.badbizfinder.blogspot.com and www.thereallybadbizfinder.wordpress.com and reproductions and variations therof previously and/or currently available elsewhere, including but not limited to:  www.ripoffreport, www.pubcit.typepad.com (CL&P Blog), www.ocmetrobusiness.com and www.digg.com;*

- 121 -

2.      *Publishing, transmitting, distributing or otherwise publicly displaying tortious statements which state or imply illegal conduct by PARSA LAW GROUP, APC and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, absent of asjudication of illegality;*

3.      *Publishing, transmitting, distributing or otherwise publicly displaying defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, including those found in **Exhibit "B"** to Plaintiff's Request for a Temporary Restraining Order.*

4.      *Publishing, transmitting, distributing or otherwise publicly displaying defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates; and*

5.      *PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates; either directly or indirectly.The above injunction relief is effective immediately and shall remain in place in perpetuity."*

630.    Prior to signing the Permanent Injunction, Defendant Judge Miller should have required that the "defamatory and/or tortious statements," be defined.  In addition, Defendant Judge Miller should have required that the identity of "PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates," be defined so Plaintiff could avoid conduct in violation of this injunction that could lead to contempt of court.  But he did not and Plaintiff was later charged with criminal contempt of the permanent injunction.

631.    In accordance with section 52.1(e) of the Banes Act, Civil Code section 52.1(e), ***"No order of the Court shall restrict the content of a person's speech."***

632.    The statement "PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, including those found in Exhibit "B" to Plaintiff's Request for a Temporary Restraining Order," is vague and ambiguous particularly in light of the fact that Exhibit "B" is 208 pages long.  The description of Exhibit "B" is set forth by Defendant Attorney Berstein:

- 122 -

1
2
3
4

> *"True and correct copies of Defendants' blog entries/articles downloaded and saved in PDF form and then printed by me on May 4, 2009 from the following internet websites www.badbizfinder,wordpress,com (Bates Stamped PARSA 1-171; www.badbizfinder.blogspot.com (PARSA 172-206) and www.linkedin.com/in/badbizfinder (PARSA 207).]*

5

633.    It is unclear how Plaintiff could identify "PARSA LAW GROUP, APC's

6

officers, directors, members, shareholders, agents, representatives, employees and/or affiliates,

7

***including those*** found in Exhibit 'B' when the 208 pages is admittedly not conclusive (by use

8

of the word "including") and could not possibly clearly and succinctly identify the persons

referred to in the protected group.

9

634.    ***In the Parsa Case***, the Court entered a Minute Order that spoke strictly about

10

the Default Judgment and failed to mention the Permanent Injunction although the document

11

signed by Defendant Judge Miller dated June 2, 2009 is entitled, "Default Judgment With

12

Permanent Injunction." (In fact, there is no Minute Order at all in this case that mentions the

13

Permanent Injunction.)  The Minute Order stated:

14
15

> *a.    "Exhibit A, Direct Expenditures in Response to Bad Biz Finder was marked and admitted on behalf of Defendant Parsa Law Group."*

16

[However, Plaintiff has never seen this document nor is it identified in the docket, or attached to the transcript.].

17
18
19

> *b.    "The Court having fully considered the argument of Plaintiff, both written and oral, as well as the evidence presented, now rules as follows: The Court, on its own motion, orders Beverly Sullivan be named in the judgment as an 'AKA' of Erin Baldwin."*

20
21
22
23

> *c.    "The Court enters judgment for Plaintiff, PARSA LAW GROUP, APC, a Professional Law Corporation against Defendants, Bad Biz Finder, an unknown business entity; and Erin K. Baldwin aka Beverly Sullivan, an individual, in the amount of $275,000.00 for loss profits, $206,250.00 for clients lost and refunds made; $123,265.66 for expenses as listed in Exhibit "A," and costs of $976.76 for a total judgment amount of $605,492.42."*

24
25

> *d.    "Default Judgment signed and filed this date, as interlineated by the Court."*

26
27
28

[The word "disparaging" was manually crossed out so that it did not accompany the words "defamatory and tortious." Each time Plaintiff's name appeared, the words "aka Beverly Sullivan" was manually handwritten in as a last minute change without any grounds to substantiate that Beverly Sullivan was an alias of Plaintiff.]

- 123 -

635.   The case Defendant Judge Miller relied upon to deny Defendant Parsa Law Group's request for a preliminary injunction on May 19, 2009, *Evans v. Evans* (2008) 162 Cal.App.4th 1157 (2008) states:

> *"The injunction broadly prohibited Linda from publishing any defamatory comments about Thomas. <u>This sweeping prohibition fails to adequately delineate which of Linda's future comments might violate the injunction and may lead to contempt of court. An injunction is unconstitutionally vague if it does not clearly define the persons protected and the conduct prohibited.</u>"*

636.   In Plaintiff's case, in several places, the injunction names Defendant Parsa Law Group's "officers, directors, members, shareholders, agents, representatives, employees, and/or affiliates" as protected parties but fails to name the members of each category. Likewise, the injunction refers to Defendant Parsa Law Group's services; and again, no explanation as to what constitutes the services.

### June 3, 2009

637.   Bad Biz Finder published an article entitled, *"Bad Biz Finder Forms Class Action Lawsuit Against Landlord, UDR, on Behalf of CA Tenants."*

638.   Bad Biz Finder published an article entitled, *"UDR Class-Action Lawsuit."*

639.   Bad Biz Finder published an article entitled, *"CA State Bar Take Notice: Rodis Law Victim Wants to Blow His Brains Out."*

### June 4, 2009

640.   **In the Parsa Case,** Plaintiff received and quickly resubmitted the Application for Waiver of Court Fees and Costs and said application was granted by the Court. 298.   The Application for Waiver of Court Fees and Costs was quickly resubmitted by Defendant Baldwin and granted by the Court on June 4, 2009 as was the minor address correction on the Motion to Set Aside Default, etc.

641.   Bad Biz Finder published an article entitled, *"UDR Investor Alert: UDR Aggressive AGR – Class Action Lawsuits."*

642.   Bad Biz Finder published an article entitled, *"Two Days of Heartache: The Wreckage Left By Rodis Law & America's Law."*

643.    Bad Biz Finder published an article entitled, *"Parman's 'Crisis on Main Street' TV Ad is Now Privest Financial."*

### June 6, 2009

644.    Bad Biz Finder published an article entitled, *"Censorship is Alive & Well at WordPress."*

645.    Bad Biz Finder published an article entitled, *"Page Not Found: Consumers in Crisis Comes to the Rescue."*

### June 8, 2009

646.    **In the Second UDR Unlawful Detainer Case**, the Court finalized its Minutes for the Motion for Summary Judgment and/or Adjudication.

647.    Bad Biz Finder published an article entitled, *"Gunderson Dettmer Backs WordPress to Censor Our Aid to Consumers."*

648.    Bad Biz Finder published an article entitled, *"2000 Post:  Consumer Advocate Forms Class Action Lawsuit Against Landlord, UDR, On Behalf of CA Tenants."*

649.    Bad Biz Finder published an article entitled, *"Almaden Lake Village: Consumer Advocate Forms Class Action Lawsuit Against Landlord, UDR, On Behalf of CA Tenants."*  [And an identical article for each of UDR's California properties.]

### June 9, 2009

650.    **In the Second UDR Unlawful Detainer Case:**  The Court issued a Writ of Possession.

651.    Bad Biz Finder published an article entitled, *"Rodis is Still Hard at Work Scamming the Unsuspecting Consumer."*

652.    Bad Biz Finder published an article entitled, *"Let's Sue the California State Bar! How Fun Would That Be?"*

653.    Bad Biz Finder published an article entitled, *"Consumer Advocate Files Writ of Mandate Against California State Bar."*

### June 10, 2009

654.    Bad Biz Finder published an article entitled, *"Warning to Consumers."*

- 125 -

**June 11, 2009**

655.    Bad Biz Finder published an article entitled,   *"FTC Announces Civil (Not Criminal) Contempt Charges Against D'Antonio."*

656.    Bad Biz Finder published an article entitled,   *"Scott Drexel Fired!!  State Bar Votes Not to Renew For Another 4 Years."*

**June 12, 2009**

657.    **In the Second UDR Unlawful Detainer Case**, Plaintiff appeared *ex parte* for a "Motion and Proposed Order to Stay the Execution of the Judgment of Eviction for Unlawful Detainer."  After waiting from 8:00 a.m. to 4:45 p.m. to be heard, Defendant Judge Robinson who claimed she had read all the pleadings in the case announced to Plaintiff, "Unless you can come up with $8,000 (the amount of the Judgment), in the next 15 minutes, I can't help you."

658.    Bad Biz Finder published an article entitled,   *"The State of CA Has Let You Down: What is 'Fake Consumer Help'?"*

**June 13, 2009**

659.    **In the Second UDR Unlawful Detainer Case**, Plaintiff appealed to Defendant Beltran, the Harbor Justice Center Court Operations Officer, who agreed to stay the eviction until the case was reviewed.  Plaintiff relied on this promise and was scheduled to meet with Defendant Beltran the following Tuesday.

660.    Bad Biz Finder published an article entitled,   *"UDR CEO Buys 60K Shares to Manipulate Stock Price & Volume."*

**June 14, 2009**

661.    Bad Biz Finder published an article entitled,   *"Consumer Alert: 'The Directory of Registered Loan Modification Companies' is a Scam."*

662.    Bad Biz Finder published an article entitled,   *"Join Lawsuit for Loan Mod Fraud Restitution."*

663.    Bad Biz Finder published an article entitled,   *"Nick Chavarela Claims Another Victim and Sets Standard for State Bar Lawsuit."*

**June 16, 2009**

- 126 -

664.     *In the Second UDR Unlawful Detainer Case,* despite the promise of Defendant Beltran (who was "on vacation" this date), Plaintiff (without warning) was forcibly removed from her apartment by Defendant OC Sheriffs.  The Sheriff only permitted Defendant to take what she could carry and her two dogs, then informed Plaintiff that she could return within the next ten (10) days to recover the balance of her property.  Since Defendant UDR had previously towed and sold her car, Plaintiff left on foot.

665.     Bad Biz Finder published an article entitled, *"UDR Spends Shareholder Money on GPS System When Its Apts Are Falling Apart."*

666.     Bad Biz Finder published an article entitled, *"UDR Class Action is Exploding!"*

### June 17, 2009

667.     Bad Biz Finder published an article entitled, *"Steven Kop Busted By His Own Stupidity:  Now the FBI & FTC Are Involved."*

668.     Bad Biz Finder published an article entitled, *"Senator Tom Harmon!  Your UDR Renters Need Your Help Now!"*

### June 18, 2009

669.     *In the Second UDR Unlawful Detainer Case,* the Court entered "Writ of Possession Returned – Wholly Satisfied."

670.     Bad Biz Finder published an article entitled, *"The Marc Tow Fan Club: Sam, Peter, Rob, Brad & Darwin."*

### June 19, 2009

671.     *In the Second UDR Unlawful Detainer Case,* despite the sheriff's instruction that Plaintiff had ten (10) days to recover her property; three (3) days later, Defendant UDR illegally seized the entire contents of Plaintiff's apartment (including nearly 400 files of evidence and personal data of tenants who had registered to participate in the class action lawsuit against Defendant UDR, all documents pertaining to the unlawful detainer actions, as well as case documents for the Parsa Case which Plaintiff planned to appeal.

672.     A neighbor of Plaintiff's emailed Plaintiff while it was happening and stated that since Plaintiff had left there were 24/7 security guards around her apartment not allowing

- 127 -

anyone near it; even questioning people that looked like Plaintiff about where they were going and who they were. All of Plaintiff's property was moved to an offsite storage facility owned by Defendant UDR and Plaintiff has yet to recover it.

### June 20, 2009

673. Bad Biz Finder published an article entitled, *"What is a Limited Scope Legal Representation Contract?"*

674. Bad Biz Finder published an article entitled, *"Craig M. Laverty Replaces Jeffrey Cancilla at Solutions Law Group."*

675. Bad Biz Finder published an article entitled, *"Cancilla Must Terminate His Representation of You Before Laverty Can Ask You to Sign His Contract."*

### June 22, 2009

676. Bad Biz Finder published an article entitled, *"UDR (NYSE:UDR) Throws Tenant Out on Street in Retaliation & Exposes Corrupt OCSC Judges."*

### June 24, 2009

677. Bad Biz Finder published an article entitled, *"UDR Executive W. Mark Wallis Dumps 20,000 Shares – Smart Man."*

678. Bad Biz Finder published an article entitled, *"UDR, Inc. Gets $200M From Portfolio Sale & Claims to Fund 'Gen'l Corporate Obligations' Definition, Please?"*

679. Bad Biz Finder published an article entitled, *"$10,000 or One Year in Prison for EACH Violation of the CA Foreclosure Consultant's Act."*

680. Bad Biz Finder published an article entitled, *"NYSE:UDR: Corruption Scandal Rocks Orange County Superior Court."*

### June 28, 2009

681. Bad Biz Finder published an article entitled, *"Is Traut Law Group the New 'Rodis Law Group'?"*

### June 29, 2009

682. Ten (10) days after evicting Plaintiff, taking all her property and with knowledge that she was homeless, penniless and carless, Defendant UDR hired Defendant Parsa Law Group's attorneys (Defendant BKGG) and filed an identical strategic lawsuit

- 128 -

against public participation against Plaintiff (disguised as a defamation action.) The caption of the lawsuit was UDR, Inc., a Maryland Corporation v. ***Erin K. Baldwin, an individual also known as Bad Biz Finder and Beverly Sullivan***; and Does 1 through 10, inclusive.

683. But for the complete ambiguity of the Parsa Case, Defendant BKGG could not have filed this action on behalf of Defendant UDR. This case were filed with the presumption that Plaintiff was the principal of Bad Biz Finder even though it had never been proven as such. The UDR Case was a Complaint for Damages for (a) Trade Libel; (b) Tortious Interference with Business Relations; (c) Tortious Interference with Prospective Business Relations; and (d) Civil Harassment, Case No. 30-2009-00125305-CU-DF-CJC and the matter was assigned to Judge David R. Chaffee, Department C-17. (This case will hereinafter be referred to as the "UDR Case.")

684. ***In the UDR Case,*** Defendant UDR (through its attorneys, Defendant BKGG, specifically, Defendant Attorney Goodman) filed a Civil Case Cover Sheet ***dated March 29, 2009***, three months prior to the date of the Summons and Complaint and categorized the case as a tort action for defamation, the same as the ***Parsa Case***.

685. ***In the UDR Case,*** Defendant UDR (through its attorneys, Defendant BKGG, specifically, Defendant Attorney Goodman) filed a Notice of Related Case (together with the Complaint and Civil Case Cover Sheet) claiming that both cases:

       a.     arose from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact; and

       b.     were likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

686. Since the Parsa Case had already been disposed of by judgment three weeks prior to the filing of the UDR Case, it is unclear how a "substantial duplication of judicial resources" would occur and secondly, if both cases "arose from identical transactions incidents, or events requiring the determination of the same or substantially identical questions of law," it is also unclear why the cases did not contain identical causes of action given both

- 129 -

1   Defendant UDR and Defendant Parsa Law Group were corporations claiming defamation

2   against a private party blogger.

### July 2, 2009

4       687.    Bad Biz Finder published an article entitled, *"Frauds: Martin Andelman, ML-*

5   *Implode & 'Mandelman Matters'."*

### July 6, 2009

7       688.    Bad Biz Finder published an article entitled, *"Senator Tom Harman Turns His*

8   *Back on California Renters Seeking Relief From Slumlord, UDR, Inc. (NYSE:UDR)."*

### July 7, 2009

10      689.    Bad Biz Finder published an article entitled, *"Martin Andelman is a Fraud and*

    *"Mandelman Matters" is a Scam."*

### July 9, 2009

12      690.    ***In the UDR Case***, Defendant UDR (through its attorneys, Defendant BKGG,

13  specifically, Defendant Attorney Goodman) filed a 170.6 Peremptory Challenge to disqualify

14  Judge David Chaffee claiming he was biased against their client, Defendant UDR.

### July 10, 2009

16      691.    Bad Biz Finder published an article entitled, *"See Ya Oleg! Artishuk is Orderd*

17  *to Stop All Business Activities."*

18      692.    Bad Biz Finder published an article entitled, *"Bye-bye Oleg Artishuk – DRE*

19  *Issues Desist & Refrain Order."*

### July 11, 2009

21      693.    Bad Biz Finder published an article entitled, *"FINALLY! Schwarzenegger*

22  *Holds Loan Mod Attys Accountable Via Senate Bill 94."*

### July 12, 2009

24      694.    Bad Biz Finder published an article entitled, "Traut Back-Pedals to Cover Lies

25  About Stuart Spencer."

### July 13, 2009

27      695.    The third strategic lawsuit against public participation was filed against

28  Plaintiff only two (2) weeks after the second one (the UDR Case) on behalf of two other loan

1   modification attorneys similar to Defendant Parsa. The caption reads "Solutions Law Group,

2   LLC; Solutions Processing, LLC; Jeffrey A. Cancilla; and Craig M. Laverty *v. Erin K.*

3   *Baldwin, an individual also known as Bad Biz Finder and Beverly Sullivan;* and Does 1

4   through 10, inclusive.

5       696.    But for Defendant BKGG's ambiguous naming of Plaintiff as a defendant in the

6   Parsa and UDR cases, Defendant BKGG could not have filed this action on behalf of

7   Defendants Solutions Law and Solutions Processing, and Defendant Attorneys Cancilla and

8   Laverty. This case were filed with the presumption that Plaintiff was the principal of Bad Biz

9   Finder even though it had never been proven as such. The Cancilla/Laverty Case was a

10  Complaint for Damages for (a) Trade Libel; (b) Tortious Interference with Business Relations;

11  (c) Tortious Interference with Prospective Business Relations, Case No. 30-2009-00126004

12  and the matter was assigned to Judge David T. McEachen, Department C-21. (This case will

    hereinafter be referred to as the "Cancilla/Laverty Case.")

13      697.    *In the Parsa Case,* Plaintiff traveled by bus to file a Reply to Plaintiff's

14  Opposition to Defendant's Motion to Set Aside Default, etc. scheduled for July 14, 2009. At

15  the same time she personally visited Department C-14 and requested information from

16  Defendant Turner about how to appear telephonically for the July 14, 2009 hearing since

17  Plaintiff did not have sufficient funds to return by bus again the next day. Plaintiff was

18  instructed to coordinate the participation through Court Call in the morning at 888-882-6878

19  or visit www.courtcall.com for more information. Defendant Turner did not instruct Plaintiff

20  that she would need a printout of the fee waiver approval from the Department even though

21  Defendant Turner knew that it was required to appear telephonically.

22      698.    Later that day, *in the Parsa Case,* Plaintiff contacted Court Call to make the

23  arrangements and was asked to fax a written acknowledgment that the Court had approved the

24  fee waiver. Since Plaintiff had only hours earlier appeared personally in Department C-14 and

25  had not been provided with said acknowledgment, she telephoned Defendant Turner and

26  requested that she provide an authorization to Court Call on Plaintiff's behalf. Defendant

27  Turner informed Plaintiff that she would have to travel back to the Court to pick it up and then

28  fax it herself. Plaintiff explained that she had just spent her last few dollars traveling to the

- 131 -

1  Court to file the Reply and to inquire how to appear telephonically the next day.  Defendant

2  Turner refused to assist Plaintiff stating: "This is a court of law, we don't **_do_** favors."

3  Consequently, Plaintiff was unable to appear.

4      699.  *In the Cancilla/Laverty Case,* Defendant BKGG filed a Notice of Related Case

5  (together with the Complaint and Civil Case Cover Sheet) claiming that both cases: (a) arose

6  from the same or substantially identical transactions, incidents, or events requiring the

7  determination of the same or substantially identical questions of law or fact; and (b) were

8  likely for other reasons to require substantial duplication of judicial resources if heard by

9  different judges.

10     700.  Bad Biz Finder published an article entitled,  *"UDR Officers Sold Twice as Many Shares as They Purchased."*

11     701.  Bad Biz Finder published an article entitled,  *"NYSE:UDR 2009 Insider Stock*

12  *Transactions Spell Zero Confidence From UDR Executives."*

13                              **July 14, 2009**

14     702.  *In the Parsa Case,* Defendant Judge Miller stated in his tentative ruling that

15  although Plaintiff's Motion was timely brought he was ***"unclear if Baldwin has any authority***

16  ***to appear for Bad Biz."***  This was six (6) weeks after Defendant Judge Miller had assigned

17  sole liability to Plaintiff for a $604,515.66 default judgment and permanently enjoined her

18  speech.

19     703.  Plaintiff found it odd that Bad Biz Finder was considered by the Court to be the

20  only defendant in the Parsa Case since Bad Biz Finder is an "unknown entity" and as such, had

21  never been served with a Summons and Complaint. Defendant Parsa Law Group's attorneys,

22  Defendant BKGG, had dismissed all causes of action against Defendant Beverly Sullivan and

23  Does 1-10 on May 27, 2009.  When Defendant Judge Miller stated he was unclear whether

24  Plaintiff had any authority to appear for Bad Biz Finder, it seemed as though were no

25  defendants to which a judgment could be ordered.

26     704.  *In the Parsa Case*, Defendant BKGG filed an Affidavit of Nicholas D. Myers,

27  Esquire, of Facts

28

                                   - 132 -

705.    Bad Biz Finder published an article entitled, *"The Street Rates NYSE:UDR 'D+'"*

706.    Bad Biz Finder published an article entitled, *"UDR Shareholders Urged to Sell & Tenants Reminisce About the Good Times With Essex."*

### July 15, 2009

707.    *In the UDR Case,* Defendant UDR's Peremptory Challenge was granted and the case was reassigned to Judge Geoffrey Glass.

### July 16, 2009

708.    *In the UDR Case,* Defendant UDR (through its attorneys, Defendant BKGG, specifically, Defendant Attorney Goodman) filed another 170.6 Peremptory Challenge to disqualify the judge they had been assigned, Judge Geoffrey Glass, claiming that he too was biased against thie client, Defendant UDR.  The law clearly states that each party to an action is entitled to ***one*** Peremptory Challenge.  However, it was vital that Defendant UDR get before Judge Miller.

709.    Bad Biz Finder published an article entitled, *"The Loan Mod Consumer: 'The Deer in the Headlights' Phenomenon."*

710.    Bad Biz Finder published an article entitled, *"Alex Dastmalchi is Not a Part of My Organization, Claims Parsa – Want the Scoop?"*

### July 17, 2009

711.    Bad Biz Finder published an article entitled,  *"Senator Tom Harman Neglects His Duties at Home as He Prepares to Run for Attorney General."*

### July 18, 2009

712.    Bad Biz Finder published an article entitled, *"Senator Tom Harman Releases Statement Today About CA Unemployment - That's News?"*

713.    Bad Biz Finder published an article entitled, *"Traut Law Firm Busted in Colorado - Other Firms Are Coming Up Next - Two With the Initials 'PLG'."*

714.    Bad Biz Finder published an article entitled,  *"CA State Bar is Waking Up – First Up, Our Old Pal, Sean Rutledge of United Law Group."*

### July 19, 2009

- 133 -

715. Bad Biz Finder published an article entitled, *"NYSE:UDR News: Ken Heebner, Founder of Capital Growth Mgt, Unloads 2 Million UDR Shares at a 36% Loss."*

716. Bad Biz Finder published an article entitled, *"Here's a List of Attys for CA State Bar to Launch its NEW 'Strict Standards' Against Loan Mod Attorneys."*

### July 20, 2009

717. Defendant Traut Law filed a lawsuit against Plaintiff in Defendant OCSC (on behalf of two other loan modification attorneys Plaintiff had written about, Defendants Traut Group, E. Traut and J. Traut) entitled *Traut Law Group v. Erin K. Baldwin*, Case No. 30-2009-00126328 for Business Tort. The case was assigned to Judge Sheila Fell. *(Hereinafter referred to as the "Traut Case.")*

### July 21, 2009

718. Plaintiff relocated to Big Bear, California and stayed on a temporary basis with Defendants K. White and P. White. Plaintiff offered marketing consulting to K. White's real estate business in exchange for room and board. Plaintiff resided with Defendant K. White and P. White for twenty (20) days (July 21 – August 10, 2009) at 321 Wabash Avenue, Sugarloaf, California. During this time K. White was sexually inappropriate toward Plaintiff causing P. White to become hostile and vindictive toward Plaintiff escalating to Plaintiff's voluntary departure on August 10, 2009.

### July 23, 2009

719. Bad Biz Finder published an article entitled, *"Parsa Law Group Uses Frivolous Defamation Lawsuits to Silence the Truth About Illegal Loan Modifications."*

### July 24, 2009

720. *In the Parsa Case,* Defendants Schneider, Mullenweg, WordPress and Automattic (at the advice of their attorney, Defendant Attorney Dettmer) terminated the Bad Biz Finder blog leaving thousands of consumers in foreclosure without an objective, fact-based resource to help them navigate the foreclosure process. The blog was shut down as a result of the Permanent Injunction issued against Plaintiff on June 2, 2009 by Defendant Judge Miller and carried out by Defendant BKGG, and Defendant Attorneys Burkhalter, Kessler, Goodman, Berstein and Myers, all of whom knew the court order was unconstitutional.

- 134 -

**July 26, 2009**

721.    Defendant K. White, introduced Plaintiff to his employer, Defendant Dolan (owner of Prudential Properties of Big Bear). Plaintiff interviewed three times with Defendant Cofsky as Defendant Dolan for an open position as Defendant Dolan's assistant.

**July 27, 2009**

722.    Plaintiff was offered and accepted the position to commence Monday, August 3, 2009. At no time during the interview process or job offer were conditions placed on the commencement of Plaintiff's start date.

**July 29, 2009**

723.    Defendant Dolan asked Plaintiff to compile a written job description as they had mutually agreed upon including an assessment of the company's operations. Defendant Dolan had concerns about the financial status of his business under the fiduciary management of his office manager, Defendant Cofsky, who was known to have a substance abuse problem. Plaintiff completed and emailed the job description as instructed so that Defendant Dolan's staff could view it prior to his arrival. He planned to use it as a basis for justifying to his staff Plaintiff's hourly rate.

**August 3, 2009**

724.    Plaintiff reported for her first day of work unaware that Defendant Cofsky had found out that Defendant Dolan had asked Plaintiff to review her work. Defendants K. White and P. White had respresented to Plaintiff that Defendant Cofsky was mismanaging corporate funds and skimming off the escrow division of the office. In order to conceal these known facts and prevent Plaintiff from beginning her review, at 11:00 am Defendant Cofsky misrepresented to Defendant Dolan that Plaintiff's employment references "did not pan out" and Plaintiff was terminated. In fact, Defendant Dolan had asked his wife to come and take Plaintiff offsite. Although Plaintiff was outraged, she promised K. White that she would not seek legal counsel while residing with them.

**August 4, 2009**

725.    Defendant Dolan appeared the next morning in court on criminal charges of domestic violence against his wife which was carefully concealed because Defendant Dolan

- 135 -

1   was on the Board of Directors of DOVES, a domestic violence service in Big Bear.  DOVES

2   was run by Defendant Hewitt whom Plaintiff later shared a fiduciary relationship for services

3   rendered in connection with domestic violence against her at the hand of Defendant Crow.

**August 5, 2009**

4

5   726.    In the ***Second UDR Unlawful Detainer Case***, Plaintiff contacted Defendant

6   UDR (specifically Defendant Toomey) to inquire about the return of her property seized on

7   June 19, 2009, three (3) days after Defendant UDR Villa Venetia performed a retaliatory

8   eviction upon Plaintiff.  Plaintiff was put on hold for a very long time and later learned that

9   Defendants UDR and Toomey had recorded and traced her call.

**August 8, 2009**

10

11   727.    Defendant Dolan met with Defendant K. White at his office to discuss

12   Defendant Dolan's fear that Plaintiff might pursue legal action against him for wrongful

13   termination.  When Defendant K. White arrived home he threatened Plaintiff that if she sought

     legal action against Defendant Dolan, that she "would be on the streets."

**August 9, 2009**

14

15   728.    As a direct result of Plaintiff's traced telephone call to Defendant UDR on

16   August 5, 2009, *supra*, Defendant Estrada appeared at the residence of K. White and P. White

17   to serve the Summons and Complaints in the UDR Case and Cancilla/Laverty Cases.  The

18   unexpected arrival of Defendant Estrada and the erractic manner in which he conducted

19   himself, cast Plaintiff in a false light to Defendants K. White and P. White and they became

20   upset with Plaintiff.

**August 10, 2009**

21

22   729.    Plaintiff voluntarily left the next day and accepted an invitation to rent a room

23   in Big Bear City from Bernadine Krueger.  *[Bernadine Krueger passed away on May 15,*

24   *2011, therefore she is not named as a Defendant.  However, the facts surrounding her part in*

25   *this action will be stated herein.]*

26   730.    Plaintiff and Ms. Krueger had a previously-executed Retainer Agreement for

27   business consulting services.  Plaintiff and Ms. Krueger mutually agreed to a modification of

28   the agreement to barter the business consulting services in exchange for rent.  Ms. Krueger

- 136 -

1    was an unfortunate case of chronic alcoholism but at the time Plaintiff moved in, she

2    expressed a positive willingness to live a sober lifestyle.

### August 12, 2009

731.    *In the Parsa Case*, Benjamin Diehl, Esq., opened an investigation of Defendant Parsa Law Group and Defendant Parsa & Associates regarding violations of California State Bar Professional Rules of Conduct, Rule 1-320 (sharing legal fees with non-attorneys) and rule 1-400 for violation of solicitation and advertising methods. The test of the letter is set forth forth, *supra*.

### August 13, 2009

732.    *In the UDR Case,* the Proof of Service of Summons is filed by its attorneys of record, Defendant BKGG.

733.    *In the Cancilla/Laverty Case,* the Proof of Service of Summons is filed by its attorneys of record, Defendant BKGG.

734.    *In the Traut Case,* a Proof of Service is substitute filed by Defendant Traut Law.

### August 14, 2009

735.    Plaintiff began researching her legal options for wrongful termination by Defendant Dolan now that she was no longer residing with Defendants K. White and P. White.

736.    *In the Traut Case,* Defendant Traut Law filed its Proof of Service.

### August 21, 2009

737.    After two months of sobriety, Ms. Krueger relapsed and quickly began demonstrating bizarre, unpredictable, and abusive behavior. Although Plaintiff supported Ms. Krueger's desire for a sober lifestyle, Plaintiff began looking for another place to live.

### August 31, 2009

738.    *In the Parsa Case,* Kristin L. Ritsema, Esq., Supervising Trial Counsel of Defendant State Bar filed a "Transmittal of Records of Conviction of Attorney (Bus. & Prof. Code §§ 6101-6102; Cal. Rules of Court, rule 9.5 *et seq.*")  (Case No. 09-C-12545) against Defendant Parsa directed to the Clerk of the State Bar Court.

> *"Pursuant to the provisions of Business and Professions Code sections 6101-6102 and California Rules of Court, rule 9.5 et seq., the Office of the Chief*

- 137 -

*Trial Counsel transmits a certified copy of the records of conviction of the following member of the State Bar for such consideration and action as the Court deems appropriate."*

739.    ***Related to the Parsa Case***, on September 1, 2000, Defendant OC District Attorney charged Defendant Parsa with seven (7) counts of statutory rape.  On May 17, 2011, Defendant Parsa was convicted of two (2) of them.  On August 31, 2009, eight years after his conviction, Defendant California State Bar claims Defendant Parsa never reported his crimes nor did serve a day in jail or register as a sex offender. In Ms. Ritsema's document it states:

*"Violations of Penal Code § 261.5 (Unlawful Sexual Intercourse with Person under 18 Years of Age), 2 counts, misdemeanors which involve moral turpitude analogous to In re Lesansky (2001) 25 Cal. 4 11 and In re Safran (1976) 18 Cal. 3d 134.*

*"We bring to the Court's attention that, should the Court enter an order of **interim suspension** herein, the Court may wish to require the above-named member to comply with the provisions of rule 9.20, California Rules of Court, paragraph (a), within 30 days of the effective date of any such order; and to file the affidavit with the Clerk of the State Bar Court provided for in paragraph (c) of rule 9.20 within 40 days of the effective date of said order, showing the member's compliance with the provisions of rule 9.20."*

740.    2011 California Rules of Court, Rule 9.20 **(a)** is entitled, "<u>Duties of disbarred, resigned, or suspended attorneys</u>":

(a)     *Disbarment, suspension, and resignation orders:*

*The Supreme Court may include in an order disbarring or suspending a member of the State Bar, or accepting his or her resignation, a direction that the member must, within such time limits as the Supreme Court may prescribe:*

*(1)     Notify all clients being represented in pending matters and any co-counsel of his or her disbarment, suspension, or resignation and his or her consequent disqualification to act as an attorney after the effective date of the disbarment, suspension, or resignation, and, in the absence of co-counsel, also notify the clients to seek legal advice elsewhere, calling attention to any urgency in seeking the substitution of another attorney or attorneys;*

*(2)     Deliver to all clients being represented in pending matters any papers or other property to which the clients are entitled, or notify the clients and any co-counsel of a suitable time and place where the papers and other property may be obtained, calling attention to any urgency for obtaining the papers or other property;*

- 138 -

(3)     **_Refund any part of fees paid that have not been earned_**; and

(4)     Notify opposing counsel in pending litigation or, in the absence of counsel, the adverse parties of the disbarment, suspension, or resignation and consequent disqualification to act as an attorney after the effective date of the disbarment, suspension, or resignation, and file a copy of the notice with the court, agency, or tribunal before which the litigation is pending for inclusion in the respective file or files.

741.    Rule 9.20 **(c)** of the 2011 California Rules of Court is **not** part of Ms. Ritsema's recommended disciplinary plan; nonetheless, it is set forth as follows:

(b)     Notices to clients, co-counsel, opposing counsel, and adverse parties All notices required by an order of the Supreme Court or the State Bar Court under this rule must be given by registered or certified mail, return receipt requested, and must contain an address where communications may be directed to the disbarred, suspended, or resigned member.

(c) _Filing proof of compliance:_

Within such time as the order may prescribe after the effective date of the member's disbarment, suspension, or resignation, the member must file with the Clerk of the State Bar Court an affidavit showing that he or she has fully complied with those provisions of the order entered under this rule. **_The affidavit must also specify an address where communications may be directed to the disbarred, suspended, or resigned member._**

742.    These facts are corroboration for the news articles on Bad Biz Finder that Defendant Judge Miller referred to on June 2, 2009:

"I'm not going to hash it out statement by statement, but there are a number of the statements while they are not very nice might be posted as matters of opinion, but many of them purport to state facts which Mr. Parsa has just testified, and I believe him, are untrue about **_alleged criminal acts_**, fraudulent business practices, et cetera, and that's how the Court reaches its conclusion."

743.    Ironically, on the same day Defendant Parsa was being charged by Defendant State Bar for crimes of moral turpitude, Defendant BKGG filed criminal contempt charges against Plaintiff for violating the Permanent Injunction that was based, in part, on Plaintiff's reports about Defendant Parsa's crimes of moral turpitude.

## September 2, 2009

- 139 -

744.    *In the Parsa Case,* Plaintiff filed an Appeal of the Default Judgment and Permanent Injunction entered against her June 2, 2009 by Defendant Judge Miller.

745.    In the *Parsa, UDR and Cancilla/Laverty Cases*, Plaintiff contacted the California Anti-Slapp Project ("CASP") for assistance.

746.    In the *Parsa, UDR and Cancilla/Laverty Cases,* Defendant Judge Miller, on his own motion, related all three cases and joined them together under his judicial review.  All cases were reassigned for all purposes to Defendant Judge Miller.

747.    *In the Parsa Case*, Defendant Judge Miller issued a $5,000 Bench Warrant for Plaintiff's arrest for failure to appear at the August 31, 2009 Order to Show Cause Re Contempt.

### September 4, 2009

748.    *In the Parsa Case – Appeal*, Plaintiff's Notice of Appeal is lodged/received in the Court of Appeal, Fourth District Court of Appeal, Division Three, Santa Ana, California.

### September 9, 2009

749.    *In the Traut Case*, a Case Management Conference is scheduled for Novermber 10, 2009.

### September 14, 2009

750.    *In the Parsa Case – Appeal*, mail is returned, then resent to Plaintiff regarding a notice to file CCIS & CCIS form.

### September 17, 2009

751.    At 8:30 a.m., Ms. Krueger was very drunk and in this state she called the Big Bear Sheriffs and falsely reported that Plaintiff was "threatening her life." Ms. Krueger stated that she and Plaintiff had been arguing about the fact that Plaintiff had used an old cooking pot to soak her feet and that Ms. Krueger was disgusted with her.

752.    Shortly thereafter, Big Bear Sheriff Deputy Meelker arrived on the scene, found Krueger drunk and stayed to keep the peace while Plaintiff packed and moved her property outside Ms. Krueger's residence.   Deputy Meelker reported no evidence of criminal activity on Plaintiff's part and even stated in his report, "Krueger is HNB [drunk] and causing problems." In 2001, Ms. Krueger was remanded into custody for being drunk in court during a

- 140 -

1  hearing on a criminal complaint against her for petty theft and had a long history of offenses

2  and bizarre conduct in connection with her chronic alcoholism.

3  753.  Two weeks prior to this date, another business consulting client, Defendants

4  John and Gail Elerding (owners of TJ's Custom Woodwork) offered Plaintiff a similar

5  bartering arrangement in exchange for a room to rent at their home located at 10425 Selenium

6  Lane, Baldwin Lake, California 92314.  Defendant J. Elerding arrived shortly after Deputy

7  Meelker left and moved Plaintiff's property to his office a couple of blocks away.

**September 18, 2009**

8

9  754.  ***In the Parsa Case – Appeal***:  Mail returned, unable to forward; in connection

with the September 14, 2009 resent notice to file CCIS & CCIS form.

10

**September 19, 2009**

11

12  755.  Defendant Dolan communicated to Defendant K. White that he was very

unhappy about the fact that Plaintiff had begun to pursue her legal in connection with the

13

wrongful termination on August 1, 2009.  As a result, on this date at approximately 5:00 p.m.

14

Defendant K. and P. White assaulted Plaintiff inside Defendant Starbucks located at Interlaken

15

Center on Big Bear Boulevard, Big Bear Lake, California, on their way to church where K.

16

White was the Recovery Minister.

17  756.  Defendants rushed up to Plaintiff's table and pinned Plaintiff against the wall,

18  shouted obscenities, threats, and made physically aggressive gestures toward Plaintiff with the

19  intention of intimidating and frightening her.  Defendant P. White grabbed the pen out of

20  Plaintiff's hand and wrote all over her papers, slammed the top of her laptop computer down

21  and attempted to dump Plaintiff's cup of coffee on it.  Defendant K. White raised his fist

22  toward Plaintiff as if he was going to strike her.  Plaintiff was seated opposite the cashier's

23  station, and as such, the entire incident was captured on videotape.  It was a Saturday and

24  Defendant Starbucks was full of people which made the environment loud and boisterous.  As

25  Defendant K. White was leaving he shouted at Plaintiff, " You're not from around here, the

26  cops will be coming to your house soon."

27  757.  Plaintiff called "911" to report the assault and Big Bear Sheriff Deputy James

28  Wijnhamer arrived on the scene a few minutes later.  Defendant Wijnhamer took a report from

- 141 -

Plaintiff, interviewed other patrons, encouraged Plaintiff to seek a restraining order against Defendants K. and P. White, then left to locate the assailants. Before he left he told Plaintiff that his completed his report would be ready within five (5) business days.

758.  Defendant Wijnhamer went to Defendants K and P. White's residence but they were not there and Defendant Wijnhamer called Plaintiff to get a cell phone number for weither assailants. Plaintiff gave Defendant Wijnhamer P. White's cell phone number and he agreed to follow through with an investigation. However, according to the police report the interview with Defendants K. and P. White either never took place; or, if it did, it was not officially reported. Defendant K. White is a felon, ex-prison convict, and as such maintains a highly-restricted real estate license with the California Department of Real Estate. Defendant K. White was fearful that the consequences of his actions could have a deleterious affect on his future as a real estate agent. This fear coupled with P. White's resentment of Plaintff set into motion a very unfortunate series of events that caused great injury to Plaintiff on many levels.

759.  It began with K. White calling and meeting with Defendant Big Bear Sheriff Sergeant Jeremy White with whom he shared a personal relationship. In a September 23, 2009 police interview, Defendant K. White admitted to meeting with Defendant "in a personal setting to discuss *'what to do about Erin Baldwin'*." In the same interview, Defendant K. White also admits to committing an assault. He stated: *"I lost my temper and really got in her face."*

760.  Defendant Starbucks' District Manager for the area, Defendant Dena Davis arrived at the scene shortly after Defendant Wijnhamer left. She interviewed Plaintiff and others and gave Plaintiff a Corporate Incident Report number stating that the formal incident report would be sent to her within ten (10) days. However, many attempts via Defendant Davis, Starbuck's Asset Protection Partner, Krista Osborne, and Starbuck's corporate secretary and General Counsel, Paula E. Boggs, Defendant Starbucks refused to help Plaintiff obtain a copy of the Corporate Incident Report and surveillance video. Plaintiff was informed that the surveillance viedo could only be obtained at the request of a police officer.

761.  Also, despite multiple attempts, Defendant Wijnhamer refused to cooperate with Plaintiff insofar as his investigation of Defendants K. and P. White and Starbuck's

- 142 -

requirement that he request the surveillance videotape on Plaintiff's behalf. Without the completed investigation and evidence, Plaintiff could not apply for a temporary restraining order.

### September 23, 2009

762.   ***In the Parsa Case – Appeal***, a Dismissal order is sent to the presiding justice for signature pursuant to Rule 8.100(c), "Appellant having failed to pay the statutory filing fee in compliance with rule 8.100(b)(1) of the California Rules of Court, after notice given pursuant to rule 8.100(c)(2), the appeal filed on September 02, 2009, is DISMISSED."

763.   In an attempt to mitigate the consequences of their assault against Plaintiff and falsely represent Plaintiff as having a history of violence, Defendants K. and P. White filed a citizen's arrest warrant on behalf of Ms. Krueger (without her knowledge or consent) in connection with the September 17, 2009 false report. Defendants K. and P. White scheduled an interview at their home with Big Bear Sheriff Deputy Michael McCracken to report the events of what occurred on September 17, 2009 even though they had not been there. They claimed that Plaintiff beat up Ms. Krueger, stole her property, and trashed her house. Deputy Meelker was present on the scene and had he observed any of what Defendant K. and P. White claimed, it surely would have been in his report and Plaintiff would have been arrested. But that was not the case because none of these claims are true.

764.   Ms. Krueger was not present during the interview nor had she been invited. The written police report indicates that at the end of the interview P. White called Ms. Kruger to request her attendance to make a statement which Ms. Krueger did but admitted therein that she never intended to file a report. A citizen's arrest form was completed that day for assault, not battery, and Defendant P. White asked Ms. Krueger to sign it which she did.

765.   After the interview concluded, Defendant McCracken (at the suggestion of Defendants K. and P. White), proceeded without notice to the business office of Plaintiff's client and landlord, Defendants J. and G. Elerding of TJ's Custom Woodwork. Once there, Defendant McCracken  interrogated and "warned" them about Plaintiff and her alleged criminal conduct. Defendant also searched Plaintiff's property that was still at the business offices since September 17, 2009 and wrote down the serial numbers of Plaintiff's computers.

- 143 -

He claimed to be looking for the stolen property Defendants K. and P. White claimed she had taken from Ms. Krueger.

766.     Defendant McCracken claimed he wanted to interview Plaintiff but at the same time cast Plaintiff in a false light to Defendants J. and G. Elerding including lecturing them about the dangers of taking a stranger into their home without first running a criminal check, researching Plaintiff's past business activities, the legal consequences of executing a rental agreement versus having someone living as a guest in their home, and so on. The interrogation frightened Defendants J. and G. Elerding when Defendant McCracken's comments had no basis of fact.

767.     Plaintiff did not have a criminal past; nor was there a legitimate investigatory purpose for interviewing Defendants J. and G. Elerding.  Defendant McCracken violated Plaintiff's constitutional rights under color of law and invaded her privacy without probable cause.  When Defendant McCracken asked Plaintiff's whereabouts Defendants J. and G. Elerding insisted on going with Defendant McCracken to let him in to their home to interrogate Plaintiff but Defendant McCracken insisted that they not call ahead so that they could capture Plaintiff "off guard."

768.     Plaintiff was in the shower when they arrived and (according to Defendants J. and G. Elerding) "Defendant McCracken rushed up the stairs" and began banging on the bathroom door which terrified Plaintiff she had no idea someone was in the house.  Plaintiff quickly got dressed and Defendant McCracken insisted on interviewing Plaintiff in her bedroom (a loft area) without identifying himself of the purpose for his visit.  Plaintiff answered his questions but stopped half way through the interview to inquire as to the nature of his visit at which time Defendant McCracken informed Plaintiff that she was a suspect in a criminal case of battery.

769.     Defendant McCracken issued Plaintiff a "Notice to Appear" on the criminal charge of battery in San Bernardino Superior Court on December 1, 2009, then left.  Defendant SBDA never filed a criminal complaint against Plaintiff until January 25, 2009, almost two months after her arraignment on December 1, 2009.

**September 24, 2009**

- 144 -

770.    Plaintiff called the Big Bear Sheriff substation to lodge a complaint against Defendant McCracken for the illegal tactics he employed in his alleged "investigation" of Plaintiff the day before.  Sheriff dispatch informed Plaintiff that Big Bear Sheriff Sergeant Bryan Lane was Defendant McCracken's supervisor and the commanding officer on duty that day.  Although Plaintiff did not request it, Defendant Lane appeared at Plainiff's residence a short time later to speak with Plaintiff.

*[Please note: This was the second time the BBSD visited Plaintiff at her home address and as such, were aware of her address and how to locate her.]*

771.    When Defendant Lane arrived, he intentionally misrepresented facts associated with a person's civil rights, lawful police protocol and the purpose of a "citizen's arrest warrant" all in an attempt to conceal the unlawful conduct of his subordinate, Defendant McCracken.  Defendant Lane gave Plaintiff his card and asked her to sent him the written statement she had prepared and read to him while he was there which she never did.  Instead, she contacted Defendant Lane's superior, Lieutenant Errol Bechtel and reported the facts to him who said he would send Plaintiff a complaint form but he never did.  When Plaintiff followed up in a week Defendant Bechtel informed her that Defendant Lane was off the case and that, in fact, Defendant Lane was now under investigation along with his subordinate, Defendant McCracken.

772.    During that past week Plaintiff had forwarded to Defendant Lane evidence of harassing emails from Defendants K. and P. White to Plaintiff and to Plaintiff's clients using the email moniker "erinvictim."   Plaintiff was able to trace the I.P. address to Cornerstone Mortgage in Houston, Texas, Defendant P. White's employer, as well as to Defendants K. and P. White's home office email addresses.

773.    Although Defendant Bechtel had informed Plaintiff that Defendant Lane was off the case pertaining to Defendant McCracken, Defendant Lane was sent by Captain Greg Garland to interview Defendants J. and G. Elerding in connection with what he purpoted to be an "Internal Affairs investigation" regarding Defendant McCracken.  Prior to the interview, Plaintiff spoke to Captain Greg Garland about the conflict of interest, however, Defendant

- 145 -

Lane went anywat.  Defendants J. and G. Elerding informed Plaintiff that the interview was about Plaintiff not Defendant McCracken.

### September 27, 2009

774.    At 5:04 p.m., Plaintiff sent an email request to Defendant Lane for law enforcement intervention surrounding the emails of Defendants K. and P. White.  At 5:54 p.m., Plaintiff sent a request for a temporary restraining order against them until Internal Affiars had completed its investigation of Defendant McCracken.

### September 28, 2009

775.    At 11:37 a.m., Plaintiff forwarded a threatening comment from Defendants K. and P. White to Defendant Lane that was left on Plaintiff's blog stating "we hope you go to jail soon."  At 11:44 a.m., Plaintiff forwarded another email that Defendants K. and P. White sent to Plaintiff's client, Defendant J. Elerding hoping to present Plaintiff in a false light.

### September 30, 2009

776.    Defendants K. and P. White filed a false police report against Plaintiff for Penal Code section 653M(b), for "harassing and annoying emails and telephone calls," Plaintiff allegedly made to them.

777.    In the meantime, Plaintiff was still waiting for assistant from Defendant Wijnhamer with regard to the completed police report and surveillance video from the September 19, 2009 assault on Plaintiff by Defendants K. and P. White.

### October 1, 2009

778.    In the *Parsa Law Group Case – Appeal*:  Mail returned, unable to forward. Apellant's Order dismissing the appear.  Due to the fact that Big Bear only delievers mail to post office boxes, Plaintiff missed a lot of mail.

### October 5, 2009

779.    In the UDR Case, Defendant UDR (through its attorneys, Defendant BKGG) filed a Request for Entry of Default against Plaintiff. ***This request was rejected by the Clerk of the Court.***

- 146 -

780.    In the Cancillas/Laverty Case, Defendants Cancilla and Laverty (through its attorneys, Defendant BKGG) filed a Request for Entry of Default against Plaintiff. *__This request was rejected by the Clerk of the Court__.*

781.    Defendants K. and P. White file, *Keith White v. Erin K. Baldwin*, San Bernardino County Superior Court Case No. CIVHS900261 for Civil Harassment, to get a temporary restraining order against Plaintiff in connection with September 30, 2009 false police report against Plaintiff for Penal Code section 653M(b), "harassing and annoying emails and telephone calls." (This case will hereinafter be referred to as the "White Case.")

782.    *__In the White Case__*, Plaintiff reported a strange phone call made to her by Defendant K. White. It pertained to K. White going to Court and that Plaintiff should show up but he did not offer any detail or what it was about. Although Plaintiff did not ask for it, Big Bear Sheriff Deputy Brian visited Plaintiff at home to take a report.

783.    *__In the UDR Case,__* Defendant UDR (through its attorneys BKGG) submitted a Request for Default and the Request was denied by the Court Clerk.

784.    *__In the White Case,__* Defendants K. and P. White included this declaration in their application for a Temporary Restraining Order. The elements of California Civil Harassment include: (a) Unlawful violence; (b) A credible threat of violence or; (c) A knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person and that serves no legitimate purpose. Due to the fact that Plaintiff had not even seen Defendants K. and P. White since she left their home on August 10, 2009, it would be difficult to corroborate that Plaintiff was guilty of any of the above.

785.    Below is the declaration that was supplied to the judge to justify a temporary restraining order against Plaintiff. Despite the fact that most of it is speculative, hypothethical, and based on what they fear might happen, there is not one single incident upon which Defendants K. and P. White can call upon to establish a pattern of conduct required to restrain a person.

> *"Erin K. Baldwin was a guest in our home from approx 7/18/2009 to 8/10/2009. She came to our home as a referral through Alcoholics Anonymous [Plaintiff has been sober 14 years]. Ms. Baldwin claimed to be homeless, jobless and without a car – through no fault of her own, of course. As people in recovery and Christians, we gave her an opportunity to get back on her feet,*

- 147 -

1
2
3

*allowing her to stay with us for a short time. We soon discovered she had fabriacted much of her story, lied repeatedly and began to notice dangerous behavior, i.e she told Patricia A White that when she was around knives she had to suppress a desire to "stab people", therefore was prescribed Prozac.*

4
5
6
7
8
9

"On 8/10/2009, we told her she would have to find another place to stay. Since that day she has been harassing and slandering us throughout town; to our friends and our employers. This affects the business of Keith D White. We are afraid of her next move. She seems to think we are the enemy, when in reality all we did was try to help her. Unfortunately, we found our her true character so she seems bent on destroying us in order to continue her pattern of "con artist". Erin is homeless and jobless by design; she openly admits that if she stays indigent she is judgment proof. She has nothing more to lose, and knows we do.

10
11

"Keith and Patty have kept the police/sheriff informed every step of the way and have been advised by them to obtain a restraining order against Erin K Baldwin.

12
13
14
15

"Keith and Patty White want/need the harassment to STOP. Ms. Baldwin is damaging our reputations, attempting to get us fired from our jobs, and has threatened our marriage. Ms. Baldwin "makes it up as she goes", telling stories containing 5% truth and 95% fabrication. Ms Baldwin's lies are getting more vicious and dangerous with each telling. Erin's behavior seems to be more psychotic with each passing day.

16
17
18
19

"When we drive into our garage our first thought is, "are our animals still alive?". The second is to look through the house to make sure Ms Baldwin hasn't broken in. Ms Baldwin knows we are the only full time residents on our block; she knows our routines, the times we attend church and recovery meetings. We look in the back seat of the car to make sure she's not there! We are more afraid each day, while she continues her harassment, seemingly with no consequences.

20
21
22
23

"Our effort to reach out our hand and help Ms Baldwin has been met with vicious attacks on our character and employment. Ms. Baldwin's statements of, "for $50,000 I'll go away", makes her true motives clear. Ms. Baldwin has been at this for a long time; she has many civil cases filed against her dating back to 1992, for slander and defamation as well as for domestic violence.

24
25

"Keith D White was admitted to the hospital with severe chest pains which were directly attributed to the level of stress he is experiencing throughout this ordeal.

26
27
28

"Several times in the beginning of Erin Baldwin's stay with us she expressed the opinion to both Patricia A White and Keith D White that she wanted "Patty's" life. "Why can't I have a life like this?". The following emails and behavior seem to show that Erin Baldwin really meant what she*

- 148 -

1    *said. She wants to replace Patty in the life of Keith and Patty White. One more*
2    *reason Patty is afraid for her life where Erin in concerned.*

3    *"Erin K Baldwin repeated many times 'you just wait, your time is*
     *coming' to both Keith D and Patricia A White. We take that as life*
4    *threatening."*

**October 6, 2009**

5    786.    ***In the White Case,*** Defendants K. and P. White failed to properly notify
6    Plaintiff of the *ex parte* hearing, therefore, by default the temporary restraining order was
7    issued. The Court ordered that the Big Bear Sheriffs serve the restraining order on Plaintiff.
8    Since Defendants Lane, McCracken and Shedd had been to Plaintiff's residence they could
9    have easily fulfilled that requirement.

**October 8, 2009**

10
11   787.    Plaintiff met with Chaplain John Day for pastoral counseling in the morning.
12   He was referred to Plaintiff by Defendant G. Elerding and Plaintiff met him at achurch she was
13   attending. He was also the Chaplain for the Big Bear Sheriffs so Plaintiff throught he might
14   me able to provide some insight into some of her issues of late.

15   788.    Following that meeting, Plaintiff had an appointment with Michael Masotto,
16   owner of Edgewater Resorts in Big Bear Lake, whom she had met at a Rotary Club meeting
17   when Plaintiff attended as a guest of Michael Beveridge, owner of Home Improvement
18   Specialists, another business consulting client. After their appointment, Mr. Masotto drove
19   Plaintiff back to the business offices of T.J.'s Woodworking.

20   789.    When they arrived Mr. Masotto requested that Plaintiff sit with him in his car
21   for a few minutes to complete their business discussion. A sheriff vehicle pulled up behind
22   Mr. Masotto's car sat there for 5-10 minutes and then left. Perhaps ten minutes later the same
23   thing happened again. Mr. Masotto is a friend of Defendant Captain Garland of the Big Bear
24   Sheriff's Department. Then oddly, Mr. Masotto stated he was going to turn around so that it
25   was facing the street and for Plaintiff to "sit tight." As soon as he had finished doing that a
26   third sheriff vehicle pulled in and Deputy Christopher Morsch exited his vehicle and motioned
27   for Plaintiff to roll down the window which she did. At this point, Plaintiff was very frustrated
28   and annoyed with the fact that the Big Bear Sheriffs happened to be everywhere she was and

- 149 -