1  particularly at that moment when she was conducting a business discussion. On behalf of

2  Defendants K. and P. White, Defendant Morsch was there to interview Plaintiff regarding the

3  PC 653M(b) investigation that Defendants K. and P. White had filed on September 30, 2009

4  that was apparently already resolved with the temporary restraining order they had obtained.

5  Plaintiff felt it was simply harassment and felt the same when he Plaintiff's name and Plaintiff

6  knew he knew her and saw a paper he was holding with her name on it.  She pointed to her

7  middle name and said, "Kelly."

8      790.    At that point Defendant Mosrch became very angry and stated, "I believe you

9  are Erin Baldwin … you fit the description of Erin Baldwin."  Plaintiff asked, "Who are you

10  and what is this about?"  Defendant Morsch looked at Mr. Masotto and announced, "You are

11  aiding and abetting a criminal, step outside your vehicle, I am calling for back up, your car is

12  going to be impounded."  Plaintiff exited the vehicle and ran toward the TJ Woodworking

13  business offices to get Defendant J. and G. Elerding.  Defendant G. Elerding inquired what this

14  was all about and Defendant Morsch stated that Plaintiff was "a suspect in making an

15  annoying telephone call," to which G. Elerding asked, "Could the call be traced to her phone?"

16  to which Defendant Morsch stated, "No."  As a result, the later police report stated the

17  investigation was about "harassing emails," not telephone calls.

18      791.    Defendant Morsch then began to grab Plaintiff and place handcuffs on her even

19  though he had not told her what the charges were.  He grabbed her even harder and other

20  officers showed up to restrain Plaintiff they headed to the police vehicle and Defendant

21  Morsch put Plaintiff in the back of the police car.  Plaintiff heard Defendant Morsch tell a third

22  party that her arrest was based solely on giving what they considered "a false name."

23      792.    Plaintiff was delivered to the Big Bear Sheriff's substation where she

24  immediately invoked her Miranda right to remain silent, asked for an attorney and refused to

25  act beyond that point.  The Big Bear sheriffs began a custodial investigation without reading

26  Plaintiff her rights and she refused to cooperate which made them very angry.  This is when the

27  police brutality began.  Plaintiff sustained severe physical injuries at the hand of five male Big

28  Bear Sheriff deputies, namely Defendants Morsch, King, Broadhurst, Massey and Long.  The

female was Defendant Domingue.  The following is a first person account of what occurred

1     over the next several hours into the early morning hours of October 9, 2009. (BBSD is Big

2     Bear Sheriff's Department and WVDC is West Valley Detention Center):

> "a.     I was taken into the booking room at BBSD substation and in an attempt
> to get me to take a photograph, one male deputy grabbed a bunch of my hair at
> my scalp and forced my head back, one male deputy grabbed my chin and
> forced my head upwards and one male deputy grabbed my hands from behind
> and twisted my arm. They took several pictures and laughed. Defendant
> Domingue stood in the hallway and while I screamed for help called me
> "mental" and shouted "Taser her!"

> "b.     BBSD sent the photos to West Valley Detention Center and one
> of photographs was made into a badge. The badge was given to Plaintiff at
> WVDC and I saw my red face clenched in pain, the gloved hand on my chin and
> the tips of the fingers of the hand that held my hair. The female deputies at
> WVDC taunted Plaintiff and asked Plaintiff whether I was mental and needed
> to go into the holding cell with a straight jacket. They then took the badge back
> and said they were going to take "a more flattering" photo and I wore that
> badge until I was released.

> "c.     After my photograph was taken at the BBSD substation I was standing
> in front of a small metal podium and two of the male deputies slammed my face
> down onto the podium and I sustained a large bruise on my chin and the side of
> my face as well as numbing and injuries to my ear and hearing.

> "d.     Then two BBSD deputies held my arms and brought Plaintiff over to
> where the fingerprinting station was in the booking room and threatened
> Plaintiff that if I didn't cooperate they would break my arm. One arm was
> released and one male deputy grabbed it and sprained my wrist (as documented
> on the hospital report) as he tried to force Plaintiff to take finger prints. I could
> not resist at this point or any other point while I was in the booking room as
> there were four male deputies and one female in there at all times.

- 151 -

"e.      At that point I was turned around in the booking room and slammed up against the corner of the wall and told to get down on my knees and then lay on my stomach on the floor. I explained that I could not lie like that on hard floor because of a previous whiplash car accident. When I was on my knees I felt a boot in my back and I fell face first onto the hard floor. The force of the boot caused injury to my ribs (as documented in the hospital report). I heard one of the male deputy's laugh and say, "Get down on the floor like the dog that you are.""

"f.      I was then dragged by my feet down the hallway while my head continuously banged against the hard floor and hit a corner of a wall causing several head contusions (as documented in the hospital report). While I was being dragged my pants started falling down and the male deputies were making sexual comments and whistling. My boots fell off and they threw them into the trash.

"g.      I was then taken out behind the BBSD substation and I thought they were going to shoot me. I was held by four male deputies as Sergeant Jeremy King approached me and got very close to my face and said, "We don't think you belong in Big Bear and think you should go back down the hill to Orange County where you come from."

"h.      I looked him straight in the eye and said, "I'll go back down the hill just as soon as I see you go to prison." At that point King drenched me with this liquid form of pepper spray on my face, chest, arms, ears, and all open skin surfaces (as documented in the hospital report). I fell to the ground and screamed then heard a deputy vomiting in the corner from the intensity of the pepper spray and someone called him "a pussy."

i.      Blinded and screaming for emergency medical help, I was taken back inside and literally thrown into another cell and collapsed on the floor. I heard the water running and all the deputies laughing and mocking Plaintiff. I felt like

*my skin was being peeled away from my body. I have never felt such pain in my whole life and I desperately needed cold water.*

"j.     *After they all left I worked my way around the walls of the cell until I found the source of the water I had heard before and found a sink. I pulled myself up and stood in front of it for a very long time rinsing my face and arms and chest with cold water. In the process my clothing became drenched with water and I began to shake from the cold because it was October in Big Bear.*

"k.     *I was extremely nauseous and vomited in the sink. I was in there for what seemed like hours. Then the same deputies came back and took Plaintiff back to my original cell and pushed Plaintiff inside and I fell and hit my head again.*

"l.     *was shaking from the cold yet my skin was still burning. My vision was impaired and my ears were ringing. I felt blood on my hand and arms where later I saw scratches and cuts. My clothes and socks were drenched with water and they refused to bring me a blanket. I wrapped the bed mat around me to try to get warm but every 15 minutes or so someone would come into my cell and yell at me and kick the bed to scare me.*

"m.     *I was told that all I had to do was sign the citation and it would all be over; they would let me go home. I was in such a fog mentally and bad shape a physically that I was not comprehending anything. I was also scared to death emotionally.*

"n.     *At some point during the early morning hours two deputies came by and threw the temporary restraining court order into my cell from Keith and Patty and it just sat there until the morning because I was terrified to move and still had not regained my sight. I heard someone say, "Keith's goin' love this." The court record states that Sergeant Jeremy King served the document on Plaintiff, so I assume he was one of the two that came by my cell.*

"o.     In the morning I was transported to WVDC barefooted in a bus with all men. My clothes were still wet and I was in a lot of pain and still very nauseous. When I got to WVDC the nurse examined me and urged me to seek immediate emergency medical treatment, then made sure I was released on my own recognizance.

"p.     One of the female deputies told Plaintiff, "You know, you could have avoided all of this by simply signing the citation."

"q.     Plaintiff was never put into the general population at WVDC but the BBSD spread a rumor amongst members of the Big Bear Chamber of Commerce that the way I sustained my injuries was that I had gotten into a fight with another female inmate at WVDC and that it had all been caught on videotape.

"r.     It never happened as I brought to WVDC, saw the nurse, made several telephone calls to Gail Elerding and Michael Beveridge and waited for Michael to pick me up.

**October 10, 2009**

793.    Plaintiff sought emergency medical care at Bear Valley Community Hospital the next morning and was treated by Dr. Michael Hartstein, attending physician in the emergency room on the morning of October 10, 2009.  When the attending room nurse saw Plaintiff's physical appearance, she became enraged and demanded to know "who did this to you?" Plaintiff responded that it was the Big Bear Sheriffs and nurse called the substation and spoke to Defendant Lane, the commanding officer on duty, who communicated to the nurse, "We were just doing our job."

**October 14, 2009**

794.    At the advice of Marty Striano, a long time resident and business owner of Big Bear (Striano Construction Plaintiff launched a blog called "The Big Bearian" to document the events leading up to her false arrest and beating, the actual events of the in-custody brutality,

- 154 -

1   and the events that transpired after the fact all the way through the present. Striano

2   communicated his bad experience with local officials surrounding the abduction of his

3   daughter and advised Plaintiff to "stay as public as possible." I also posted photographs taken

4   by Gail Elerding the morning after I was released from West Valley Detention Center.

### October 15, 2009

6   795.   Plaintiff wrote an email to Big Bear Chamber of Commerce members, Big Bear

7   Lake City officials, and San Bernardino County officials to seek assistance in the events that

8   occurred on October 8-9, 2009. ***The only official*** that responsed was George Watson, Chief of

9   Staff to County Supervisor, Neil Derry, who asked Plaintiff to contact him right away, which

10   she did.  Plaintiff later learned that the motivation behind Defendant Watson's call was to

11   collect information on Plaintiff for his co-worker, Jamie Garland, wife of Big Bear Sheriff

12   Captain, Defendant Garland.

13   796.   City Councilperson Rick Herrick, who owned the local radio station, K-BHR,

14   quashed the story on all media outlets.

### October 17, 2009

15   797.   Plaintiff submitted two online legal intake forms to the Southern California

16   chapter of the American Civil Liberties Union for help on the police brutality case.  Plaintiff

17   communicated this to Defendant Watson who offered to follow-up for her as he had contacts

18   with the ACLU.  Defendant Watson ensured Plaintiff that Defendant Derry was very interested

19   in "getting to the bottom of the issues as soon as possible."

### October 19, 2009

21   798.   ***The Traut Case:***   Defendant Traut Law filed a request for Entry of Default

22   against Plaintiff.

### October 21, 2009

24   799.   The Big Bearian published an article entitled, *"Big Bear Sheriffs Beat & Burn*

25   *Woman in Custody."*

### October 22, 2009

27   800.   ***The UDR Case:***   Defendant UDR filed a Request for Entry of Default against

28   Plaintiff.  UDR .  Once again, the request was rejected by the Clerk of the Court.

- 155 -

801. The Big Bearian published an article entitled, *"Letter to Big Bear Sheriff Sgt Lane & District Atty Michael Ramos."*

802. The Big Bearian published an article entitled, *"Big Bear Sheriffs Employ Private Investigator, Ron Lander, to Stalk Erin Baldwin."*

803. The Big Bearian published an article entitled, *"Big Bear Sheriffs Use Fake 'Citizen's Arrest Warrants' to Trick Citizens into Answering Questions That Violate Their Civil Rights."*

### October 23, 2009

804. **Parsa Law Group – Appeal:** Plaintiff faxed a Notice of Motion to Vacate Dismissal of the Appeal and Return Appeal to Active Status.

805. **Parsa Law Group – Appeal:** Court order states:

> *"Order of dismissal vacated. The appeal was dismissed on September 23, 2009, for appellant's failure to post filing fees. (See Cal. Rules of Court, rule 8.100(b).) Today, appellant submitted by facsimile a motion to vacate the dismissal. No proof of service is attached to the motion, but given appellant has now complied with the filing fee requirement, the motion is GRANTED. The dismissal is VACATED and the appeal is REINSTATED. Appellant is further ORDERED to serve respondent with a copy of the motion to vacate within 15 days of the date of this order and to provide this court with a proof of service showing such service or the appeal may be again dismissed."*

806. The Big Bearian published an article entitled, *"California State Bar Lies and Should Be Sanctioned Right Along With the Attorneys They Are Suspending."* Plaintiff had read an article wherein Russell Weiner (Interim Chief Trial Counsel for the California State Bar) had been interviewed and he stated something to the effect of, "It's a good thing the State Bar got on top of the loan modification fraud when it did."

### October 24, 2009

807. The Big Bearian published an article entitled, *"Reader Reminds Us of the Danger Behind Sheriff "Good Ol' Boys" Network."*

808. The Big Bearian published an article entitled, *"Whites Assault Baldwin in Starbucks Then File a Restraining Order Against Her - What The...?."*

- 156 -

**October 25, 2009**

809.     The Big Bearian published an article entitled,  *"But I Thought Big Bear Was Going to Be Safe, Serene & Tranquil:  Patty & Keith White – Part II."*

810.     The Big Bearian published an article entitled,  *"Big Bear Sheriff's Chaplain, John Day, 'Warns' Baldwin in Church Today."*

811.     The Big Bearian published an article entitled,  *"Another "SUSPECT" Beaten By SB Sheriffs & Then Released With No Charges Filed By DA."*

812.     The Big Bearian published an article entitled,  *"Now I Know Why DA Mike Ramos Isn't Calling Me Back."*

**October 26, 2009**

813.     The Big Bearian published an article entitled,   *"Part III - Patty & Keith White: A Troubled Prudential Office & Assault Captured on Video."*

814.     The Big Bearian published an article entitled,  *"Patty & Keith White Set Themselves Up for Criminal Perjury Charges."*

815.     The Big Bearian published an article entitled,  *"A Word About Mike Dolan of Prudential Properties of Big Bear."*

816.     ***In the White Case,*** Defendant K. and P. White request a permanent restraining order.  Plaintiff file an Opposition with a 37-page Declaration entitled, "Facts & Reasons" wherein Plaintiff documented how every single claim made was false and that the facts of the case could not sustain a charge of civil harassment..

**October 28, 2009**

817.     ***In the White Case,*** Defendants K. and P. White and Plantiff appeared before Defendant Judge Malone for an Order to Show Cause why the TRO served on Plaintiff in custody on October 9, 2009 should not be made permanent. In support of Plaintiff's  position and prior to this hearing, Defendant Judge Malone had not read Plaintiff's opposition, nor did he give Plaintiff sufficient time to present her case. Defendant Judge Malone ruled in favor of Defendants K. and P. White even thought their enire legal position was based on conjecture, projection of things that might happen, and unfounded and unsubstantiated fear based on what they considered "sociopathic tendencies" unsupported by medical expertise or any hard

- 157 -

1   evidence whatsoever. Plaintiff timely filed an appeal but it was reject as the Court Clerk stated

2   that "the case had reached its final disposition."

3       818     On the same day, Plaintiff received notice that the San Bernardino Disticr

4   Attorney had filed five criminal charges against her in connection with her beating in custody

5   including:

> a.     *"COUNT 1:  On or about October 8, 2009, in the above named judicial district, the crime of GIVING FALSE INFORMATION TO A POLICE OFFICER, in violation of PENAL CODE SECTION 148.9(a), a misdemeanor, was committed by Erin Kelly Baldwin, who did unlawfully falsely represent and identify himself/herself as another person and as a fictitious person to a police officer, upon a lawful detention and arrest, in order to evade the process of the court and to evade the proper identification of the person by the Investigating Officer."*
>
> b.     *"COUNT 2:  On or about October 17, 2009, in the above named judicial district, the crime of RESIST, OBSTRUCT, DELAY OF PEACE OFFICER OR EMT, in violation of PENAL CODE SECTION 148(a)(1), a misdemeanor, was committed by Erin Kelly Baldwin, who did willfully and unlawfully resist, delay and obstruct Deputy Morsch who was then and there a peace officer attempting to and discharging the duty of his/her office and employment."*
>
> c.     *"COUNT 3:  On or about October 17, 2009, in the above named judicial district, the crime of BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL, in violation of PENAL CODE SECTION 243(b), a misdemeanor, was committed by Erin Kelly Baldwin, who did willfully and unlawfully use force and violence upon the person of Deputy Massey when said defendant(s) Erin Kelly Baldwin, knew and reasonably should have known that said person was Peace Officer then and there engaged in the performance of his/her duties."*
>
> d.     *"COUNT 4:  On or about October 17, 2009, in the above named judicial district, the crime of BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL, in violation of PENAL CODE SECTION 243(b), a misdemeanor, was committed by Erin Kelly Baldwin, who did willfully and unlawfully use force and violence upon the person of C Morsch when said defendant(s) Erin Kelly Baldwin, knew and reasonably should have known that said person was Peace Officer then and there engaged in the performance of his/her duties."*
>
> e.     *"COUNT 5:  On or about October 17, 2009, in the above named judicial district, the crime of DISOBEYING COURT ORDER, in violation of PENAL CODE SECTION 166(a)(4), a misdemeanor, was committed by Erin Kelly Baldwin, who did unlawfully commit contempt of court by willful*

- 158 -

*disobedience of a process and order lawfully issued by a court, to wit, Restraining order."*

819.   All criminal charges brought against Plaintiff on October 8, 2009, by Defendant SB District Attorney were predicated on an alleged "follow-up investigation on a PC653M case" brought by Defendants K. White and P. White against Plaintiff on September 30, 2009. Defendant K. White and P. White allege that the PC 653 allegations were the catalyst for seeking a TRO. Said follow-up investigation was initiated by Defendant SB Sheriff Morsch on October 8, 2009, to get Plaintiff's "side of the story."

820.   Until October 8, 2009, Plaintiff had no knowledge she was a suspect in a criminal action; which suspect status was based on Defendant SB Sheriff Morsch's unilateral and unqualified "legal interpretation" of the TRO dated October 6, 2009, which TRO had not even been served on Plaintiff yet. Said "follow-up investigation" resulted in five (5) criminal charges brought against Plaintiff on October 8, 2009, none of which included the charge for which Defendant SB Sheriff Morsch sought out Plaintiff that day, i.e., California Penal Code section 653M.

821.   All criminal charges brought against Plaintiff on October 8, 2009, by Defendant SB District Attorney lacked probable cause. Plaintiff was falsely arrested without a warrant by order of the court and was falsely imprisoned at the Big Bear Sheriff substation where she was severely beaten, threatened and burned, before transferring Plaintiff to Defendant West Valley Detention Center.

822.   The District Attorney stated that Plaintiff resisted arrest on October 8, 2009 and such criminal act made up Count 1 of the Criminal Complaint in Case No. MSB906348. However, one cannot be charged with resisting arrest if the arrest is unlawful, as it clearly was. The alleged "annoying telephone call" could not be traced to my phone and if I was merely a suspect in this innocuous crime, the BBSD could have returned to my home or called Plaintiff to ask Plaintiff questions regarding THE WHITES complaints against Plaintiff. However, the BBSD chose a method of detention that was likely to cause a reaction that could justify arresting Plaintiff on charges unrelated to the purpose of the detention.

823. The District Attorney stated that Plaintiff battered two peace officers on October 8, 2009 and such criminal acts made up Counts 2 and 3 of the Criminal Complaint in Case No. MSB906348. The hospital report written by Dr. Michael Hartstein of Bear Valley Community Hospital stated that I was the one that was battered, however, the District Attorney felt it necessary to protect the interests of the Sheriff's Department neglecting its duty to seek justice on behalf of the People of the State of California.

824. The District Attorney stated that Plaintiff gave a false name on October 8, 2009 and such criminal act made up Count 4 of the Criminal Complaint in Case No. MSB906348. Plaintiff did not state a false name, rather gave her middle name, and the Sheriff's clearly knew that it was her middle name as it is clearly stated on the document he was holding and many others before it.

825. The District Attorney stated that Plaintiff violated a court order on October 8, 2009 and such criminal act made up Count 5 of the Criminal Complaint in Case No. MSB906348. The court order for which this charge was based was the TRO issued by Defendant Judge Ochoa on behalf of Defendants K. and P. White on October 6, 2009. However, the court order was not even served on Plaintiff until October 9, 2009 while she was in custody at the Big Bear Sheriff's substation.

826. In an attempt to hide this deliberate act of fraud on the part of the Defendant SBDA Defendant Robles committed intentional obstruction of justice by altering the charge date on four of the five charges in the written Complaint from October 8, 2009 to October 17, 2009 hoping Plaintiff would not notice but she did. The dates remain October 8, 2009 in the court record to this day.

827. On the very same day that Defendant Judge Malone ordered a 3-year permanent restraining order against Plaintiff and the SBDA filed a criminal complaint against Plaintiff, Plaintiff also received a telephone call from Defendant Watson from Defendant Superior Derry's Office. Defendant Watson wanted to follow up with Plaintiff after he spoke with Defendant Captain Garland about Plaintiff's beating in custody. Defendant Watson told Plaintiff that the ACLU had contacted Defendant Captain Garland and that Defendant Captain Garland told the ACLU that "there was no case because everything that happened that night

had been captured on videotape." Plaintiff was outraged since the ACLU had never even contacted her prior to Plaintiff prior to contacting Defendant Captain Garland and that based on the ACLU's conversation with Defendant Captain Garland, the ACLU had decided not to take my case.

### October 29, 2009

828. *In the Traut Law Case:* Case Management Statement filed by Traut Law Group.

829. *In the Traut Law Case:* Amendment to Complaint (DOE 1) filed by Traut Law Group.

830. The Big Bearian published an article entitled, *"Good Ol' Boy Victorville Judge Steve Malone Ignores the Facts & Joins the Rank and File."*

831. The Big Bearian published an article entitled, *"Liar, Liar: Keith White Makes it Up as He Goes Along and Victorville Judge Steve Malone Swallows it All."*

832. The Big Bearian published an article entitled, *"Knickerbocker Mansion Owner, Stan Miller, Arrested – Yet Another "Suspect" in Custody for Allegedly Using the Phone."*

### October 30, 2009

833. *In the Parsa Case – Appeal:* Received document entitled: (1) copy of motion to vacate dismissal of appeal and reinstate, with proof of service to opposing counsel.

834. *Cancilla/Laverty Case:* Request for Entry of Default submitted by Cancilla, et al.; : Request for Entry of Default rejected by the Court.

835 The Big Bearian published an article entitled, *"Shout Out to Big Bear Sheriff's Deputy James Wijnhamer."*

### October 31, 2009

836. The Big Bearian published an article entitled, *"Patty & Keith White Civil Harassment Case Goes to a Jury Trial."*

837. The Big Bearian published an article entitled, *"Big Bear Sheriff Bloopers: Deputy Chris Morsch Predicts the Future."*

- 161 -

**November 1, 2009**

838. The Big Bearian published an article entitled, *"District Attorney Michael Ramos Sends Me a Love Letter, How Thoughtful."*

**November 2, 2009**

839. The Big Bearian published an article entitled, *"Knickerbocker's Stan Miller Grants The Big Bearian Exclusive Interview."*

840. The Big Bearian published an article entitled, *"ACLU Violates the Civil Rights It Claims to Protect."*

841. The Big Bearian published an article entitled, *"According to Internal Affairs, Big Bear Sheriffs Lane & McCracken Lied About "Citizen's Complaint."*

**November 3, 2009**

842. ***Parsa Law Group Case – Appeal:*** Civil case information statement filed. Faxed Part III

843. The Big Bearian published an article entitled, *"Tips From Big Bear Valley Citizens."*

**November 4, 2009**

844. The Big Bearian published an article entitled, *"Follow-Up Tips Regarding K-BHR, Terrorism, and Malone From Big Bear Valley Citizens."*

845. The Big Bearian published an article entitled, *"Do San Bernardino County Cops Get Bonus Pay for Every Suspect They Beat Up Then Release for Insufficient Evidence?"*

**November 5, 2009**

846. ***In the UDR Case,*** Defendants BKGG file Application to Appear Ex Parte to Enter Default of Defendant

847. The Big Bearian published an article entitled, *"Rick Herrick 'No Likey' Competition - In 2005 Jack Hammer Got Nailed or Run Out of Town - You Decide - Another 'Terrorist Threat' Was Filed."*

848. The Big Bearian published an article entitled, *"Sheriffs in Tan v. Police in Blue."*

- 162 -

1

**November 6, 2009**

2    849.    *In the UDR Case,* Defendant Judge Miller sets the Default Prove-Up Hearing

3    for December 11, 2009

4    850.    *In the UDR Case,* Defendant Judge Miller Orders Default to be Entered as to

5    Erin K. Baldwin, aka Bad Biz Finder and Beverly Sullivan

6    851.    The Big Bearian published an article entitled, *"White Case Heats Up: Baldwin*

7    *Has Malone Removed & Demands Jury Trial."*

8    852.    The Big Bearian published an article entitled, *"The Keith & Patty White Show*

9    *(Co-starring the Big Bear Sheriffs, Judge Steve Malone, Keller Williams' Mike Dolan, DA*

10    *Laura Robles and County Supervisor Neil Derry)."*

11    853.    The Big Bearian published an article entitled, *"ACLU's Samuel Parker Calls*

12    *to Deny, Lie, and Offers No Help ... WHY Did He Call?"*

**November 8, 2009**

13    854.    The Big Bearian published an article entitled, *"Baldwin Seeks Emergency*

14    *Internal Affairs Investigation."*

15

**November 9, 2009**

16    855.    The Big Bearian published an article entitled, *"Judge Steven C. Malone Sets*

17    *Himself Up For a Battle."*

18

**November 10, 2009**

19    856.    In the Traut Law Case, The Case Management Conference is Rescheduled to

20    January 12, 2010.

21

**November 12, 2009**

22    857.    The Big Bearian published an article entitled, *"The Stan Miller You Never*

23    *Knew, But Should."*

24    858.    The Big Bearian published an article entitled, *"Big Bear Sheriff Rumor:*

25    *Baldwin Got Bruises & Burns in a Fight With an Inmate at West Valley."*

**November 13, 2009**

26

27    859.    In the Traut Law Case:  Amendment to Complaint (DOE 2) is filed.

28    860.    The Big Bearian published an article entitled, *"Good Samaritan Sheriff."*

- 163 -

870. Received email from Christopher Allen (callen@sbcsd.org), Internal Affairs Division of the San Bernardino County Sheriff's Department at 3:38 p.m. stating: "Please contact me when you can to schedule an interview here at Sheriff's Headquarters regarding the concerns addressed in your fax dated November 9, 2009."

### November 16, 2009

871. The Big Bearian: "San Bernardino Internal Affairs Contacts Baldwin for an Interview."

872. The Big Bearian: "Mike Dolan's Buyer's Agent, Mickey Peterson, Shows Her Christian Values."

873. I replied at 12:17 p.m. to Chris Allen's November 13 email from erinbaldwin@rocketmail.com requesting that we meet in Big Bear since I had no transportation and informing him that I did not have access to a computer other than one hour per day at the library.

### November 17, 2009

874. Received email to erinbaldwin@rocketmail.com at 11:52 a.m. from Chris Allen as if he never received my email from the day before stating: "This is a follow-up request for an interview regarding your citizen's complaint. Please contact Plaintiff when you can to arrange the interview."

875. At 5:55 p.m. I forwarded my November 16 email to Chris Allen informing him that I had already responded. I also replied to his November 17 email at 5:56 p.m. informing him that I had already responded.

### November 18, 2009

876. The Big Bearian: "Keith and Patty White – Notice of Appeal."

877. At 11:10 a.m. I once again forwarded my November 16 email to Chris Allen informing him that I had already responded and that the arraignments in MSB906348 (November 28) and MSB905837 (December 1) were coming up very soon and I wanted to schedule the meeting.

- 164 -

878.    Since I was getting no response from Chris Allen, at 11:13 a.m., I once again forwarded my November 16 email to Chris Allen (callen@sbcsd.org); David Williams, Internal Affairs,  San Bernardino County (dwilliams@sbcsd.org); Big Bear Sheriff Captain Greg Garland (ggarland@sbcsd.org); County Supervisor Neil Derry Mountain Rep, Jamie Garland (jgarland@sbcounty.gov); County Supervisor Neil Derry's Chief of Staff, George Watson (gwatson@sbcounty.gov); Rod Hoops, Sheriff of San Bernardino County (rhoops@sbcsd.org); Paul Cook (Assistant Sheriff of San Bernardino County (pcook@sbcsd.org); and Big Bear Sheriff Deputy James Wijnhamer (jwijnhamer@sbcsd.org).

### November 19, 2009

879.    I had no response from anyone from the group email sent on November 18 at 11:13, so I sent another email at 4:27 p.m. to the same group (plus copied T. Matthew Phillips, an attorney with a history of representing plaintiffs against the Big Bear Sheriffs) further requesting a meeting in Big Bear.

### November 20, 2009

880.    The Big Bearian:   "Uffer is Over & Internal Affairs Drags Their Ass."

881.    The Big Bearian:   "Brains, Beauty and Balls – That's Erin Baldwin"

882.    The Big Bearian:   "Do Not Give Up" A Fellow Big Bearian Encourages Baldwin."

883.    The Big Bearian:   "Mother of Beaten Son Needs Help."

### November 23, 2009

884.    The Big Bearian:   "San Bernardino County DA, Laura Robles, Committed 'Intentional Prosecutorial Misconduct' Causing Mistrial But Her State Bar Record Remains Clean as a Whistle."

### November 24, 2009

885.    The Big Bearian:   "Whites Assault Baldwin in Starbucks, Then File a Restraining Order Against HER — What The…..?"

886.    The Big Bearian:   "Charlie Kimball Loudly Speaks."

### November 25, 2009

- 165 -

887. The arraignment on MSB906348 comes before the Court and I plead "not guilty" on two counts of battery on a peace officer, one count of resisting arrest, one count of giving a false name and one count of violating a court order. The Court appoints a public defender for Plaintiff however the District Attorney does not provide Plaintiff a copy of Complaint, nor endorsements nor a witness list at the arraignment which is required under California Penal Code section 1009. The Pretrial Hearing is scheduled for December 9, 2009.

888. Defendants K. and P. White are present at this arraignment which I found strange because at this point I had no idea that the Complaint contained a fraudulent criminal charge dated October 8, 2009, for violating a court order. Plaintiff asks Defendant Teti why Defendants K. and P. White are in the courtroom that date and that they were there in conjunction with District Attorney to present a motion to Defendant Judge Brodie.

889. MSB906348 Arraignment before Judge Kyle Brodie ("Brodie") on charges associated with my October 8-9 beating in custody. I pled "not guilty" to 2 counts of battery on a peace officer, 1 count of resisting arrest, 1 count of giving a false name and 1 count of violating a court order. The Court grants Plaintiff a Public Defender.

890. In violation of CPC 1009, the SB DA did not provide Plaintiff (prior to arraignment) a copy of the Complaint in this case, nor endorsements, or a witness list.

891. The Pretrial Hearing was set for December 9, 2009.

**November 26, 2009**

892. The Big Bearian: "What I'm Thankful For This Year."

**November 27, 2009**

893. The Big Bearian: "Actions Speak Louder Than Words: The White's Actions (in Connection with the District Attorney) Betray Their Words."

**November 28, 2009**

894. The Big Bearian: "White's Delete Blog - Baldwin Seeks Justice."

**November 29, 2009**

895. Case Management Conference scheduled for January 25, 2010 in C-14 at 8:30 a.m. in Cancilla, Laverty, et al. v. Erin Baldwin and Beverly Sullivan, Case No. 30-2009-00126004-CU-DF-CJC

- 166 -

**December 1, 2009**

896.    The arraignment on MSB905837 comes before the Court and I plead "not guilty" on one count of battery. The Court appoints a public defender for Plaintiff however the District Attorney does not provide Plaintiff a copy of Complaint, nor endorsements nor a witness list at the arraignment which is required under California Penal Code section 1009. The Pretrial Hearing was scheduled for December 15, 2009.

897.    In violation of CPC 1009, the SB DA did not provide Plaintiff (prior to arraignment) a copy of the Complaint in this case, nor endorsements, or a witness list, prior to arraignment.

898.    Pretrial Hearing was set for December 15, 2009.

**December 2, 2009**

899.    The Big Bearian:  "Who's Stalking Whom?  Whites Show Up to the Krueger Arraignment."

900.    I followed up with the Internal Affairs investigation by calling Chris Allen's office and spoke with his secretary, Jessica Sullivan.  She stated that neither she nor Chris had received any emails from Plaintiff at all and would I forward them to her attention.  I sent all four emails between 12:47 p.m. and 1:05 p.m

901.    Ms. Sullivan also stated that Chris Allen would be calling Plaintiff later in the afternoon to schedule an appointment which he never did.

**December 3, 2009**

902.    The Big Bearian:  "A Mysterious Case off Battery Against Bernie Krueger Reveals a Sinister Plot."

903.    I sent an email at 7:47 a.m. to Jessica Sullivan to make sure she had received all 4 emails and would she please confirm that she had via return email.   (See, Exhibit "5") I had no response from Ms. Sullivan so I sent another email at 11:12 a.m. stressing the urgency of the matter since my Pretrial Hearing was scheduled in less than a week. (See, Exhibit "5") Speak to Jessica Sullivan that informs Plaintiff the the San Bernardino County Sheriff's Department does not received email correspondence from Yahoo accounts and this is why nine of my emails were received.  This is patently false because I have several reponses to my

- 167 -

1    emails to SB Sheriffs indicating that the SB County Sheriff's server does not block emails from

2    yahoo accounts.

### December 8, 2009

3

4    904.    UDR Defamation Case 30-2009-00125305:  DECLARATION - OTHER

5    FILED BY UDR, INC. ON 12/08/2009 (Tracy Saffos)

6    905.    UDR Defamation Case 30-2009-00125305 :  DECLARATION - OTHER

7    (ERIC J GOODMAN) FILED BY UDR, INC. ON 12/08/2009

### December 9, 2009

8

9    906.    When I arrive at the Pretrial Hearing on MSB906348 I still don't have a

10   Complaint in this matter, nor evidence, nor a witness list. I also have not been assigned a

     Public Defender nor has a Public Defender even reviewed my case prior to the Pretrial

11   Hearing.

12   907.    However, at the Pretrial Hearing, Public Defender Kawika Smith (hereinafter

13   referred to as "SMITH") hands Plaintiff the Complaint filed on October 28, 2009 as written by

14   ROBLES. This is the first time I saw the Complaint and I immediately noticed that date of the

15   criminal charges have been altered from October 8, 2009 (as stated in the Court record) to

16   October 17, 2009, to compensate for THE WHITES' TRO served on Plaintiff while I was in

17   custody by the BBSD.

18   908.    SMITH also handed Plaintiff seventy (70) pages of discovery, eighty percent

19   (80%) of which was filler documents printed off the Internet by THE WHITES to present

20   Plaintiff in a false light and had absolutely nothing to do with any criminal charge set forth on

21   the Complaint. SMITH asked Plaintiff to review the Complaint and the discovery which I did

22   in the hallway outside the courtroom. I also openly discussed it with my partner at the time,

23   Charlie Kimball (hereinafter referred to as "KIMBALL") because SMITH failed to tell

24   Plaintiff that Deputy District Attorney William Gale (hereinafter referred to as "GALE") was

25   seated a couple of benches down from Plaintiff within earshot of my discussion with

26   KIMBALL.

27   909..   After about thirty (30) minutes time, SMITH returned with a plea bargain from

28   GALE. The first item on the plea bargain was "cease blogging" [relating to my blog, "The Big

- 168 -

COMPLAINT FOR MONEY DAMAGES, DECLARATORY & INJUNCTIVE RELIEF FOR 42 U.S.C. §1983 CLAIMS, ETC. (AGTG)

1  Bearian" where I had been documenting all events relating to the cases at hand]. Nonetheless,

2  it was a direct violation of my First Amendment right of free speech. This term was followed

3  by the equally outrageous plea bargain terms of pleading guilty to battery on a peace office,

4  resisting arrest, three years probation, etc. I rejected the plea bargain outright and continued

5  the pretrial hearing to January 25, 2010 for investigation purposes. GALE was visibly shaken

6  when SMITH handed him the Pretrial Worksheet that indicated that I wished to waive time

7  and continue the pretrial hearing.

8      911.    The Big Bearian: "Baldwin REJECTS DA's Plea Bargain: Case Will Go to a

9  Jury After Thorough Investigation."

10      912.    The Big Bearian: "Erin Baldwin Charters a New Course for The Big Bearian."

    913.    Request for Dismissal Without Prejudice - Entire Action Filed by Cancilla,

11  Laverty, et al., in Cancilla, Laverty, et al. v. Erin Baldwin and Beverly Sullivan, Case No. 30-

12  2009-00126004-CU-DF-CJC

13      914.    Case Dismissed with Disposition of Request for Dismissal in Cancilla, Laverty,

14  et al. v. Erin Baldwin and Beverly Sullivan, Case No. 30-2009-00126004-CU-DF-CJC

15      915.    When I arrived at the Pretrial Hearing on MSB906348 I still had not been given

16  a copy of the Complaint, nor evidence substantiating the Complaint, nor a witness list. I also

17  had not been contacted by a public defender nor did I know his identity. However, during the

18  Pretrial Hearing, Public Defender Kawika Smith ("Smith") handed Plaintiff the Complaint

19  written by Robles and filed on October 28, 2009.  This was the first time I saw the Complaint

20  and I immediately noticed that the dates of the criminal charges had been altered from October

21  8, 2009 (as stated in the Court record) to October 17, 2009, to compensate for the fraudulent

22  criminal charge of "violating a court order" which could not possibly have happened on

23  October 8, 2009 since I wasn't served until October 9, 2009.

24      916.    Smith also handed Plaintiff seventy (70) pages of discovery, eighty percent

25  (80%) of which were documents printed off the Internet by the Whites to present Plaintiff in a

26  false light and had absolutely nothing to do with any criminal charge set forth on the

27  Complaint.

28      917.    Smith asked Plaintiff to review the Complaint and the discovery which I did in

the hallway outside the courtroom. I also openly discussed it with my partner at the time, Charlie Kimball ("Kimball") because Smith failed to tell Plaintiff that Deputy District Attorney William Gale ("Gale") was seated a couple of benches down from Plaintiff within earshot of my discussion with Kimball.

918.   After about thirty (30) minutes time, Smith returned with a plea bargain from Gale. The first item on the plea bargain was "cease blogging" [relating to my blog, "The Big Bearian" where I had been documenting all events relating to the cases at hand]. Nonetheless, it was a direct violation of my First Amendment right of free speech.

This term was followed by the equally outrageous plea bargain terms of pleading guilty to battery on a peace office, resisting arrest, three years probation, etc. I rejected the plea bargain outright and continued the pretrial hearing to January 25, 2010 for investigation purposes. Gale was visibly shaken when Smith handed him the Pretrial Worksheet that indicated that I wished to waive time and continue the pretrial hearing.

919.   I moved out of the Elerdings home and in with Kimball as the Elerdings were experiencing some very serious marital issues. A couple of weeks earlier Gail Elerding had moved out of the house and was living in their business office in town.

### December 11, 2009

920.   Traut Defamation Case:  NOTICE - OTHER (OF CASE MANAGEMENT CONFERENCE) FILED BY TRAUT LAW GROUP ON 12/11/2009

921.   UDR Defamation Case 30-2009-00125305:  MINUTES FINALIZED FOR DEFAULT PROVE-UP HEARING 12/11/2009 08:30:00 AM.

922.   UDR Defamation Case 30-2009-00125305:  THE COURT ENTERS JUDGMENT AS TO COMPLAINT.

923.   UDR Defamation Case 30-2009-00125305:  CASE DISPOSED WITH DISPOSITION OF DEFAULT

924.   UDR Defamation Case 30-2009-00125305:  JUDGMENT BY COURT ON 12/11/2009

925.   UDR Defamation Case 30-2009-00125305:  DEFAULT JUDGMENT BY COURT WITH PERMANENT INJUNCTION

**December 14, 2009**

926.    The Big Bearian:  "CHARLIE KIMBALL SPEAKS: What Are We, As Individuals, Doing to Preserve Our Rights Under the Law?"

**December 15, 2009**

927.    SMITH agreed to appear on my behalf at the Pretrial Hearing on MSB905837 and effectively joined the cases together under BRODIE for all purposes. At this point I still did not have a Complaint in this matter, nor evidence or a witness list. SMITH told Plaintiff that he had communicated with the SBDA and they decided to "use the Citation written by McCracken on September 25, 2009 as the Complaint." The SBDA didn't know that I knew that the law required them to file a formal Complaint once I had entered a plea of "not guilty" on December 1, 2009. The SBDA effectively lost their right to charge Plaintiff with this crime and I had planned on raising this issue in a Motion in Limine prior to trial.

928.    Smith agreed to appear on my behalf at the Pretrial Hearing on MSB905837 and effectively joined the cases together under Brodie for all purposes. At this point I still did not have a Complaint in MSB905837, nor evidence or a witness list.

Smith told Plaintiff that he had communicated with the SBDA and they decided to "use the Citation written by McCracken on September 25, 2009 as the Complaint." The SBDA didn't know that I knew that the law required them to file a formal Complaint once I had entered a plea of "not guilty" on December 1, 2009.

929.    The SBDA effectively lost their right to charge Plaintiff with this crime and I had planned on raising this issue in a Motion in Limine prior to trial.  However, I never got the chance because I was arrested on February 25, 2010 prior to commencement of trial. [Please note: When I was incarcerated (February 25 – March 28, 2010), the SBDA lied to the judge and told her that I was in custody on both the MSB906348 and the MSB905837 cases when in fact I was only in custody on FSB1000789 and out on my own recognizance with no bail on the other two cases.  I was also representing myself in pro per and not allowed to even speak to the judge to defend myself against the lies of the SBDA.  The judge added $10,000 bail on each of the case and my public defender, Geoffrey Canty ("Canty") tried to convince

- 171 -

1   Plaintiff to let his office represent Plaintiff after he had already acted on my behalf on cases for

2   which I was my own attorney.]

3                                   **December 21, 2009**

4          930.    On December 21, 2009, in the Big Bear Sheriff Brutality Case, Plaintiff

5   appeared before Judge Katrina West and terminated her court-appointed public defenders,

6   Defendant Attorney Smith and Defendant Attorney Shoup, for cause.

7                                   **December 29, 2009**

8          931.    Traut Defamation Case:  PROOF OF SERVICE OF SUMMONS FILED BY

9   TRAUT LAW GROUP ON 12/29/2009

10                                  **December 30, 2009**

11         932.    UDR Defamation Case 30-2009-00125305:  PLTFF UDR INC CASE

12  SUMMARY IN SUPPORT OF APPLICATION FOR COURT JUDGMENT AGAINST

13  DEFT ERIN K. BALDWIN ALSO KNOWN AS BAD BIZ FINDER AND ALSO KNOWN

    AS BEVERLY SULLIVAN

14                                  **December 31, 2009**

15         933..   As matters heated up on my blog and in my cases relating to my issues with the

16  BBSD, matters became tense between Plaintiff and KIMBALL. We were living way out in

17  Baldwin Lake and I wanted to be closer to town so I could get a job and look for my own

18  place. I accepted an invitation to move into the spare room of the home of Jason Lee Crow

19  (hereinafter referred to as "CROW") on a platonic basis. We had a written agreement that I

20  would provide domestic chores in exchange for rent and that I could stay in the house until

21  April 1, 2010.

22         934.    CROW is a month-to-month tenant and assured Plaintiff that his landlord, Larry

23  Berryman (hereinafter referred to as "BERRYMAN") was fine with the arrangement which I

24  found out later was a lie. He also lied to Plaintiff that his girlfriend from San Bernardino was

25  fine with the arrangement (which she certainly was not) and told his neighbor that he and I

26  were sleeping together.

27         935.    After about three weeks I discovered that CROW was a drug addict. He started

28  smoking marijuana at 8:30 a.m. every morning together with his neighbor, snowboarder and

                                        - 172 -

drug dealer, Mike Eggleston, as well as his other neighbor Ralph and all of Ralph's buddies. CROW is also on dependent on many other prescription pills both for an alleged heart condition as well as other recreational drug addictions.

936.    CROW (although not apparent in the beginning) became more and more unstable, unpredictable, misogynistic and abusive as time went on. He cultivated fantasies that I was his girlfriend and even videotaped Plaintiff shoveling snow with his background voice stating, "There she is shoveling snow to show her man what a stud she is." When I asked him "Where is my man? I didn't know I had a man?" he got very abusive and nasty.

937..    CROW and I never engaged in sexual relations although he constantly asked Plaintiff for "pole dances" and let Plaintiff know that he had slept with every female roommate he had ever lived with. It made Plaintiff sick and I felt really bad for his girlfriend but I kept to myself and worked hard to get a job so I could move out.

### January 12, 2010

938.    Traut Defamation Case:  Case Management Conference rescheduled for February 9, 2010.

### January 13, 2010

939.    Traut Defamation Case:  MINUTES FINALIZED FOR CASE MANAGEMENT CONFERENCE 01/12/2010 08:45:00 AM.

### January 19, 2010

940.    Traut Defamation Case:  NOTICE - OTHER (CMC) FILED BY TRAUT LAW GROUP ON 01/19/2010

### January 25, 2010

941.    The continued Pretrial Hearing comes before Judge Katrina West (hereinafter referred to as "WEST") at which time I terminate my relationship with SMITH and the Public Defender's Office for cause. They failed to collect the discovery and interview witnesses required in the two cases and caused delays that would be very costly to Plaintiff going into trial. WEST agreed that I could be my own attorney. In light of the fact that SMITH and the Public Defender's Office had failed to meet their obligations as my attorney, I asked for a

- 173 -

1  continuance on the trial start date to April 8 and although the SBDA vigorously objected,

2  WEST granted my request.

3       942.    On this date I also filed a Pitchess Motion to open for inspection the

4  confidential personnel records of the BBSD deputies that beat Plaintiff in custody and those

5  that attempted to cover it up after the fact. I filed it with the Court while I was still there and

6  also served it on SBDA Jonathan Robbins (the latest in a long string of District Attorneys

7  assigned to my cases) (hereinafter referred to as "ROBBINS").

8       943.    The court set the date for the Motion hearing for February 8, 2010, however,

9  they made an error as that was a court holiday, so the motion was re-scheduled for February

10  15, 2010. The SBDA did not file an Opposition to the Motion.

   Filed January 25, 2010:   The People of the State of California v. Erin K. Baldwin, San

11  Bernardino County Superior Court Case No. MSB905837, filed on January 25, 2010.

12       944.    January 25, 2010:   The People of the State of California v. Erin K.

13  Baldwin, San Bernardino County Superior Court Case No. MSB905837 for Battery that

14  allegedly occurred on September 17, 2009 against Bernadine Krueger but filed as a Citizen's

15  Arrest by Keith and Patty White.   Judges:   Judge Kyle Brodie, Judge Katrina West, Judge

16  Ronald M. Christiansen, Judge Michael Dest, Judge Donna Gunnell-Garza, andJudge Southern

17  Guy.]

18                              **January 30, 2009**

19       945.    The Big Bearian:   "Once Upon a Time ..."

20                              **January 31, 2009**

21       946.    The Big Bearian:   "San Bernardino District Attorney Commits Intentional

22  Fraud & Obstruction of Justice."

23       947.    The Big Bearian:   "Bogus Plea Bargains & Your Miranda Rights."

24                              **February 3, 2009**

25       948.    Traut Defamation Case: AMENDED COMPLAINT (DOE 4) FILED BY

26  TRAUT LAW GROUP ON 02/03/2010

27       949.    Traut Defamation Case: REQUEST FOR DISMISSAL WITH PREJUDICE -

   PARTY FILED BY TRAUT LAW GROUP ON 02/03/2010

28

                                    - 174 -

950. The Big Bearian: "Baldwin Files Motion to Gain Access to Confidential Personnel Records of Big Bear Sheriffs."

**February 4, 2010**

951. Traut Defamation Case: COMPLAINT DISPOSED WITH DISPOSITION OF REQUEST FOR DISMISSAL.

952. Traut Defamation Case: CASE DISMISSED WITH DISPOSITION OF REQUEST FOR DISMISSAL

953. Parsa Law Group Case – Appeal: Filed declaration of: Aplt's failure to comply w/CRC, rule 8.140. No fees and/or reporter's waivers were deposited.

**February 5, 2009**

954. Parsa Law Group Case – Appeal: Appeal dismissed per rule 8.140(b). Pursuant to California Rules of Court, rule 8.140(b)(1), the appeal filed September 02, 2009, is DISMISSED for appellant's failure to deposit costs in a timely manner for preparation of the record on appeal.

955. The Big Bearian: "Is Writing the Truth on a Blog Considered Harassment?"

**February 8, 2010**

956. The Big Bearian: "No Warrant, No Probable Cause, and Criminal Perjury by Big Bear Sheriffs."

**February 9, 2010**

957. The Big Bearian: "California State Bar's Board of Governors Get a Chance to Right the Wrongs."

958. The Big Bearian: "Citizen's Arrests Are Misunderstood, Misused and Likely to Get You Sued: Part I."

959. Traut Law Case: Case Management Conference rescheduled for April 6, 2010.

**February 10, 2010**

960. The Big Bearian: "Citizen's Arrests – Part II – The DA Presses Charges on Third Party Testimony."

**February 11, 2010**

- 175 -

961    .The Big Bearian:  "Big Bear Sheriff Brutality Pictorial – Don't Think It Can't Happen to You."

### February 12, 2010

962.    The Big Bearian:  "McCracken Goes Rogue Cop, Violates Every Rule in the Book, and Decimates Baldwin's Civil Rights."

### February 13, 2010

962.    The Big Bearian:  "Martin Andelman is a Fraud and 'Mandelman Matters' is a Scam."

### February 15, 2010

963.    The Pitchess Motion came on for hearing on this date before BRODIE and he stated he would not rule on it as the Motion had not been served on the appropriate custodian of records. The Court had previously instructed me to serve the Motion on the SBDA and this was false information. BRODIE would not tell Plaintiff who the proper custodian of records was and was quick to degrade Plaintiff in open court by stating, "It's really hard being your own attorney."

964.    Therefore, I performed more research and found that the Motion had to be served on Jay Blankenship, Civil Liabilities Division of the San Bernardino County Sheriff's Department. The Court also advised Plaintiff that I had to come back to the Courthouse, re-file the Motion and then re-serve it.

965..    As I lived in Big Bear and had no transportation I was grossly handicapped to be coming back and forth to court. However, I finally found a way and scheduled the re-filing and re-serving of the Pitchess Motion for February 25, 2010, the very date I was falsely arrested for "Assault with a Deadly Weapon" and was incarcerated for 32 days.

966.    The two Sheriff's deputies that arrested Plaintiff on February 25, 2010 (Deputy Alex COLLINS and Deputy Michael BROADHURST) were on the list of deputies whose confidential personnel records were to be opened for inspection once the Motion was filed and served.

### February 16, 2010

- 176 -

967. The Big Bearian: "Starbucks, Inc. (NASDAQ:SBUX) Participates in Obstruction of Justice in Big Bear Lake, California."

**February 17, 2010**

968. The Big Bearian: "The Truth is Out About Parsa Law Group & the CA Dept. of Real Estate."

969. The Big Bearian: "More Lies By DA Jonathan Robbins in Charge of Battery Against Baldwin."

**February 18, 2010**

970. Traut Defamation Case: NOTICE - OTHER (OF CASE MANAGEMENT CONFERENCE) FILED BY TRAUT LAW GROUP ON 02/18/2010

971. Parsa Law Group Case – Appeal: Mail returned, unable to forward. Dismissal order sent to aplt, return to sender, not deliverable as addressed, unable to forward

972. The Big Bearian: "Baldwin Reports More Fraud and Incompetence By the San Bernardino District Attorney & Public Defender."

**February 19, 2010**

973. The Big Bearian: "Judge Kyle Brodie to Baldwin in Court: 'It's Really Hard Bring Your Own Attorney'"

974. The Big Bearian: "Donald E. Brown Dishonors the Marine Corps By His Thoughtless and Cruel Remarks."

**February 20, 2010**

975. The Big Bearian: "The District Attorney Seems to Have Forgotten Their Job Description."

**February 21, 2009**

976. The Big Bearian: "Another Smart & Feisty Chick Doesn't Take Any Crap From Martin Andelman, Steve Dibert or Aaron Krowne."

977. The Big Bearian: "Not Looking Too Good for the DA."

978. The Big Bearian: "Putting Sheriff Candidate Paul Schrader to the Test: 'Fresh Start' or 'False Start'? We'll See."

- 177 -

979.    The Big Bearian:  "Baldwin Seeks & Is Denied Judge Brodie's Help in Setting Guidelines of 'Civility & Professionalism' With the DA."

<u>**February 23, 2010**</u>

980.    .CROW continued his harassment of Plaintiff and I sought refuge at my neighbor's home, Doreen and Larry Martin (hereinafter referred to as "THE MARTINS"). When I told Larry what was happening he offered to speak with CROW and went over that night and warned CROW "not to lay hands on her and to turn the Internet back on so that she can effectively move out."

981.    The Pitchess Motion came on for hearing before Brodie and he stated he would not rule on it as the Motion had not been served on the appropriate custodian of records for the San Bernardino County Sheriff's Department. The Court had previously instructed Plaintiff to serve the Motion on the SBDA and this was false information. Brodie would not tell Plaintiff who the proper custodian of records was and was quick to degrade Plaintiff in open court by stating, "It's really hard being your own attorney."

982.    Therefore, I performed more research and found that the Motion had to be served on Jay Blankenship, Civil Liabilities Division of the San Bernardino County Sheriff's Department. The Court also advised Plaintiff that I had to come back to the Courthouse, re-file the Motion and then re-serve it.

983.    As I lived in Big Bear and had no transportation I was grossly handicapped to be traveling back and forth to court. However, I finally found a way and scheduled the re-filing and re-serving of the Pitchess Motion for February 25, 2010, the very date I was falsely arrested for "Assault with a Deadly Weapon" and was incarcerated for 35 days.

984.    The two Sheriff's deputies that arrested Plaintiff on February 25, 2010 (Deputy Alex Collins and Deputy Michael Broadhurst) were on the list of deputies whose confidential personnel records were to be opened for inspection once the Motion was filed and served.

985.    Traut Defamation Case:  MINUTES FINALIZED FOR CASE MANAGEMENT CONFERENCE 02/09/2010 08:45:00 AM.

986.    The Big Bearian:  "Derry-Lemke-Garland-Malone-White: Round & Round & Round We Go: Where It Stops, Nobody Knows."

- 178 -

987. The Big Bearian: "County Supervisor Neil Derry's Team Includes Joe Turner, Racist & Advocate of Violence."

988. Crow continued his harassment of Plaintiff and I sought refuge at my neighbor's home, Doreen and Larry Martin ("the Martins"). When I told Larry what was happening he offered to speak with Crow and went over that night and warned Crow "not to lay hands on her and to turn the Internet back on so that she can effectively move out."

### February 24, 2010

989. I got the good news that I was awarded the job with Carls & Sons Plumbing to begin March 8, 2010. The next step was finding a new place to live in the interim until I could start my job and save up enough money.

990. Doreen MARTIN took Plaintiff to DOVES (a domestic violence program in Big Bear Lake) to seek help leaving the abusive environment I was living in with CROW. I met with the Director of DOVES, Jane Hewitt (hereinafter referred to as "HEWITT"), who after a thorough assessment, rated CROW a "7" out of "10" on a scale of dangerous and violent men ("10" being the worst).

991. We met for approximately two hours and at the conclusion HEWITT recommended that I enter a DOVES shelter in either Victorville or San Bernardino. I agree that this is a good plan and tell her I will return the next day after straightening up some issues at home. HEWITT agreed, gave Plaintiff a MARTA bus pass for the next day, a "HOPE Phone" to use in case of an emergency and the advice of placing a chair under the door knob of my bedroom door in case CROW started to bother Plaintiff again.

992. Doreen MARTIN picked Plaintiff up after my appointment and I was overjoyed that I had a job, was going to be able to go into a shelter and had HEWITT to support Plaintiff. I followed her advice and took a chair from the dining room set and placed it under the door knob of my bedroom door. When CROW came home he noticed the chair missing and tried to break down my door to get it. The police were called and Deputy Jablonsky (hereinafter referred to as "JABLONSKY") arrived at the scene. As soon as JABLONSKY spoke to CROW, he called for his commanding officer, LANE to come on over. In the meantime I

- 179 -

1  called the DOVES hotline as I had been instructed using the HOPE phone I had been given

2  just hours before by HEWITT.

3       993.    When LANE arrived, he and JABLONSKY came into my bedroom and instead

4  of listening to the facts pertaining to the domestic violence and my plan to go into a shelter the

5  next morning, LANE and JABLONSKY threatened Plaintiff that if they had to come out again

6  that they would arrest Plaintiff for petty theft for taking CROW's chair. JABLONSKY also

7  lied and told Plaintiff that CROW was going to be moving out of the house and needed to

8  come into my room and remove all his property the next morning. He also warned Plaintiff

9  that he didn't want any trouble with Plaintiff the next morning.

     994.    The Big Bearian:  "The Price of Telling the Truth in America."

10                             **February 25, 2010**

11       995.    I could easily write twenty more pages on the events that occurred on the

12  morning of my arrest and the errors and lies present in the police report and Probable Cause

13  Declaration written by COLLINS in this case.

14       996.    Following are a few of the false statements made by CROW, documented by

15  the BBSD, and relied upon by the SBDA to file a criminal Complaint against Plaintiff for

16  felony Assault With a Deadly Weapon. Please note that there were no witnesses, no evidence,

17  no injuries, no warrant, nor probable cause – only the testimony of CROW (a chronic drug

18  addict with ulterior motives so stated and documented the night before the arrest). [I will

19  supplement this document with an amendment so that all the facts are entered into evidence.]

20       997.    "CROW met BALDWIN at church." This is false. I met CROW at a food bank

21  that he had been fleecing for months. He lives alone yet put down on his food bank

22  documentation that he had a family of four to feed and went every week to collect food until

23  his kitchen was stuffed with more food than any one person could ever consume. He could

24  afford to pay for food but preferred to spend his money on drugs. Believer's Chapel hosts the

25  food bank but CROW never attended church there because he believed that Sunday was "party

26  day" and was stoned by the time church started.

27       998.    "BALDWIN needed a place to stay so CROW allowed her to stay at his

28  residence for a couple of weeks until she found a place to live." We had a written agreement

1    that I could stay at the residence until April 1 and that I would perform domestic chores for my

2    half of the rent ($250) which did and have proof of such completion of tasks.

3         999.   "While in the kitchen area of the residence, the victim and suspect were

4    involved in an argument over the suspect needing to move out." I had not spoken one word to

5    CROW that morning as JABLONSKY had informed Plaintiff the night before that CROW did

6    not want any communication with Plaintiff. CROW and I had never spoken about my needing

7    to move out and further, he had no authority to effectuate an eviction or ask Plaintiff to do

8    anything as he was not the owner or landlord of the dwelling, rather a month-to-month tenant.

9    In addition, CROW and I had a written agreement stating that I could reside at the dwelling

10    until April 1, 2010.

11         1000.   "As the victim walked out the front door, the suspect threw a heavy drinking

     glass at him." The layout of the house and the distance from the kitchen to the front door

12    makes it literally and logistically impossible for Plaintiff to have done this. It is approximately

13    35 feet from the kitchen to the front door and there is a corner that prohibits a straight line shot

14    from the kitchen to the front door. Also, the wall that the police state I hit with the glass when

15    I missed CROW's head is not a straight line shot from the kitchen either. CROW is 6'3" and I

16    am 5'7" tall. If the drinking glass was "heavy" as the police report claims, there is no way I

17    could have thrown a glass a distance of 35 feet at a height of 6'2".

18         1001   "The glass missed the victim's head, striking the wall 1-2 feet from the victim."

19    If CROW was walking out the front door as the police report indicates, there is no wall that is

20    1-2 feet from that location. The wall that the photo indicates in the attachments to the police

21    report is right next to the front door, not 1-2 feet away.

22         1002.   "CROW said BALDWIN had access to his lap top computer and sent out

23    emails to his co-workers stating he is a drug addict and does drugs all day." CROW does not

24    even own a lap top computer. He only has a desk top that sits on a desk in his kitchen. I did not

25    need access to any computer belong to CROW as I had my own desk top computer in my

26    room, a Dell, which fact JABLONSKY, LANE, WOLFE, COLLINS, and BROADHURST

27    could all validate as they all saw my computer when they were each in my bedroom during the

28    police incidents that occurred on February 24 and February 25, 2010.

1003.  "CROW also told Plaintiff that BALDWIN took chairs from the kitchen area which did not belong to her and barricaded herself in her bedroom with the chairs and would not let CROW enter the room to get his lap top." I took one chair at the direction of DOVES and placed it under the door knob for security purposes. It's a good thing I did because on the evening of February 24 CROW attempted to break down my door. Again, CROW does not own a lap top and I didn't need any computer belonging to him as I had my own desktop computer set up in my room.

1004.  HEWITT refused to help Plaintiff with informing the Sheriffs of my visit to her office the day before. She said I had not signed a release of information form and that she could not provide any information to anyone. I asked her to please fax the form it to WVDC and that I would sign it but she refused saying she did not have the fax number and didn't know how to look it up. She claimed, "I don't know you! I only spent an hour with you; I don't have anything to do with this!" She was obviously distraught and fearful of her involvement.

1005.  I later realized that HEWITT was more than likely acting in collusion with the BBSD in retaliation for an article I had written exposing the fact that DOLAN (owner of PRUDENTIAL BIG BEAR) was on the Board of Directors of DOVES (a domestic violence program) while at the same time (September 2009) was facing domestic violence charges against him in San Bernardino Superior Court for battery on his wife.

1006.  It was not a long shot to place HEWITT, DOLAN, and the BBSD all in bed together. However, it didn't occur to Plaintiff until I was in jail and had spoken to several women who were familiar with HEWITT and DOVES. Without exception, everyone I spoke to revealed that DOVES was nothing more than an operation that covered up the crimes of local Big Bear Valley cops, politicians and other officials.

### February 26, 2010

1007.  I was arrested on the morning of February 25, 2009, a Thursday, and for all intents and purposes should have been arraigned the next day, February 26, 2010. However, I was not brought before a magistrate until Monday, March 1.

1008.  Deputy District Attorney P. Christianson (hereinafter referred to as

- 182 -

"CHRISTIANSON") filed a Complaint against Plaintiff for Assault with a Deadly Weapon with the Intent to Cause Great Bodily Injury (California Penal Code section 245(a)(1)) based solely on a police report and "Probable Cause Declaration" written by BBSD rookie Deputy Alexander Collins (hereinafter referred to as "COLLINS"). The Court Case No. is FSB1000789 and the DA Case No. is 2010-00-0010472.

1009.    The SBDA classified the charge as a "serious felony" under California Penal Code section 1192.7(c), however, Deputy Public Defender Geoffrey Canty (hereinafter referred to as "CANTY") told Plaintiff that the SBDA should never even filed the charge as a felony. The Complaint was vague and unclear and certainly did not state facts sufficient to form a cause of action for a serious felony or Assault with a Deadly Weapon with the Intent to Cause Great Bodily Injury (California Penal Code section 245(a)(1)).

1010.    The text of the Complaint read:

*"On or about February 25, 2010, in the above named judicial district, the crime of ASSAULT WITH A DEADLY WEAPON, BY MEANS LIKELY TO PRODUCE GBI, in violation of PENAL CODE SECTION 245(a)(1), a felony, was committed by Erin Kelly Baldwin, who did willfully and unlawfully commit an assault upon Jason Crow with a deadly weapon, to wit, a large drinking glass, and by means of force likely to produce great bodily injury."*

1011.    This Complaint is subject to a Demurrer for many reasons but primarily because it does not state what I did with the alleged "drinking glass." Also, it states that the alleged drinking glass was "a deadly weapon" but no deadly weapon was recovered; thus there is no crime. There were also no witnesses and no injuries. Thus, it should have been acknowledged as a "simple assault" and classified as a misdemeanor, not a "serious felony." The SBDA knew they didn't have a case on this charge but they had to hold Plaintiff in custody long enough to prevent Plaintiff from re-filing and re-serving the Pitchess Motion and further preparing for trial on the two cases for which WEST granted Plaintiff In Pro Per status.

1012.    The SBDA also intentionally obstructed justice by raising my bail to ten times higher than the statutory guideline for the crime. My bail was set at $50,000 upon arrest but a few days later, the bail was raised to $500,000 to prevent Plaintiff from posting bail. This is a direct violation of my constitutional right prohibiting excessive bail and even though I voiced

1  this very loudly in court and to my Public Defender I was held in custody for almost three

2  weeks on this excessive bail.

3      1013.  On the morning after I was brought into custody at WVDC, a woman by the

4  name of Kelly Papp (hereinafter referred to as "PAPP") visited Plaintiff in jail. She identified

5  herself as Animal Control and that she had custody of my two dogs. She brought pictures of

6  my dogs and informed Plaintiff that if I was not out of jail by March 9, 2010, that that my dogs

7  would be adopted out [or implied: euthanized].

8      1014.  I was in abject terror as these animals are like my children. PAPP knew what

9  my reaction would be and she handed Plaintiff a sheet of paper and asked Plaintiff to write

10  down my very closest friends and family and their contact information. She wanted Plaintiff to

11  make a list of "people that could possibly come and pick up my dogs" but she didn't use the

12  list for that purpose at all.

13      1015.  She also informed Plaintiff that as of that date she already had a list of people

14  interested in adopting my dogs as "they were small." I later found out from Tammy at the Big

15  Bear Shelter that this was a lie and a manipulation to scare Plaintiff. As of March 11, 2010,

16  Tammy told Plaintiff no one had come in to adopt my dogs and that a list did not exist.

17      1016.  I had no idea that my dogs were even taken to a shelter and I found it hard to

18  believe that in less than 24 hours there would already be "a list of people" wanting to adopt my

19  dogs. I also found it hard to believe that PAPP would come all the way into the jail to visit

20  Plaintiff out of concern for my dogs.

                                         **March 1, 2010**

21      1017.  I was taken to the WVDC "Video Court" arraignment room within the jail

22  facility. There were approximately 100 people in the room and two Public Defenders sitting at

23  the front of the room. They were there apparently to make sure our constitutional rights were

24  not violated, however, neither one of them spoke to the people they were supposed to be

25  representing nor knew anything about any one of the cases before them. A noticed that the

26  majority of the people in that room had not been given copies of their Complaint and certainly

27  had not been given copies of the discovery or a witness list as required by law prior to an

28  arraignment taking place.

1018.   We were told to watch a video on television that was to explain all of our rights which I did. Then a male Sheriff's deputy yelled at Plaintiff for not signing the "Advisement of Legal Rights" which I had not read because I was watching the video to learn about my legal rights. He stood over Plaintiff and told Plaintiff to sign the paper and I stated that I had not read it and was not comfortable signing something I had not read. He got very angry and grabbed the paper out of my hand.

1019.   I was seated at the very front of the room and directed my comments to the seated Public Defender and stated that I was not willing to allow a judge to enter an automatic plea of "not guilty" for Plaintiff on my behalf, that I wanted to enter a Demurrer to the Complaint as the Complaint did not state facts sufficient to make up a cause of action for a charge of a serious felony or an assault with a deadly weapon. I asked the Public Defender if I could do that and he stated, "Yes, you can talk to the Judge about that." At that point the male Sheriff deputy ordered Plaintiff to get up out of my chair and ejected Plaintiff from the arraignment. He told Plaintiff I was being "disruptive, insubordinate and not following the West Valley program." He told Plaintiff I would not be heard by the Judge that day, to go back to my cell, and if I could control myself, I might get to go to Court the next day.

1020.   By the time the next day came around, the 72-hour deadline to arraign a person in custody had passed and I should have been releases and the charges dropped.

1021.   Filed March 1, 2010:   Jason Crow v. Erin Baldwin, San Bernardino County Superior Court Case No. FAMHS1000015, filed on March 1, 2010 for Domestic Violence, Judge Thomas S. Garza, Judge Gilbert Ochoa. March 1, 2010:   Jason Crow v. Erin Baldwin, San Bernardino County

### March 2, 2010

1022.   The next day I was added on to the "Live Court" schedule and shackled and brought to the San Bernardino Superior Court where I was brought before Judge Kenneth Barr (hereinafter referred to as "BARR") for yet another arraignment. I informed the Court that the time to arraign Plaintiff had passed but BARR ignored my comments and my desire to enter a Demurrer to the Complaint.

1023.  He spoke over Plaintiff and entered a "not guilty" plea on my behalf that I adamantly objected to and as I was objecting, I was told to "sit down and shut up," that I was "rude for interrupting the judge" when in fact it was BARR who spoke over Plaintiff. There was a Public Defender present but he did not speak up for Plaintiff and allowed my constitutional rights to be trampled. The bailiff took Plaintiff outside the courtroom and once again told Plaintiff to "sit down and shut up." The Public Defender came out for a second and told Plaintiff to sit there until he came back but he never came back and the Sheriff deputy took Plaintiff back to the holding cell in the back of the courthouse. I told the Sheriff deputy that my Public Defender wanted Plaintiff to wait for him but the deputy ignored Plaintiff and pushed Plaintiff down the hall.

1024.  I had my prepared written Demurrer with Plaintiff that day and wanted to give it to my Public Defender for filing but I was not allowed to speak to my Public Defender nor was I allowed to speak on my own behalf. Once again I was asked to sign the "Advisement of Legal Rights" and I refused because it was not clear and I had questions that were not being answered and issued that were not being addressed.

1025.  The Minutes from his hearing were woefully inaccurate and my Public Defender was unwilling and unavailable to speak on my behalf about these matters even though I repeatedly advised him of such inaccuracies.

1026.  Traut Defamation Case:  PROOF OF SERVICE OF SUMMONS FILED BY TRAUT LAW GROUP ON 03/02/2010

### March 3, 2009

1027.  Parsa Law Group:  Letter sent to: Ms. Baldwin (by email) re reinstating appeal and being relieved from default.

### March 9, 2010

1028.  Traut Defamation Case:  REQUEST FOR DISMISSAL WITH PREJUDICE - PARTY FILED BY TRAUT LAW GROUP ON 03/09/2010

### March 10, 2010

1029.  Even though I should have been released due to the fact that the time to arraign Plaintiff had expired, I was not released. The "Pre-preliminary" Hearing was scheduled for this

- 186 -

1  date. I tried to bring my prepared Demurrer and Answer to the Complaint to the Courthouse

2  but the WVDC deputy forced Plaintiff remove the two legal documents from my pocket and

3  place them on top of the vending machine in a public area room. She would not let Plaintiff

4  bring the court documents because she said that there was no court order on file for Plaintiff

5  allowing Plaintiff to bring anything but a pocket comb and Bible. [When I returned from court

6  my legal documents were still on top of the vending machine but were unfolded and had been

7  read.]

8      1030.   This the first time my Public Defender, Jeffrey Lawrence (hereinafter referred

9  to as "LAWRENCE") even spoke to Plaintiff even though I had been calling practically every

10  day and he was there when I called. He told his secretary to tell Plaintiff "There is nothing I

11  can do for you until I get into Court." He never even once asked Plaintiff for facts pertaining to

12  the case for which he was assigned to be my legal advocate. A person that is incarcerated has

about five minutes to speak to a Public Defender at each hearing and so time is of the essence.

13      1031.   The first thing LAWRENCE stated to Plaintiff when he met Plaintiff was, "I

14  can't wait to see what nasty things you're going to write about Plaintiff on your blog." He was

15  referring to "The Big Bearian" where I had documented the fact that his co-worker, SMITH,

16  had summarized my case with the BBSD as follows: "This case boils down to the fact that the

17  Big Bear Sheriffs are slapping you around after they slapped you around."

18      1032.   So, in essence, SMITH was admitting that he knew that the BBSD beat Plaintiff

19  up and that they were retaliating against Plaintiff. So when he brought Plaintiff a plea bargain

20  wherein the SBDA wanted Plaintiff to plead guilty to battery on a peace officer, I was

21  outraged and knew I had to fire SMITH and terminate my relationship with the Public

22  Defender's office. I reported these facts on my blog and apparently it was embarrassing for the

23  Public Defender's office as LAWRENCE freely jeopardized his career by making that the

24  focus of his legal representation of Plaintiff while I was incarcerated instead of vigorously

25  defending Plaintiff which is his duty.

26      1033.   Then LAWRENCE took Plaintiff to task in open court for my "reckless

27  behavior in sending emails and posting to forums while incarcerated." I just looked at him in

shock because I couldn't believe how ignorant he was to believe that I could access the

28

- 187 -

Internet from jail. He had printed out a post from "Topix" a local Big Bear forum where someone had posted a comment pretending to be Plaintiff. It was a very sarcastic and ridiculously childish attempt of someone with malicious intent to put Plaintiff down while incarcerated but LAWRENCE actually believed I posted it from jail. I was stunned to think he knew so little about the source of his client base. I demanded a copy of the post and he didn't want to give it to Plaintiff because he had scribbled a note on it stating that I had responded in a sarcastic comment, "I didn't write that!"

1034.   Then he showed Plaintiff an email sent to him by SMITH to point out what he believed were my caustic remarks to SMITH when he was representing Plaintiff in court. Again, I was shocked that LAWRENCE was taking up my short amount of time with him to browbeat Plaintiff about the past relationship I had with the San Bernardino County Public Defender's Office prior to my being incarcerated on the present charge. He was more interested in "evening the score" than he was in doing his job and I was furious.

1035.   During the hearing I also tried to tell LAWRENCE that the warrant I was being held on was not valid; that it was a civil case that had been disposed of and that the case was now on appeal. Thus, the lower court no longer had jurisdiction over the case and the pending bench warrant of $5,000 for a failure to appear at a Default Prove Up Hearing had been vacated. LAWRENCE flat out ignored my request for a copy of the warrant and insisted that he had already researched the matter and that the warrant was valid.

1036..   It has now been shown that the warrant was never valid and I should never have been held on the warrant. As CANTY pointed out, the charge should never have been filed as a felony. The SBDA had to file it as a felony because they had no warrant for my arrest and a felony charge does not require a warrant. The Probable Cause Declaration written by COLLINS was insufficient as well.

1037.   At this hearing, Judge Michael DEST tried to trick Plaintiff into joining all of the cases together with the felony charge for which I was incarcerated. He was hoping to mitigate his liability for intentionally violating my constitutional right prohibiting excessive bail. He presented the option as a way for Plaintiff to earn "credits for time served," but I knew what he was doing. He tried to join all the cases together so he could justify the $500,000 bail.

- 188 -

1  Eventually DEST became frustrated with my unwillingness to go along with something I

2  didn't understand and dropped it and stated he would keep Plaintiff In Pro Per on the other

3  cases.

4      1038.   This is when I began to believe that no matter what I did or said, that I was not

5  going to be released based on sound and reasonable facts or efficient legal representation. The

6  whole purpose of my being incarcerated was to further intimidate Plaintiff to drop my actions

7  against the Whites, the BBSD and now the SBDA and SBCPD.  Even though I should have

8  been released due to the fact that the time to arraign Plaintiff had expired, I was not released.

9  The "Pre-preliminary" Hearing was scheduled for this date. I tried to bring my prepared

10  Demurrer and Answer to the Complaint to the Courthouse but the WVDC deputy forced

11  Plaintiff remove the two legal documents from my pocket and place them on top of the

12  vending machine in a public area room. She would not let Plaintiff bring the court documents

13  because she said that there was no court order on file for Plaintiff allowing Plaintiff to bring

14  anything but a pocket comb and Bible. [When I returned from court my legal documents were

   still on top of the vending machine but were unfolded and had been read.]

15  This the first time my Public Defender, Jeffrey Lawrence ("Lawrence") spoke to Plaintiff even

16  though I had been calling the SBCPD practically every day from jail and he was there when I

17  called. He told his secretary to tell Plaintiff "There is nothing I can do for you until I get into

18  Court." He never even once asked Plaintiff for facts pertaining to the case for which he was

19  assigned to be my legal advocate.

20      1039.   The first thing Lawrence said to Plaintiff when he met Plaintiff was, "I can't

21  wait to see what nasty things you're going to write about Plaintiff on your blog." He was

22  referring to "The Big Bearian" where I had documented the fact that I had fired the SBCPD's

23  in the MSB906348 and the MSB905837 cases when his co-worker, Smith had summarized my

24  case with the BBSD as follows: "This case boils down to the fact that the Big Bear Sheriffs are

25  slapping you around after they slapped you around."  So, in essence, Smith was admitting that

26  he knew that the BBSD beat Plaintiff up and that they were retaliating against Plaintiff.  When

27  Smith brought Plaintiff a plea bargain wherein the SBDA wanted Plaintiff to plead guilty to

28

battery on a peace officer, I was outraged and terminated my relationship with the Public Defender's office.

1040.  I reported these facts on my blog and apparently it was embarrassing for the SBCPD as Lawrence freely jeopardized his career by making that the focus of his legal representation of Plaintiff while I was incarcerated instead of vigorously defending Plaintiff which is his duty.

1041.  During the hearing I also tried to tell Lawrence that the warrant I was being held on was not valid; that it was a civil case that had been disposed of and that the case was now on appeal. Thus, the lower court no longer had jurisdiction over the case and the pending bench warrant of $5,000 for a failure to appear at Contempt hearing had been vacated. Lawrence ignored my request for a copy of the warrant and insisted that he had already researched the matter and that the warrant was valid.

1042.  It has now been shown that the warrant was never valid and I should never have been held on the warrant. As Canty pointed out, the charge should never have been filed as a felony. The SBDA had to file it as a felony because they had no warrant for my arrest and a felony charge does not require a warrant. The Probable Cause Declaration written by Collins was insufficient as well.

1043.  At this hearing, Judge Michael Dest tried to trick Plaintiff into joining all of the cases together with the felony charge for which I was incarcerated. He was hoping to mitigate his liability for intentionally violating my constitutional right prohibiting excessive bail.  He presented the option as a way for Plaintiff to earn "credits for time served," but I knew what he was doing.

1044.  Dest tried to join all the cases together so he could justify the $500,000 bail. I continually denied his offer to help Plaintiff and eventually Dest became frustrated with my unwillingness to change and stated he would keep Plaintiff on an in pro per status on MSB906348 and the MSB905837.

### March 11, 2010

1045.  On this date I spoke with LAWRENCE on the phone and he apologized for his behavior in Court from the day before but it was just a further manipulation. He said he would

- 190 -

1  try and help Plaintiff get a bail reduction hearing with the SBDA but he couldn't guarantee

2  anything.

3      531.    During this telephone call I told LAWRENCE that PAPP had lied to Plaintiff

4  when she came to the jail on February 26, 2010 and told Plaintiff that there was already a list

5  of people waiting to adopt my dogs. I told LAWRENCE that I had spoken to Tammy at the

6  Big Bear Shelter who informed Plaintiff that no one had come in to adopt my dogs. I was

7  outraged that PAPP would lie to Plaintiff to manipulate Plaintiff into pleading out quickly to

8  save my dogs. LAWRENCE stated he would call PAPP and see what he could do for Plaintiff,

9  but again, he "could not make any promises."

10     On this date I spoke with Lawrence on the phone and he apologized for his behavior in

11  Court from the day before but it was just a further manipulation. He said he would try and help

12  Plaintiff get a bail reduction hearing with the SBDA but he couldn't guarantee anything.

13     During this telephone call I told Lawrence that PAPP had lied to Plaintiff when she

14  came to the jail on February 26, 2010 and told Plaintiff that there was already a list of people

15  waiting to adopt my dogs. I told Lawrence that I had spoken to Tammy at the Big Bear Shelter

16  who informed Plaintiff that no one had come in to adopt my dogs. Lawrence stated he would

17  call Papp and see what he could do for Plaintiff, but again, he "could not make any promises."

### March 12, 2010

18     532.    The Preliminary Hearing was scheduled for this date but was vacated without

19  my consent, knowledge or explanation. In the 32 days I was incarcerated I was never given a

20  preliminary hearing which is required by law within 10 court days of the arraignment. That

21  date came and went on March 16, 2010 and I wasn't released until March 28, 2010. In

22  addition, a Judge ever formally charged Plaintiff with a crime.

23     533.    The SBDA falsely stated in the Minutes that I had waived time on the case for

24  which I was incarcerated which I did not do.

25  The Preliminary Hearing was scheduled for this date but was vacated without my consent,

26  knowledge or explanation.

27  In the 32 days I was incarcerated I was never given a preliminary hearing which is required by

28  law within 10 court days of the arraignment. That date came and went on March 16, 2010 and

- 191 -

1  I wasn't released until March 28, 2010. In addition, a Judge never formally charged Plaintiff

2  with a crime.

3  **March 15, 2010**

4  534.    Although I have been incarcerated twenty (20) days, this is the first time

5  WVDC allows Plaintiff to go to the law library even though I have informed them on

6  numerous occasions that I am an In Pro Per litigant in two pending criminal actions. Under the

7  law I am entitled to four hours per week in the law library if I am representing myself in

8  pending cases, but WVDC prohibited Plaintiff from exercising my rights.

9  535.    On this date, I prepared and mailed a "Request for Continuance of the Trial

10  Readiness Conference and the Trial" in MSB906348 to the San Bernardino County Superior

11  Court directed to Judge Katrina West (Department set for the Trial Readiness Conference) and

12  Judge Kyle Brodie (Department set for Trial). I also sent a service copy to the SBDA attention

13  ROBBINS. The trial and trial readiness conference were scheduled for the first week of April

14  and I requested that they be continued for ninety (90) days or until I had the present matter of

15  FSB1000897 resolved and I was out of custody. I never heard back from the Court nor was I

16  permitted any other visits to the law library to find out the status of my requests.

17  Although I have been incarcerated 20 days, this is the first time WVDC allowed Plaintiff to go

18  to the law library as an in pro per litigant in two pending criminal actions. Under the law I am

19  entitled to four hours per week in the law library if I am representing myself in pending cases,

20  but WVDC prohibited Plaintiff from exercising my rights.

21  On this date, I prepared and mailed a "Request for Continuance of the Trial Readiness

22  Conference and the Trial" in MSB906348 to the San Bernardino County Superior Court

23  directed to West and Brodie.  I also sent a service copy to the SBDA attention Robbins. The

24  trial and trial readiness conference were scheduled for the first week of April and I requested

25  that they be continued for ninety (90) days or until I had the present matter of FSB1000897

26  resolved and I was out of custody.

27  I never heard back from the Court nor was I permitted any other visits to the law library to find

28  out the status of my requests.

**March 18, 2010**

- 192 -

1    Traut Defamation Case:  ANSWER TO COMPLAINT FILED BY YAHOO! INC ON
2    03/18/2010

3        I attended a hearing scheduled to reduce my bail and this time I was heard by yet
4    another magistrate, Judge Donna Garza-Gunnell ("Garza").

5        Canty attempted to convince Plaintiff that my best interests would be served by re-
6    hiring the SBCPD to represent Plaintiff in all the cases. He stated that my negotiating position
7    would be strengthened by combining the cases and that the SBDA would be much more
8    willing to offer Plaintiff a deal. I told Canty I would be willing to combine the cases "after the
9    deal offered by the SBDA" was presented to Plaintiff for my evaluation. All of a sudden "the
10   deal" vanished and "the DA doesn't have your file with him."

11       Once again, just as Dest had done on March 10, Garza attempted to join all the cases
12   together. I once again adamantly objected. As the bail issue came before Garza, the SBDA lied
13   to GARZA that I was being held in custody on MSB906348 and the MSB905837.  Of course I
14   didn't know this was the discussion in front of the judge and I couldn't hear what was being
     said. The result made the issues discussed apparent.

15       Garza did something I found hard to believe.  She reduced the bail from the grossly
16   elevated amount of $500,000 back to where it should have been to $50,000. Then she took the
17   two cases everyone had been trying to join together and added bail on to them so that I had no
18   choice but to be held in custody on all three cases.

19       The first case she added bail to was MSB906348 and I had been released on my own
20   recognizance on October 9, 2009 and had been out acting as my own attorney for almost five
21   months. Garza removed the "O/R" status and added $10,000 bail to hold Plaintiff in custody
22   on that case.

23       The second case she added bail to was MSB905837 in connection with the alleged
24   battery of Krueger reported by the Whites.  It was such a fraudulent complaint that the SBDA
25   had not even filed a formal Complaint on the matter. I had never been in custody on this matter
26   and was never even issued a Citation on the date of the incident because there was no crime.
27   But Garza didn't care and went ahead and added $10,000 bail to hold Plaintiff in custody on
28   that case as well.

- 193 -

COMPLAINT FOR MONEY DAMAGES, DECLARATORY & INJUNCTIVE RELIEF FOR 42 U.S.C. §1983 CLAIMS, ETC. (AGTG)

It didn't seem to matter that West had given Plaintiff the right to act as my own attorney in MSB906348 and the MSB905837. Every time I tried to speak and stand up for myself I was pushed out the door of the courtroom and told to "shut up." My Public Defender was working against Plaintiff, the SBDA had all the cases joined together and Garza was setting a Preliminary Hearing for April 8 (42 days after I was incarcerated) and a trial date for May 10.

I tried to tell GARZA that my date for the Preliminary Hearing had already expired and that the date she had set for the Preliminary Hearing (April 8) was the date that was previously set for trial date. However, at this point she was so dazed and confused that she just called the next case and ignored Plaintiff.

I was going to be held in custody for at least two more months with no hope in sight. I would never be released if I did not plea out; I was being steamrolled.

Every day after the March 18 hearing I put out an Inmate Request Slip asking that an Internal Review Board evaluate my release date as I had not been given a Preliminary Hearing. I didn't think I was going back to court until April 8 but one day I was randomly informed by WVDC Inmate Services that I was going back to Court on March 24, 2010.

536.    Hearing scheduled to reduce my bail and this time I was heard by yet another magistrate, Judge Donna Garza-Gunnell (hereinafter referred to as "GARZA"). Public Defender CANTY attempted to convince Plaintiff that my best interests would be served by re-hiring the Public Defender's office to represent Plaintiff in all the cases. He stated that my negotiating position would be strengthened by combining the cases and that the SBDA would be much more willing to offer Plaintiff a deal. I told CANTE I would be willing to combine the cases "after the deal offered by the SBDA" was presented to Plaintiff for my evaluation. All of a sudden "the deal" vanished and "the DA doesn't have your file with him."

537.    Once again, just as DEST has done on March 10, GARZA attempted to join all the cases together. I once again adamantly objected. As the bail issue came before GARZA, the SBDA lied to GARZA that I was being held in custody on other charges. Of course I didn't know this as the discussion was in front of the judge and I couldn't hear what being said. The result made the issues discussed apparent.

538.  GARZA did something I found hard to believe. She reduced the bail from the grossly elevated amount of $500,000 back to where it should have been to $50,000. Then she took the two cases everyone had been trying to join together and added bail on to them so that I had no choice but to be held in custody on all three cases.

539.  The first case she added bail to was MSB906348 in connection with the BBSD's beating in custody. I had been released on my own recognizance on October 9, 2009 and had been out acting as my own attorney for almost five months. GARZA removed the "O/R" status and added $10,000 bail to hold Plaintiff in custody on that case.

540.  The second case she added bail to was MSB905837 in connection with the alleged battery of KRUEGER reported by THE WHITES. It was such a fraudulent claim that the SBDA had not even filed a formal Complaint on the matter. I had never been in custody on this matter and was never even issued a Citation on the date of the incident because there was no crime. But GARZA didn't care and went ahead and added $10,000 bail to hold Plaintiff in custody on that case as well.

541.  So, now the cases were all joined just as everyone had hoped and I was royally screwed. Every time I went to open my mouth and stand up for myself I was pushed out the door of the courtroom and told to "shut up." My Public Defender was working against Plaintiff, the SBDA had all the cases joined together and GARZA was setting a Preliminary Hearing for April 8 and a trial date for May 10. I tried to tell GARZA that my date for the Preliminary Hearing had already expired and that the date she had set for the Preliminary Hearing (April 8) was the date that was previously set for my trial date. However, at this point she was so dazed and confused that she just called the next case and ignored Plaintiff.

542.  I was going to be held in custody for at least two more months with no hope in sight. I would never be released if I did not plea out; I was being steamrolled.

**March 18, 2010**

543.  Every day after the March 18 hearing until a signed a plea bargain on March 26, 2009, I put out an Inmate Request Slip asking that an Internal Review Board evaluate my release date as I had not been given a Preliminary Hearing. I didn't think I was going back to

- 195 -

court until April 8 but one day I was randomly informed by WVDC Inmate Services that I was going back to Court on March 24, 2010.

### March 23, 2010

Traut Defamation Case: CASE MANAGEMENT STATEMENT FILED BY YAHOO! INC ON 03/23/2010

### March 26, 2010

544. I signed a plea bargain written by the SBDA on this date and in front of DEST, SPENCER and CANTE. I agreed to plead guilty to one count of misdemeanor "disturbing the peace" in Case No. MSB905837. I agreed to plead guilty to one count of misdemeanor "resisting arrest" in Case No. MSB906348. The SBDA dismissed FSB1000789 (the charge of assault with a deadly weapon and the only reason I was incarcerated) in its entirety. I also agreed to three years of summary probation, to pay court fees in the amount of $384, and to not contact the SBDA, San Bernardino Sheriffs CROW, THE WHITES, and KRUEGER for any reason other than to report a crime, to coordinate the return of my property, or in connection with a civil case proceeding.

545. I didn't disturb the peace nor did I resist arrest. I had no choice but to sign a plea bargain, I could not win. I was locked up, shut up and had no legal representation nor was I allowed to go to the law library. I could not get a consistent or fair judicial examination of the charge against Plaintiff nor were my constitutional rights acknowledged, respected, or given any merit. Lies and manipulation were at center stage and I had no voice to combat them.

546. The SBDA, San Bernardino Sheriffs, CROW, THE WHITES, or KRUEGER are not victims of any criPlaintiff. Rather, they are the instigators of perverse crimes includingfelony perjury, conspiracy, collusion, intentional obstruction of justice, malicious prosecution to name just a few.

547. The SBDA continued to use the false $5,000 bench warrant to hold Plaintiff in custody at WVDC until Sunday night. On the day of my release from jail, Orange County Court officials "decided not to come and pick Plaintiff up on the warrant" and instead I was cite-release and order to appear in Orange County Superior Court on June 6, 2010. There was

- 196 -

never a valid warrant for my arrest. If there had been it would have been effectuated many times prior to my arrest on February 25, 2010. My license had been run many times by BBSD and it never showed up.

548.     However, just prior to my February 25 arrest, I was placing a lot of pressure on the attorneys at BKGG and on Judge MILLER to validate the court order awarding PARSA $605,000 in the civil defamation lawsuit against Plaintiff and my blog. The bench warrant that falsely held Plaintiff in custody was from that case. BKGG and MILLER have a lot to lose and they are no doubt at the heart of my current challenges.

I signed a plea bargain written by the SBDA on this date and in front of Dest, Spencer and Canty, I agreed to plead guilty to one count of misdemeanor "disturbing the peace" in Case No. MSB905837.

I agreed to plead guilty to one count of misdemeanor "resisting arrest" in Case No. MSB906348.

The SBDA dismissed FSB1000789 (the charge of assault with a deadly weapon and the only reason I was incarcerated) in its entirety.

I also agreed to three years of summary probation, to pay court fees in the amount of $384, and to not contact the SBDA, San Bernardino Sheriffs, Crow, the Whites, and Krueger for any reason other than to report a crime, to coordinate the return of my property, or in connection with a civil case proceeding.

I didn't disturb the peace nor did I resist arrest. I had no choice but to sign a plea bargain, I could not win. I had no legal representation nor was I allowed to go to the law library. I could not get a consistent or fair judicial examination of the charge against nor were my constitutional rights acknowledged, respected, or given any merit. Lies and manipulation were at center stage and I had no voice to combat them.

The SBDA, San Bernardino Sheriffs, Crow, the Whites, and Krueger are not victims of any crime. Rather, they are the instigators of perverse crimes including felony perjury, conspiracy, collusion, intentional obstruction of justice, and malicious prosecution to name just a few.

The SBDA continued to use the false $5,000 bench warrant to hold Plaintiff in custody at WVDC until Sunday night. On the day of my release from jail, Orange County Court officials

- 197 -

# COUNT I

Violation of Federal Civil Rights (42 U.S.C. § 1983)

## First Amendment

As to All Defendants

100.    Plaintiff claims that Defendants violated her civil rights by intentionally, willfully, knowingly, recklessly and maliciously acting or purporting to act in the performance of their official duties and in violation of Plaintiff's First Amendment rights including Plaintiff's right (a) to freedom of speech without prior restraint; (b) to speak critically of the government; (c) to publish anonymously; (d) to protection from strategic lawsuits against public participation; (e) to freedom of the press; (f) to petition the government for a redress of grievances; (g) to peaceably assemble for the purpose of petitioning the government for a redress of grievances; and (h) to associate with others similarly situated.

100.    Pursuant to *Dennis v. Sparks*, 449 U.S. 24 (1980), private parties in collusion with public entities, officials and employees, <u>also act under color of law for the purposes of claims under 42 U.S.C §1983</u>.  As such, Plaintiff also claims that private party Defendants in this action acted in collusion with public officials to violate her rights by intentionally, willfully, knowingly, recklessly and maliciously acting to violate Plaintiff's First Amendment rights including Plaintiff's right (a) to freedom of speech without prior restraint; (b) to speak critically of the government; (c) to publish anonymously; (d) to protection from strategic lawsuits against public participation; (e) to freedom of the press; (f) to petition the government for a redress of grievances; (g) to peaceably assemble for the purpose of petitioning the government for a redress of grievances; and (h) to associate with others similarly situated.

100.    *United States v. Price* (383 U.S. 787, 794 (1966); 398 U.S., at 152) held: "A private party involved in such a conspiracy, even though not an official of the State, can be liable under 1983. Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents,'

100.    In *Lovell v. City of Griffin* (303 U.S. 444 (1938)), United States Supreme Court

- 288 -

Chief Justice Hughes defined the press as, "every sort of publication which affords a vehicle of information and opinion."

100.    In *California Motor Transport Co. v. Trucking Unlimited* (404 U.S. 508 (1972)), the United State Supreme Court held that the right to petition the government: "extended to all three branches of government: the Congress, the executive <u>and the judiciary</u>.

100.    In *NAACP v. Alabama* (357 U.S. 449 (1958)), the United States Supreme Court acknowledged that the freedom to associate was not explicitly protected in the First Amendment, but that "the freedom of association is a fundamental right protected by it."

100.    In violating Plaintiffs' rights as set forth above and other rights that will be proven at trial, Defendants acted under color of state law and restrained or denied Plaintiff's rights (a) to freedom of speech without prior restraint; (b) to speak critically of the government; (c) to publish anonymously; (d) to protection from strategic lawsuits against public participation; (e) to freedom of the press; (f) to petition the government for a redress of grievances; (g) to peaceably assemble for the purpose of petitioning the government for a redress of grievances; and (h) to associate with others similarly situated conducted.  The illegal restraint or denial of Plaintiff's rights under the First and Fourteenth Amendments to the Constitution of the United States.

100.    As a direct and proximate result of the violation of the constitutional rights of Plaintiff by Defendants, Plaintiff suffered general and special damages as alleged in this Complaint and are entitled to relief under 42 U.S.C §1983.

100.    The conduct of Defendants was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

**Violation of Federal Civil Rights (42 U.S.C. § 1983)**

**<u>Fourth Amendment</u>**

As to All Defendants

100.    Plaintiff claims that Defendants violated her civil rights by intentionally, willfully, knowingly, recklessly and maliciously acting or purporting to act in the performance of their official duties and in so doing violated Plaintiff's Fourth Amendment rights including

- 289 -