Erin K. Baldwin
Post Office Box 3141
Beaumont, CA 92223
(951) 333-1484
erinbaldwin@rocketmail.com
Plaintiff *Pro Se*

FILED
CLERK, U.S. DISTRICT COURT

SEP 28 2011

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

ERIN K. BALDWIN, an Individual

Plaintiff,

v.

BANK OF AMERICA CORPORATION, Sandor Samuels; CALIFORNIA ATTORNEY GENERAL; Kamala Harris; Edmund G. Brown; THE STATE BAR OF CALIFORNIA; CLIENT SECURITY FUND; Robert A. Hawley; Paul O'Brien; Thomas Layton; John Noonen; Douglas Winthrop; Howard Miller; William Hebert; Joseph L. Dunn; Judy Johnson; Gwen Moore; Jon Streeter; Jeannine English; THE CALIFORNIA DEPARTMENT OF REAL ESTATE; THE RECOVERY ACCT.; Traci Stevens; Jeff Davi; Barbara Bigby; Steven Ellis; Wayne Bell; Dionne Young; Erik Duckworth; COUNTY OF ORANGE; ORANGE COUNTY BOARD OF SUPERVISORS; ORANGE COUNTY DISTRICT ATTORNEY; ORANGE COUNTY PUBLIC DEFENDER; ORANGE COUNTY SHERIFF'S DEPARTMENT; Nicholas Chrisos; Thomas Mauk; Steve Dunivent; William Campbell; John M.W. Moorlach; Janet Nguyen; Shawn Nelson; Patricia Bates; Tony Rackauckas; Joseph D'Agostino; Elizabeth Henderson; Deborah A. Kwast; Frank Ospino; Jean Wilkinson; Denise Gragg; Martin F. Schwarz; Jennifer L. Nicolalde; Sandra Hutchens; Brian Cossairt; Wilfred Moreno; COUNTY OF SAN BERNARDINO; SAN BERN-ARDINO COUNTY BOARD OF SUPERVISORS; SAN BERNARDINO DISTRICT ATTORNEY; SAN BERNARDINO PUBLIC DEFENDER; SAN BERNARDINO COUNTY SHERIFF'S DEPART-MENT; Jean R. Basle; Ruth Stringer; Gregory C. Devereaux; Josie Gonzales; Brad Mitzelfelt; Neil F. Derry; Janice Rutherford; Gary Ovitt; Michael

Case No. 5:11-CV-01300-DOC-SP

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES & DECLARATORY & INJUNCTIVE RELIEF RE VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS UNDER THE FIRST, FOURTH, FIFTH, SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATED CONSTITUTION AND**
PLAINTIFF's NOTICE TO THE COURT WITHHOLDING CONSENT TO REFERRAL TO MAGISTRATE

**Demand for Jury Trial**
and
Request for Court-Appointed Counsel

**Claims Under 42 USC §1983**
**&**
**California State Law Claims**
*(Pursuant to Supplemental Jurisdiction)*

**FIRST AMENDED COMPLAINT**

**TO COLLATERALLY ATTACK & TO VACATE AS VOID AB INITIO THE DEFAULT, DEFAULT JUDGMENT, CIVIL CONTEMPT CITATIONS AND PERMANENT INJUNCTION**

| | |
|---|---|
| 1 | Ramos; Jim Hackleman;  Dennis Christy; Scott Byrd; Patrick Christianson; Laura Robles; William |
| 2 | Gale; Jonathan Robbins; Melinda Spencer; Timothy Dixon; Doreen Boxer; Lauri Ferguson, Phyllis |
| 3 | Morris; Geoffrey Canty; Jeffrey Lawrence; Mark Shoup; Kawika Smith; Rodney Hoops; Gregory |
| 4 | Garland; Erroll Bechtel; Jay Blankenship; Lori Bachelor; Douglas Wolfe; Craig Harris; Detective |
| 5 | Kruger; Bryan Lane; Jeremy King; Christopher Morsch; Alexander Collins; Michael McCracken; |
| 6 | Michael Broadhurst; Brian Shedd; Deputy J. Long; Deputy J. Massey; Kelly Papp; Doug Smith; CITY |
| 7 | OF BIG BEAR LAKE; Rick Herrick;  Elizabeth Harris; Bill Jahn; Darrell Mulvihill; Michael Karp; |
| 8 | **THOMAS V. GIRARDI; SARAH L. OVERTON; FRANZ E. MILLER, _in his_** |
| 9 | **_individual capacity as an adjunct professor of law at Whittier Law School_; Stacie Turner; Jodi Roa;** |
| 10 | **Janet Taylor;** CENTURY LAW GROUP LLP; Paul Virgo; Edward O. Lear; WHITTIER LAW |
| 11 | SCHOOL; Sharon Herzberger; Penelope L. Bryan; John Fitzgerald; PARSA LAW GROUP, APC; |
| 12 | James M. Parsa; Deborah Parsa, Arash Dastmalchi; Michael Ponzillo; Roya Rohani; Martin Andelman; |
| 13 | Julie Greenfield; Marilyn Moberg; STARBUCKS, INC; Paula E. Boggs, Dena Davis, Krista Osborne; |
| 14 | BURKHALTER, KESSLER, GOODMAN & GEORGE LLP; Alton G. Burkhalter; Daniel  J. |
| 15 | Kessler; Eric J. Goodman; Gregory C. Clement; Michael Oberbeck; Rosamund Lockwood; Amanda |
| 16 | McLaughlin; David A. Berstein; Nicholas D. Myers; Nicholas P. Kohan; M. Masha Rohani; |
| 17 | UDR, INC; UNITED DOMINION REALTY, L.P.; UDR WESTERN RESIDENTIAL, INC; UDR |
| 18 | VILLA VENETIA APARTMENTS, L.P.; UDR CALIFORNIA PROPERTIES, LLC; UDR |
| 19 | CALIFORNIA G.P., II, LLC; James Klingbeil; Thomas W. Toomey; Lynne Sagalyne; Mark |
| 20 | Sandler; Warren L. Troupe; David L. Messenger; Richard Giannotti; Melissa Hurtado; Tracy L. |
| 21 | Saffos; Karisa Harmon; Debi Froude; SOLUTION LAW GROUP, LLC; SOLUTION PROCESSING, |
| 22 | LLC; Jeffrey A. Cancilla; Craig M. Laverty; TRAUT LAW GROUP; Eric V. Traut; James Traut; |
| 23 | TODD A. BRISCO & ASSOCIATES, APC; Todd A. Brisco; Cynthia S. Poer; Daniel Coor; KEITH D. |
| 24 | WHITE; PATRICIA A. WHITE; JANE HEWITT; JASON L. CROW; MICHAEL P. DOLAN; |
| 25 | AUTOMATTIC, INC; Matthew Mullenweg; Toni Schneider; Scott Dettmer; Thomas Villeneuve; THE |
| 26 | GO DADDY GROUP, INC; Warren Adelman; Robert  Parsons; CSL COMPUTER SERVICE |
| 27 | LANGENBACH, GmbH; and DOES 1 through 200, inclusive:    _**Defendants**_ |
| 28 | |

<u>**Second Amended Complaint**</u>

1.   Malicious Prosecution & Seizure

2.   Excessive Bail & Fines

3.   Concealment of Evidence

4.   Fabrication of False Evidence

5.   Making False Public Statements

6.   Monell Claims

7.   Failure to Supervise & Control

8.   Conspiracy

9.   Excessive Force

10.  California Government Code §815.

11.  False Arrest & Imprisonment

12.  Legal Malpractice

13.  Breach of Fiduciary Duty (Attorney)

14.  Professional Negligence

15.  Conspiracy to Commit Legal Malpractice

16.  Conspiracy to Engage in Breach of Fiduciary Duty

17.  Conpiracy to Engage in Professional Negligence

18.  Conversion

19.  Fraud & Deceit

20.  Constructive Fraud

21.  Intentional Misrepresentation

22.  Constructive Trust & Equitable Lein

- 2 -

## A.    NATURE OF THE ACTION

1.      Plaintiff, Erin K. Baldwin, is an investigative reporter and journalist *("Plaintiff")* who wrote and published truthful articles and reports about matters of great public concern strictly for the benefit of California consumers and tenants and and anonymously to avoid retaliation. Plaintiff's articles and reports constitute "protected speech" under the First Amendment to the United States Constitution and accordingly, are immune from defamation lawsuits, injunctions restraining her speech, and retaliation.

2.      Beginning in late 2008, Plaintiff noticed a series of events unfolding that appeared to be intentional fraud against consumers. As a public service, Plaintiff documented this series of events in a public forum to inform and warn California homeowners and renters.The series of events included:

a.      An unusually large number of Californians qualifying for no down-payment, 3-year interest-only sub-prime mortgage loans, they could barely afford, leading to ..

b.      "post-3-year interest-only" mortgage loan defaults on the increase adversely affecting California's foreclosure rate, and in turn Plaintiff watched the significant flow of new renters into the California marketplace.

c.      Still, plenty of homeowners sought loan modifications and relied on the California Foreclosure Consultants Act to protect them.

d.      This law (codified in California Civil Code §2945, et seq.) prohibited the collection of fees in advance of work performed from consumers, by all loan modification service providers except attorneys.

e.      As a direct result, "non-attorneys" (predominately the subprime mortgage brokers who had sold the defaulting home loan to the consumer in the first place) associated with attorneys so they could also collect advanced fees.

f.      Attorneys started lending their law licenses to non-attorneys for a percentage of fees collected.  However, this association was in name only; the attorney rarely performed the work and homeowners were losing their homes everyday.

- 3 -

g.    Consumers reasonably assumed they had retained a lawyer qualified to assert the proper affirmative defenses required to effectively negotiate a loan modification, because they signed a "Legal Retainer Agreement," and paid upwards to $5,000 in advance.

h.    Plaintiff was shocked at the complete denial and lack of action taken by the California State Bar and California Department of Real Estate; two entities required by law to monitor and discipline its members to protect consumers.

i.    heightened unemployment rates and small business failure; to

j.    the drying up of the credit market and resulting crash in home values; to seeming ambivalence and disregard for consumer safety.

3.    Plaintiff's investigative reports and journalistic articles wrote extensively about the above-stated series of events which naturally:

a.    Exposed the corruption and lack of consumer protection at Defendants CAG, CSB and DRE with respect to California loan modification services;

b.    Reported on the collusory relationship between Defendants CAG, CSB and DRE, the result of which intentionally defrauded California consumers in foreclosure; and

c.    Announced she was interested in pursuing a Writ of Mandate on behalf of California consumers to facilitate restitution by Defendants CAG, CSB and DRE for the harm caused to consumers by not monitoring and/or disciplining its attorney members.

d.    Demanded that the restitution to be paid to consumers via Defendant CSB's "Client Security Fund" and Defendant DRE's "Recovery Account."

4.    Nearly 185,000 consumers read Plaintiff's investigative reports and journalistic articles in less than six months and she received countless notes of gratitude, relief and joy to find a source of information that was one hundred percent absent a profit motive and dared to write about the reality of the loan modification and rental marketplaces. However, Plaintiff has paid an enormous price for her journalistic endeavors to help others; and that is the subject of this Complaint.

5.    In retaliation of Plaintiff's reports and articles, Defendants named herein (and others to be named) violated Plaintiff's constitutional rights by bringing defamation lawsuits, issuing and enforcing restraining injunctions and monetary judgments, and retaliated against

- 4 -

1    Plaintiff personally and in civil and criminal court.  Defendants' actions intentionally and

2    maliciously deprived Plaintiff of her constitutional rights.

3        6.    Plaintiff brings the herein action to federal court for redress of violations

4    described in ¶2, *supra,* on the authority of federal legislation, 42 U.S.C. §1983, that states:

5        *"Every person who, under color of any statute, ordinance, regulation,*
     *custom, or usage, of any State or Territory or the District of Columbia,*
6        *subjects, or causes to be subjected, any citizen of the United States or other*
     *person within the jurisdiction thereof to the deprivation of any rights,*
7        *privileges, or immunities secured by the Constitution and laws, shall be liable*
     *to the party injured in an action at law, suit in equity, or other proper*
8        *proceeding for redress, except that in any action brought against a judicial*
     *officer for an act or omission taken in such officer's judicial capacity,*
9        *injunctive relief shall not be granted unless a declaratory decree was violated*
     *or declaratory relief was unavailable..."*
10

11       7.    Defendants named herein (and others to be named) are: (a) public entities,

12   officials, and employees that acted under color of state law; and (b) private parties that acted in

13   collusion with said public officials.  In, *Dennis v. Sparks,* 449 U.S. 24 (1980), the United

14   States Supreme Court held that private parties acting in collusion with public entities, officials

15   and employees, also act under color of law for the purposes of 42 U.S.C §1983 claims, to wit:

16       *"Private persons, jointly engaged with state officials in a challenged*
     *action, are acting "under color" of law for purposes of 1983 actions. And the*
17       *judge's immunity from damages liability for an official act that was allegedly*
     *the product of a corrupt conspiracy involving bribery of the judge does not*
18       *change the character of his action or that of his co-conspirators."*

19       8.    As a result of Defendants' actions, Plaintiff has suffered deprivation of rights

20   guaranteed to her under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to

21   the United State Constitution.  Plaintiff has also suffered the loss of all her personal property

22   on two separate occasions; her car; her job; the companionship of her two dogs; economic

23   harm; physical and emotional harm; irreparable damage to her reputation; and has incurred

24   substantial loss of income defending herself against the civil and criminal cases set forth in the

25   "Statement of Facts," and other actions that Defendants knew were baseless.

26       9.    Defendants knew that the criminal charges and civil actions against Plaintiff

27   were completely and utterly unsupported by probable cause and were based on fabricated

28   and/or concealed evidence, reliance upon and the repeating and enchancement of false public

- 5 -

statements both written and oral which statements greatly prejudiced Plaintiff's ability to overcome the sometimes overwhelming legal, personal and professional attacks.

10. Defendants' actions evidenced a reckless and callous disregard for and deliberate indifference to Plaintiff's constitutional rights, state law, and their respective fiduciary duties to Plaintiff, as well as their responsibility to the criminal justice system, the requirement of coming into each action with clean hands (and staying that way), and the very nature of the proper administration of justice.

11. The actions of the Defendants named herein (and perhaps others to be named in the future), individually and in concert, maliciously conspired to bring criminal charges and civil litigation against Plaintiff as a part of a premeditated plan to discontinue the publication of extremely accurate, fact-based and legally-substantiated investigative reports and journalistic articles about matters of great public concern, that expose their unlawful conduct that is dangerous to California consumers and tenant.

12. As such, Defendants' actions interfered in Plaintiff's ability to warn consumers in foreclosure of the many pitfalls associated with modifying a loan; as well as consumers who had already lost their homes and were re-entering the rental marketplace for the first time in a very long time. Said interference was not subtle, courteous and respectful. As will be demonstrated herein, it was vicious, inhumane, criminal, malevolent and immoral and without one shred of justification. The plain fact is that when criminal cash flow is interrupted someone has to pay and that someone was Plaintiff and for that Plaintiff seeks a remedy.

13. In addition, due to Defendants' policies, customs, practices and supervisory misconduct, other persons similarly situated as Plaintiff, are also at risk. Ironically, this was the very subject of many of Plaintiff's reports and articles Defendants sought to destroy. Plaintiff also seeks an order and permanent injunction as set forth in detail, *infra,* to protect all journalists, investigative reporters, and average, everyday citizens like Plaintiff who only desires the freedom to exercise her constitutional rights without abject terror of further retaliation, loss of liberty, property, economic stability, love, companionship and a sense of purpose.

- 6 -

14.     This Complaint also seeks to prohibit further acts by Defendants separately, or in concert, with others named and/or not named, to prejudge and predetermine the outcome of any cases involving Plaintiff. Plaintiff is informed and believes and thereon alleges that certain Defendants acted in concert to prejudge and predetermine the outcome of the criminal and civil cases against Plaintiff set forth in Part I of the "Statement of Facts."

15.     None of these Defendants had any jurisdiction or power to do so, or to corruptly influence the outcome of any of the cases brought against Plaintiff. Nonetheless, all of the conduct by these Defendants was done sub rosa and as such, was and continues to be extremely prejudicial to Plaintiff. It is difficult enough to face a legal controversy *pro se*, but to do so with knowledge that no matter how hard you work to present an ethical and valid argument, your efforts will be in vain. This has been the unconscionable environment in which Plaintiff has lived for almost three (3) years now and so, Plaintiff appears here to find a remedy for her claims and prays that her status as a *pro se* litigant will not bar the unfettered access to a redress of her grievances in federal court.

16.     Plaintiff believes it is important to note at this point that when Senate Bill 94 was enacted prohibiting all loan modification service providers from collecting fees in advance for services rendered, said prohibition had an expiration date, January 1, 2013. In a little over a year there will be a new wave of unprecedented consumer fraud. Plaintiff fears that Defendants CAG, CSB, and DRE have not taken advantage of the moratorium granted so that they could put into place regulatory devices to protect consumers. Plaintiff mentions this fact here as an alert to the Court that time is of the essence; all unconstitutional injunctions currently in place against her must be lifted so that she can once again serve the public by writing important investigative reports and journalistic articles on subjects of great public concern. Plaintiff also requests that the Court order injunctions against Defendants named herein so that further retaliation against Plaintiff will cease.

17.     Under *Monroe v. Pape*, a plaintiff is not required to exhaust any available state court remedies before invoking Section 1983, because the purpose of this statute is to open federal courts to claims that federal rights were violated. (Monroe v. Pape, 365 U.S. 167 (1971); (*See, also, McNeese v. Bd. of Educ.*, 373 U.S. 668 (1963)). As well, under *Patsy v.*

- 7 -

*Board of Regents*, the Court excused plaintiff's failure to raise an employment discrimination claim in a state administrative proceeding. (Patsy v. Bd. of Regents, 457 U.S. 496 (1982)). Pointing to Section 1983's purpose of opening the federal courts to plaintiffs seeking the vindication of federal rights, the Court ruled that Congress had not intended that plaintiffs first exhaust any available state administrative remedies.

18.   This is a civil action for monetary damages and declaratory and injunctive relief under 42 U.S.C. §1983 and common law claims under the Constitution of the State of California. Plaintiff herein requests a stay on proceedings for all related matters against Plaintiff until the herein action is resolved, namely, *Parsa Law Group v. Bad Biz Finder, et al.*, Orange County Superior Court Case No. 30-2009-00117752; *and* (b) *UDR, Inc. v. Erin Baldwin, et al.*, Orange County Superior Court Case No. 30-2009-00125305.

19.   Plaintiff herein demands a jury trial and requests court-appointed counsel.

20.   Plaintiff herein requests the privilege to file all further documents electronically and to receive documents electronically.

21.   In addition, Plaintiff herein requests an Order of the Court granting Plaintiff permission to serve Defendants the herein First Amended Complaint by mail. Although Plaintiff is working, the cost to personally serve all Defendants named herein is cost prohibitive to Plaintiff and this Order of the Court would he greatly appreciated. Plaintiff also wishes to acknowledge her understanding of the term "economy of judicial resources," and respects same. Each and every Defendant has been named for a specific purpose and is vital to the adjudication of the issues herein.

22.   Plaintiff herein notifies the Court that she withholds consent to referral to a Magistrate Judge, that she was not advised upon filing of her original Complaint that she had an option to withhold consent to a magistrate. Plaintiff is now informed that it is standard protocol to receive the United States District Court Form, "Notice, Consent, and Reference of a Civil Action to a Magistrate Judge," upon filing an actin. Plaintiff suggests that this oversight be overcome by her statement herein that she strongly exercises her right to withhold consent to a magistrate and requests; rather, that a Magistrate Judge be assigned for all discovery purposes instead.

23.     On August 25, 2011 Plaintiff filed an Opposition to "Order of the Court Re Notice of Reference to a United States Magistrate Judge," dated August 16, 2011.  Within said Opposition, Plaintiff gave Notice of her intent to file this First Amended Complaint, a Request for Electronic Filing Privileges, and Notice of a 170.1 Challenge of Orange County Superior Court Judge Franz E. Miller.  To date, Magistrate Pym has not ruled on said Opposition or acknowledged receipt of same.  Therefore, Plaintiff respectfully reinstates her requests and notices as stated therein.

24.     Finally, Plaintiff herein notifies the Court that she filed claims with The County of Orange and the County of San Bernardino prior to filing the herein action; and both claims were rejected in whole.

## B.     JURISDICTION AND VENUE

25.     Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-24 of this Complaint.

26.     This action arises under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as corollary articles and sections of the Constitution of the State of California, 42 U.S.C. §1983, California law.

27.     This Court has original jurisdiction over Plaintiffs' constitutional and federal law claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a).

28.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described by Plaintiffs' federal claims, and independent original jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1332 because this action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

29.     Venue is proper in the Central District of California pursuant to 28 U.S.C. §§1391(b)(1), (2), and (3), because most or all of the Defendants reside and may be found in the Central District of California and a substantial part of the events giving rise to these claims occurred in the Central District of California.

/ / /

- 9 -

## C.   PARTIES TO THE ACTION

30.   Bank of America *("Defendant BOA")* is the single largest beneficiary of mortgage fraud in California, due, in large part, to its collusory relationship with the California Attorney General's Office *("Defendant CAG")*, the California State Bar *("Defendant CSB")*, and the California Department of Real Estate *("Defendant DRE")*, the mutual objective of which is to defraud California consumers for financial gain.

31.   Due to the fact that Plaintiff is neither an attorney nor real estate professional, Defendants CAG, CSB, and DRE have no jurisdiction over her.  As a result, Plaintiff now represents an obstacle to Defendant BOA's surreptitious strategy to finalize a settlement of its consumer claims directly with Defendants CAG, CSB, and DRE, who then agree to reject substantially all consumer claims they receive from Bank of America victims thereby circumventing restitution to the claimants altogether in excess of $10 billion.

32.   Public entities called upon non-public conspirators and beneficiaries, Thomas V. Girardi, Esq. *("Defendant Girardi")* and his associates; and James M. Parsa *("Defendant Parsa")* and his associates, to implement their objectives pertaining to Plaintiff.

33.   Although not exhaustive, Defendant Girardi's associates are predominately private parties at Defendants CAG, CSB, and DRE (past and present), as well as public officials (past and present) acting under color of state law in Orange and San Bernardino counties.

34.   Although not exhaustive, Defendant Parsa's associates are predominately private parties acting in concert with public officials who under color of state law.  *Dennis v. Sparks, supra,* clearly enunciated that private parties in collusion with public officials are just as liable, under 42 U.S.C. §1983, as the public officials with whom they collude.

35.   Defendant Parsa's associates also include fellow loan modification fraud attorneys that, prior to the enactment of Senate Bill 94, unlawfully and intentionally associated with non-attorneys to assist them evade the law prohibiting all loan modification service providers (*except attorneys*) from collecting fees in advance of work performed.

36.   And finally, Defendant Parsa's associates include open forum media outlets to the public and electronic communication channels that that have a history of colluding with

- 10 -

public officials for financial gain as well as attorneys acting on behalf of loan modification service providers to violate Plaintiff's constitutional right to unrestrained and protected speech about matters of public concern.

37.     The bridge that connects Defendants Girardi and Parsa is Century Law Group LLC *("Defendant CLG")*, run by two former California State Bar employees, Edward O. Lear, Esq. *("Defendant Lear")* and Paul J. Virgo, Esq. *("Defendant Virgo")*. Defendant CLG's primary practice area is to protect attorneys with large client trust accounts that get caught breaking the law. Defendant CSB is Defendant CLG's primary referral source. Girardi exercises dominion and control over the CSB and CAG by means of unlawful financial contributons and bundling of contributions and from the unlawful use od Medicare funds.

38.     The actions taken against Plaintiff, almost without exception, are offenses that can be traced to Defendants BOA, CAG, CSB, DRE, Girardi and his associates and Defendant Parsa and his associates. This is not to say that all defendants named in this complaint colluded and conspired with all other defendants in this complaint, creating one grand conspiracy. That is not correct, however, Plaintiff's investigative reports exposing fraud in matters of public concern united all defendants together in one common cause, to silence Plaintiff in order to continue the fraud resulting in unjust enrichment against California consumers and tenants.

39.     ERIN K. BALDWIN *("Plaintiff")* is a citizen and resident of the state of California, United States of America.

40.     Defendant BANK OF AMERICA CORPORATION *("Defendant BOA")* Delaware Corporation with its principal place of business located at 401 North Tryon Street, Charlotte, North Carolina   28255 and Corporate Agent for Service of Process at CT Corporation located at 150 Fayetteville Street, Box 1011, Raleigh, Nort Carolina 27601.

41.     SANDOR E. SAMUELS *("Defendant Samuels")* was, at all times relevant to this action, the Executive Managing Director, Chief Legal Officer and Assistant Secretary of Countrywide. Defendant Samuels is being sued herein in his individual capacity in collusion with public officials and private parties. In 2008, Bank of America purchased Countrywide Financial for $4.1 billion. In 2006, Countrywide financed 20% of all mortgages in the United

- 11 -

## D.   STATEMENT OF FACTS

232.   The claims for relief arising in this Complaint are based primarily on an outrageous volume of legal actions brought against Plaintiff in a very short period of time, the objective of which was to cause her to discontinue writing and publishing investigative reports and journalistic articles exposing fraud against consumers and tenants in California.

233.   As such, Plaintiff presents facts of this case as follows:

a.   Part I:   A chronological listing of cases, proceedings and actions brought against Plaintiff; actions Plaintiff has taken to defend against said cases, proceedings, and actions; and the relevant facts that give rise to the causes of action contained herein *("Statement of Facts: Part I")*.

b.   Part II:   A chronological listing of investigative reports and journalistic articles written and published by Plaintiff that are the primary catalyst to the cases, proceedings and actions set forth in Statement of Facts: Part I; and related correspondence and commentary *("Statement of Facts: Part II")*;

234.   The herein action is the only lawsuit Plaintiff has brought in connection with the cases, proceedings and actions set forth in the Statement of Facts: Part I.  All other legal pleadings filed and actions taken were brought <u>in defense</u> of said cases, proceedings and actions.

235.   Within the original actions set forth in the Statement of Facts: Part I, there are "cases within the case," such as appeals, removals to district court, contempt actions, and so on.  In these situations, the case or action <u>within</u> the original action will be listed separately in chronological order and a notation will be made in the facts of the original case.

### Part I:   Chronological Listing of Cases, Proceedings & Actions

236.   Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-235 of this Complaint.

(1)
### JANUARY 26, 2009
*Parsa Law Group, APC v. Bad Biz Finder*

Orange County Superior Court
Case No. 30-2009-00117752-CU-CJC-DF

- 64 -

Defamation
(brought against Plaintiff by Burkhalter, Kessler,
Goodman & George, LLP on behalf of Parsa Law Group)
(**"Parsa Defamation Case"**)

237.    Plaintiff is an investigative reporter and journalist who wrote and published truthful, fact-based, and legally-substantiated articles and reports about matters of great public concern strictly for the benefit of California consumers and tenants,   Accordingly, these articles and reports constitute "protected speech" under the First Amendment and are immune from defamation lawsuits, injunctions restraining her speech, and retaliation.

238.    The above civil case was filed in Orange County Superior Court, Central Justice Center (Civil Unlimited Division) on January 26, 2009, by Daniel J. Kessler, Esq., partner at Burkhalter, Kessler, Goodman & George LLP (named herein as "Defendant BKGG," and "Defendant Kessler").   This case, hereinafter referred to as the **"Parsa Defamation Case,"** set forth three causes of action against Plaintiff: (a) Defamation Per Se; (b) Intentional Interference in Contractual Relations; and (c) Intentional Interference in Prospective Relations.

239.    The Parsa Defamation Case was assigned to a judicial officer in Department C-14 named herein as a defendant in his individual capacity as an adjunct professor of law at Whittier Law School ("Defendant Professor Miller").   Defendant Kessler and another BKGG Partner, Eric J. Goodman, Esq., (who acted as lead counsel in this case) were, at all times relevant to this action, co-adjunct professors of law at Whittier Law School with Defendant Professor Miller.

240.    Parsa Law Group, APC did not have standing to sue on the date this action was iniatiated nor throughout the litigation or now.   A professional law corporation cannot survive as a separate and valid entity if the lawyer for which it is formed is not eligible to practice law. The lawyer for which Parsa Law Group, APC was formed is James M. Parsa ("Defendant Parsa").   Defendant Parsa lost his eligibility to practice law on May 17, 2001, when the Orange County District Attorney ("OCDA") convicted him of two (out of seven charges) brought against him for unlawful sexual intercourse and oral copulation of pre-teen boys and girls.

- 65 -

241. Defendant Parsa failed to register as a sex offender, report his convictions to the California State Bar, and continued to practice law in the fields of personal injury and loan modification for eight years. As a direct result of Defendant Parsa's relationship with a San Diego district attorney he walked away from these charges with community service which in light of the crime was as irresponsible as not ensuring that he registered as a sex offender and was suspended from the practice of law.

242. On April 21, 2009, Plaintiff discovered Defendant Parsa's criminal past and reported it directly to the California State Bar and as the subject of an investigative report published in a public forum to warn consumers of possible risks inherent in associating with Defendant Parsa. This information was not obtained by Plaintiff in a covert manner nor published to defame Defendant Parsa. Rather, it is a matter of public record easily accessible on the court's website and was published by Plaintiff as a public service announcement.

243. As the result of Plaintiff's persistent reports to the California State Bar ("Defendant CSB"), Defendant Parsa was suspended from the practice of law for crimes of moral turpitude on August 31, 2009, began an interim suspension after conviction on October 16, 2009, and voluntarily tendered his resignation with charges pending on October 27, 2009. Defendant Parsa is eligible to return to the practice of law in less than a month, October 16, 2011 and because he was charged with an offense other than a violation of Defendant CSB's rules of professional conduct, he is not required to make restitution to the thousands of consumers he defrauded.

244. In addition, Parsa Law Group, APC ("Defendant Parsa Law") is listed with the California Secretary of State as a "suspended" corporation. According the the California Secretary of State, the term "suspended," is defined as:

*"The business entity's powers, rights and privileges were suspended or forfeited in California 1) by the Franchise Tax Board for failure to file a return and/or failure to pay taxes, penalties, or interest; and/or 2) by the Secretary of State for failure to file the required Statement of Information..."*

245. Defendant Parsa Law's attorneys, Defendant BKGG, would necessarily have knowledge that their client's entity status was "suspended," as the agent for service of process for Defendant Parsa Law is another BKGG Partner, Gregory Clement ("Defendant Clement").

- 66 -

Defendant BKGG entity named in this lawsuit at some point in the onging litigation eity its clieDefendant  Corporate Entity

246.    The Parsa Defamation Case is a strategic lawsuit against public participation in violation of California Code of Civil Procedure §425.16 (California's Anti-SLAPP legislation). This action was intended solely to censor, intimidate and silence Plaintiff by burdening her with the cost and time of a legal defense until she abandoned her investigative reports and journalistic articles.  The claims contained within this case are nonsensical, meritless, and ever-changing via two amended complaints.  Various defendants in varying capacities are named and one defendant that was dismissed, was resurrected on the date the Judgment was entered by the Court because Defendant BKGG could not substantiate any other defendant.

247.    The cause of action for Defamation Per Se is against an individual, not a professional law corporation.  However, ironically, it is appropriate for the namesake of Defedant Parsa Law.   Classic examples of the cause of action for Defamation Per Se include statements claiming that the person has committed (a) serious sexual misconduct; (b) serious criminal misbehavior; (c) or that a person is afflicted with a loathsome disease.  All apply to Defendant Parsa and it is a matter of public record.

248.    The following chronology of the Parsa Defamation Case comprises important facts that form the basis of the causes of action contained within this Complaint.   *[For consistency purposes, although Plaintiff was a defendant in the First UDR-UD Case, she will continue to be referred to as "Plaintiff," and all other parties will maintain their assigned defendant name relevant to the herein action.]*

Chronology of the Parsa Defamation Case:

249.    On January 26, 2009, the Complaint in this action was filed against Bad Biz Finder, an "unknown business entity," by Parsa Law Group, APC, a California Professional Law Corporation, for three (3) causes of action: (a) Defamation Per Se; (b) Intentional Interference in Contractual Relations; and (c) Intentional Interference in Prospective Relations. The filing parties were Daniel J. Kessler, Esq., ("Defendant Kessler"), Partner at Burkhalter, Kessler, Goodman & George, LLP; and (b) Michael Oberbeck, Esq. ("Defendant Oberbeck"), although the attached Civil Case Coversheet indicates only two (2) causes of action.

- 67 -

250. On its face this Complaint stated a singular remedy: Money Damages. However, the Civil Case Coversheet stated three remedies: (1) Money Damages; (2) Injunctive and Declaratory Relief; and (3) Punitive Damages. In violation of CCP §425.10(a)(2), the Complaint did not state the amount of money damages demanded in the Prayer for Relief.

251. The Summons failed to state the status of the entity being served, *i.e.*, "Notice to the Person Served: You are served "<u>as an individual defendant</u>"; "<u>as the person sued under the fictitious name of: [ …]</u>"; or "<u>on behalf of:</u>." As well, the applicable CCP §416 subsection is not completed. It was never clear how Defendants Parsa Law or BKGG went about serving an unknown business entity. The remedies sought in this action were stated as (a) monetary; (b) nonmonetary; declaratory or injunctive relief; and (c) punitive.

252. The Complaint pled examples of Plaintiff's alleged defamatory content published as of the date of Complaint. It lists articles that were published after January 26, 2009, titles of articles that were never published, but, curiously, leaves out the following articles that *were*, in fact, published prior to the filing date:

a. "<u>Parsa Law Group's National Loan Modification Center Violates Every Rule Under Sub-Section 2945.4 of the CA Foreclosure Consultant's Act</u>," published on January 20, 2009. Plaintiff's investigative report compared, side by side, Defendant Parsa Law's Retainer Agreement with the statutory requirements set forth in California Civil Code §2945.4, commonly known as the "California Foreclosure Consultant's Act" ("CFCA").

b. "<u>Parsa Law Group / National Loan Modification Center is Not in Compliance with Contract Requirements under the CA Foreclosure Consultant Act</u>," published on January 20, 2009. Again, Plaintiff's compared Defendant Parsa Law's contract with the contract requirements set forth in the CFCA, found at California Civil Code §2945.4.

c. "<u>James Parsa, Parsa Law Group & NLMC Face Steep Penalties [For Violating The CFCA]</u>," published on January 21, 2009. Plaintiff's investigative report stated the penalties for violating the CFCA ($10,000 per incident); and as an example, demonstrated her findings from the two previous articles as possible companies in violation."

d. "<u>The Truth About James Parsa is Revealed</u>," published on January 22. 2009, regarding the inconsistencies and padding contained in his resume.

- 68 -

e. "Parsa Law Group / National Loan Modification's Prospective Customers Are Swarming to Bad Biz Finder For Help," published on January 22, 2009.

253. On January 27, 2009, Plaintiff was personally served with a subpoena to appear at a deposition in this case as an "interested party." Since Plaintiff was not named in the Complaint, nor did she have an interest in the Complaint, she did not attend. Later, Defendant Parsa Law attempted to compel Plaintiff's appearance which attempts failed.

254. Also, on January 27, 2009, Defendants Goodman, Kessler, and fellow BKGG attorney, Nicholas Myers ("Defendant Myers") set out on a course of action to violate Plaintiff's rights to privacy as set forth in 47 U.S.C. §551(c), the "Federal Cable Privacy Act," that prohibits a cable operator from disclosing "personally identifying information concerning any subscriber without the prior written or electronic consent of the subscriber concerned," or a court order.

255. Defendants Goodman, Kessler and Myers requested this information pursuant to 18 U.S.C. §2703(c)(2). This federal statute applies only to subpoenas issued by government entities, to wit:

> "A provider of electronic communication service or remote computing service shall disclose to a governmental entity the (a) name; (b) address; (c) local and long distance telephone connection records, or records of session times and durations; (d) length of service (including start date) and types of service utilized; (e) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and (f) means and source of payment for such service (including any credit card or bank account number), of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1)."

256. On January 27, 2009, Defendant BKGG knowingly sent subpoenas posing as an attorney for a government entity to: (a) Road Runner Holdco, LLC; (b) Road Runner High Speed Data; (c) American Online, Inc.; and (d) Time Warner, Inc.

257. The subpoenas requested the following information about an I.P. address it claimed belonged to Plaintiff. Defendants Goodman, Kessler and Myers demanded production of documents to which it was not legally entitled, as follows:

- 69 -

"1.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document the identity of the subscriber having been assigned IP Address: 76.87.33.0.

"2.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document the identity of the subscriber having been assigned the email address: badbizfinder@aol.com.

"3.    Produce all Radius Logs for the subscriber assigned IP Address: 76.87.33.0.

"4.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document any other user names, email addresses or accounts owned by the same person or registered to the same street or billing address as the person identified by your own records as having been assigned IP Address 76.87.33.0.

"5.    Produce any and all invoices generated by AOL to the subscriber assigned IP Address 76.87.33.0.

"6.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document financial transactions (i.e., payments, etc.) made by the subscriber assigned IP Address 76.87.33.0 as a result of invoices generated by AOL to the subscriber assigned IP Address 76.87.33.0.

"7.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document any technical support provided to the subscriber assigned IP Address 76.87.33.0.

"8.    Produce any and all documents which evidence, reference, mention, reflect, record and/or otherwise document any technical support provided to the subscriber assigned IP Address 76.87.33.0."

258.    Plaintiff's position and argument has always been is that an "I.P. address" identifies a computer, not a person, and certainly not a defendant in an unlimited civil action for defamation. Defendant Parsa Law violated Plaintiff's constitutional right to due process of law by seeking confidential, personally identifying information without giving her the opportunity to quash same. Defendant Parsa Law and its attorneys Defendant BKGG always had an email for Plaintiff and connot claim differently.

259.    On February 2, 2009, Mary Courage representing Time Warner's Subpoena Compliance Division responded by faxed letter to Defendant Myers informing him of the law pursuant to 47 U.S.C. §551(c), supra, insisting on a court order, and notifying him that:

"If you are planning on seeking this information through a court order, please be aware that we will need sufficient time prior to disclosure to provide our customer with notice of the order as required by Section (c)(2)(B) of the Act. If you require that we not inform our subscriber as such disclosure would

- 70 -

*jeopardize your investigation, it will be necessary that you include a statement
to that effect within the wording of your court order signed by the judge."*

260.    On February 5, 2009, Defendant Myers responded to Ms. Courage stating,
""Pursuant to California law, a subpoena is considered and has the full effect of a court order"
and cited CCP §2020.240 as his authority.  No response from Ms. Courage.

261.    On February 11, 2009, Defendant Myers sent another letter to Ms. Courage
reminding her that a subpoena is the same as a court order and further: "As this is a matter
involving defamation and tortious interference with business relations, we must move quickly
to quash ongoing harm to our client." No response from Ms. Courage.

262.    On February 18, 2009, Defendant Myers sent another letter to Ms. Courage
requesting a meet and confer conference pursuant to CCP §2025.450, "regarding the
deficiencies in your response to the Subpoena and our intention to seek a court order to compel
compliance."

263.    On February 19, 2009, Ms. Courage sent an email to Defendant Myers stating:

*"Unfortunately, we will not be able to comply with your subpoena as it stands.
We are bound by federal regulatory statutes as noted in our previous letter to
you.   The Cable Privacy Act supersedes California law andprohibits our
answering your subpoena unless it has been signed by a judge."*

264.    On February 25, 2009, at 6:40 P.M. Defendant Myers emailed the
aforementioned Time Warner subpoena to subpoenainquiry@twcable.com, and followed up at
9:53 P.M. with a telephone call.

265.    On February 26, 2009, at 9:53 A.M.,  stated: "We will await the receipt of the
order signed by the judge.  We cannot respond with subscriber information until that has been
received.  Keep in mind the notification issues."

266.    On February 26, 2009, Defendant Goodman filed an "Ex Parte Application to
Compel Time Warner, Inc.'s Compliance With Deposition Subpoena for Records"; and both
Defendants Parsa and Goodman filed Declarations in support thereof.  The hearing was set for
March 10, 2009.

267.    Also on February 26, 2009, Plaintiff received an email allegedly from the Legal
Department of AOL, LLC, entitled, "Member Notification" wherein they informed Plaintiff

- 71 -

that they had received a "Subpoena for the Identity of AOL Member Screen Name" in the matter of *Parsa Law Group APC v. Bad Biz Finder, et al.* The message was very vague:

> *"If we have not heard from you or your lawyer indicating that you are moving to quash this subpoena, AOL will release the requested information pursuant to the subpoena.  If you do intend to file a motion to quash the subpoena, please provide us with a copy.  If you have any questions you should consult with an attorney or the attorney who served the subpoena.  AOL LLC – Legal Department."*

268.    Furthermore, the subpoena attached to the email was dated January 27, 2009, addressed to American Online, Inc. and the February 16, 2009 deadline for production of documents had already passed.  Plaintiff discovered that the entity, "American Online, Inc," is not registered with the California Secretary of State.  On January 11, 2001, AOL merged with Time Warner forming "AOL-Time Warner, Inc.," utilizing Time Warner's legal department until the two companies split on May 28, 2009.  Therefore, an AOL Legal Department did not exist on February 26, 2009.  The email failed to state a telephone number, address and, and reply questions went unanswered.  Lastly, an indictaor that the email was fraulent presented itself in the "If you have any questions you should consult with an attorney <u>or the attorney who served the subpoena</u>."   After repeated attempts to get her question answered Plaintiff let this one go.

269.    On March 6, 2009, Defendant Parsa Law filed its First Amended Complaint For Damages.  It added two causes of action:  (a) Trade Libel; and (b) Unfair Competition & Business Practices.  Plaintiff is not added into the caption of the matter, but is added into the first paragraph of the Complaint, to wit:  "To: Bad Biz Finder, Erin K. Baldwin," as well as in "The Parties."

270.    At the request of Defendant BKGG Myers, on March 16, 2009, Reed Smith Attorney, Marilyn Moberg, Esq. ("Defendant Moberg") provided a letter to Defendant Myers representing that she was counsel for AOL, LLC, and as such, was authorized to provide Defendant Myers the personal identifying information for the email account badbizfinder@aol.com.  She claimed she was providing this information based on a telephone call and letter from Defendant Myers, rather than a formal subpoena or court order.  Defendant Moberg stated in her letter that the owner of the email address was "Beverly Sullivan," and

- 72 -

that was the singular basis of Defendant BKGG adding Beverly Sullivan as an "individual defendant" in its Second Amended Complaint.

271.    Plaintiff has found no evidence to support the fact that Defendant Moberg was, is, or has ever been legal counsel for AOL, LLC.    Defendant Moberg's letter addressed to Defendant BKGG Myers, states, in part:

> *"This letter confirms follows up [sic] our letter of February 26 and our telephone call today during which you informed me that you have not received any objection, motion to quash or other communication from the subscriber or any attorney on its behalf regarding the production of information by AOL. Accordingly, the following letter provides the information we agreed as set forth in the prior letter.*
> *"The name and telephone number of the subscriber having been assigned the address badbizfinder@aol.com is:  Beverly Sullivan, Day and Eve phone number: (454) 247-1084.  Additional IP addresses at which this account was accessed:  IP 64.74.98.14 and 201.161.143.6."*

272.    Side Note:

> *In preparation for the herein action, Plaintiff inquired as to the validity of Defendant Moberg's claim with Reed Smith Executive Management Team, Gregory B. Jordan, Global Managing Parter; Robert A. Nicholas, Global Head of Legal Personnel; Gary A. Sokulski, Chief Operating Officer; and Richard A. Jones, Chief of Litigation Department.*
> *Reed Smith Attorney Boyd C. Sleeth was named the representative of Messrs. Smith, Jordan, Nicholas, Sokulski and Jones to respond to Plaintiff's request for information.  On February 11, 2011, Mr. Sleeth sent Plaintiff a letter stating:*
> *"Your letter to Messrs. Smith, Jordan, Nicholas, Sokulski and Jones was referred to me.  As Marilyn Moberg informed you by letter on Novermber 4, 2009, please be advised that Ms. Moberg's March 16, 2009 letter to Nicholas D. Myers [Defendant BKGG Myers]  was written by her as an attorney representing AOL LLC."*

273.    On March 19, 2009, Defendant Parsa Law filed its Second Amended Complaint For Damages.  No new causes of action were added.  However, two new defendants were added: Erin Baldwin, an individual; and Beverly Sullivan, an individual.  It is clear the rationale behind Defendant BKGG adding Beverly Sullivan, however, Plaintiff consistently pleaded that there was never any justification or evidence supporting the decision to add her as defendant.

- 73 -

274.   Also on March 19, 2009, Defendant BKGG stated in its pleading the changes made and justification for same:

(a) added Trade Libel as a cause of action;

(b) added Unfair Competition and Business Practices (California Business & Professions Code section 17200, et seq.);

(c) added a new defendant, Erin K. Baldwin, an individual;

(d) Added a new defendant, Beverly Sullivan, an individual;

(e) stated that Baldwin and Sullivan, as individuals, are liable for the acts of Bad Biz Finder because they were "alter egos" of Bad Biz Finder;

(f) asserted that the privilege of separate existence would promote injustice because "Co-Defendants Baldwin and Sullivan organized and controlled BBF, so that it is now, and at all times mentioned in this Complaint, merely an instrumentality, agency, conduit or adjunct of Co-Defendants Baldwin and Sullivan; and

g) asserted that Baldwin and Sullivan acted in bad faith and dominated and controlled Defendant BBF such that Baldwin and Sullivan are jointly and severally liable for the acts complained of in this Complaint.

275.   On March 30, 2009, Defendant Parsa Law claims to have filed its Proof of Service of Summons for the Second Amended Complaint.  However, the docket in this case also states that a Proof of Service was filed on April 6, 2009 and April 7, 2009.  The reason why Defendant BKGG kept re-filing a bogus Proof of Service is because it was waiting for a response from the subpoena they served Time Warner, Inc., to provide confidential personally-identifying information about Plaintiff's cable account so they could name her to the Complaint.  The response never came because Defendant BKGG's request is unlawful unless it is requested in the form of a court order signed by a judge.

276.   On April 11, 2009, the Court signed a court order demanding Time Warner Cable's compliance with Defendant BKGG's request for personally identifying information for I.P. address 76.87.33.0, they claim belonged to Plaintiff.  Not only was this action in violation of the Federal Cable Privavcy Act, but it is an unconstitutional invastion of Plaintiff's

privacy to publish anonymously. In *Lovell v. Griffin* (303 U.S. at 303 U. S. 452) the United States Supreme Court held:

> "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information, and thereby freedom of expression. Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value."

277.    On April 29, 2009, in response to the unlawful court order signed by the Court and served by Defendant BKGG, Time Warner, Inc. produced account information including name, address, phone number, user name and length of service.  However, Time Warner made the statement, *"We do not make any representations as to the identity of any individual who actually used the above IP address on the date and time in question."*

278.    As stated, *supra*, an I.P. address does not identify a person, it identifies a computer, and it certainly does not identify a defendant in a civil unlimited case for defamation.  Defendant BKGG added Plaintiff into its First Amended Complaint on March 6, 2009 without any justification whatsoever.  It attempted to conceal this fact by only listing Plaintiff in the body of the Complaint, not in the caption.

279.    On May 7, 2009, Defendant Parsa Law filed an Ex Parte Application for Temporary Restraining Order, Issuance of an Order to Show Cause Re Preliminary/Permanent Injunction; Memorandum of Points & Authorities, Declaration of James M. Parsa, Esquire; Declaration of David A. Berstein; Esq., Exhibits A-E; and [Proposed] Order; the hearing was set for May 8, 2009.

280.    On May 8, 2009, there is no record of an *ex parte* hearing taking place, however the Minutes reflect that it was granted.

281.    On May 11, 2009, Defendant Parsa Law filed an Order to Show Cause Re Preliminary Injunction scheduled for May 19, 2009.

282.    On May 18, 2009, Defendant BKGG Berstein filed a Supplemental Declaration in Support of its Request for a Preliminary Injunction against Plaintiff.

283.    On May 18, 2009, the Court entered a tentative ruling Re  Defendant Parsa Law's Order to Show Cause Re Preliminary Injunction that stated:

- 75 -

*"Hear argument.   Reasoning: Determine whether plaintiff served the
application on defendants; plaintiff shows reasonable likelihood of prevailing
and irreparable harm; the problem is unconstitutional prior restraint (See
Evans 162 A4 1157)."*

284.     On May 18, 2009, the Defendant Professor Miller cited *Evans v. Evans* (2008)
162 Cal.App.4th 1157, Cal.Rptr.3d, as his prevailing thesis in denying Defendant Parsa Law's
request for a Temporary Restraining Order against Plaintiff.   It appears from the Court's
citation, that it acknowledged that restraint of Plaintiff's speech would be unconstitutional.

285.     Therefore, after setting out his basis for <u>denying</u> Defendant Parsa Law's
Temporary Restraining Order/Preliminary Injunction, Defendant Professor Miller did the
unthinkable. He <u>granted</u> a <u>permanent</u> restraining order a short twelve (12) days later.  Even the
oddest of scenarios can be explained by a fist full of cash.

286.     On May 18, 2009, Defendant Professor Miller believed this citation applicable:

*"The right to free speech is . . . one of the cornerstones of our society, and is
protected under the First Amendment of the United States Constitution and
under an "even broader" provision of the California Constitution...*

*"An injunction that forbids a citizen from speaking in advance of the time the
communication is to occur is known as a "prior restraint." ... A prior restraint
is the most serious and the least tolerable infringement of the First Amendment.*

*"... Prior restraints are highly disfavored and presumptively violate the First
Amendment.  This is true even when the speech is expected to be of the type that
is not constitutionally protected.*

*"... To establish a valid prior restraint under the federal Constitution, a
proponent has a heavy burden to show that <u>the countervailing interest is
compelling, the prior restraint is necessary and would be effective in promoting
this interest, and less extreme measures are unavailable</u>. ..."*

*"Further, any permissible order "must be couched <u>in the narrowest terms</u> that
will accomplish the pin-pointed objective permitted by constitutional mandate
and the essential needs of the public order.*

*" . . . Even if an injunction does not impermissibly constitute a prior restraint,
the injunction must <u>be sufficiently precise to provide "a person of ordinary
intelligence fair notice that his contemplated conduct is forbidden</u>. ...*

*"An injunction is unconstitutionally vague if it does not <u>clearly define the
persons protected and the conduct prohibited</u>. ... An order prohibiting a party*

- 76 -

*from making or publishing false statements is a classic type of an unconstitutional prior restraint. ... While [a party] may be held responsible for abusing his right to speak freely in a subsequent tort action, <u>he has the initial right to speak freely without censorship.</u>"*

*"This portion of the order is also invalid as unconstitutionally vague and overbroad. The injunction broadly prohibited Linda from <u>publishing any defamatory comments</u> about Thomas.*

*<u>"This sweeping prohibition fails to adequately delineate which of Linda's future comments might violate the injunction and lead to contempt of court.</u>*

*The fact that the court's prohibition on publishing false materials applied only to speech on the Internet does not affect our analysis. The courts have made clear that <u>speech on the Internet is accorded the same First Amendment protection as speech on other forums.</u>"*

287.   **On June 2, 2009, he granted this:**

"IT IS FURTHER ORDERED that Defendant BAD BIZ FINDER and ERIN K. BALDWIN, and those in active concert or participation with them, are from this day forward enjoined and restrained from:

1.   Publishing, transmitting, distributing or otherwise publicly displaying all previously-publicized or publicly available defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, <u>namely those blog entries/articles previously and/or currently available at the</u> <u>websites</u> www.badbizfinder.wordpress, www.badbizfinder.blogspot.com and www.thereallybadbizfinder.wordpress.com <u>and reproductions and variations therof previously and/or currently available elsewhere, including but not limited to:</u> www.ripoffreport, www.pubcit.typepad.com (CL&P Blog), www.ocmetrobusiness.com and www.digg.com;

2.   Publishing, transmitting, distributing or otherwise publicly displaying <u>tortious statements</u> which state or imply illegal conduct by PARSA LAW GROUP, APC and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, absent of a judication of illegality;

3.   Publishing, transmitting, distributing or otherwise publicly displaying defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates, including those found in **Exhibit "B"** to Plaintiff's Request for a Temporary Restraining Order.

- 77 -

**[Exhibit "B," is 324 pages of investigative article print-outs.]**

4.      *Publishing, transmitting, distributing or otherwise publicly displaying defamatory and/or tortious statements about PARSA LAW GROUP, APC, PARSA LAW GROUP, APC's services, and/or PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates; and*

5.      *PARSA LAW GROUP, APC's officers, directors, members, shareholders, agents, representatives, employees and/or affiliates; either directly or indirectly.The above injunction relief is effective immediately and shall remain in place in perpetuity."*

288.    On May 19, 2009, Plaintiff's "Application for Waiver of Court Fees and Costs," was rejected with a comment from the Clerk, Latesha: "We are unable to file this fee waiver because a business can't file for a fee waiver so I will charge the credit card for $13.00. If you have any questions please call 714-834-4724 and ask for Latesha. Thank you."  The statement regarding charging the credit card refers to the *acceptance of Plaintiff's Opposition to the Preliminary Injunction*.

289.    On May 19, 2009, Latesha forwarded the rejected fee waiver and Plaintiff's Opposition to the Preliminary Injunction to Department C-14 in time for the hearing. Although she requested that the fee waiver be immediately returned to Plaintiff, Defendant Turner intentionally kept it in the department until June 2, 2009, the date the Default Judgment was entered against Plaintiff.

290.    Defendant Turner did this without knowledge that Plaintiff *knew* it had been rejected and returned to her on May 19, 2009, with instructions to return the rejected fee waiver to Plaintiff.  Defendant Turner failed to do so in collusion with the Court to prevent Plaintiff from making a first appearance fee, thereby giving the Court a reason to enter her Default. The reason for this collusion is stated, *infra*, on May 29, 2009.

291.    On May 19, 2009, the Court denied Defendant Parsa Law's Request for Temporary Restraining Order and/or Preliminary Injunction.  This was the time that the Court and Defendants BKGG, Parsa, and Parsa Law and others put their best foot forward to give the appearance of being cognizant and respectful of Plaintiff's constitutional rights.

- 78 -

292. However, the reality rested in CCP §529, that states:

*"On granting an injunction, the court or judge <u>must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction.</u> Within five days after the service of the injunction, the person enjoined may object to the undertaking. If the court determines that the applicant's undertaking is insufficient and a sufficient undertaking is not filed within the time required by statute, the order granting the injunction must be dissolved."*

293. Defendant BKGG did not want to post an undertaking because it knew it was "wrongfully enjoining" Plaintiff.  All parties involved knew that the injunction was unconstitutional and that it was likely at some point that Plaintiff would be able to set it aside and collect on the undertaking.  So, to mitigate the risk involved, the Court denies the preliminary injunction and promotes it as a true act of judicial equanimity to overshadow the act is is about to take against Plaintiff.

294. Also on May 19, 2009, Defendant Parsa Law submitted a Request for Entry of Default.

295. On May 27, 2009, Plaintiff filed a Motion for an Order Setting Aside Default; the hearing was set for July 14, 2009.

296. As of May 28, 2009, prior to the Court entering her Default on June 2, 2009, Plaintiff had filed <u>two responsive pleadings</u> in the Parsa Defamation Case.  Therefore, the Court could not take Plaintiff's Default.  That the Court determined they were not in an acceptable format ot an eppearance fee was not paid or for whatever administrative reason, it is not sufficient to enter Default against Plaintiff for $604,515.66.  The pleadings are as follows:

a. Opposition to Defendant Parsa Law's Request for a Temporary Restraining Order/Preliminary Injunction dated May 19, 2009.  The Court refused to acknowledge the pleadings because, as it said, the pleading was "in an anonymous format and not timely."  Nonetheless, it had been filed and the Court had acknowledged that it had been filed.

b. Motion for an Order Setting Aside Default dated May 27, 2009.  While the Court acknowledged that the Motion was "timely brought," it failed to acknowledge that

- 79 -

Plaintiff had the authority to act on behalf of Bad Biz Finder. However, the Court had no problem recognizing Plaintiff as a defendant when it held her solely liable for a six-figure judgment and permanently enjoined her speech severely violating her constitutional rights.

297.   On May 28, 2009, Defendant Parsa Law filed and was granted a Request for Dismissal as to "Beverly Sullivan and Does 1-10, inclusive," as to all causes of action.

298.   Also on May 28, 2009, Defendant Parsa Law's May 19, 2009 Request for Entry of Default was rejected by the Court Clerk, namely, ""M. Nordman, Deputy Clerk," who entered a "Notice to Filing Party" stating the reasons for the rejection:

> "a.    Statement of Damages has not been filed with the court. It is required if requesting punitive damages. Note that it also has to be served to each defendant.
> "b.    Declaration of James Parsa: no proof has been submitted to support your demand. Please include some documentation how you have calculated the "economic loss of $206,250.00." Also, you have listed that you have lost 300 clients between January and May, is there any documentation that would support this? Note that the signature on the document is a copy.
> "c.    Please submit a Judgment, you have submitted an Order.
> "d.    Proof of Service is not in legal format; Clerk is not able to file it as is.
> "e.    Attorneys' fees requested exceed rule 366. If you wish to ask more than the rule states, please submit a declaration explaining why you are entitled to them. Also, no agreement is attached that would allow you to collect any attorneys fees. Please refer a rule that gives you this right."

299.   On May 19, 2009, Plaintiff fax-filed an Opposition to Defendant Parsa Law's Order to Show Cause Re: Preliminary Injunction but as stated below, the Court refused to acknowledge it because it was "anonymous and untimely."

> "The Court informs counsel it received Plaintiff's Opposition to Ex Parte Application for a Temporary Restraining Order; Opposition to Motion for Preliminary / Permanent Injunction. _The Court states for the record that because the filing by Plaintiff was untimely and anonymous, the Court did not consider it._ The Court hears oral argument. The Order to Show Cause re: Preliminary Injunction is denied without prejudice. The Default Prove-Up Hearing is scheduled for May 29, 2009 at 8:30. Matter is trailed for counsel to file the Request for Entry of Default in the Clerk's Office.

300.   On May 19, 2009, BKGG Defendant Berstein filed a Request for Entry of Default as to Plaintiff; the Default Prove-Up hearing was set for May 29, 2009.

- 80 -

301.   On May 28, 2009, Defendant Parsa Law filed and was granted a Request for Dismissal as to "Beverly Sullivan and Does 1-10, inclusive," as to all causes of action.

302.   On May 29, 2009, following the UDR hearing, Plaintiff contacted the Court Clerk of Department C-14 for a status of the Default Prove-Up Hearing at which time Plaintiff was informed that said hearing had been continued to June 2, 2009. The Minute order stated the reason as: "Default Prove-Up Hearing continued to 06/02/09 at 11:30 a.m. in this department ... ***due to the unavailability of plaintiff***." However, it is unclear how a professional law corporation can be "unavailable," when its attorney were present. The actual reason for the continuance was the clerk's rejection of Defendant Parsa Law's default ptove-up package and the Court's plan to circumvent the requirements in the rejection notice.

303.   The May 29, 2009 Minute Order also stated: ***"8:34 AM, The Court conducts a chambers conference, unreported, with counsel present."*** Improper extrajudicial *ex parte* contact occurs when a judge communicates with  (a) one party to a lawsuit to the exclusion of the other party or parties; and/or (b) initiates discussions about a case with disinterested third parties. (*See,* Canon 3(A)(4), ABA Model Code of Judicial Conduct). This conference included both elements, except that the ***dis***interested third parties were actually very interested in the outcome of the conference. Included in the conference was "one party to a lawsuit to the exclusion of the other party," Plaintiff was not invited, but Defendants Parsa, Goodman and Berstein attended; and the interested third parties were Defendant CSB Investigators, Tom Layton and John Noonen.

305.   Defendant CSB was very interested, in fact, <u>dedicated</u>, to the cause of permanently enjoining Plaintiff's speech because she was publishing the facts about Defendant CSB's liability to the public for the misconduct of its attorney members involved in loan modification fraud. Plaintiff also published reports about (a)  Defendant CSB's collusory relationship with Defendant DRE; (b)  how to file a claim with the CSB "Client Security Fund," for restitution for harms done by its attorney members; and perhaps most damaging, (c)  Plaintiff's widespread promotion of her intention to file a Writ of Mandate forcing Defendant CSB to make restitution to the consumers harmed.

- 81 -

306.    Attorney Thomas V. Girardi directed California State Bar attorney Paul O'Brien to send State Bar investigators Tom Layton and John Noonen to offer a "financial incentive" to Defendant Professor Miller in exchange for entering a Default Judgment with Permanent Injunction against Plaintiff to silence her in perpetuity.

a.    "A court ruling is subject to reversal if obtained through prejudicial improper ex parte communication." (See, *People v. Winnetka* (1980) 28 Cal.3d 587, 169 Cal.Rptr. 713, 620 P.2d 163; and *In re Calhoun* (1976) 17 Cal.3d 75, 130 Cal.Rptr. 139, 549 P.2d 1235.

b.    In fact, even if an *ex parte* communication is not prejudicial, it may still be improper and may still subject the attorney to discipline. (See, *People v. Laue*, 130 Cal.App.3d at 1060; and *In re Jonathan S.* (3rd Dist. 1979) 88 Cal.App.3d 468, 151 Cal.Rptr. 810.

307.    Defendant Parsa was present not only because it was his case that served to covertly satisfy the malevolent objectives of Defendant CSB but <u>he was funding</u> the "financial incentive" out of his client trust account which, at that time, was approximately $11 million.

308.    In exchange for Defendant Parsa funding the transaction, Defendant CSB agreed to "suspend" Defendant Parsa in theory only.  Defendant CSB agreed to deflect all consumer claims made to its Client Security Fund against Defendant Parsa.  In January, 2011, Plaintiff received a copy of one such letter from a consumer, that states:

> "In re: Your Application for Reimbursement from the Client Security Fund; CSF No. [omitted for privacy purposes].
> Dear XXXX
>     "This is in response to your recent inquiry regarding the status of your application.  Mr. Parsa has not yet been disbarred by the California Supreme Court nor has his resignation been accepted by the California Supreme Court.
>     "Mr. Parsa will not be considered officially disciplined by this office until the investigation is final and the State Bar's discipline recommendation is accepted by the California Supreme Court.  The Client Security Fund cannot anticipate how long this will take.  Under Rule 3.432(A) discipline of the attorney is a major requirement for reimbursement and the fund cannt resolve an application until the discipline is final.
>     "Once discipline is imposed on Mr. Parsa, the Client Security Fund Commission must still review an application and issues a decision under its own Rules of Procedure.  We cannot guarantee that your application will be

- 82 -

*approved for reimbursement.   The Commission must determine that your application meets all of the requirements for reimbursement.*

*"There are a very large number of cases awaiting review by the Client Security Fund Commission, so please understand that even once the discipline is official, it will still be some months before you receive a decision from the Client Security Fund Commission.  You should allow a minimum of six months or longer after the California Supreme Curt makes the discipline official before a decision can be made by the Fund.*

*"You are welcome to go to the California State Bar website, www.calbar.ca.gov to monitor the discipline status of this attorney.*

*"Thank you for your patience and cooperation.  If you have any further questions or concerns, please correspond with us in writing so that we can properly respond to you.*
*CLIENT SECURITY FUND UNIT*

309.    Plaintiff asserts that it took Defendant Parsa's foreclosure consultant less than a minute to take $3,500 from this consumer and she has been waiting a year and a half to get it back.  After the funds were electronically taken from her account, she never heard from Defendant Parsa or his staff again.

310.    At the June 2, 2009 Default Prove-up Hearing, the Court Reporter's Transcript documented Defendant Parsa's testimony to justify a Default Judgment against Plaintiff in the amount of $604,515.66 (without having to document or provide proof for any of his claims) thereby completely circumventing the standard requirements set forth in the May 28, 2009 Rejection Notice of the Clerk.

311.    According to the June 2, 2009 Court Reporter's Transcript, the extent of Defendant Parsa's "testimony" upon which the Court relied to form its conclusion that Plaintiff's statements were defamatory, thus "unprotected speech," to justify a permanent injunction against Plaintiff grossly violating her constitutional rights is as follows:

*"THE COURT :*          *Mr. Parsa, is everything you wrote in your Declaration of May 27, 2009, true and correct?*
*Mr. Parsa:*             *Yes, Your Honor.*
*THE COURT  :*          *Okay, Mr. Berstein, you may inquire further as you desire.*
*Mr. Berstein:*          *Thank you, your honor.*
*Direct Examination*
*Mr. Berstein:  Mr. Parsa, with regard to the court's, I guess, request for some clarity, the 300 or so clients that we have indicated were lost by the law firm, were these clients refunded their money?*

- 83 -

| | | |
|---|---|---|
| 1 | Mr. Parsa: | Yes, they were. |
| | Mr. Berstein: | Okay.  All of them? |
| 2 | Mr. Parsa: | Every single one. |
| | Mr. Berstein: | Okay.  And the $206,250.00 that reflects what your profit would have been had |
| 3 | | those clients remained at Parsa Law Group? |
| 4 | Mr. Parsa: | That's correct. |
| | Mr. Berstein: | Okay.  And what is your understanding as to why these clients left Parsa Law |
| 5 | | Group? |
| 6 | Mr. Parsa: | They were specifically concerned about the comments and points raised by the |
| | | website "Bad Biz Finder," and essentially were not at all in the position or of |
| 7 | | the mood to accept an explanation.  They simply wanted their money back. |
| | | They felt there was a scam involved and that was the end of that.  There was no |
| 8 | | dissuading them. |
| | Mr. Berstein: | And are these people that you personally spoke to? |
| 9 | Mr. Parsa: | The majority of them, yes.  As far as their refunds, every single one was |
| 10 | | approved by myself. |
| | Mr. Berstein: | Now, in addition to the 206,250, you indicated to me that your firm had to take |
| 11 | | steps to correct what had been done by Bad Biz Finder. |
| | Mr. Parsa: | Yes, that's correct. |
| 12 | Mr. Berstein: | And what are we talking about there? |
| | Mr. Parsa: | First of all, we did hire a PR firm in an attempt to counter what the Bad Biz |
| 13 | | Finder was spreading.  That firm's name is Idea Hall.  My contract with them |
| | | began in April, April 1st, went through June 1, 2009.  The contract is for |
| 14 | | $45,000.  To date I have already paid them and they have earned  $30,000.  In |
| 15 | | addition to that, if you want me to continue? |
| | Mr. Berstein: | Yeah, are there any other expenses that have been directed toward correcting |
| 16 | | what has been done  by Bad Biz Finder? |
| | Mr. Parsa: | Since February of this year, 2009, we have increased our advertising budget in |
| 17 | | an effort to counter react the losses we were experiencing.  I estimate that to be |
| 18 | | about 10% of our clientele, and that was an additional $10,000 a month, |
| | | approximately, sometimes $12,000, for a total of $40,000 through the first of |
| 19 | | this month, June 1st. |

312.   With that, the Court granted Defendant Parsa Law a judgement against Plaintiff

in the amount of $604,515.66 and signed the Permanent Injunction.  The Court Reporter's

Transcript documented that the Court signed the Default Judgement with Permanent Injunction

with knowledge it was unconstitutionally void for vagueness, overbroad, violated Plaintiff's

due process rights and was an unconstitional prior restraint of Plaintiff's protected speech

about matters of public concern:

> "THE COURT:  Now, if Ms. Baldwin chooses to seek the guidance of the Court
> as to what is permissible or not permissible under this injunction so as to
> fashion something that protects her free speech right while preventing her from
> making libelous defamatory statements, I would invite her to do so."

- 84 -

313.    The permanent injunction was not only unconstitutional, but by its vagueness, placed Plaintiff in a prejudicial position to easily violate the injunction.  The U.S. Supreme Court, in *Hill v. Colorado*, 530 U.S. 703, 732 (2000), ruled on this issue rendering the permanent injunction void *ab initio*, if "It fails to provide 'a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement'."

314.    In *eBay Inc. v. MercExchange L.L.C* 547 U.S. 388 (2006), the United States Supreme Court set forth and considered its "traditional four-factor test historically employed by courts of equity," to wit, that a plaintiff must demonstrate four things prior to the permanent injunction issuing:

        a.    That Plaintiff has suffered an irreparable injury;

        b.    That remedies available at law; such as monetary damages, are inadequate to compensate for that injury;

        c.    That considering the balance of hardships between the parties, a remedy in equity is warranted; and

        d.    that the public interest would not be disserved by a permanent injunction.

315.    The Court failed to identify and list in the Permanent Injunction any specific statements it found defamatory, therefore, what constituted "unprotected speech," to justify the extraordinary measure of permanently enjoining a jounralists speech.  Further comments from Defendant Professor Miller in memorialized in the June 2, 2009 Court Reporter's Transcript are as follows:

> *"Certainly free speech rights are possessed by individuals who chose to speak anonymously.  The question here, however, is whether or not Ms. Baldwin, in the guise of Bad Biz Finder knowingly made false statements about Parsa Law Group, and the Court finds besides the fact that Bad Biz Finder is clearly making great efforts or Ms. Baldwin is making great efforts to remain anonymous <u>allows the court to make the inference that she is knowingly making false statements</u> with the intent to injure Parsa Law Group.*
>
> *"I'm not going to hash it out statement by statement, but there <u>are a number of the statements</u> while they are not very nice might be posted as matters of opinion, but <u>many of them</u> purport to state facts which Mr. Parsa has*

- 85 -

1      *just testified, and I believe him, are untrue about alleged criminal acts,*
2      *fraudulent business practices, et cetera, <u>and that's how the Court reaches its</u>*
       *<u>conclusion</u>.*

3      [Which ones?  The Court never identified, documented or listed in the body of the injunction
4      the statements that formed the basis of his decision to permanently enjoin the "protected
       speech" of a journalist reporting on matters of public concern.]

5
6      **"So, Ms. Baldwin, <u>having had the opportunity to come out of hiding</u>**
       **<u>and give the Court her opinion on this matter, opted not to</u>, which is her right,**
7      **but on the face of the evidence here it's overwhelming that the statements**
       **were libelous both in the general sense and the trade libel sense. ...**

8
9      [Plaintiff "came out of hiding" twice prior to the June 2, 2009 hearing:  She filed an
       Opposition to Defendant Parsa Law's Request for TRO and again on May 28, 2009 on which
10     date she filed a Motion to Set Aside the Default Judgment."  In light of these facts, Defendant
       Professor Miller did not have jurisdiction to enter Plaintiff's Default.]

11
12     **"So, in any event, the court finds by a preponderance of the evidence**
       **that Bad Biz Finder and Erin K. Baldwin – Oh, suggestions have been made,**
13     **although I'm not sure under oath by anyone, that Beverly Sullivan is an aka**
       **of Erin Baldwin.**

14     **[Response from Defendant Parsa Law Attorney David Berstein:**
15     **"<u>Yeah. We're not exactly sure. We believe her to be an aka, but we know the</u>**
       **<u>real person to be Beverly – or Erin K. Baldwin</u>."]**

16
17     [On the date Defendant Professor Miller signed a Default Judgment against Plaintiff in the
       amount of $604,515.66 and permanently enjoined her speech, he had no idea whether she was
18     a defendant in the action, or not.]

19     [Six weeks later in his tentative ruling denying her Motion to Set Aside the Default Judgment
       and Dissolve the Permanent Injunction, Defendant Professor Miller stated: "Not clear if
20     Baldwin has any authority to appear on behalf of Bad Biz."]

21     **"Okay.  What I'm going to do is then enter judgment against Bad Biz**
22     **Finder and Erin K. Baldwin aka Beverly Sullivan.  If, in fact, you find that ---**
       **something to the effect that Beverly Sullivan is indeed a separate person, you**
23     **can bring an action to amend your judgment accordingly.**

24     **"If you find out later on that Beverly Sullivan is the real name, true**
25     **name, of Erin K. Baldwin, again, I think you can probably amend, if**
       **necessary.  But at this point judgment will be against Bad Biz Finder and**
26     **Erin K. Baldwin aka Beverly Sullivan for Trade Libel and Defamation."**

27

28

- 86 -

316.    On June 2, 2009, Defendant Turner mailed to Plaintiff her rejected fee waiver. Plaintiff received in on June 4, 2009, fixed the errors, then faxed it back.  The fee waiver was granted two days after the Default Judgment was entered and Defendant Professor Miller stated the reason on the record:

317.    July 13, 2009, Plaintiff traveled by bus to file a Reply to Plaintiff's Opposition to Defendant's Motion to Set Aside Default, etc. scheduled for July 14, 2009.   At the same time she personally visited Department C-14 and requested information from Defendant Turner about how to appear telephonically for the July 14, 2009 hearing since Plaintiff did not have sufficient funds to return by bus again the next day.  Plaintiff was instructed to coordinate the participation through Court Call in the morning at 888-882-6878 or visit www.courtcall.com for more information.  Defendant Turner did not instruct Plaintiff that she would need a printout of the fee waiver approval from the Department even though Defendant Turner knew that it was required to appear telephonically.

318.    Plaintiff contacted Court Call to make the arrangements and was asked to fax a written acknowledgment that the Court had approved the fee waiver.  Since Plaintiff had only hours earlier appeared personally in Department C-14 and had not been provided with said acknowledgment, she telephoned Defendant Turner and requested that she provide an authorization to Court Call on Plaintiff's behalf.  Defendant Turner informed Plaintiff that she would have to travel back to the Court to pick it up and then fax it herself.   Plaintiff explained that she had just spent her last few dollars traveling to the Court to file the Reply and to inquire how to appear telephonically the next day.  Defendant Turner refused to assist Plaintiff stating: "This is a court of law, we don't do favors." Consequently, Plaintiff was unable to appear.

319.    Also, on July 13, 2009, the Court stated in its tentative ruling preceding the hearing on Plaintiff's Motion to Set Aside the Default:

> **"Although Defendant's Motion was timely brought it is unclear if Baldwin has any authority to appear for Bad Biz."**

320.    Accordingly, the Court did not consider Plaintiff's arguments.  However, six weeks prior to this tentative ruling, on June 2, 2009, the Court was so sufficiently clear that

- 87 -

1    Baldwin had the authority to appear for Bad Biz, that it assigned sole liability to Plaintiff for a

2    $604,515.66 default judgment and permanently enjoined her speech.

3        321.    On July 14, 2009, the Court completely disregarded Plaintiff's arguments in

4    opposition to the June 2, 2009 Default Judgment with Permanent Injunction.   In her papers,

5    Plaintiff, having been recognized by the Court as a Defendant in this action on June 2, 2009,

6    initiated her Motion to Set Aside the Default with: "As Defendant in this action, we request

7    that the Court set aside the default in this case."  The Court denied Defendant's Motion to Set

8    Aside the Default Judgment.

9        322.    Bad Biz Finder has always been referred to as an "unknown business entity" in

10   the Parsa Defamation Case and as such, could not be served with a Summons and Complaint.

11   On May 27, 2009, Defendant BKGG, dismissed all causes of action against Defendant Beverly

12   Sullivan and Does 1-10 on May 27, 2009.  Then, as stated, *supra,* Defendant Professor Miller

13   stated he was unclear whether Plaintiff had any authority to appear for Bad Biz Finder.  If it

14   please the Court, were ther any legitimative defendants names in the Parsa Defamation Case?

15       323.    On July 14, 2009 (the same date the Court refused to acknowledge Plaintiff as a

16   defendant in the Parsa Defamation Action), Defendant BKGG filed an application for an Order

17   to Show Cause Re Contempt against Plaintiff for allegedly violating the terms of the June 2,

18   2009 Default Judgment with Permanent Injunction.

19       324.    On August 31, 2009, the Court held an OSC Re Contempt against Plaintiff for

20   her alleged intentional violations of the June 2, 2009 permanent injunction even though the

21   terms of the injunction were so  murky that the even the Court acknowledged as much on the

22   date it signed the injunction:

> *"THE COURT:  Now, if Ms. Baldwin chooses to seek the guidance of the Court as to what is permissible or not permissible under this injunction so as to fashion something that protects her free speech right while preventing her from making libelous defamatory statements, I would invite her to do so."*

25       325.    Due to the fact that Plaintiff was not timely noticed for this hearing, she did not

26   attend.   The Court ordered a bench warrant for her arrest (with a $5,000 bail), held it until

27   September 10, 2009, then released it (but failed to serve it) on Plaintiff.

28

- 88 -

326. This August 31, 2009 Orange County civil bench warrant was used to arrest and incarcerate Plaintiff in a San Bernardino County correctional facility for thirty-five (35) days beginning February 25, 2010, six (6) months after the bench warrant was issued. During this period of incarceration she was not brought before an Orange County magistrate nor was she given a preliminary hearing to formally charge her with a crime. This constitutes many egregious violations of Plaintiff's constitutional rights. *[Please see "Parsa Defamation Case - Contempt; Case #7," infra, for a statement of facts pertaining specifically to the Contempt case* **and** *"Criminal Case No. FSB1000789; Case #22]*

327. On August 31, 2009, on the same date Plaintiff was held in contempt for continuing to defame  Defendant Parsa's "good name," and Defendant Parsa Law's "stellar business reputation," Kristin Ritsema, Supervising Trial Counsel, of Defendant CSB's Office of the Chief Trial Counsel, filed Case No. 09-C-12545, against James Mazi Parsa (CSB No. 153389) and sent a "Transmittal of Records of Conviction of Attorney" as to Defendant Parsa for "crimes involving moral turpitude," in connection with Orange County Superior Court Case No. NB00HM06291, wherein Defendant Parsa's was convicted of two (2) counts of unlawful sexual intercourse (California Penal Code §261.5) with minors.

328. On September 17, 2009, State Bar Court Presiding Judge JoAnn Remke ordered Defendant Parsa suspended from the practice of law effective October 16, 2009. Judge Remke also ordered Defendant Parsa to comply with Rule 9.20 of the California Rules of Court, and "perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this suspension." The Rule 9.20 Compliance Declaration approved by the State Bar Court Executive Committee on June 7, 2001 and revised on December 13, 2006, requires (that if ordered by the Court, as was the case with Defendant Parsa), attorneys being suspended take the following actions and declare under penalty of perjury that they have done so:

> *1.      I notified all clients and co-counsel, in matters that were pending on the date upon which the order to comply with rule 9.20 was filed by certified or registered mail, return receipt requested, of my consequent disqualification to act as an attorney after the effective date of the order of suspension/disbarment, and in those cases where I had no co-counsel, I urged the clients to seek legal advice elsewhere, calling attention to any urgency in seeking another attorney*

- 89 -

*(OR) Asset that:  As of the date upon which the order to comply with rule 9.20 was filed, I had no clients.*

*2.      I delivered to all clients any papers or other property to which the clients were entitled, or notified clients and co-counsel, if any, of a suitable time and place where the papers or other property could be obtained, and called attention to any urgency for obtaining the papers or other property (OR) Assert that:  As of the date upon which the order to comply with rule 9.20 was filed, I had no papers or other property to which clients were entitled.*

*3.      I refunded fees paid, any part of which had not been earned. As of the date upon which the order to comply with rule 9.20 was filed, I had earned all fees paid to me.*

*4.      I notified all opposing counsel or adverse parties not represented by counsel in matters that were pending on the date upon which the order to comply with rule 9.20 was filed by certified or registered mail, return receipt requested, of my disqualification to act as an attorney after the effective date of my suspension, disbarment, or the Supreme Court's acceptance of my resignation, and filed a copy of my notice to opposing counsel/adverse parties with the court, agency or tribunal before which litigation was pending for inclusion in its files. As of the date upon which the order to comply with rule 9.20 was filed, I did not represent any clients in pending matters.*

329.    On October 8, 2009, Defendant Parsa's wife, Deborah Parsa sued him for divorce via Orange County Superior Court Case No. 09D009278 so that Defendant Parsa could transfer into her name and to others more than $11 million he had remaining in his client trust account. Defendant CSB requires that members that tender their resignation with charges pending return all monies to existing clients (See Declaration, supra) and provide a full accounting of same prior to resignation.  The divorce judgment was entered on March 16, 2010.

330.    On October 16, 2009, Defendant Parsa began an interim suspension post-August 31, 209 conviction by Defendant CSB.

331.    On the 40th day deadline for Defendant Parsa to comply with the rule 9.20 requirements set forth, supra, October 27, 2009, he voluntarily tendered his resignation with charges pending. By so doing, Defendant Parsa avoided his mandatory compliance with Rule 9.20.  Defendant Parsa is eligible to return to the practice of law in less than a month, on October 16, 2011. Due to the fact that Defendant Parsa was charged with an offense of moral

turpitude rather than a violation of Defendant CSB's rules of professional conduct, he is not required by Defendant CSB to make restitution to the thousands of consumers he defrauded. As well, due to the fact that Defendant Parsa put his client trust fund monies in his wife's name, he will have a neat fund to begin his new venture.

332.    In the meantime, Plaintiff that told the truth about Defendant Parsa and his business, Defendant Parsa Law, has an unconstitutional permanent injunction restraining her from reporting on the aforementioned fraud. In addition, Plaintiff has a money judgment in the amount of $604,515.66 that Defendant Parsa can attach to any monies Plaintiff has or property she may acquire. On August 27, 2011, in its tentative ruling on Plaintiff's Motion to Set Aside the Default Judgment and Dissolve the Permanent Injunction, the Court denied Plaintiff's Motion because her Points & Authorities contained too many pages. Plaintiff withdrew her Motion and will proceed herein to remedy her damages.

333.    On September 2, 2009 Plaintiff filed an Appeal of the June 2, 2009 Default Judgment with Permanent Injunction. *[Please see "Parsa Defamation Case - Appeal; Case #8," infra, for a statement of facts pertaining specifically to the Appeal case.]*

334.    On March 24, 2011, Plaintiff filed a Writ of Mandate with the Court of Appeal Re Judicial Disqualification. *[See March 24, 2011, "Parsa Defamation Case - Writ of Mandate," for more details.]*

335.    On June 6, 2011, Plaintiff removed the Parsa Defamation Case to district court pursuant to federal question jurisdiction. *[See June 6, 2011, "Parsa Defamation Case - Removal to District Court," for more details.]*

336.    On August 16, 2011, Plaintiff filed the herein Complaint to remedy the issues contained within this complaint and the thirty-one (31) others to follow.

337.    Defendants associated with this action brought this case with unclean hands and have demonstrated bad faith throughout the litigation of this case. Pursuant to the Doctrine of Unclean Hands, Defendant Parsa Law is not entitled to obtain relief due to the fact that it acted unethically and in bad faith with respect to the subject of this Complaint. Defendant Parsa Law's sole and malicious objective in this litigation was and is to circumvent liability for its illegal actions by extinguishing Defendant's freedom of speech that acts as a public service to

- 91 -

1  expose Defendant Parsa Law's illegal actions and does so for the protection and welfare of

2  consumers.

3      338.    In violation of California Code of Civil procedure §128.7, Defendant UDR

4  presented a Complaint and other pleadings and papers to the Court in bad faith and did so for

5  an improper purpose, such as to harass or to cause unnecessary delay or needless increase in

6  the cost of litigation. The claims, defenses, and other legal contentions within this Complaint

7  are not warranted by existing law and, indeed, comprise a frivolous argument.

8      339.    Plaintiff asserts that Defendant UDR's actions herein constitute violations of her

9  Constitutional rights as well as state law violations incorporated herein by supplementary

10  jurisdiction.

11      340.    On August 30, 2011, in his tentative ruling, Defendant Professor Miller denied

12  Plaintiff's Motion to Vacate the Default Judgment with Permanent Injunction solely because

13  the Memorandum of Points & Authorities has too many pages. Plaintiff withdrew her motion.

14      341.    Although Plaintiff has not been served with Defendant Parsa's Motion to

15  Dismiss, the docket in this matter states that a hearing on said Motion to Dismiss is scheduled

16  in this case for October 18, 2011.

(2)

### **FEBRUARY 17, 2009**
### *UDR Villa Venetia Apartments L.P. v. Erin Baldwin*

Orange County Superior Court
Case No. 30-2009-00244203-CL-UD-HLH
Unlawful Detainer
(brought against Plaintiff by Todd A. Brisco & Associates, APC)

### **("First UDR-UD Case")**

    343.    The above civil case was filed in Orange County Superior Court, Harbor Justice Center; assigned to Commissioner Richard E. Pacheco, Department H-1, for the claim of Unlawful Detainer. Plaintiff was a *pro se* litigant for the entire proceedings of this action entitled, "First UDR-UD Case," Case No. 30-2009-00244203-HJC-UD.

- 92 -

344.    The Complaint in this matter was filed on February 17, 2009 by Defendant UDR's unlawful detainer attorney, Todd A. Brisco, Esq. ("Defendant Brisco") of Todd A. Brisco & Associates ("Defendant "Brisco & Assoc.") and was dismissed nine (9) days later, on February 26, 2009, in Plaintiff's favor.

345.    The Complaint failed utterly to state a claim for which a remedy was available, could not establish a cause of action for unlawful detainer, and demonstrated that the action against Plaintiff was malicious and retaliatory in nature.  In addition, Plaintiff and Defendant UDR had a separate payment arrangement agreement ("Separate Agreement") notwithstanding the terms of the lease.  As such, until the Separate Agreement was set aside by mutual consent, the terms of the lease were not sufficient to establish a cause of action for unlawful detainer.

346.    Nonetheless, on or about December 15, 2009, Defendant UDR unilaterally set aside the Separate Agreement and began the retaliatory eviction process against Plaintiff based solely on her efforts to associate with fellow tenants (similarly situated) to form a unified vehicle for redress of grievances, i.e., a class action lawsuit.

347.    Four days after this action was filed, on February 21, 2009, Defendant UDR towed Plaintiff's vehicle from the apartment complex parking lot without cause, without notice, and without affording Plaintiff the right to know the issues involved so she could remedy them.  Defendant UDR claims Plaintiff's care was unlawfully parked without proper tenant identification but Plaintiff parked in the same spot consistently and had a tenant identification placard on her rear view mirror that was found later in the bushes near where her car was parked.

348.    Plaintiff could not afford to recover her car from impound due to the fact that the fees had already accrued to in excess of $500.00.  As a direct and proximate result, Plaintiff's car was sold shortly thereafter causing great prejudice to Plaintiff in her defense of this case.

349.    To conceal the misconduct inherent in this case and to allow Defendant UDR to file an identical case three (3) days later, Defendant UDR in collusion with the Orange County Superior Court deleted the entire record of this case.  When Plaintiff entered her case number, the result was: "No record found."  When Plaintiff entered the name, "UDR," all unlawful

detainer actions filed by Defendant UDR from 2005 to the present appeared. Not only was Plaintiff's case record missing, the entire case number *sequence* "30-2009-00244..." was missing.

350.    Plaintiff inquired with the Clerk of the Court, as to the reason she could not locate her case information and was told "The Court has a policy to conceal all records of unlawful detainer actions where the tenant wins."  If that is true, Defendant UDR has successfully evicted 1,155 Orange County tenants since October 24, 2004, seventy-one (71) months; sixteen (16) tenants per month.

351.    Using a conservative judgment amount of $6,000 per tenant multiplied by 16 tenants/month, the total is $96,000 per month. If this figure is multiplied by 71 months, the total revenue realized by Defendant UDR from evicting tenants equals $6,861,000.  Defendant UDR has collected nearly $7 million in ill-gotten gains in one county of California since 2004 based on a residential lease agreement that is in violation of California state law, therefore, void *ab initio*.

352.    This $7 million figure does not take into consideration monies Defendant UDR has accrued from its unlawful ratio utility billing system, liquidated damages and hold harmless clauses, and late fees and penalties. One could easily multiply the $7 million figure (for one county) by 45 which is why Defendant UDR's California apartment portfolio represents forty percent (40%) of its $500 million annual revenue.

353.    Plaintiff investigated and reported about truthful and legally-substantiated facts like these for the benefit of tenants.  Plaintiff's speech was protected under the First Amendment and as such, was immune from retaliation, defamation actions, and injunctions restraining her speech.

354.    The following chronology of the First UDR-UD Case represents Defendant UDR's first, albeit, short-lived attempt to retaliate against Plaintiff.  It formed the bais of three (3) additional cases to follow. *[For consistency purposes, although Plaintiff was a defendant in the First UDR-UD Case, she will continue to be referred to as "Plaintiff," and all other parties will maintain their assigned defendant name relevant to the herein action.]*

Chronology of the First UDR-UD Case:

- 94 -

355.    On February 17, 2009, Defendant UDR filed, then improperly served the Summons and Complaint on Plaintiff.  The required notices, figures, dates, and exhibits were completely false, misleading and/or missing entirely.

356.    On February 18, 2009, Plaintiff filed a Motion to Quash Service of Summons; and the hearing was set for February 23, 2009.

357.    On February 21, 2009,  Defendant UDR towed Plaintiff's car claiming it did not have proper tenant identification.  In fact, it had a temporary tag hanging from the rear view mirror given to Plaintiff by Defendant Froude.  Plaintiff had just purchased a used car, went to the office to obtain a parking sticker, was informed they had none, and was given a temporary parking tag to use until more stickers arrived.

358.    When Plaintiff discovered her car missing she spotted the temporary tag in the bushes (it was bright yellow in color) a short distance from where her car had been parked. Plaintiff made several copies of the tag and used it as an exhibit throughout the unlawful detainer actions against her.  The impound fees were cost prohibitive for Plaintiff and as such, her car was sold shortly thereafter.

359.    On February 21, 2009, Defendant UDR filed a <u>Request for Default</u> against Plaintiff.

360.    On February 22, 2009, Defendant Brisco & Assoc. attorney, Cynthia Poer ("Defendant Poer") represented to Plaintiff that she had filed a <u>Request for Dismissal</u> in Plaintiff's case, and as such, she did not need to appear in Court the next day for the hearing on her Motion to Quash.

361.    Also on February 22, the Court entered a "Notice to Filing Party," in which it rejected Defendant UDR's <u>Request for Default</u>, due to the fact that Plaintiff had filed a Motion to Quash and a default xould not be made.

362.    On February 23, 2009, Plaintiff appeared for the hearing on her Motion to Quash and Defendant Poer was already present before the Court.  Plaintiff demanded a copy of the Request for Dismissal and Defendant Poer could not produce it.  Put in the corner, Defendant Poer was forced to dismiss the action orally during th hearing and filed the appropriate documentation a few days later.

- 95 -

363.    On August 16, 2011, Plaintiff filed the herein Complaint to remedy the issues contained within this complaint and the thirty-one (31) others.

364.    Defendants associated with this action brought this case with unclean hands and have demonstrated bad faith throughout the litigation of this case. Pursuant to the Doctrine of Unclean Hands, Defendant UDR is not entitled to obtain relief due to the fact that it acted unethically and in bad faith with respect to the subject of this Complaint. Defendant UDR's sole and malicious objective in this litigation was and is to circumvent liability for its illegal actions by extinguishing Defendant's freedom of speech that acts as a public service to expose Defendant UDR's illegal actions and does so for the protection and welfare of consumers.

365.    In violation of California Code of Civil procedure §128.5, Defendant UDR presented a Complaint and other pleadings and papers to the Court in bad faith and did so for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. The claims, defenses, and other legal contentions within this Complaint are not warranted by existing law and, indeed, comprise a frivolous argument.

366.    Plaintiff asserts that Defendant UDR's actions herein constitute violations of her Constitutional rights as well as state law violations incorporated herein by supplementary jurisdiction.

(3)

**MARCH 3, 2009**
***UDR Villa Venetia Apartments L.P. v. Erin K. Baldwin***

Orange County Superior Court
Case No. 30-2009-00248999-CL-UD-HLH
Unlawful Detainer
(brought against Plaintiff by Todd A. Brisco & Associates, APC)

**("Second UDR-UD Case")**

368.    The aforementioned civil case was filed in Orange County Superior Court, Harbor Justice Center; was assigned to Commissioner Richard E. Pacheco, Department H-1; for the cause of action of Unlawful Detainer. Plaintiff was a pro se litigant for the entire proceedings of this action entitled, "Second UDR-UD Case," Case No. 30-2009-00244203-HJC-UD.

- 96 -

369.     The Complaint in this matter was filed on March 3, 2009 by Defendant UDR's unlawful detainer attorney, Todd A. Brisco, Esq. ("Defendant Brisco") of Todd A. Brisco & Associates ("Defendant "Brisco & Assoc."), two (2) courts days after the First UDR-UD Case was dismissed.  This second Complaint contained the exact same deficiencies as the First UDR-UD Case.  Plaintiff was a *pro se* litigant for the entire case, and as stated, *supra,* was prejudiced by the fact that Defendant UDR unilaterally reneged on their Separate Agreement, unlawfully seized her car (resulting in its sale), and left Plaintiff to resort to public transportation to, once again, defend herself in a meritless, retaliatory unlawful detainer action that violated her constitutional rights.

370.     To conceal the misconduct inherent in this case, Defendant UDR in collusion with the Orange County Superior Court, altered the "search title" of this case to "UDR Newport Beach North LP" instead of its actual "search title, "UDR Villa Venetia LP" and assigned it a peculiar case number not in sequence.  The case immediately preceding Plaintiff's case is case number "00248427" for a case filed on February 27, 2009; Plaintiff's case number is "00248999" filed on March 3, 2009; and the case immediately following Plaintiff's case is case number "00249438" filed on March 4, 2009.

371.     The following chronology of the Second UDR-UD Case represents Defendant UDR's second attempt to perform a retaliatory eviction against Plaintiff.  By this time, Defendant UDR had connected with Defendant Parsa Law's attorneys Defendant BKGG and had joined forces against Plaintiff.   The third UDR case that follows on June 29, 2009 was filed by Defendant BKGG and was an almost identical defamation lawsuit to the Parsa Defamation Case.  [For consistency purposes, although Plaintiff was a defendant in the First UDR-UD Case, she will continue to be referred to as "Plaintiff," and all other parties will maintain their assigned defendant name relevant to the herein action.]

Second UDR-UD Case Chronology:

372.     On or about December 15, 2008, Defendant UDR began to retaliate against Plaintiff for associating with other tenants (similarly situated) to form a unified vehicle for redress of grievances, namely, a class action lawsuit identifying seven separate causes of

- 97 -

1    action in involving unlawful UDR lease provisions.   Shortly thereafter, Defendant UDR

2    unilaterally reneged on the Separate Agreement.

3         373.    On March 3, 2009, two court days after the first UDR-UD Case was dismissed,

4    Defendant UDR filed the <u>Second</u> UDR-UD Case entitled, *UDR Villa Venetia Apartments LLP*

5    *v. Erin K. Baldwin*, Orange County Superior Court Case No. 30-2009-00248999, again

6    assigned to Defendant Commissioner Pacheco, Department H-1.   The Second UDR-UD Case

7    set forth the exact same claims as the First UDR-UD Case.

8         374.    On March 10, 2009, Defendant UDR filed an Application & Order to Serve

9    Summons By Posting Re Unlawful Detainer; said application was granted.

10        375.    On March 16, 2009, Plaintiff filed a Motion to Quash Service of Summons and

11   Complaint; and the hearing was set for March 27, 2009.

12        376.    Also on March 16, 2009, Plaintiff applied for  and was granted a Waiver of

13   Court Fees and Costs.

14        377.    On March 24, 2009, Defendant UDR filed its Opposition to Plaintiff's Motion

15   to Quash Service of Summons and Complaint.

16        378.    On March 27, 2009, the hearing on Plaintiff's Motion to Quash Service of

17   Summons came before the Court.   Plaintiff anticipated that her Motion would be denied and

18   that Commissioner Pacheco would order her to file a responsive pleading.   Accordingly, prior

19   to the hearing, Plaintiff filed a Demurrer to the Complaint and when Defendant Commissioner

20   Pacheco acted as anticipated,  Plaintiff served the Demurrer; hearing was scheduled for April

21   10, 2009.

22        380.    On April 2, 2009, Defendant UDR filed an Amended Complaint.

23        381.    On April 7, 2009, Plaintiff discovered that Defendants UDR shared an improper

24   extrajudicial and personal relationship with Defendant Commissioner Pacheco resulting in bias

25   and prejudice against Plaintiff.    Accordingly, Plaintiff filed a 170.6 Challenge as to

26   Commissioner Pacheco.

27        382.    On April 8, 2009, Commissioner Pacheco granted Plaintiff's 170.6 Peremptory

28   Challenge.

- 98 -

383.   On April 9, 2009, Plaintiff filed a Demand for Jury Trial; Trial was set for April 20, 2009.

384.   On April 10, 2009, the Second UDR-UD Case was reassigned to criminal court judge, Judge Craig Robison; with no explanation as to why an unlawful detainer action would be aassigned to a criminal judge.

385.   Also on April 10, 2009 the hearing on Plaintiff's Demurrer to the Complaint is rescheduled to May 1, 2011.

386.   Also on April 10, 2009, Defendant UDR filed a response to Plaintiff's Demurrer to the Complaint.

387.   On April 16, 2009, Plaintiff filed a Demurrer to the Amended Complaint; hearing is scheduled for May 1, 2009.

388.   On April 24, 2009, Defendant UDR filed its Opposition to Plaintiff's Demurrer to the Amended Complaint.

389.   On May 1, 2009, the hearing on the Demurrer was held and the Court denied Plaintiff's Demurrer and ordered her to file an Answer to the Complaint.

390.   On May 4, 2009, Defendant UDR filed a Notice of Ruling Re Plaintiff's requirement to file an Answer to the Complaint.

391.   Also, on May 4, 2009, Plaintiff filed (a) a Reply to Defendant UDR's Opposition to Plaintiff's Demurrer to the Amended Complaint; and (b) an Answer to the Complaint.

392.   On May 6, 2009, Plaintiff filed (a) an Answer to the Amended Complaint; and (b) Petition for Writ of Mandate; hearing scheduled for May 15, 2009.

393.   Also on May 6, 2009, Defendant UDR filed five (5) Motions To Compel Re Discovery as to (a) Form Interrogatories; (b) Form Interrogatories-General;  (c) Production of Documents – Set One;  (d) Special Interrogatories – Set One; and (e) To Deem Requests for Admissions as True; the hearing was scheduled for May 15, 2009.

394.   On May 7, 2009, the Court entered its Minutes Re Plaintiff's Demurrer to the Amended Complaint.

- 99 -

395.   On May 7, 2009, Plaintiff received a very disturbing email from Defendant Brisco of Defendant Brisco & Assoc. The email originated from a Static I.P. number assigned exclusively to "BRISCO TODD LAW OFFICE OF-050514003632 SBC 07113001604829050 514003636." The email stated:  ***"Erin, You Silly b!tch, get a life.  You are not a lawyer, you are a criminal, addict and piece of $hit.  I hope you end up behind bars."***

396.   On May 11, 2009, Plaintiff filed the  Proof of Service By Mail for her Answer/Writ of Mandate.

397.   On May 13, 2009, Defendant UDR filed a Request / Counter-Request to Set Case for <u>Court Trial</u>, allowing 45 minutes.

398.   On May 15, 2009, the Court finalized its Minutes regarding the five Motions to Compel Discovery filed by Defendant UDR and ordered Plaintiff to pay sanctions in the amount of $960.00.

399.   On May 18, 2009, Plaintiff filed a Request/Counter-Request for a <u>Jury Trial</u>, allowing five (5) days.

400.   On May 19, 2009, the Jury Trial is set for June 1, 2009.

401.   On May 20, 2009, Defendant UDR filed a Motion for Summary Judgment and included with the Motion were the following documents:

        a.   Separate Statement of Undisputed Material Facts and Supporting Evidence for the Motion for Summary Judgment;

        b.   Declaration of Karissa Harmon in Support of  the Motion for Summary Judgment;

        c.   Declaration of  Cynthia S. Poer in Support of  the Motion for Summary Judgment;

        d.   Request for Judicial Notice of the First Amended Complaint; and

        e.    Request for Judicial Notice of the Notice of Motion and Motion to Deem Requests for Admissions as True.

402.   On May 27, 2009, the Court reassigned the hearing on the Motion for Summary Judgment to Department H-12 and rescheduled the date to May 29, 2009.

403.   Also on May 27, 2009, the Court reassigned the Jury Trial to Department H-12 and rescheduled the commencement date to June 1, 2009.

404.   Also on May 27, 2009, Defendant UDR filed a Proof of Service of Summons & Complaint as to "Unnamed Occupants," and a Request for Entry of Default.

405.   On May 28, 2009, Plaintiff filed an Opposition to Defendant UDR's Motion for Summary Judgment.

406.   On May 29, 2009 many events took place:

a.   The Court reassigned Defendant UDR's Motion for Summary Judgment and Jury Trial to Department, H-07;

b.   Defendant UDR served Plaintiff with its Reply to her Opposition to Defendant UDR's Motion for Summary Judgment;

c.   Defendant UDR served Plaintiff with three (3) Motions in Limine in preparation for the Jury Trial scheduled to commence the following Monday, June 1, 2009.

d.   The hearing for Defendant UDR's Motion for Summary Judgment came before Judge Craig Robison and he stated that he was not going to rule on Defendant UDR's Motion for Summary Judgment but ordered parties to commence trial the following Monday.

e.   Plaintiff requested a continuance on the Jury Trial until after Judge Robison ruled on Defendant UDR's Motion for Summary Judgment.

f.   Throughout the case, Plaintiff's right to raise, argue or plead triable issues of fact had been denied.  She was repeatedly told that she must reserve all pleading, argument and mention of triable issues of fact until the trial date.

g.   Consequently, many important facts were still outstanding that were of an exculpatory nature to Plaintiff's case.

h.   A determination of the triable issues of fact by a jury was essential to the fair and equitable resolution of the legal controversy.

i.   Consequently, a ruling on Defendant UDR's Motion for Summary Judgment in favor of Plaintiff confirmed that triable issues of fact still remained to be determined.

- 101 -

1          j.     Conversely, a ruling on Defendant UDR's Motion for Summary

2    Judgment in favor of Defendant UDR confirmed that **_no_** triable issues of fact still remained to

3    be determined and the need to proceed to a jury trial was moot.

4          k.     Therefore, the necessity of Judge Robison ruling on Defendant UDR's

5    Motion for Summary Judgment prior to the commencement of the Jury Trial was imperative

6    and Plaintiff argued same on May 29, 2009.

7          l.     When Plaintiff began making these arguments, Judge Robison became

8    very angry and his bailiff walked over to Plaintiff and stood behind her jiggling his handcuffs.

9          m.     The matter was closed and Plaintiff spent the entire weekend preparing

10   to go to trial.

11      407.    On June 1, 2009, Plaintiff filed a Supplemental Opposition to Defendant UDR's

12   Motion for Summary Judgment.

13      408.    Also, June 1, 2009, Plaintiff was prepared to start the Jury Trial as ordered by

14   Judge Craig Robison the Friday before.  The following events occurred:

15         a.     Instead of commencing the jury trial as ordered, Plaintiff was ushered

16   into a vacant courtroom (with black paper on the windows).

17         b.     Judge Derek Johnson came to the bench and granted Defendant UDR's

18   Motion for Summary Judgment.

19         c.     Plaintiff's right to plead, argue and have a jury determine the

20   outstanding triable issues of fact was denied.

21         d.     Plaintiff queried Judge Derek Johnson as to his reasoning, and he stated,

22   "You might want to look that up for your appeal," and left the bench.

23      409.    On June 8, 2009, the Court finalized its Minutes for Defendant UDR's Motion

24   for Summary Judgment.

25      410.    On June 9, 2009, the Court issued a Writ of Possession.

26      411.    On June 12, 2009, Plaintiff appeared *ex parte* on a "Motion and Proposed Order

27   to Stay the Execution of the Judgment of Eviction for Unlawful Detainer."  Plaintiff waited at

28   Harbor Justice Center from 8:00 a.m. to 4:45 p.m. to be heard.  At 4:45 p.m., Judge Karen

Robinson who claimed she had read all the pleadings in the case announced to Plaintiff,

- 102 -

"Unless you can come up with $8,000 (the amount of the Judgment), in the next 15 minutes, I can't help you."

412.    On June 13, 2009, Plaintiff filed a grievance with Orange County Superior Court Operations (specifically Court Operations Officer, Defendant Kelli Beltran) who handled administrative review issues for the Harbor Justice Center in Newport Beach, California and West Justice Center in Laguna Hills, California.  Defendant Beltran agreed to stay the eviction until the case was reviewed and scheduled a meeting with Plaintiff for June 23, 2009 at 1:30 P.M.

413.    On June 16, 2009, despite Defendant Beltran's promise to stay the eviction, Defendant UDR ordered the Orange County Sheriff's Department to forcibly removed Plaintiff from her apartment.  Plaintiff relied on Defendant Beltran's promise and had not packed or removed her property.  Deputy T.J. Young permitted Defendant to take only what she could carry and her two dogs and informed Plaintiff she could return within the next ten (10) days to recover the balance of her property.  Since Defendant UDR had previously towed and sold her car, Plaintiff left with her bicycle and dogs and a few other items.

414.    On June 17, 2009, Dwayne Roberts, Director of Civil Operations at Orange County Superior Court left Plaintiff a message stating that the meeting she had scheduled for June 23, 2009 with Defendant Kelli Beltran was cancelled.  He stated that there was "no evidence of impropriety found" in Plaintiff's case.  On the message, Defendant Roberts told Plaintiff to call him at 714-568-9943 if she had any questions, and when she did she found that it was a blocked number for the Orange County District Attorney's Office.

415.    On June 17, 2009, Plaintiff's neighbor sent her an email informing Plaintiff that Defendant UDR had two security guards outside Plaintiff's apartment 24/7 making sure that no one went near Plaintiff's apartment.  In fact, she stated: "I let my dog out this morning at 6:00 A.M. and they ran up to me and asked me which apartment I was from. Their description must be blonde lady.....still out there 24 hours a day."

416.    On June 18, 2009, the Court entered "Writ of Possession Returned – Wholly Satisfied."

- 103 -

417.   On June 19, 2009,  Plaintiff's neighbor sent her an email informing Plaintiff that Defendant UDR was insider her apartment packing her property and placing it in moving fan. She stated that there was someone videotaping the entire process.  She also reiterated that since Plaintiff was evicted Defendant UDR had placed two security guard to stand watch over Plaintiff's apartment 24/7, not allowing anyone near it; even questioning people that looked like Plaintiff about where they were going and who they were.   All of Plaintiff's property was moved to an offsite storage facility owned by Defendant UDR .  Plaintiff has not yet recovered her property.

418.   On June 19, 2009 Defendant UDR's employee, Melissa Hurtado who was the Apartment Community Manager at UDR Villa Venetia where Plaintiff was a tenant, prepared a "Notice of Right to Reclaim Abandoned Property," pursuant to California Civil Code §1984, which stated:

> *"Please take notice that when you vacated the above-described premises, the following personal property remain (insert description of personal property):  See 4 attached inventory pages.*
>
> *Unless you pay the reasonable costs of storage for all the personal property described above, and take possession of the property which you claim, no later than 7/10/09 (insert date not less than 5 days after notice is  personally served, or if mailed, not less than 18 days after notice is deposited in the mail), your personal property will be disposed of according to California Civil Code §1988 in one of the following manners:*
>
> *1.   Property valued at more than $300 (this options was checked): Because this propert is believed to be worth more than $300, it will be sold at a public sale after the notice of the sale has been given by publication.  You have the right to bid on the property at this sale.  After the property is sold and the cost of storage, advertising, and sale is deducted, the remaining money will be paid over to the county.  You may claim the remaining money at any time within one year after the county receives the money.*
>
> *You may reclaim you [sic] abandoned personal property at:  1623 N. O'Donnell Way #A, Orange, CA 92867.*
> *Dated: 6/19/2009*
> *Signature of Landlord:  [It is signed by Defendant Melissa Hurtado.]*
> *Type or Print Name of Landlord:  UDR Villa Venetia Apartments, LP*
>
> *Address and Phone Number of Landlord:  2775 Mesa Verde Dr. E., Costa Mesa, CA 92626, p: (714) 540-1800; (714) 556-2374."*

- 104 -