1     *officers take personal property away from an owner to use as evidence.*"

2     415.    In *United States v. Mendenhall*, 446 U.S. 544, 551, 64 L. Ed. 2d 497, 100 S. Ct.

3     1870 (1980), the Supreme Court held:

4        *"The Fourth Amendment also protects against unreasonable seizure of the*

5        *person, including a brief detention. The government may not detain an*

        *individual even momentarily without reasonable, objective grounds. For*

6        *example, a person's refusal to listen or answer does not by itself furnish such*

        *grounds. A person is seized within the meaning of the Fourth Amendment only*

7        *when by means of physical force or show of authority his freedom of movement*

        *is restrained, and in the circumstances surrounding the incident, a reasonable*

8        *person would believe that he was not free to leave."*

9

                 **Violation of Plaintiff's Fifth Amendment Rights**

10       **(Guaranteed to the States Through the Fourteenth Amendment)**

11     416.    Plaintiff herein claims violations of the Fifth Amendment to the U.S.

12     Constitution by public officials acting under color of state law and private parties that acted in

13     joint participation with said state actors.

14     417.    Plaintiff has a Fifth Amendment right to be protected against prosecution for

15     the same offense; however, this right has been violated since January of 2009 by officials

16     acting under color of state law and private parties acting in joint participation with these

17     officials, and by so doing, these private parties also acted under color of state law. These

18     violations of Plaintiff's Fifth Amendment right to be protected against prosecution for the same

19     offense were committed in retaliation of Plaintiff's Writings that represent protected speech

20     about matters of public concern, and when these violations were brought to the attention of the

      courts, they were mocked, ignored, rejected, and disposed of without due process of law.

21     418.    Plaintiff has a Fifth Amendment right to be protected against being compelled

22     in any criminal case to be a witness against herself; however, this right has been violated since

23     January of 2009 by officials acting under color of state law and private parties acting in joint

24     participation with these officials, and by so doing, these private parties also acted under color

25     of state law. These violations of Plaintiff's Fifth Amendment right to be protected against

26     being compelled in any criminal case to be a witness against herself Plaintiff's Writings that

27     represent protected speech about matters of public concern, and when these violations were

28     brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of

1    without due process of law.

2         419.   Plaintiff has a Fifth Amendment right to be protected against the deprivation of

3    liberty without due process of law; however, this right has been violated many times since

4    January of 2009 by officials acting under color of state law and private parties acting in joint

5    participation with these officials, and by so doing, these private parties also acted under color

6    of state law.  These violations of Plaintiff's Fifth Amendment right to be protected against the

7    deprivation of liberty without due process of law were committed in retaliation of Plaintiff's

8    Writings that represent protected speech about matters of public concern, and when these

9    violations were brought to the attention of the courts, they were mocked, ignored, rejected, and

10   disposed of without due process of law.

11        420.   Plaintiff has a Fifth Amendment right to be protected against the deprivation of

12   property without due process of law; however, this right has been violated many times since

13   January of 2009 by officials acting under color of state law and private parties acting in joint

14   participation with these officials, and by so doing, these private parties also acted under color

15   of state law.  These violations of Plaintiff's Fifth Amendment right to be protected against the

16   deprivation of property without due process of law were committed in retaliation of Plaintiff's

17   Writings that represent protected speech about matters of public concern, and when these

18   violations were brought to the attention of the courts, they were mocked, ignored, rejected, and

19   disposed of without due process of law.

20        421.   Plaintiff has a Fifth Amendment right to be protected against abuse of

21   government authority in a legal procedure; however, this right has been violated many times

22   since January of 2009 by officials acting under color of state law and private parties acting in

23   joint participation with these officials, and by so doing, these private parties also acted under

24   color of state law.   These violations of Plaintiff's Fifth Amendment right to be protected

25   against abuse of government authority in a legal procedure were committed in retaliation of

26   Plaintiff's Writings that represent protected speech about matters of public concern, and when

27   these violations were brought to the attention of the courts, they were mocked, ignored,

28   rejected, and disposed of without due process of law.

          422.   Plaintiff has a Fifth Amendment right to be protected against the use of

evidence illegally obtained by law enforcement officers or in collusion with law enforcement officers; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Fifth Amendment right to be protected against the use of evidence illegally obtained by law enforcement officers or in collusion with law enforcement officers were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

423.  Plaintiff was charged with the crime of contempt on August 31, 2009 in *Parsa Law Group v. Bad Biz Finder, et al.*  Said contempt charges were dismissed in Plaintiff's favor.

424.  Plaintiff was charged with the same crime on November 10, 2009 in a case that on September 2, 2009 was related by law to the case from the first contempt charge.

425.  Plaintiff was charged with the crime of contempt on November 10, 2009 in UDR, Inc. v. Bad Biz Finder, et al. Said contempt charges are still pending.

426.  On June 19, 2009, Plaintiff was deprived of her property seized from her Costa Mesa apartment without due process of law.

427.  On or about August 31, 2009, Plaintiff was deprived of her property seized from her Costa Mesa storage unit without due process of law.

428.  On or about February 25, 2010, Plaintiff was deprived of her property seized from her Big Bear City residence without due process of law.

429.  On October 8, 2009, Plaintiff was deprived of liberty when she was falsely arrested and imprisoned without due process of law.

430.  Defendants knew or should have known that double jeopardy attached at the arraignment of Plaintiff for the second charge of criminal contempt.

431.  Defendants knew or should have known that seizure of Plaintiff's property on June 19, 2009 deprived her of her property without due process of law.

432.  Defendants knew or should have known that seizure of Plaintiff's property on or about August 31, 2009, deprived her of her property without due process of law.

- 153 -

433.    Defendants knew or should have known that seizure of Plaintiff's property on or about February 25, 2010 deprived her of property of her property without due process of law.

434.    Defendants knew or should have known that seizure of Plaintiff's person on October 8, 2009 deprived her of her liberty without due process of law.

435.    Defendants knew or should have known that seizure of Plaintiff's person on February 25, 2010 deprived her of her liberty without due process of law.

436.    Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Fifth Amendment rights.

437.    Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.

438.    By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

439.    Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

440.    Plaintiff seeks a remedy to Defendants' acts in violation of her Fifth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

### Violation of Plaintiff's Sixth Amendment Rights
### (Guaranteed to the States Through the Fourteenth Amendment)

441.    Plaintiff herein claims violations of the Sixth Amendment to the U.S. Constitution by public officials acting under color of state law and private parties that acted in joint participation with said state actors.

442.    Plaintiff has a Sixth Amendment right to a speedy and public trial by an impartial jury; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Sixth Amendment right to a speedy and public trial by an impartial jury were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and  disposed of without due process of law.

- 154 -

443.    Plaintiff has a Sixth Amendment right to be informed of the nature and cause of the accusation; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Sixth Amendment right to be informed of the nature and cause of the accusation were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

444.    Plaintiff has a Sixth Amendment right to be confronted with the witnesses against her; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Sixth Amendment right to be confronted with the witnesses against her were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

445.    Plaintiff has a Sixth Amendment right to have compulsory process for obtaining witnesses in her favor; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Sixth Amendment right to have compulsory process for obtaining witnesses in her favor were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

446.    Plaintiff has a Sixth Amendment right to have effective assistance of counsel for her defense; however, this right has been violated many times since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These

- 155 -

violations of Plaintiff's Sixth Amendment right to have effective assistance of counsel for her defense were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

447. Plaintiff was denied the right to a speedy and public trial by an impartial jury when charged with the crime of contempt on August 31, 2009.

448. Plaintiff was denied the right to a speedy and public trial by an impartial jury when charged with the crime of contempt on November 10, 2010.

449. Plaintiff was denied the right to a speedy and public trial by an impartial jury when charged with crimes associated with MSB906348 on October 28, 2009.

450. Plaintiff was denied the right to a speedy and public trial by an impartial jury when charged with the crime of battery on January 25, 2010.

451. Plaintiff was denied the right to a speedy and public trial by an impartial jury when charged with the crime of assault with a deadly weapon on February 25, 2010.

452. Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of contempt on August 31, 2009.

453. Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of contempt on November 10, 2009.

454. Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with crimes associated with MSB906348 on October 28, 2009.

455. Plaintiff was denied the right be informed of the nature and cause of the accusation when charged with the crime of battery on January 25, 2010.

456. Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of assault with a deadly weapon on February 25, 2010.

457. Plaintiff was denied the right to be confronted with the witnesses against her when charged with the crime of contempt on August 31, 2009.

458. Plaintiff was denied the right to be confronted with the witnesses against her when charged with the crime of contempt on November 10, 2009.

459. Plaintiff was denied the right to be confronted with the witnesses against her when charged with crimes associated with MSB906348 on October 28, 2009.

460. Plaintiff was denied the right to be confronted with the witnesses against her when charged with the crime of battery on January 25, 2010.

461. Plaintiff was denied the right to be confronted with the witnesses against her when charged with the crime of assault with a deadly weapon on February 25, 2010.

462. Plaintiff was denied the right to obtain witnesses in her favor when charged with the crime of contempt on August 31, 2009.

463. Plaintiff was denied the right to obtain witnesses in her favor when charged with the crime of contempt on November 10, 2009.

464. Plaintiff was denied the right to obtain witnesses in her favor when charged with crimes associated with MSB906348 on October 28, 2009.

465. Plaintiff was denied the right to obtain witnesses in her favor when charged with the crime of battery on January 25, 2010.

466. Plaintiff was denied the right to obtain witnesses in her favor when charged with the crime of assault with a deadly weapon on February 25, 2010.

467. Plaintiff was denied the right to have effective assistance of counsel for her defense when charged with the crime of contempt on August 31, 2009.

468. Plaintiff was denied the right to have effective assistance of counsel for her defense when charged with the crime of contempt on November 10, 2009.

469. Plaintiff was denied the right to have effective assistance of counsel for her defense when charged with crimes associated with MSB906348 on October 28, 2009.

470. Plaintiff was denied the right to have effective assistance of counsel for her defense when charged with the crime of battery on January 25, 2010.

471. Plaintiff was denied the right to have effective assistance of counsel for her defense when charged with the crime of assault with a deadly weapon on February 25, 2010.

472. Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to a speedy and public trial by an impartial jury.

473.    Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to be informed of the nature and cause of the accusation against her.

474.    Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to confront the witnesses against her.

475.    Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to obtain witnesses in her favor.

476.    Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to have effective assistance of counsel for her defense.

477.    Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Sixth Amendment rights.

478.    Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.

479.    By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

480.    Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

481.    Plaintiff seeks a remedy to Defendants' acts in violation of her Sixth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

482.    In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court enunciated a test to determine whether the right to speedy trial right has been violated:

      a.    length of delay;

      b.    reason for the delay;

      c.    time and manner in which the defendant has asserted her right;

      d.    degree of prejudice to the defendant which the delay has caused.

483.    In *Strunk v. United States* 412 U.S. 434 (1973), the U.S. Supreme Court held:

> "If the reviewing court finds that a defendant's right to a speedy trial was violated, then the indictment must be dismissed and/or the conviction overturned ...Since the delayed trial is the state action which violates the defendant's rights, no other remedy would be appropriate. Thus, a reversal or dismissal of a criminal case on speedy trial grounds means that no further prosecution for the alleged offense can take place."

- 158 -

484.   In Brewer v. Williams, 430 U.S. 387 (1977), the U.S. Supreme Court held:

*"The right to counsel means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him, whether by formal charge, preliminary hearing, indictment, information, or arraignment."*

*"Once adversary proceedings have begun against a defendant, he has a right to legal representation when the government interrogates him and that when a defendant is arrested, arraigned on an arrest warrant before a judge and committed by the court to confinement, there can be no doubt that judicial proceedings have been initiated."*

485.   In Faretta v. California, 422 U.S. 806 (1975), the U.S. Supreme Court held:

*"The power to choose or waive counsel lies with the accused, and a state cannot intrude."*

486.   The Supreme Court has applied the protections of this amendment to the states through the Due Process Clause of the Fourteenth Amendment.

487.   Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Sixth Amendment rights.

488.   Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.

489.   By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

490.   Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

491.   Plaintiff seeks a remedy to Defendants' acts in violation of her Sixth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

**Violation of Plaintiff's Eighth Amendment Rights**
**(Guaranteed to the States Through the Fourteenth Amendment)**

493.   Plaintiff herein claims violations of the Eighth Amendment to the U.S. Constitution by public officials acting under color of state law and private parties that acted in joint participation with said state actors.

494.    <u>Plaintiff has an Eighth Amendment right to be protected against excessive bail</u>; however, this right has been violated since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Eighth Amendment right to be protected against excessive bail were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

494.    <u>Plaintiff has an Eighth Amendment right to be protected against excessive fines</u>; however, this right has been violated since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Eighth Amendment right to be protected against excessive fines were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

494.    <u>Plaintiff has an Eighth Amendment right to be protected against cruel and unusual punishment</u>; however, this right has been violated since January of 2009 by officials acting under color of state law and private parties acting in joint participation with these officials, and by so doing, these private parties also acted under color of state law.  These violations of Plaintiff's Eighth Amendment right to be protected against cruel and unusual punishment were committed in retaliation of Plaintiff's Writings that represent protected speech about matters of public concern, and when these violations were brought to the attention of the courts, they were mocked, ignored, rejected, and disposed of without due process of law.

495.    On March 10, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. FSB1000789;

496.    On March 18, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. MSB906348;

497.  On March 18, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. MSB905837;

498.  On March 26, 2010, Plaintiff was subjected to excessive fines in connection with San Bernardino County Case No. MSB906348;

499.  On March 26, 2010, Plaintiff was subjected to excessive fines in connection with San Bernardino County Case No. MSB905837;

500.  On October 8-9, 2009, Plaintiff was subjected to cruel and unusual punishment in the custody of the San Bernardino County Sheriff's Department.

501.  Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to protection against excessive bail.

502.  Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to protection against excessive fines.

503.  Defendants knew or should have known that Plaintiff was a criminal defendant and entitled to protection against cruel and unusual punishment.

504.  In Furman v. Georgia (408 U.S. 238 (1972)), Justice Brennan wrote:

> *"There are, then, four principles by which we may determine whether a particular punishment is "cruel and unusual": (a) a punishment must not by its severity be degrading to human dignity; (b) a severe punishment that is obviously inflicted in wholly arbitrary fashion; (c) a severe punishment that is clearly and totally rejected throughout society; and (d) A severe punishment that is patently unnecessary."*

505.  In *United States v. Salerno*, 481 U.S. 739 (1987), the U.S. Supreme Court held:

> *"The only limitation imposed by the bail clause is that the government's proposed conditions of release or detention not be excessive in light of the perceived evil."*

506.  Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Eighth Amendment rights.

507.  The Supreme Court has applied the protections of this amendment to the states through the Due Process Clause of the Fourteenth Amendment.

508.  Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.

- 161 -

509.    By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

510.    Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

511.    Plaintiff seeks a remedy to Defendants' acts in violation of her Eighth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

## Violation of Plaintiff's Fourteenth Amendment Rights

512.    Plaintiff herein claims violations of the Fourteenth Amendment to the U.S. Constitution by public officials acting under color of state law and private parties that acted in joint participation with said state actors.

513.    Four principles are asserted in the text of the 14th amendment.

    a.      State and federal citizenship for all persons regardless of race both born or naturalized in the United States was reaffirmed.

    b.      No state would be allowed to abridge the "privileges and immunities" of citizens.

    c.      No person was allowed to be deprived of life, liberty, or property without "due process of law."

    d.      No person could be denied "equal protection of the laws."

514.    The U.S. Supreme Court ruled that, in certain circumstances, the Due Process Clause requires a judge to recuse himself when there is a conflict of interest.

515.    If a judge refuses to recuse himself or the Court of Appeal refuses to disqualify him, Plaintiff's due process rights under the Fourteenth Amendment are violated.

516.    In Monroe v. Pape, 365 U.S. 167 (1961), the U.S. Supreme Court held:

> *"The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful; see United States v. Classic, 313 U.S. 299, 326 (1941); Screws v. United States, 325 U.S. 91, 107 -111 (1945); Williams v. United States, 341 U.S. 97, 99 -100 (1951).*

517.    Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Fourteenth Amendment rights.

518.    Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.

519.    By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

520.    Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

521.    Plaintiff seeks a remedy to Defendants' acts in violation of her Fourteenth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

522.    Plaintiff's position as the owner and operator of an Internet site constituted a property and liberty interest protected by the Due Process Clause of the 14th Amendment.

523.    Defendants' acts constituted a forced interruption of and interference with Plaintiff's property and/or liberty interest protected by the of the 14th Amendment.

<u>Doctrine of Unclean Hands</u>

524.    Pursuant to the Doctrine of Unclean Hands, Plaintiff is not entitled to obtain an equitable remedy (i.e., a Permanent Injunction) due to the fact that it acted unethically and in bad faith with respect to the subject of this Complaint.

525.    California has long recognized the maxim that: "No one can take advantage of his own wrong." (Civ. Code. § 3517.)

526.    The foundation of the Unclean Hands Doctrine was elucidated in Kendall-Jackson Winery, Ltd v. Superior Court (1999) 76 Cal. App.4th 970, 978:

> *"The unclean hands doctrine protests judicial integrity and promotes justice.*
> *"It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system.*
> *"Thus, precluding recovery to the unclean plaintiff protects the courts, rather than the opposing parties' interest.*
> *"The doctrine promotes justice by making a plaintiff answer for its own misconduct in the action.*
> *"It prevents "a wrongdoer from enjoying the fruits of his transgression.*
> *"A plaintiff must act fairly in the matter for which he seeks a remedy.*

- 163 -

> *"He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."*

527. At least one recent California case suggests the defense of unclean hands may be submitted to the jury. (Fuller-Austin Insulation Company v. Highlands Insurance Company (2006) 135 Cal.App.4th 958, 974.)

528. The Court in Dickson, Carlson & Campillo v. Pole (2000) 83 Cal. App. 4th 436, 446 held:

> *"A plaintiff's inequitable conduct in connection with the matter in controversy provides a complete defense to the plaintiff's action. ... Conduct is sufficient to constitute unclean hands if it "violates conscience, or good faith, or other equitable standards of conduct."*

529. The Court in Fladeboe v. American Isuzu Motors, Inc. (2007) 150 Cal.App.4th 42, 56. held:

> *"The Doctrine of Unclean Hands also applies to bad faith conduct by the plaintiff in connection with the matter in controversy."*

530. California Courts have long recognized that fraud in the underlying transaction or other inequitable conduct bars relief. (See, Powell v. Bank of Lemoore (1899) 125 Cal. 468; Jose v. Utley (1921) 185 Cal. 656; London v. Marco (1951) 103 Cal. App. 2nd 450.)

531. As demonstrated, *supra,* and as will continue to be demonstrated, *infra,* defendants in this action have unclean hands, and have demonstrated bad faith.

532. Plaintiff has been severely prejudiced by the tactics of the Defendants in this action as they were the decision-makers and the ones with all the power.

533. Plaintiff requests no special treatment; only equal treatment and a judicial officer that will be impartial and fair to all regardless of their professional or financial status.

534. Plaintiff hereby requests legal assistance by way of a stand-by counsel.

### Plaintiff's Rights to Equal Protection to the Laws

The "194" Sub-Categorization of Plaintiff's Case Represents an

<u>Intentional Deprivation of Her Constitutional Rights</u>

- 164 -

535.    Plaintiff's Section 1983 Civil Rights Complaint was filed on August 16, 2011 with the United States District Court, Central District, Eastern Division. It was assigned to the calendar of United States District Court Judge David O. Carter ("District Judge Carter") and automatically referred to United States District Court Magistrate Judge Sheri Pym ("Magistrate Judge Pym") because Plaintiff is a *pro se* litigant.

536.    Plaintiff selected the proper case category on the Civil Case Coversheet, "440 - Civil Rights," however, the Central District Court has a custom, procedure and policy of sub-categorizing cases brought by citizens without an attorney. Said sub-category is called a "194 Case," and other than *pro se* civil rights claims, the only other case type in the "194 Case" sub-category is "550 - Prisoner Civil Rights" for plaintiffs currently in custody at a correctional facility.

537.    The "Notice of Reference to a U.S. Magistrate Judge," given to *pro se* litigants at the time they file their civil rights complaints states:

> "Pursuant to General Order 08-05, the within action has been assigned to the calendar of the Honorable David O. Carter, U.S. District Judge.  Pursuant to the General Order 05-07, the within action is referred to U.S. Magistrate Judge Sheri Pym, who is authorized to hear preliminary matters and conduct all further hearings as may be appropriate or necessary.

> "Thereafter, unless the Magistrate Judge determines that a trial by District Judge is required, the Magistrate Judge shall prepare a report and recommendation and file it with the Clerk of the Court together with proposed findings of fact and conclusions of law where necessary or appropriate, and a proposed written order or judgment, which shall be mailed to the parties.

> "In the event the Magistrate Judge concludes that a trial by District Judge is required, the Magistrate Judge shall so report to the District Judge.

> "Subsequent documents, correspondence and all other matters to be called to the Magistrate Judge's attention must be submitted and/or filed at the following location: Eastern Division, 3470 Twelfth St., Rm. 134, Riverside, CA 92501."

538.    Plaintiff asserts the final part of paragraph 1, *supra,* contradicts itself.  It states, "who is authorized to hear preliminary matters and conduct all further hearings as may be appropriate or necessary."  The first part, *i.e.,* "authorized to hear preliminary matters" is in line with Section 636(b)(1)(A).  But the last part, "and conduct all further hearings as may be

- 165 -

1   appropriate or necessary," leads Plaintiff to believe that the duties of the U.S. Magistrate Judge

2   are not limited at all.

3       539.    The first part of Paragraph 2, ***"Thereafter, unless the Magistrate Judge***

4   ***determines that a trial by District Judge is required,"*** is disquieting because it appears that

5   Magistrate Judge Pym, a Section I judge, who was sworn into office four months prior to the

6   assignment of Plaintiff's complaint, could unilaterally make a decision whether Plaintiff is

7   entitled to exercise her constitutional right under the Seventh Amendment to a jury trial "by

8   jury before a Section III U.S. District Judge.

9       540.    Next, it summarizes what will happen if Magistrate Judge Pym unilaterally

10  decides that Plaintiff's case does not merit a trial (much less a jury trial) before a Section III

11  U.S. District Judge: ***"the Magistrate Judge shall prepare a report and recommendation and***

12  ***file it with the Clerk of the Court together with proposed findings of fact and conclusions of***

13  ***law."*** This is a very complex case; without the presentation of witnesses, evidence, testimony,

14  experts, and so on, all that would be revealed and considered would be previous state court

15  decisions not applicable to the purpose of bringing this action in federal court under 28 U.S.C.

16  §1983.

17      541.    In *Byrd v. Blue Ridge Cooperative*, 356 U.S. 525 (1958), the Court held:

18      *"Perhaps even more clearly in light of the influence of the Seventh Amendment,*
        *the function assigned to the jury 'is an essential factor in the process for which*
        *the Federal Constitution provides'."*

19

20      542.    The herein case demands a jury trial to render a decision on the findings of fact,

21  that according to the "Notice of Reference" is assigned to Magistrate Judge Pym.  It is only

22  upon a jury decision on the facts of the case can relevant conclusions of law be drawn and

23  given as jury instructions for meaningful deliberation.

24      543.    Then Magistrate Judge Pym will prepare: ***"a proposed written order or***

25  ***judgment, which shall be mailed to the parties."***  Plaintiff can certainly see how this

26  procedure might be the only solution on a logistical basis for an incarcerated plaintiff; but that

27  is not the case with Plaintiff and she demands and expects all the rights available to civil rights

28  plaintiffs that can afford an attorney.  From the outset of this case, Plaintiff has requested

appointed counsel on a stand by basis only.  However, the Court has chosen to ignore said request along with Plaintiff's request for a preliminary injunction to end ongoing retaliation against Plaintiff by defendants named herein.

544.   And finally, the third paragraph states: ***"In the event the Magistrate Judge concludes that a trial by District Judge is required, the Magistrate Judge shall so report to the District Judge."***  A Section I judge cannot make this decision; nor can she make a decision to dispose of Plaintiff's case with a report and recommendation.  Magistrate Judge Pym has six months experience; it is unconscionable and indeed, a reversible error, to place a case of this magnitude in the hands of a junior magistrate judge.

545.   On August 23, 2011, Magistrate Judge Pym entered the "Initial Civil Rights Case Order and Regarding Time Limit for Serving Complaint." It states:

> *"In preparing and submitting all pleadings and correspondence, plaintiff must comply with the following requirements:  At the top of the first page of any document sent to the court, plaintiff must provide his or her name and mailing address, including any information needed for mail to be delivered such as prisoner number or building number."*

546.   Since Plaintiff has been denied access to the Court's electronic filing program not because she doesn't have an attorney, but because she isn't an attorney, Plaintiff must drive to Court and file all pleadings at the clerk's office.  See, Magistrate Judge Pym's Minute Order dated October 17, 2011 that states in relevant part:

> *"Plaintiff has requested permission to file documents electronically and participate in the court's Case Management / Electronic Case Filing ("CM/ECF") system. Under General Order 10-07, only persons registered in the court's CM/ECF system may participate in the system and electronically file documents with the court, and only attorneys admitted to practice in the United States District Court for the Central District of California may become registered CM/ECF users.*
>
> *"Accordingly, because plaintiff is not an attorney admitted to practice before this court, at this time she is precluded from participating in the CM/ECF system and filing documents electronically."*

30.   On August 25, 2011, Plaintiff filed an Opposition to the "Notice of Reference" because it appeared from General Order 11-06 that she was entitled to a reassignment to District Judge Carter if she did not consent to a Magistrate Judge.  General Order 11-06 states in relevant part:

*"Reassignment of Case.  A case initially assigned to a magistrate judge pursuant to this Order shall be randomly reassigned to a district judge if a party has not consented to the exercise of jurisdiction by the magistrate judge within the time required by the Local Rules. A magistrate judge shall be randomly assigned to the reassigned case as the discovery judge."*

547.    On October 5, 2011, Plaintiff requested said reassignment from Judge Carter's clerk, Julie Barrera:

*"In accordance with my "Notice for Leave to Amend the First Amended Complaint and <u>Second Notice to the Court Withholding Consent to Referral to Magistrate Judge</u>," filed yesterday and deposited in Judge Carter's mandatory filing box, may I please have a "Notice of Impending Reassignment to a United States District Judge" filed today on my behalf (in Case No. 5:11-CV-01300-DOC-SP) due to the fact that:*

*"One or more of the parties has requested reassignment to a United States District Judge or has not consented to the jurisdiction of a United States Magistrate Judge."*

*"Also may I please have the Notice state that all hearing dates presently scheduled before, and all existing orders made by Magistrate Judge Pym be vacated and renoticed and reviewed by Judge David O. Carter.*

*"I found that my request is not unusual in the State of California for pro se litigants."*

548.    On October 17, 2011, Ms. Barrera responded to Plaintiff via return email:

*"Since this is not a MJ Direct Assignment case (where they can opt out of having only an MJ hear the matter) we are not able to do what is being requested. <u>This is a regular 194 case</u>. If you take a look at the minute order of 10/11/11, document entry #15, Judge Carter has already addressed this issue in the last paragraph.*

549.    The last paragraph of Judge Carter's Order dated October 11, 2011, states:

*"Second, as Judge Pym explained, the consent of parties is not required when pretrial proceedings are referred to a magistrate judge in accordance with 28 U.S.C. §636(b). If Plaintiff wishes to make a formal motion for Judge Pym's disqualification, Plaintiff must file a formal motion titled as such. <u>Otherwise, Magistrate Judge Pym will remain assigned to the case for all pretrial proceedings, to the extent permitted by 28 U.S.C. §636(b)</u>."*

550.    Plaintiff's asserts that the text in the "Notice of Reference" contradicts the text in 28 U.S.C. §636(b):

- 168 -

551.    Section 636(b)(1)(A) states:

"*Notwithstanding any provision of law to the contrary ... a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court,* **except a motion** *for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.*

552.    Section 636(b)(1)(B) applies to criminal cases, not civil, and states:

"*A judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A),* **of applications for post-trial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.**

553.    Section 636(b)(1)(C) also applies to criminal cases, not civil, and states:

"**The magistrate judge shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.**"

"*Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.*

*A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.*

*The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.*"

554.    Plaintiff's asserts that the text in the "Notice of Reference" contradicts the text in  General Order No. 05-07 (relevant to 194 cases) conflicts with Section 636(b)(1)(A) and with itself:

       a.    On page 2, it states:  "IT IS FURTHER ORDERED that the following civil and criminal matters shall be referred to the full-time Magistrate Judges:  3. Pro se §1983 and Bivens cases for pretrial purposes (except for cases where a federal judicial officer is named as a defendant)."

b. Pretrial purposes is defined as "non-dispositive actions," *i.e.,* those that do not dispose of a case.

c. However, on page 7, General Order 05-07 states that Magistrate Judge cannot hear "potentially" dispositive motions except in pro se §1983 matters: "IT IS FURTHER ORDERED that, except in cases pending before the particular Magistrate Judge for all purposes, the following civil and criminal matters shall not be referred to the Magistrate Judges: (6) Potentially dispositive motions listed in 28 U.S.C. § 636(b)(1)(A), except in social security disability cases, non-capital state or federal habeas corpus petitions, and pro se § 1983 and Bivens cases."

555. Plaintiff's asserts that the text in the "Notice of Reference" contradicts the text in General Order No. 05-07 (relevant to 194 cases) conflicts with Section 636(b)(1)(A) and with itself: Federal Rules of Civil Procedure, Rule 72, also conflicts with Section 636(b)(1)(A)

a. FRCP Rule 72(a) states:

*"<u>Nondispositive Matters.</u>*
*When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."*

c. FRCP Rule 72(b) states:

*"<u>Dispositive Motions and Prisoner Petitions.</u>*
***"(1) Findings and Recommendations.***
*"A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense or a prisoner petition challenging the conditions of confinement. A record must be made of all evidentiary proceedings and may, at the magistrate judge's discretion, be made of any other proceedings. The magistrate judge must enter a recommended disposition, including, if appropriate, proposed findings of fact. The clerk must promptly mail a copy to each party."*

***"(2) Objections.***

*"Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the magistrate judge considers sufficient.*

**"(3) Resolving Objections.**
*"The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."*

Plaintiff is Denied Right to Withhold Consent to Magistrate Judge

<u>& Proceed Before Article III District Court Judge</u>

556.   There is significant Supreme Court precedent underscoring the constitutional requirement that Article III judges (Supreme Court Justices, Court of Appeal Justices, and U.S. District Court Judges) are the ultimate decision-makers on matters involving substantial constitutional questions, like the issues raised in Plaintiff's Complaint.   Article III of the Constitution of the United States sets forth specific directives for Article III Judges, to wit:

*"<u>Section 1</u>:*  **The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish.** *The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office."*

*"<u>Section 2</u>:*  **The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; [...] and between** *citizens of different states [...]. ;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.*

*"In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be party, the Supreme Court shall have original jurisdiction.* **In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make."**

- 171 -

PLAINTIFF'S SECOND AMENDED COMPLAINT

557.    In placing limits on the authority that can be delegated to magistrates, the courts have concluded that in dispositive judicial proceedings, Article III and the Fifth Amendment of the U.S. Constitution establishes rights for litigants to have their cases heard and decided by Article III, as opposed to Article I judges.   When important interests are at stake, and the nature of the judicial proceeding has a significant effect upon the rights and liberties of the accused, magistrates (or other non-Article III adjudicators) may preside in only two narrowly defined situations: (a) when specially appointed [to specific tasks] and subject to ongoing supervision by Article III judges; and (b) after ***obtaining the litigants' consent***. [13]

558.    In *Gomez v. United States*, 490 U.S. 858, 865 (1989), the U.S. Supreme Court held that a non-Article III official may preside when fulfilling a role "subject to the district judge's ongoing supervision and final decision." In *Gomez*, a unanimous Supreme Court held that the task of conducting voir dire examination and presiding at jury selection in a felony trial requires an Article III presence. However, the district court judge in *Gomez* assigned a magistrate [for the specific task of] directing jury voir dire. The magistrate subsequently conducted the voir dire examination and presided at jury selection for petitioners' trial on multiple felony counts.

559.    ***Petitioners contested the magistrate's appointment, but the district court judge overruled the objection.***

560.    Sensitive to potential challenges, however, the judge explicitly offered to review any of the magistrate's rulings *de novo*. Despite this offer, the petitioners failed to challenge the selection of any specific juror.

561.    The trial proceeded and the jury convicted the petitioners. It was not until well after conviction that petitioners challenged the authority of the magistrate to supervise jury selection.   Even then, however, petitioners made no specific claim of prejudice, nor did they allege that the magistrate failed properly to discharge his duties.

562.    On appeal, the Second Circuit affirmed their convictions, observing that such a delegation did not violate Article III nor the Due Process Clause of the Fifth Amendment.

---

[13] *See,* Federal Magistrates Act of 1968, Pub. L. No. 90-578, 82 Stat. 1107 (codified at 28 U.S.C.§§ 631-639 (1988)); *Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1044 (7th Cir. 1984); *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.,* 725 F.2d 537, 546 (9th Cir.), cert. denied, 469 U.S. 824 (1984).

563.    The petitioners then sought writ of certiorari from the U.S. Supreme Court. The Court granted the writ, and after reviewing petitioners' claim, noted that "jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice.'"

564.    Although the Court specifically avoided the constitutional implications of permitting a magistrate to preside over jury selection in a felony criminal trial, it concluded that "the right to have an Article III judge preside in such a consequential proceeding was so basic to fair trial rights *that the harmless error doctrine could not apply*."

565.    This lack of ongoing control is the linchpin of the Court's decision in Gomez. Once counsel had completed the selection of the jury before the magistrate, the district court could exercise no further supervision.  After the jury was empaneled, it became difficult for the reviewing court to repair possible error committed by the presiding magistrate. Consequently, the magistrate became the final arbiter of the jury selection process. The Supreme Court found this situation intolerable and refused to interpret the Federal Magistrates Act to permit magistrates to preside at jury selection.

566.    As the U.S. Supreme Court found:

> *"In matters of great constitutional significance, the trial should be tried before an Article III judge and will enjoy the protections conferred by the Constitution and Bill of Rights.  While trial before a magistrate may occur, the magistrate must be appointed by the district court, is subject to the consent of the litigants, and may face de novo review of the decision."*

567.    As stated, *supra*, Plaintiff was denied the right to withhold consent to a magistrate judge hearing her case by District Judge Carter in his October 11, 2011 Order and by his clerk, Julie Barrera, in her email dated October 17, 2011.  Said Order of the Court violated Plaintiff's federal rights and should be reversed.

568.    The U.S. Supreme Court has also determined that magistrates may preside is in misdemeanor offenses and civil matters.  Under these circumstances, a magistrate may preside only upon the special designation of the district court and, correspondingly, *with the express consent of the parties*.[14]

---

[14] *See*, 28 U.S.C. § 636(c) (1988).  In a criminal matter, under 18 U.S.C. § 3401(b), (f) (1988), either the defendant or the

569.    Even if the parties consent to magistrate adjudication, however, the district court may, *sua sponte*, remove the proceeding from the magistrate and order trial to proceed in district court. (*See,* 18 U.S.C. §3401)

570.    Consent is the linchpin of magistrate adjudication. The Supreme Court, in preserving the magistrate's role, declared that, <u>absent consent</u>, trial of a civil case before a magistrate would constitute a *per se* violation of Article III." [15]

571.    In *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 542, 469 U.S. 824 (1985), in a Ninth Circuit *en banc* opinion, Justice Kennedy observed that "A mandatory provision for trial of an unrestricted class of civil cases by a magistrate and not by Article III judges would violate the constitutional rights of the litigants."

572.    Later, the Ninth Circuit sitting *en banc* withdrew this panel decision and reversed the holding. (Pacemaker, 725 F.2d at 547.) The new majority concluded that careful district court supervision of the magistrate trial and the requirement of litigant consent overcame constitutional objections. Id. at 544-46.

573.    The Ninth Circuit's en banc decision closely resembles those of the First, Second, and Third Circuits, all of which have upheld the constitutionality of magistrate civil trials on the grounds of close district court supervision, which preserves the interests of Article III, and litigant consent, ***which protects the due process rights of the parties.***[16]

574.    In *Olympia Hotels Corp. v. Johnson Wax Development Corp.* 908 F.2d 1363 (7th Cir. 1990) the Court of Appeal held: "Parties cannot be forced to try a dispute subject to federal jurisdiction only by Article III, before a judge who is not authorized to exercise the power conferred by that article."

575.    *In Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982), the U.S. Supreme Court held that: "Article III jurisdiction cannot be conferred on non-Article III courts (*i.e.,* courts without the independence and protection given to Article III judges)."

---

prosecution may demand trial by an Article III judge.
[15] *See, Gomez,* 490 U.S. at 867-68, 870-72;  and *Commonwealth Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986).
[16] See, Collins v. Foreman, 729 F.2d 108 (2d Cir.), cert. denied, 469 U.S. 870 (1984); Goldstein v. Kelleher,  728 F.2d 32 (1st Cir.), cert. denied, 469 U.S. 852 (1984); Wharton-Thomas v. United States, 721 F.2d 922 (3d Cir. 1983).

- 174 -

576.   In *United States v. Lake*, 910 F.2d 414, 417 (7th Cir. 1990), the Seventh Circuit held: "Once again, consent is important. <u>The parties may not be forced to use a magistrate against their wishes.</u>"

577.   Additionally, in *Clark v. Poulton*, 914 F.2d 1426, 1428 (10th Cir. 1990), the Tenth Circuit held:

> *"Magistrates lack jurisdiction to conduct an evidentiary hearing and make recommended findings (absent consent) in a suit under 28 U.S.C. §636 (1988). A magistrate may not proceed without the express consent of the parties-and even if consent is given, the magistrate's decision is subject to de novo review by the district court. <u>Consent is the principle implicated in each of these cases.</u>*[17]

578.   Plaintiff did not discover the above facts until November 3, 2011.  Plaintiff is outraged and appalled at this tactic.[18]

579.   Plaintiff asserts that Magistrate Judge Pym was assigned this case as the most junior Magistrate Judge.  This appears to be common practice amongst California government entities.  To safeguard against liability, they can argue "rookie mistake," in connection with Federal Rules of Civil Procedure, Rule 61, also known as the "Harmless Error Doctrine." This rule is very broad and leaves ample room for arbitrary interpretations:

> *"Unless justice requires otherwise, no error in admitting or excluding evidence — <u>or any other error by the court</u> or a party — is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."*

580.   That is why Plaintiff has chosen to expose said fraud within her Second Amended Complaint prior to commencement of litigation.  Once the Complaint is filed,

---

[17] 28 U.S.C. §636(b)(1) (1988) provides that without consent, a magistrate may not: hear or decide a motion for an injunction; hear a motion for summary judgment; hear or decide a motion to dismiss an indictment; hear or decide a motion to suppress evidence in a criminal case; <u>or hear or decide a contested motion to dismiss in a civil action</u>. To the extent § 636 permits a magistrate to rule on pretrial matters or to conduct evidentiary hearings, § 636(b)(1) specifies that these actions are subject to de novo review by a district court.

[18] Was the Court given reason to believe that Plaintiff would be a prisoner in the near future meriting this case categorization? Plaintiff, a Riverside County resident, received a notice in the mail dated October 31, 2011, warning Plaintiff that she could be arrested and imprisoned at her home or work by the Orange County Sheriff's Department for an outstanding $1,000 civil bench warrant released on August 18, 2011(over two months ago) by OC Superior Court Judge Franz E. Miller and only two days after  he was served as a defendant with the original Complaint on August 16, 2011.

Plaintiff anticipates being flooded by Motions to Dismiss based on an argument akin to "harmless error," Federal Rules of Civil Procedure, Rule (12)(b)(6), "motion to dismiss for failure to state a claim upon which a remedy may be granted."

581.    Plaintiff asserts that the aforementioned issues are indeed **reversible error** and in direct violation of Plaintiff's constitutional rights.

<u>Improper Adjudication of Judge Franz Miller's Motion to Dismiss</u>

582.    Plaintiff wishes to point out that Magistrate Judge Pym has already violated United State Code §636(b)(1) (*see*, fn. 5, *infra*), namely, that she is prohibited from hearing or deciding a contested motion to dismiss in a civil action.

583.    On September 7, 2011, Magistrate Sheri Pym entered an Order of the Court pertaining to Defendant Judge Franz E. Miller's Motion to Dismiss that stated:

> *Defendant Judge Franz E. Miller's motion to dismiss (docket no. 7) was filed on September 6, 2011, <u>and noticed for hearing on October 11, 2011</u>.*
>
> *IT IS ORDERED AS FOLLOWS:*
>
> *1.    The noticed hearing date is ORDERED OFF CALENDAR.*
> *2.    Plaintiff's opposition, or notice of non-opposition, to the motion to dismiss must be served and filed <u>on or before September 28, 2011</u>. Any opposition should be limited to the issues raised in the motion to dismiss.*
> *3.    Defendant's reply, if any, shall be served and filed within 14 days of the filing of plaintiff's opposition.*
> *4.    <u>Unless otherwise ordered, the motion will be taken under submission, without oral argument, when briefing is complete, and the parties will be notified by mail or email of all further proceedings.</u>*
> *Plaintiff is cautioned that failure to timely file an opposition to the motion to dismiss may be deemed consent to the granting of the motion. Local Rule 7-12.*

584.    Not only did Magistrate Judge Pym set for hearing a Motion to Dismiss when she is expressly not authorized to do so, she later vacated the hearing date, demanded an expedited briefing schedule, then took the matter under submission without allowing oral argument.

<u>Improper Ex Parte Extrajudicial Communications</u>

585.    In lieu of filing an opposition to Judge Miller's Motion to Dismiss, Plaintiff filed a First Amended Complaint ("FAC") named Judge Franz Miller in his individual capacity as an adjunct professor of law rather than a judicial officer. Plaintiff also named Franz Miller's

- 176 -

attorney, Sarah Overton, and requested her removal due to improper *ex parte* extrajudicial communications with Magistrate Judge Pym on the day Plaintiff filed her FAC.

586.  When Plaintiff filed her FAC, the Clerk advised her that Ms. Overton would be served her copy of the FAC via the Court's Electronic Filing program pursuant to U.S. District Court Central District Local Rule 5-3.3, "Service of Electronically Filed Documents" as soon as it was uploaded to PACER.  Plaintiff relied on this information and, in good faith, communicated same to Ms. Overton in an email that day, to wit:

> "*Thursday, September 28, 2011*
> *3:30 P.M.*
> *Dear Ms. Overton:*
>    *This is to inform you that I have completed the filing of a First Amended Complaint in Erin K. Baldwin v. Bank of America et al. (previously Erin K. Baldwin v. State Bar et al.).  As such, the briefing schedule on the Motion to Dismiss is moot.  I'll inform the department.*
>    *Your client has been sued as an adjunct professor of law at Whittier Law School and the First Amended Complaint is essentially a claim for relief to:  Collaterally attack and to vacate as void ab initio the default, default judgments, civil contempt citations, and permanent injunctions.*
>    <u>*Your copy will be electronically transmitted once the Court uploads the document in the next couple of days via the ECF system.*</u>"

587.  Magistrate Judge Pym had no way of knowing that Plaintiff sent the aforementioned email to Ms. Overton stating that her service copy would be electronically served, except by improper *ex parte* extrajudicial communication initiated by Ms. Overton.

588.  Magistrate Judge Pym had no reason to believe that Plaintiff had not properly served the FAC in accordance with any authority deemed required, except by improper *ex parte* extrajudicial communication initiated by Ms. Overton.

589.  Nonetheless, Magistrate Judge Pym's order of September 30, 2011 states, in relevant part:

> "*Defendant Franz Miller is the only defendant who has appeared in this case, and is apparently the only defendant who was served with the original complaint.*
>
> <u>**Plaintiff failed to file with the FAC a proof of service of the FAC on defendant Franz Miller. Because the FAC lacked this proof of service, it is subject to being stricken from the court's docket. See August 23, 2011 Order, ¶ 7; Fed. R. Civ. P. 5(d); Local Rule 5-3.**</u>

*Plaintiff is hereby ORDERED to serve the FAC on counsel for defendant Franz Miller, and to file proof of such service no later than October 7, 2011. If such proof of service is not filed by October 7, 2011, the FAC will be ordered stricken."*

590.    Judge Magistrate Pym relied on Federal Rules of Civil Procedure, Rule 5(d), Local Rule 5-3, and her August 23, 2011 "Initial Civil Rights Case Order and Regarding Time Limit for Serving Complaint" as the authority in her September 30, 2011 Order.

591.    Federal Rules of Civil Procedure, Rule 5(d) states, in relevant part: "Any paper after the complaint that is required to be served — together with a certificate of service — must be filed <u>within a reasonable time after service</u>."

592.    Local Rule 5-3 states, in relevant part: "L.R. 5-3.2 Proof of Service - Attachment to Document Served. ***If*** the proof or acknowledgment of service is attached to the original document, it shall be attached as the last page of the document."

593.    Magistrate Judge Pym's August 23, 2011 Order states, in relevant part:

*"Plaintiff is advised that, under Federal Rule of Civil Procedure 4(m), service of the summons and complaint must be accomplished on each named defendant within 120 days after the filing of the complaint. <u>The 120-day period will expire on December 14, 2011</u>. In addition, in accordance with Federal Rule of Civil Procedure 4(l) and this order, <u>plaintiff must file with this court by not later than December 21, 2011 proof of service on each defendant</u>."*

594.    Plaintiff fails to find the authority upon which Magistrate Judge Pym relied to make her ruling on service to Ms. Overton.  None of the named authorities states that:

        a.    Plaintiff must serve the document first, then attach a proof of service stating that service has been completed, and then file the document with the court; or that

        b.    Plaintiff's FAC is subject to being stricken if "a.," *supra,* is not effectuated.

595.    In any event, it would appear that striking a First Amended Complaint from the court record would fall under "dispositive matters," not within the jurisdiction of Magistrate Judge Pym.

596.    A magistrate judge may be removed "for incompetency, misconduct, neglect of duty, or physical or mental disability." (28 U.S.C. §631(i)).

- 178 -

<u>Plaintiff's Case is Ordered to Mandatory Alternative Dispute Resolution</u>

597.   In addition to the above issue, on or about October 5, 2011, District Judge Carter assigned Plaintiff's case to Mandatory Alternative Dispute Resolution.   Prior to this date, Plaintiff's case docket only stated "194"; thereafter it stated "MANADR."   Interestingly, a prisoner would never be assigned Mandatory ADR due to obvious logistical problems, so Plaintiff asserts that this is just another tactic to keep Plaintiff from bringing her case to a jury.

a.   Due to the fact that Plaintiff is not a party to a mandatory arbitration contract nor has she waived her right to a jury trial, she cannot be forced to submit to mandatory arbitration proceedings, nor would she under any circumstances.   Mandatory arbitration prevents a party from presenting its case before a jury, severely limits discovery, a single arbitrator's findings are final and not appealable, and the findings are not made public.

b.   Mediation is the other form of alternative dispute resolution and is not binding on the parties.   Plaintiff was extraordinarily thorough in planning her §1983 action and even though she was not required by law to exhaust all administrative remedies prior to filing her §1983 Complaint in District Court, [19] she did so anyway, in good faith, hoping to avoid the filing of this action.   Nonetheless, both Defendants County of Orange and County of San Bernardino rejected Plaintiff's Notice of Claim filings in whole.   As such, Plaintiff asserts that mediation would be pointless.

---

[19] See, *Felder v. Casey*, 487 U. S. 131 (1988): "Notice of claim rules are neither universally familiar nor in any sense indispensable prerequisites to litigation, and there is thus no reason to suppose that Congress intended federal courts to apply such rules, which significantly inhibit the ability to bring federal actions." [...] "While prompt investigation of claims inures to the benefit of both claimants and local governments, notice statutes are enacted primarily for the benefit of governmental defendants, and are intended to afford such defendants an opportunity to prepare a stronger case. Sound notions of public administration may support the prompt notice requirement, but those policies necessarily clash with the remedial purposes of the federal civil rights laws."

### F.    Claims For Relief

<u>COUNT ONE</u>

Unlawful Search & Seizure
Without Due Process of Law
<u>June 19, 2009</u>

598.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-597 of this Complaint.

599.    Defendants UDR, Klingbeil, Foss, Freeman, Grove, Scharar, Oliver, Toomey, Sagalyn, Sandler, Troupe, Messenger, Giannotti, Davis, Culwell, Akin, Hurtado, Saffos, Harmon, Froude, TABA, Brisco, Poer, and Coor, are "persons," as that term is used in the text of 42 U.S.C. §1983.

600.    Defendants OCSD, Hutchens, Cossairt, Moreno, and Young, acting individually and under color of state law, the UDR defendants named, supra, acting individually and in concert with UDR defendant named inparagraph 599, retailiated against Plaintiff by (a) evicting her; (b) taking all her property; then (c) wanting to charge her $2,200.00 to get back the property Defendant UDR had stolen and with which Plaintiff had a legitimate entitlement.

601.    On June 16, 2009, Defendant UDR, acting in concert with officers acting under color of state law, evicted Plaintiff from her UDR apartment in retaliation for exercising her First Amendment rights to:

        (a)    freedom of speech without prior restraint;

        (b)    right to petition the government for a redress of grievances;

        (c)    the right to peaceably assemble for the purpose of petitioning the government for a redress of grievances; and

        (d) the right to associate with others similarly associated.

602.    Despite a promised stay of eviction by Defendant Kelli Beltran of the Orange County Superior Court, Defendant OCSB removed Plaintiff from her apartments and told her she had **ten** (10) days to retrieve her property.

- 180 -

603.    However, on the third day, June 19, 2009, Defendant UDR intentionally violated Plaintiff's protected property interest without due process of law and seized the entire contents of her apartment to:

   (a) prevent her from forming a class action lawsuit;

   (b) prevent her from writing truthful and fact-based consumer reports about UDR's unlawful California leases; and

   (c) prevent her from defending a defamation law suit it was preparing to file and serve on her in ten days, June 29, 2009, when it knew she was homeless, carless and had no money.

604.    Plaintiff was engaged in protected constitutionally-guaranteed activities and Defendant UDR intentionally retaliated against Plaintiff.

605.    Plaintiff was forming a class action lawsuit on behalf of UDR's California tenants against UDR for its unlawful California residential lease agreements and substandard living conditions.

606.    On June 19, 2009, Defendant UDR unlawfully searched and seized the entire contents of Plaintiff's Costa Mesa apartment in retaliation and then later told Plaintiff she must pay $2,200.00 for the return of her property.

607.    Thereafter, according to Defendant UDR's attorney, Defendant Goodman, UDR sold Plaintiff's property to James Parsa of Parsa Law Group to use against her.

608.    On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Notice</u> of said action.

609.    On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Notice of Basis of Charges</u>.

610.    On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Be Heard</u>.

611.    On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her

- 181 -

constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Substantial and Credible Evidence to Support the Charges</u>.

612.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to An Explanation of Adverse Findings</u>.

613.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Access to the Courts</u>.

614.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Fair Trial</u>.

615.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Jury Trial</u>.

616.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Bring and Confront Witnesses</u>.

617.   On June 19, 2009, not only did UDR intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Present and Collect Evidence</u>.

618.   The actions of Defendant UDR evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

619.   The actions of Defendant UDR, deprived Plaintiff of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

620.   As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, emotional trauma, loss of property, and loss of privacy.

- 182 -

<center>COUNT TWO</center>

<center>Unlawful Search & Seizure
Without Due Process of Law
<u>August 31, 2009</u></center>

621.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-620 of this Complaint.

622.    Defendants UDR, Klingbeil, Foss, Freeman, Grove, Scharar, Oliver, Toomey, Sagalyn, Sandler, Public Storage, Abernethy, MSPL, Hughes, TABA, Brisco, Poer, and Coor are "persons," as that term is used in the text of 42 U.S.C. §1983.

623.    Defendants Public Storage, Abernethy, MSPL, Hughes in collusion with Defendants UDR, Klingbeil, Foss, Freeman, Grove, Scharar, Oliver, Toomey, Sagalyn, Sandler, OCSD, Hutchens, Cossairt, Moreno, and Young, acting individually and under color of state law to gain possess, the UDR defendants named, supra, acting individually and in concert retailiated against Plaintiff by obtaining possession her property located at a Mini Public Storage facility in Costa Mesa, California.

624.    On June 16, 2009, Defendants Abernethy and MSPL filed papers with the Court to attempt to gain possession of Plaintiff's property for the benefit, and on behalf of Defendant, acting in concert with officers acting under color of state law, at Orange County Superior Court (namely, Commissioner Richard E. Pacheco) and Defendant OCSD to further retaliatory actions against Plaintiff for exercising her First Amendment rights to:

        (a)    freedom of speech without prior restraint;

        (b)    right to petition the government for a redress of grievances;

        (c)    the right to peaceably assemble for the purpose of petitioning the government for a redress of grievances; and

        (d) the right to associate with others similarly associated.

625.    Plaintiff had been paying her storage facility bill, but all of a sudden her payments began to be returned to her. On the same Plaintiff was evicted by UDR (June 16, 2009), Defendant Abernethy filed a lawsuit in the Court to gain possession of Plaintiff's property as General Partner of Mini Storage Properties Limited, the owner of the facility.

<center>- 183 -</center>

626.   Plaintiff had filed an Opposition to Lien Sale, so Defendant Abernethy was having issues getting the job done in Court.

627.   That is, until Defendant Abernethy's associate, and fellow Board member of Bernstein AllianceBernstein Real Estate Investment Fund, Inc., UDR, Inc., gave a call to Commissioner Richard Pacheco who granted Defendant Abernethy a "special hearing."   At said hearing, Commissioner Pacheco granted Pacheco possession to Plaintiff's property without due process of law.

628.   On August 31, 2009, Defendant Abernethy had possession of Plaintiff's property and upon information and belief, turned it over to Defendant UDR.

629.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Notice of said action.

630.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Notice of Basis of Charges.

631.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Be Heard.

632.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Substantial and Credible Evidence to Support the Charges.

633.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to An Explanation of Adverse Findings.

634.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Access to the Courts.

635.   On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and

- 184 -

Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Fair Trial</u>.

636.    On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Jury Trial</u>.

637.    On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Bring and Confront Witnesses</u>.

638.    On August 31, 2009, not only did Public Storage, Abernethy, MSPL, and Hughes intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Present and Collect Evidence</u>.

639.    The actions of Public Storage, Abernethy, MSPL, and Hughes evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

640.    The actions of Public Storage, Abernethy, MSPL, and Hughes intentionally deprived Plaintiff of her constitutionally-protected property interest, as well as her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

641.    As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, emotional trauma, loss of property, and loss of privacy.

<u>COUNT THREE</u>

Unlawful Search & Seizure
Without Due Process of Law
<u>On or About February 25, 2010</u>

642.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-641 of this Complaint.

643.    Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton are "persons," as that term is used in the text of 42 U.S.C. §1983.

- 185 -

644.    Defendants CSB, Crow, Girardi, and Layton in collusion with Defendants SBSD, SBDA, acted individually and under color of state law to gain possession of Plaintiff's property left at her residence at 1017 Mountain View Boulevard, Big Bear City, California, when she was arrested on February 25, 2010.

645.    Before being released from jail, SBDA Defendant Spencer and SBPD Defendant Canty informed Plaintiff she could contact Defendant SBSD upon release to obtain her property.  However, when Plaintiff attempted to do so, no one would help her and to this day Plaintiff has still not recovered her property.

646.    Defendants named in Paragraph 623, supra, were retaliating against Plaintiff for her the article she wrote about Defendant SB County and its law enforcement practices that Plaintiff found lacking.

647.    On or about February 25, 2010, Defendant Crow had possession of Plaintiff's property and upon information and belief, turned it over to Defendants SBSD and SBDA.

648.    As a condition of release on March 26, 2010, Plaintiff was required to sign a "Stay Away Order" indicating she would not contact the San Bernardino County Sheriff's Department or San Bernardino County District Attorney for any reason other than to report a crime.

649.    As such, it was nearly impossible for Plaintiff to locate her property.  Plaintiff contacted her former public defender, SBPD Defendant Canty and he said that since Plaintiff's property had not been entered into evidence, he nor Defendant SBSD could help her recover it.

650.    Then Plaintiff sent a letter to Judge Michael Dest requesting help for same and he returned her letter suggesting she follow the advice of her public defender.

651.    On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Notice of said action.

652.    On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her Right to Notice of Basis of Charges.

653.    On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB,

- 186 -

Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Be Heard</u>.

654.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Substantial and Credible Evidence to Support the Charges</u>.

655.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to An Explanation of Adverse Findings</u>.

656.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to Access to the Courts</u>.

657.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Fair Trial</u>.

658.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Jury Trial</u>.

659.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Bring and Confront Witnesses</u>.

660.   On or about February 25, 2010, not only did Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprive Plaintiff of her constitutionally-protected property interest, but also deprived Plaintiff of her <u>Right to a Present and Collect Evidence</u>.

661.   The actions of Public Storage, Abernethy, MSPL, and Hughes evidenced a reckless and callous disregard for, and deliberate indifference to Plaintiff's constitutional rights.

662.    The actions of Defendants SBSD, SBDA, CSB, Crow, Girardi, and Layton intentionally deprived Plaintiff of her constitutionally-protected property interest, as well as her rights under the Fourth and Fourteenth Amendments to the United States Constitution.

663.    As a direct and foreseeable consequence of these deprivations, Plaintiff has suffered economic loss, emotional trauma, loss of property, and loss of privacy.

<div align="center">

COUNT FOUR
First Amendment Right to Publish Anonymously
Violation of Privacy Rights
Personal Liberty Interests

</div>

664.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-663 of this Complaint.

665.    Beginning on January 27, 2009, Defendants PLG and BKGG sought the identity of BBF's owner.    During the process, they violated Plaintiff's federal and constitutional rights including:

a.    Privacy under the Federal Cable Privacy Act (47 U.S.C. §551(c)) that requires a court order prior to the release of personally-identifying information from a cable provider.

b.    Plaintiff's First Amendment right to anonymous speech; and

c.    Plaintiff's right to due process of law guaranteed under the Fifth and Fourteenth Amendments.

666.    Even though the text of the First Amendment does state its protection of anonymous speech, the U.S. Supreme Court in its rulings, has decided that it does, and that online speech receives no less constitutional protection than any other speech. (See, McIntyre v. Ohio Elections Comm'n, 115 S. Ct. 1511, 1535 (1995); Talley v. California, 362 U.S. 60 (1960), and Lovell v. Griffin, 303 U.S. 444 (1938)).

667.    The following events demonstrate how Plaintiff's rights were violated:

a.    Prior to filing the Complaint and without a subpoena or court order, Defendants BKGG & PLG covertly acquired the Internet Protocol Address ("I.P. Address") used to set up BBF from the company hosting BBF, WordPress, owned and operated by

<div align="center">

- 188 -

</div>

1  Defendants Automattic, Mullenweg, and Schneider.

2       b.   The day after filing the Complaint, Defendants BKGG & PLG used that

3  I.P. address to serve a subpoena on American Online, Inc. demanding extensive personally-

4  identifying information about the owner of the email address, badbizfinder@aol.com.

5       c.   Said subpoena fraudulently demanded production of this information on

6  the authority of 18 U.S.C. §2703(c)(2), which federal statute applies only to subpoenas issued

7  by government entities.   Defendants PLG and BKGG are not government agencies.

8       d.   Also on January 27, 2009, Defendants BKGG & PLG served the same

9  subpoena on:

10      i.   Road Runner Holdco, LLC, a supplier of high-speed, cable-

11  based Internet access in connection with Time Warner Cable, inter alia.

12      ii.   Road Runner High Speed Data, a division of Time Warner

13  Cable, that supplies cable Internet service by way of DOCSIS-compatible modems.

14      iii.   Time Warner, Inc., at that time owner of AOL.

15      e.   On all three of the subponeas, supra, Defendants PLG & BKGG used

16  the I.P. address, illegally obtained from Defendant Automattic, and fraudulently demanded

17  information based on an inapplicable federal statute that did not entitle them to the information

18  demanded.

19  668.   On March 6, 2009, Defendants PLG and BKGG filed its First Amended

20  Complaint ("FAC") that added two causes of action, Trade Libel and Unfair Competition &

21  Business Practices but did not name any new defendants into the caption.

22  669.   On March 16, 2009, Reed Smith attorney, Defendant Moberg claimed she was

23  counsel for AOL.

24  670.   Without a subpoena or court order, Defendant Moberg provided Defendant

25  BKGG personally-identifying information for the email account badbizfinder@aol.com.  She

26  named the owner of the email as Beverly Sullivan.

27  671.   On March 19, 2009, Defendants PLG and BKGG filed its Second Amended

28  Complaint ("SAC") adding Erin Baldwin and Beverly Sullivan as defendants.  They claimed

that Defendant Moberg's letter substantiated adding Bevrerly Sullivan into the case;   but

- 189 -

offered no evidence to justify adding Erin Baldwin as a defendant.

672.   The SAC stated that Beverly Sullivan and Erin Baldwin were "alter egos" of Bad Biz Finder, not separate from Bad Biz Finder, and were jointly and severally liable for the acts complained of in the SAC.

673.   In essence, Defendant PLG & BKGG substituted BBF with two defendants, Beverly Sullivan and Erin Baldwin.

674.   Nearly a month later, on April 11, 2009, the Court signed a court order demanding that Time Warner Cable comply with Defendant BKGG's subpoena dated January 27, 2009.  It stated: "

675.   On April 29, 2009, Time Warner identified Erin Baldwin as the owner of the cable account but correctly included: "We do not make any representations as to the identity of any individual who actually used the above IP address on the date and time in question."

676.   On March 6, 2009, Defendants PLG and BKGG included Plaintiff's name into the body of its FAC with no legal justification.

677.   On March 19, 2009, Defendants PLG and BKGG included Plaintiff's name into the caption and body of its FAC with no legal justification.

678.   Defendants PLG and BKGG never amended its Second Amended Complaint to include the information received from Time Warner and make an argument for the legal justification of adding Plaintiff as a defendant of the action.

679.   On May 11, 2009, Defendants PLG and BKGG, filed a Request for a Preliminary Injunction against Plaintiff.

680.   However, on or about May 16, 2009, Defendant Automattic violated its own Privacy Policy and Plaintiff's right to privacy by releasing Plaintiff's personally-identifying information to Burkhalter, Kessler, Goodman & George, LLP without notice to Plaintiff or an opportunity to quash the request.

681.   On May 18, 2009, Plaintiff filed an Opposition to BKGG's Request for a Preliminary Injunction along with an Application for a Fee Waiver.

682.   On May 19, 2009, the Court Clerk requested Defendant Miller's courtroom clerk, Defendant Turner, to inform Plaintiff of errors on her Application for a Fee Waiver.

1    Defendant Turner intentionally failed to do so.

2         683.   On May 19, 2009, at the hearing on the Preliminary Injunction, Defendant

3    Miller acknowledged receipt of Plaintiff's Opposition but refused to consider it because "it was

4    not timely filed."

5         684.   However, on May 19, 2009, Defendant Miller denied the Preliminary

6    Injunction based on arguments contained in Plaintiff's Opposition, namely, that a preliminary

7    injunction would represent an unconstitutional prior restraint of Plaintiff's speech.

8         685.   Even though Plaintiff had filed an Opposition to the Preliminary Injunction and

9    shown good faith to acquire a fee waiver, Defendant Miller allowed Defendants PLG and

10   BKGG to file a Request for Entry of Default againt Plaintiff.

11        686.   The Default Prove-Up hearing was scheduled for May 29, 2009.

12        687.   On May 27, 2009, Plaintiff filed a Motion for an Order Setting Aside the

13   Default.

14        688.   On May 28, 2009, the Court Clerk rejected Defendant PLG' and BKGG's

15   Request for Entry of Default because it was void any documentation of its claims.  As a result,

16   the Default Prove-up hearing was continued to June 2, 2009.

17        689.   On May 29, 2009, Defendants Miller, PLG, BKGG, and California State Bar

18   Investigators, Tom Layton and John Noonen met and paid Defendant Miller a bribe to enter

     judgment and an injunction against Plaintiff.

19        690.   On June 2, 2009, at the Default Prove-Up Hearing:

20             a.      Defendant Miller acknowledged receipt of Plaintiff's Motion but refused

21   to considerate it because Plaintiff had not "paid a first appearance fee."

22             b.      Plaintiff had not paid a fee because Defendant Miller's Clerk, Defendant

23   Turner, had failed to inform Plaintiff of errors in her fee waiver application.

24             c.      Defendant Miller ordered a Default Judgment against Plaintiff for

25   $604,515.66 without documentation of its claims as required by the Court Clerk on May 28,

26   2009.

27             d.      Defendant Miller ordered a Permanent Injunction against Plaintiff:

28                    i.      without taking into consideration the fact that he had denied the

- 191 -

Preliminary Injunction just two weeks earlier on constitutional grounds;

          ii.    without a full hearing on the merits to identify the defamatory statements made by Plaintiff constituting "unprotected speech";

          iii.    without setting forth in the injunction the prohibited statements;

          iv.    without setting forth in the injunction the prohibited subjects and parties.

691.    On July 14, 2009, Defendant Miller denied Plaintiff's Motion to Set Aside the Default claiming that he was "not clear whether Baldwin had any authority to speak for Bad Biz."

692.    On July 14, 2009, Defendant PLG and BKGG filed an Application for an Order to Show Case Re Contempt against citee, "Bad Biz Finder."

693.    Said Application was granted by Defendant Miller and the hearing was set for August 31, 2009.

694.    On August 31, 2009, Defendant Miller issued a bench warrant for Plaintiff's arrest for not appearing at the OSC Re Contempt even though she had not been noticed.

695.    On February 25, 2010, Plaintiff was falsely arrested by Defendant San Bernardino Sheriff's Department on the force of this bench warrant and falsely imprisoned for 35 days in a San Bernardino County jail without probable cause.

696.    On June 1, 2010, Plaintiff was ordered to appear before Defendant Miller on the contempt charges and he assigned Plaintiff a Public Defender.

697.    From the beginning, this case was a strategic lawsuit against public participation ("SLAPP"), was decided in favor of Parsa Law Group in exchange for a bribe paid to Judge Miller financed by James Parsa and orchestrated by the California State Bar.

698.    The litigation and resolution of said case violated Plaintiff's rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

699.    On May 29, 2009:  Judge Franz E. Miller accepted a substantial bribe from the California State Bar and James Parsa to enter permanent injunctions against Plaintiff

700.    On June 2, 2009, Judge Miller ordered Default Judgment ($604,515.66) with Permanent Injunction is against Plaintiff.

- 192 -

## COUNT FIVE

Deprivation of Right to Access to the Courts
Court of Appeal Dismisses Plaintiff's Appeal
Based on Inability to Pay Fees
*Parsa Law Group, APC v. Bad Biz Finder, Erin Baldwin, et al.*

Ninth Circuit Court of Appeal, Fourth District, Division Three,
Case No. G042561, Justices Sills, Aronsen, and Rybel Presiding

701.    On September 2, 2009, Plaintiff filed an appeal of the June 2, 2009, Default Judgment with Permanent Injunction against Plaintiff in *Parsa Law Group, APC v. Bad Biz Finder* case in the Ninth Circuit Court of Appeal, Fourth District, Division Three, Case No. G042561, Justices Sills, Aronsen, and Rybel Presiding.  At that time, Plaintiff did not know that Defendant Miller had served as this Court's Senior Staff Attorney for the fourteen (14) years immediately preceding his appointment to the bench in 2002.

702.    On September 19, 2009, Plaintiff filed a Designation of Record.

703.    On September 23, 2009, A Dismissal Order was sent to the Presiding Justice for signature pursuant to Rule 8.100(c) that states:

> *"Appellant having failed to pay the statutory filing fee in compliance with rule 8.100(b)(1) of the California Rules of Court, after notice given pursuant to rule 8.100(c)(2), the appeal filed on September 02, 2009, is DISMISSED."*

704.    On October 1, 2009, Plaintiff faxed-filed a "Notice of Motion to Vacate Dismissal of the Appeal and Return Appeal to Active Status."

705.    On October 23, 2009, the Court returned the Appeal to active status.

> *"Order of dismissal vacated.  The appeal was dismissed on September 23, 2009, for appellant's failure to post filing fees. (See Cal. Rules of Court, rule 8.100(b).) Today, appellant submitted by facsimile a motion to vacate the dismissal. No proof of service is attached to the motion, <u>but given appellant has now complied with the filing fee requirement, the motion is GRANTED.   The dismissal is VACATED and the appeal is REINSTATED.</u> Appellant is further ORDERED to serve respondent with a copy of the motion to vacate within 15 days of the date of this order and to provide this court with a proof of service showing such service or the appeal may be again dismissed."*

706.    On February 4, 2010, the Court filed a declaration pursuant to Appellant's Failure to comply with California Rules of Court, Rule 8.140 claiming that no fees and/or reporter's waivers were deposited.

- 193 -

707.    On February 5, 2010, the Court of Appeal Dismissed Plaintiff's Appeal pursuant to California Rules of Court, Rule 8.140(b), that stated:

> "Pursuant to California Rules of Court, rule 8.140(b)(1), the appeal filed September 02, 2009, is DISMISSED for appellant's failure to deposit costs in a timely manner for preparation of the record on appeal."

706.    On February 6, 2010, Plaintiff wrote a letter to Kathleen A. Rossi, Senior Deputy Clerk of this Court of Appeal (hereinafter "Defendant Rossi"):

> "Yesterday I received a notice via email that the above-referenced appeal had been dismissed pursuant to Rule 8.140, Failure to procure the record. There must be a misunderstanding because I spoke with Deputy Clerk Shahira Naqshbandy in your office on December 28, 2009, which she should remember.
>
> "I called to check on the status of my appeal because I had not received Respondent's Designation of Record. Deputy Clerk Shahira Naqshbandy told me that they may not file one, which I guess is the case. She then told me that they are still waiting for the Superior Court to send over the record and once that is received then a letter will go out to me indicating that I have 30 days to file my Appellant's Opening Brief. She suggested that I call the Superior Court and find out what the delay was in sending over my record which I did the very next day.
>
> "The Superior Court stated that they were backlogged and that they would have it over in ten days and I assumed that they would do that as they promised. I was simply waiting for your letter to start the clock running on the 30 day to file my opening brief. There was also an issue with the Court Reporter's Transcripts that was also cleared up that day. Evelyn Barnett, the Court Reporter assigned to Judge Franz Miller during this case (714-834-5323), is now retired. However, I was able to speak with her and she informed me that although there were multiple hearings in this case, there was only one court reporter's transcript.
>
> "The court also informed me that there was one court reporter who substituted in for Ms. Barnett for one hearing, Arlene Ferraro (714-834-3987). I left Ms. Ferraro two messages and she never got back to me. So, I informed the Superior Court to remove my request for the Court Reporter's Transcripts and send over the Clerk's Transcript on its own. Apparently, they never did that and it appears this is a communications error through no fault of my own.
>
> "The reason why I believe Deputy Clerk Shahira Naqshbandy will remember our specific conversation is that she committed a gross faux pas in etiquette that day. She thought she had hung up the telephone after our conversation but she had not. She must have thought I sounded very unprofessional or not up to her standards of sophistication. She stated to a co-worker, "Oh my God, you should of heard this woman on the phone, she sounded like she was 13 years

- 194 -

*old." The co-worker said "An attorney?" and Ms. Naqshbandy said, "No, a Pro Per, she's going to get real far." And they both laughed. I said, "Excuse me, I'm still on the phone" and Ms. Naqshbandy immediately hung up. I called back immediately and said, "I heard what you said," to which she remarked, "I knew you were still on the line" to which I said, "no you didn't." And she continued to insist that she saw the caller I.D. and "You should be more prepared when you call and not ask questions like that." I was incensed.*

*"I asked for her supervisor's name and she gave me your name. After I calmed down, I decided not to pursue the matter but when I received this email notification, I was so furious because I had done everything in my power to follow the proper protocol. I spent weeks preparing the Designation of Record.*

*"And do you know something? This attorney, James Parsa, who was successful in winning a $605,000 judgment against me for defamation for writing the truth about him on my blog, is now no longer eligible to practice law because the California State Bar (Kristin Ritsema) and the California Attorney General's Office (Benjamin Diehl) both filed criminal actions against him pertaining to the same facts I wrote about on my blog that Judge Franz E. Miller deemed defamatory! The pending investigations of the California State Bar and the California Attorney General's Office caused Parsa to surrender his license on October 16, 2009. But what about me? I still have a $605,000 judgment against me!*

*"Now my appeal has been dismissed on a miscommunication? How preposterous is that? In any event, I hope this clears up the problem with the dismissal. Perhaps there is a better method to hurry along the Superior Court but I've done everything I know to do and perhaps you make a suggestion?"*

707.    From February 25, 2010 through March 28, 2010, Plaintiff was falsely imprisoned on the force of a bench warrant issued by Judge Franz E. Miller in the Parsa Law Group case for failure to appear at an OSC Re Contempt on the terms of the permanent injunction for which the Appeal was about. While Plaintiff was incarcerated, her Appeal was dismissed.

708.    On March 3, 2009, while Plaintiff was incarcerated, Defendant Rossi sent Plaintiff the following email:

*"I am receipt of your letter dated February 6, 2010.*

*"First let me apologize for the incident on the phone with Ms. Naqshbandy. There is no excuse for that kind of behavior and I have since talked with her about it. I assure you that will not happen again.*

- 195 -

*"As far as the dismissal of your appeal is concerned, you must file a motion with this court to reinstate the appeal and be relieved from default for failure to post the fees for the reporter's transcript. If that motion is granted, and you post the fees or obtain an order from the Orange County Superior Court waiving the fees, the appeal will proceed pursuant to the California Rules of Court.*

*"I believe the minimum amount that you must submit to the Orange County Superior Court for a deposit on the reporter's transcript is $1006.25."*

709.   On March 30, 2010, Plaintiff sent Defendant Rossi an email.

*"Are you telling me that if I can't come up with $1,000, I can't reinstate the appeal that should never have been dismissed? I am on a fee waiver and certainly do not have this kind of money.*

*"A fee should not preclude someone from filing an appeal particularly in light of the circumstances surrounding this case discussed in my letter. I would like to ask you to reconsider your position.*

710.   On April 1, 2010, Defendant Rossi responded to Plaintiff's March 30 email:

*As I mentioned in my first email, if this Court grants your request to be relieved from default and reinstates your appeal, you would then EITHER have to pay the fees for the reporter OR proceed with the fee waiver in Superior Court.....one or the other. If your fee waiver is granted in that court, then obviously you would not need to pay the $1,006.25.*

711.   Less than a week later, on April 7, 2010, the Court issued a Remittitur and the minutes stated: "Case complete."

712.   The next day, on April 8, 2010, Plaintiff was notified by email that the appeal had been dismissed solely on the fact that Plaintiff did not / could not pay the court reporter's fees. However, Plaintiff had a fee waiver in place in the underlying action and had submitted to the Court of Appeal that she was an indigent litigant and waived her right to enter the Court Reporter's transcripts into the record on Appeal.

713.   On May 11, 2010, Plaintiff tried one more time:

*"I already have a fee waiver in the Superior Court Action so I don't understand why my appeal was dismissed. Please explain.*

*I'm fairly confident that my inability to pay $1,000+ is not sufficient reason to preclude me from filing an appeal in this action, particularly after I have advised you of the fact that I had a fee waiver in the lower court action and specifically after my correspondence to your office regarding the clerk's transcript and the court reporter's transcript."*

- 196 -

714.    On May 12, 2010, Defendant Rossi responded to Plaintiff's May 11, 2010 email:

> *"The fee waiver that you have in Superior Court does not waive the fees for the clerks and reporter's transcripts.  It applies to court costs not transcript fees. That is why you were placed in default in the Superior Court and your appeal was dismissed.  Since the remittitur has now been issued in this court, we no longer have jurisdiction to make any rulings in your appeal."*

715.    On May 15, 2010, Plaintiff sent an email to Defendant Rossi:

> *"You cannot issue a remittitur, dismiss my appeal or fail to respond simply due to my inability to pay fees.  I have informed your office on many occasions of my pauper status.  I previously informed your office in writing that I could not pay the court reporter's transcript fees and to proceed with preparing the clerk transcript only.  I expressly request an explanation as to the dismissal of my appeal based on my inability to pay fees."*

716.    On May 17, 2010, Defendant Rossi responded to Plaintiff's May 15, 2010 email.

> *"I believe my previous email gave you an explanation as to why your appeal was dismissed."*

717.    This was the end result of the Parsa Appeal.  Even though Plaintiff informed the Court of Appeal that she was indigent, had a fee waiver in the lower court, and waived her right to a Court Reporter's transcript on Appeal, the Court of Appeal still dismissed her case.

718.    On March 2, 1971, the United States Supreme Court decided *Boddie v. Connecticut* (401 U.S. 371) and held Connecticut could not consistently with the Due Process and Equal Protection Clauses deny access to its divorce courts to indigents unable to pay relatively small filing and service of process fees.

719.    In deciding on whether to review subsequent petitions similar to *Boddie* in that they all concerned denial of access to the courts due to inability to pay court costs, U.S. Supreme Court Justice Black spoke for the Court:

> *"In my view, the decision in Boddie v. Connecticut can safely rest on only one crucial foundation -- that the civil courts of the United States and each of the States belong to the people of this country and that no person can be denied access to those courts, either for a trial or an appeal, because he cannot pay a fee, finance a [402 U.S. 936 , 956] bond, risk a penalty, or afford to hire an attorney.*

- 197 -

*"Some may sincerely believe that the decision in Boddie was far more limited in scope -- that is, applies only to divorce cases. Other people might recognize that this constitutional decision will eventually extend to all civil cases but believe that it can only be enforced slowly step by step, so that the country will have time to absorb its full import.*

*"But in my judgment Boddie cannot and should not be limited to either its facts or its language, and I believe there can be no doubt that this country can afford to provide court costs and lawyers to Americans who are now barred by their poverty from resort to the law for resolution of their disputes.*

*"In my judgment, the crucial foundation on which Boddie rests also forbids denial of an indigent's right of appeal in civil cases merely because he is too poor to pay appeal costs. Once the right to unhampered access to the judicial process has been established, that right is diluted unless the indigent litigant has an opportunity to assert and obtain review of the errors committed at trial.*

*Since Boddie rejected distinctions between the civil and the criminal process in determining the permissibility of restrictions upon access to the courts, we need only apply to civil cases our long line of holdings that indigent criminals cannot because of their indigency be denied an appeal or the right to a state-furnished record on appeal.*

*See Griffin v. Illinois, 351 U.S. 12 ( 1956); Draper v. Washington, 372 U.S. 487 (1963); Long v. District Court of Iowa, 385 U.S. 192 (1966); Roberts v. LaVallee, 389 [402 U.S. 936 , 959]   U.S. 40 (1967); Williams v. Oklahoma City, 395 U.S. 458 (1969). See also Douglas v. California, 372 U.S. 353 (1963).*

*Finally, there cannot be meaningful access to the judicial process until every serious litigant is represented by competent counsel. [...] But the fundamental importance of legal representation in our system of adversary justice is beyond dispute. Since Boddie held that there must be meaningful access to civil courts in divorce cases, I can only conclude that Boddie necessitates the appointment of counsel for indigents in such cases. [...]  And as with fees and transcripts, I will never agree to limit the advantages of free counsel to divorce cases.*

*There is simply no fairness or justice in a legal system which pays indigents' costs to get divorces and does not aid them in other civil cases which are frequently of far greater importance to society.*

*U.S. Supreme Court Justice Douglas concurred:  All of these case are about people who were denied access to the judicial process solely because of their indigency. [...] I believe a proper application of the Equal Protection Clause also requires that the access cases be reversed. Courts ought not be a private preserve for the affluent. All of these cases contain an invidious discrimination based on poverty, a suspect legislative classification. See Griffin v. Illinois, 351 U.S. 12 ; Boddie v. Connecticut, 401 U.S. 371 , 383 ( DOUGLAS, J., concurring).*

720.    In *M. L. B., Petitioner v. S. L. J., Individually and as Next Friend* On December 16, 1996, In *Of The Minor Children, S. L. J. And M. L. J., Et Ux.* (On Writ Of Certiorari To The Supreme Court Of Mississippi), Justice Thomas, Justice Scalia Joins, The Chief Justice joins:

> *"Today the majority holds that the Fourteenth Amendment requires Mississippi to afford petitioner a free transcript because her civil case involves a 'fundamental' right."*

[*See,* also *Ross v. Moffitt*, 417 U.S. 600, 607, 94 S.Ct. 2437, 2442, 41 L.Ed.2d 341 (1974)]

721.    *Griffin v. Illinois, 351 U.S. 12 (1956)* and succeeding decisions "stand for the proposition that a State cannot arbitrarily cut off appeal rights for indigents while leaving open avenues of appeal for more affluent persons."

722.    In Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966), the U.S. Supreme Court held:

> *"This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts."*

## COUNT SIX

Re Unlawful Search & Seizure

Exclusionary Rule / Fruit of the Poisonous Tree

Property Interest Rights - Right to Be Free of Self-Incrimination

723.    Plaintiff's property was unlawfully searched at and seized from her Costa Mesa apartment on June 19, 2009, and never returned despite requests for same.  Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle, nonetheless, it was used on multiple occasions.  Plaintiff had no notice of this search and seizure,

724.    Plaintiff's property was unlawfully searched at and seized from her Costa Mesa storage unit on or about August 31, 2009 and never returned despite requests for same.  Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle,

- 199 -

nonetheless, it was used on multiple occasions.

725.    Plaintiff's property was unlawfully searched at and seized from her Big Bear City residence on or about February 25, 2010 and never returned despite requests for same. Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle.

726.    Plaintiff's person was unlawfully seized from 613 Big Bear Boulevard, Big Bear City, California on October 8, 2009 and falsely arrested and imprisoned.  Defendants named herein did not have a warrant nor probable cause to arrest Plaintiff

727.    Plaintiff's person was unlawfully seized from 1017 Mountainview, Big Bear City, California on February 25, 2010 and falsely arrested and imprisoned without probable cause.

728.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 31, 2009 and released on September 10, 2009.

729.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 10, 2011 and released on August 18, 2011.

730.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on September 23, 2009.

731.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on October 17, 2009.

732.    Defendants knew or should have known that Plaintiff's person, house, papers, and effects were protected from unlawful search and seizure.

733.    Defendants knew or should have known that civil bench warrants issued on a void order had no force of law.

734.    Defendants knew or should have known that "Private Party Arrest Warrants" had no force of law.

735.    Defendants' acts directly, intentionally, and maliciously violated Plaintiff's Fourth Amendment rights.

736.    Silencing Plaintiff and her protected speech, then concealing said acts, was the substantial and motivating factor in the adverse actions taken by Defendants against Plaintiff.