737.    By their acts, Defendants retaliated against Plaintiff for exercising her constitutional rights.

738.    Defendants acted in bad faith under color of state law, in collusion with those acting in under color of state law, or in their individual capacities.

739.    Plaintiff seeks a remedy to Defendants' acts in violation of her Fourth Amendment rights by way of this Complaint under 42 U.S.C. §1983.

740.    In *Mapp v. Ohio*, 367 U.S. 643 (1961), the U.S. Supreme Court ruled the Fourth Amendment applies to the states by way of the Due Process Clause of the 14th Amendment.

741.    In *Mapp v. Ohio*, the Court also ruled that certain searches and seizures violate the Fourth Amendment even when a warrant was properly granted.

742.    In *Soldal v. Cook County* (506 U.S. 56, 61, 113 S.Ct. 538, 543 (1992)), the United States Supreme Court held:

*"A seizure of property occurs when there is meaningful interference by the government with an individual's possessory interests, such as when police officers take personal property away from an owner to use as evidence."*

743.    In *United States v. Mendenhall*, 446 U.S. 544, 551, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), the Supreme Court held:

*"The Fourth Amendment also protects against unreasonable seizure of the person, including a brief detention.   The government may not detain an individual even momentarily without reasonable, objective grounds.   For example, a person's refusal to listen or answer does not by itself furnish such grounds.   A person is seized within the meaning of the Fourth Amendment only when by means of physical force or show of authority his freedom of movement is restrained, and in the circumstances surrounding the incident, a reasonable person would believe that he was not free to leave."*

744.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-744 of this Complaint.

## CLAIM FOR RELIEF

**Concealment of Evidence**

**in Violation of 42 U.S.C. §1983**

~ ~ ~ ~ ~

- 201 -

745. SBSC Case No. CIVHS900261- On September 30, 2009 claim of Plaintiff's violations of Penal Code section 653M. It was alleged that deputies had collected emails substantiating the crime and entered them into evidence, assigned the evidence bar codes and that said evidence was located in the "Evidence Locker" at the Big Bear Sheriff substation. However, said evidence was never produced.

746. Despite numerous requests by Plaintiff, Defendant SBDA refused to produce the core evidence of the PC653M investigation, i.e., "20-30 plus emails sent to the Whites and their employers," obtained by Morsch on September 30, 2009, and currently in the Evidence Locker at the BBSD station. Even in the face of sanctions driven by a Motion to Compel Evidence and violation of CPC §§1054.1 and 1054.5, Defendant SBDA continued to conceal said Evidence.

747. On October 17, 2009, private party and civilian, Defendant K. White reported the crime of PC 166 (violating a court order) and San Bernardino County Sheriff Deputy Brent Meelker ("Defendant SBSD Meelker") during a time when he was assigned to active duty, responded, to wit:

Written Narrative Statement of Defendant SBSD Meelker:

"ADDITIONAL INFORMATION:

"The Internet blog was posted by Erin Baldwin on 101409, The temporary restraining order was served to Baldwin on 100809. The temporary restraining order specifically states Baldwin is to "cease and desist harassment of both Kieth [sic] D. White and Patricia A. White." This harassment by Baldwin to the Whites, through internet blogs, is a direct violation of the temporary restraining order.

"EVIDENCE:

"The Whites gave me a copy of the temporary restraining order and also copies of this Internet blog from Baldwin.

"Amongst all the copies from the Internet which the Whites gave, were various sites on where this blog was found. The copies were packaged and placed into the evidence locker at the Big Bear station; copies were also included in this report.

"CITIZEN ARREST:

- 202 -

1  "Kieth [sic] White signed a citizen's arrest form.  I advised White I would try to find Baldwin to serve the citizen arrest.  I was unable to contact white [sic], and

2  thus forwarded the information to Detective Harris for follow up with Baldwin.

3  "<u>SUSPECT CONTACT</u>:

4  "See Supplemental Report by Detective Harris.

5  "<u>DISPOSITION</u>:

6  "Forward to the District Attorney for filing.

7  [End of Documentary Evidence dated 10-17-09 written by Reporting Officer, B. Meelker

8  (Employee #D2706), Supervisor Review: Left Blank; "Bates Stamped, page 4," County of San

9  Bernardino, California, Form CA 03600, Case No. 060901645, Reporting Area: Left Blank;

10  End of Documentary Evidence dated 10-17-09 written by Reporting Officer, B

11

12  CLAIM FOR RELIEF

13  **Fabrication of Evidence**

14  **in Violation of 42 U.S.C. §1983**

15  ~ ~ ~ ~ ~

16  748.    Plaintiff realleges and incorporates herein by reference the allegations set forth

17  in paragraphs 1-9 of this Complaint.

18  749.    Fabricated evidence is defined as false or deceitful evidence that is unlawfully

19  created, usually after the relevant event in an attempt to achieve or avoid liability or

20  conviction.

21  750.    Illegally-obtained evidence is is evidence obtained by violating a statute or a

22  person's constitutional right , especially the Fourth Amendment guarantee against

23  unreasonable searches, the Fifth Amendment right to remain silent, or the Sixth Amendment

24  right to counsel.

25  751.    Testimony is evidence that a competent witness under oath or affirmation gives

26  at trial ir in an affidavit or deposition

27  752.    Fabricating evidence involves arranging or manufacturing circumstances or

28  indica, after the act is committed with the intention to use them as evidence and make it appear

1   accidental. Such evidence may be wholly forged and artificial, or it may consist in so warping

2   and distorting real facts to create an impression in the minds of those who observe them as true

3   and genuine.

4

5                                   COUNT ONE

6          753.   On October 14, 2009, Big Bear Sheriff Deputy Defendant Morsch fabricated a

7   police report nearly a week after the events took place to submit to Defendant SBDA as

8   evidence with the intent to falsely charge Plaintiff with a crime.  The report stated the name of

9   Deputy Christopher Morsch as "A. Morsch."

10         754.   On October 14, 2009, Big Bear Sheriff, Defendant Morsch, Employee No.

11  D6894, completed a formal report "County of San Bernardino, California, Form CA 03600,"

12  that claims to set forth the facts about the events on October 8-9, 2009, Case No. 060901666.

13  The report stated the victim as "State of California," the charges as PC 148.9 and PC

14  148(A)(1): False Information to Officer; and Resist / Delay / Obstruct Officer.  Big Bear

15  Sheriff Sergeant, Defendant Lane reviewed and signed the report.

16         755.   On October 14, 2009, Defendant Morsch stated:   "On 10/08/09, at

17  approximately 1805 hours, I engaged in a follow up investigation for a PC 653M, Annoy and

18  Harassing Phone Calls or Electronic Means."

19         756.   Defendant Morsch continued: "I contacted the victim in the PC 653M case

20  (refer to DR #060901539).[20] The victim gave me information regarding Suspect, Erin

21  Baldwin, stating that he believed that Baldwin was located at 613 Big Bear Blvd. [21]

22         757.   Defendant Morsch continued:  The PC 653M victim, Keith White, also had in

23  his possession a Restraining Order for Suspect Baldwin.  The Restraining Order had not yet

24  been served as Baldwin had no known address. [22]

---

[20] The alleged "victim" was Defendant Keith D. White and Defendant Patricia A. White.
[21] How would Defendant K. White know where Plaintiff was at that exact moment so that Defendant Morsch could find her? During this period of time Defendants K & P White filed multiple claims against Plaintiff stating that *she* was stalking and harassing *them*.
[22] The Big Bear Sheriffs had been to Plaintiff's home three times in the preceding six weeks and knew where she lived. However, the sheriffs wanted to stage this event in a public place at rush hour on Big Bear Boulevard.

758.     Defendant Morsch continued: "I obtained the restraining order and informed White that if I made contact with Baldwin I would serve her with the Restraining Order on the behalf of him and his wife."[23]

759.     Defendant Morsch continued: "White had given the physical description of Baldwin on my prior contact with him, but today I confirmed with him her description; a white female, approximately 5'08", 140 pounds with blonde hair and blue eyes.     With this information I went enroute to 613 Big Bear Blvd.

760.     Defendant Morsch continued:     "I arrived at 613 Big Bear Blvd. at approximately 1821 hours and observed a dark colored Lexus sedan in the driveway, facing out toward Big Bear Blvd. as if to exit." [24]

761.     Defendant Morsch continued:   "I pulled into the driveway, allowing enough room for the vehicle to exit should it need to.   As I pulled in I observed a blonde female, matching the description of Erin Baldwin sitting in the passenger seat of the Lexus."[25]

762.     Defendant Morsch continued:   The vehicle was running, with a male in the driver's seat, (later identified as Witness, Michael Mosotto).   The license plate of this vehicle was [...]

763.     Defendant Morsch continued: "I exited my patrol vehicle and approached the passenger side of the Lexus.   I waved and motioned the female in the passenger seat, later identified as Erin Baldwin to roll down her window.   She seemed hesitant and said something to the driver that I could not hear and pointed out to toward the driveway.   I again motioned with my hand for her to roll her window down, which she did.   I asked her if she was Erin Baldwin and she replied "No." I asked her what her name was and replied either "Kelly or Kathy".   I asked her in confirmation, "Kelly?" and she stated "Yes".[26]

---

[23] Defendant Morsch made contact with Plaintiff but never served a court order; the service report states that Defendant King served it early in the morning on October 9, 2009.

[24] Plaintiff was having a conversation with Michael Masotto about her business consulting services. He was dropping her off after touring his hotel. Oddly during this conversation, Mr. Masotto decided that he should turn his vehicle facing the street but that Plaintiff should remain in the car and finish their conversation.

[25] The description was, "a white female, approximately 5'08", 140 pounds with blonde hair and blue eyes," how could he match that with a person from a distance sitting in a car at dusk?

[26] Plaintiff never said, "No." Plaintiff's name *is* Kelly; it's her middle name which was printed on the papers Defendant Morsch was holding that Plaintiff pointed to when she said her name. Plaintiff was hesitant because she was mortified that this was occurring in front of a prospective customer. Later, Plaintiff's middle name printed on the citation was scratched off

764.    Defendant Morsch continued: "I asked her what her last name was and she told me she didn't have to give me her last name.  I also asked her if she had any identification on her.  She said she didn't want to talk to me and didn't have to.  At this time I informed her I believed her to be Erin Baldwin, a suspect in a PC 653M case.  When I told her this, she stated she didn't know anything of a PC 653M case.  I informed her that I did not believe her and, in fact, did think she was Erin Baldwin and that I was conducting an investigation where in she was a suspect.[27]

765.    Defendant Morsch continued:  "She stated she was leaving and motioned for the driver to drive away.  I informed the driver not to drive away and explained the vehicle was being detained. [28]

766.    Defendant Morsch continued:  "As I walked to the driver side of the vehicle, I asked the driver to turn the vehicle off and I asked him for his identification.  Mosotto was very cooperative and retrieved his identification.  As I began to get information from the driver Baldwin exited the vehicle, running towards the building.  As I had informed the occupants they were being detained, I began to tell her to stay in the vehicle, but she was already into the building as the door was only a few yards away." [29]

767.    Defendant Morsch continued: "I spoke to Mosotto, asking him if he knew who Baldwin was and he stated he only knew her first name and had just met her at a Rotary Club Meeting.  Mosotto said he was currently engaged in a business meeting with her and had not met Baldwin prior to this day." [30]

768.    Defendant Morsch continued:  While speaking to Mosotto, a male and female, later identified as John and Gail Elerding, exited the building being closely followed by

---

to conceal the fact that the arrest was without probable cause.

[27] Defendant Morsch's approach and demeanor are not apparent from this written report but he was menacing, rude, and highly inappropriate considering he was there to interview Plaintiff on whether she had made an annoying telephone call.  How could Plaintiff have known she was "a suspect in a PC 653M case," when Defendant Morsch claimed she had not been interviewed because her address was unknown?  Since she did not privy to these charges, she believed she was being harassed.

[28] Why would a non-suspect's car be detained?

[29] Plaintiff was at the business offices of T.J.'s Custom Woodworking whom she was also providing business consulting service, Plaintiff had asked Masotto to drop her off there.  Plaintiff wanted witnesses to these events since it appeared outrageous considering Plaintiff was merely a suspect, and the charge was merely making an annoying telephone call.

[30] That is false.  Plaintiff and Masotto had exchanged emails and he knew her name because he had asked her whether she was related "to the Baldwin brothers."  He had met Plaintiff at a Rotary Club meeting prior to that date, had communicated and scheduled a meeting.

- 206 -

1    Suspect Baldwin.  I began to explain to Baldwin that she was being detained for the

2    investigation of a crime wherein she is the suspect."[31]

3        769.    Defendant Morsch continued: "Baldwin became verbally agitated and upset

4    and again began to walk away. [32]

5        770.    Defendant Morsch continued:  "This time, being in close proximity to her, I

6    grabbed her left arm with my left hand, grasping onto the thick jacket she was wearing.

7    Baldwin began to slip out of the jacket pulling away from me.  I grabbed her other arm which

8    had been freed from the jacket, Baldwin spun and struck me in the chest with her forearm,

9    knocking my radio microphone from my chest and deactivating my personal recorder, located

10   in my shirt pocket.  Baldwin began to resist as I attempted to place her into handcuffs." [33]

11       771.    Defendant Morsch continued:    "During this physical confrontation with

12   Baldwin, (Wit.) John Elerding stated over and over for her to calm down, calling her, 'Erin.'"[34]

13       772.    Defendant Morsch continued: "I made several attempts to place Baldwin into a

14   department approved control hold which she would pull away and flail, attempting to kick me

15   and anything around her; which Elerding's SUV which was parked in the driveway.  Once

16   Baldwin was restrained via my handcuffs, I placed her into the rear seat of my patrol unit,

17   where she continued to kick and head-butt the window multiple times."[35]

18       773.    Defendant Morsch continued: "I explained to Elerding of my reason for contact

19   with Baldwin, Elerding (Gail) said Baldwin came running into the building where Gail and her

20   husband were, very upset, stating that she had refused to give her name and was going to lose

21   her client.  Baldwin then told the Elerding's they needed [sic] go outside with her, which they

22

23   _____

24   [31] However, Defendant Morsch was very vague and strange and had not revealed any details other than, Plaintiff "was being
     detained for the investigation of a crime wherein she is the suspect," and mentioned "653M(b)" which definition was unknown
     to Plaintiff.
     [32] Plaintiff stated, "What the hell is going on?"
     [33] Defendant Morsch had still not identified why he was there, the nature of his investigation, and Plaintiff was justly
     concerned when he began to put her hands on her.  She screamed, "What are you doing?" when Defendant Morsch began to
     place the handcuffs on Plaintiff.  This fact is corroborated by the dispatch report in connection with this case.
     [34] This is true as Plaintiff was crying hysterically, frightened and not even knowing why this was happening.
     [35] Defendant Morsch placed Plaintiff in handcuffs, detained her in the back of a police vehicle, failed to express Plaintiff's
     Miranda Rights, and still Plaintiff did not know any details about Defendant Morsch's investigation.  Plaintiff asserts that
     Defendant Morsch purposely acted inappropriately to incite the type of behavior that a reasonable person would exhibit under
     the same circumstances in order to find a reason to falsely arrest and imprison her so that the beating, burning, and further
     retaliatory intimidation could occur.

- 207 -

did.    The Elerding's saw me outside and were witnesses to what transpired, including Baldwin's combative behavior in addition to Baldwin resisting and delaying my investigation.

774.    Defendant Morsch continued:  "Interview With Witness William Currano: Currano, who is a mechanic for Bear Mountain Ski Resort, happened to be driving by and observed me attempting to restrain Baldwin and place her in handcuffs.  Currano stopped his vehicle and offered his assistance, should I need it.  Currano observed Baldwin's actions in addition to her combative and resistive behavior."

775.    Defendant Morsch continued:  "Baldwin was initially a suspect who needed to be interviewed in a PC 653M case.  My intentions were to contact Baldwin, get her side of the story with possibility of issuing her a citation for PC 653M.

776.    Defendant Morsch continued:  "The details in the PC 653M case included Baldwin sending 20-30 plus e-mails to the White's in an attempt to annoy and harass them both at their residence and places of employment.  Additionally, I had intention to serve Baldwin with the restraining order that had been issued by a Judge, protecting the White's from Baldwin.

777.    Defendant Morsch continued:  "Because the female who was in the vehicle upon my arrival matched the description of Erin Baldwin, I reasonably believed her to be the suspect in my PC 653m case.  Upon questioning she intentionally gave false information in an effort to evade proper identification by me, the investigating officer, in violation of PC 148.9 False Identification to a Peace Officer."

778.    Defendant Morsch continued:  "As I attempted to detain Baldwin she willfully resisted and delayed me in the course of my investigative duties, a violation of PC 148(a)(1).  In the aforementioned violations Baldwin was placed under arrest and transported to the Big Bear Jail.

779.    Defendant Morsch continued:  "Attempted Booking Process:  Once at the Big Bear Jail, Baldwin continued to resist and be non-cooperative, insisting she did not need to talk to me and wished to invoke her right to remain silent.

780.    Defendant Morsch continued:  "Deputy Massey, Deputy King and I made multiple attempts to process Baldwin through the booking procedure.  This procedure includes

- 208 -

certain questions on the booking form that are ultimately inputted into the computer, which need to be answered by the arrestee in order for he or she to be processed jail [sic], and in this case, ultimately released on a citation.  Baldwin continued to be uncooperative, refusing to answer any questions in relation to the booking process."

781.    Defendant Morsch continued:  "A citation for the violations of PC 148 (a)(1) and PC 148.9 was issued and filled out by me with the intention to cite release Baldwin from the Big Bear Jail, pending her signature of a promise to appear on or before the date of 12/09/09."

782.    Defendant Morsch continued:  "I contacted Baldwin who was now in a holding cell, and read her Miranda Rights.  She refused to speak with me and stated she wanted to speak to her Lawyer before she spoke to anyone.  I respected Baldwin's right to invoke her Miranda Rights."

783.    Defendant Morsch continued:  "I began to inform Baldwin of the citation and to the violations she was being cited for, Baldwin began to yell and refused to speak to me.  I informed Baldwin that in signing the citation it would allow for her release and was in no way an admission of guilt, but instead a promise to appear on or before the date of 12/09/09."

784.    Defendant Morsch continued:  "Baldwin again refused to listen, she continued to yell and curse at me, stating she did not want to tak or sign anything.  Subsequently due to Baldwin's refusal to sign the citation, a Probable Cause Declaration was written with the elements of the crime, as well as her refusal to sign the citation with the intent to bring her forthwith to a Magistrate."

785.    Defendant Morsch continued:   "Attempts To Photograph And Fingerprint Baldwin / Use Of Force / O.C.:  As part of the booking process, Deputy Massey attempted to fingerprint and photograph Baldwin.  During the entire process Baldwin was resistant and combative.  I heard Baldwin cussing, swearing and scuffling in the photograph/fingerprinting room from within the booking area while I was filling out paperwork.  I entered the room to find Deputy Massey and Deputy King struggling with a resistive Erin Baldwin at the photographing podium where individuals stand to be photographed for booking."

786.    Defendant Morsch continued:  "While Deputy Massey and Deputy King were attempting to gain control of Baldwin's arms, I was grabbed hold of one arm, which allowed Deputy King to back away.  When I grabbed a hold of Baldwin's left arm she spun around and struck me in the torso area.  Deputy King then grabbed her other arm as again as I placed Baldwin in a department approved arm lock / control hold.  Deputy Massey was able to restrain Baldwin's right arm in the same fashion with the assistance of Deputy King.  Baldwin was told several times by myself, Deputy King, and Deputy Massey to stop resisting.  Instead, she attempted to knee Deputy Massey in the groin, missing and striking the side of his leg."

787.    Defendant Morsch continued:  "Ultimately in all the attempts to photograph and fingerprint Baldwin she was resistive and combative.  Deputy King made one last attempt to get compliance from Baldwin by asking Deputy Massey and I to release her.  King attempted to calm Baldwin down verbally and asked her to comply by placing her hand on the fingerprinting/ID machine.  Baldwin continued to refuse, cursing and yelling at all in the room."

788.    Defendant Morsch continued:  "When Deputy King made an attempt to take hold of Baldwin's hand, Baldwin pulled her right hand away, swinging it up as she did so, coming inches from Deputy King's face.  King then used his Department issued Oleoresin Cap-Stun spray, delivering a short spurt to Baldwin's face of the O.C. in an effort to both protect Deputies and the Sheriff's Custody Specialist as well as Baldwin from hurting us or herself.  Once "OC'd," Baldwin was assisted outside the jail where she was given water to wash out her eyes.  After the flushing / decontamination of her eyes, Baldwin was placed into a holding cell as she was still resistive, uncooperative and combative."

789.    Defendant Morsch continued:  "Additional Charges To Consider:  Please consider the additional charge of PC 243b - Assault on a Peace Officer for Baldwin's kneeing of Deputy Massey, attempting to strike Deputy King and hitting me in the chest."

790.    Defendant Morsch continued:  "Evidence: A copy of the audio recording of my initial contact with Baldwin as well as my contacts with her in the jail was booked into evidence." [36]

---

[36] Said evidence was never produced by Defendant SBDA, despite several requests for same.  Plaintiff filed a Motion to

791.    Defendant Morsch continued: "Disposition:  Case cleared by arrest."

COUNT TWO

792.    On October 14, 2009, Defendant King fabricated a police report to submit to Defendant SBDA as evidence with the intent to falsely charge Plaintiff with a crime.

793.    On October 14, 2009, Big Bear Sheriff, Defendant King, Employee #A9080, completed a formal report "County of San Bernardino, California, Form CA 03600," that supplemented Big Bear Sheriff, Defendant Morsch's report about the events on October 8-9, 2009, Case No. 060901666 SUPP.  The report stated the victim as "State of California," the charges as PC 148.9 and PC 148(A)(1): False Information to Officer; and Resist / Delay / Obstruct Officer.  Big Bear Sheriff Sergeant, Defendant Wolfe reviewed and signed the report.

794.    On October 14, 2009, Defendant King stated:   "On October 9, 2009, at approximately 0045 hours, I was asked to assist in fingerprinting and photographing Erin Kelly Baldwin by Deputy Massey.  Deputy Morsch arrested Baldwin for resisting arrest and falsely identifying herself to a Peace Officer.  It was known to me that Baldwin was uncooperative during her arrest and uncooperative during her booking process."

795.    Defendant King continued:  "Custody Matron Pauline Domingue and Deputy Broadhurst were also in the Jail at that time."

796.    Defendant King continued:  "Deputy Massey took Baldwin out of her cell to the Photograph and Fingerprint room at the Big Bear Jail."

797.    Defendant King continued:  "On the above date and time, Baldwin insisted to me she would not cooperate.  Baldwin demanded to speak with a Lawyer at that time, prior to cooperating with us.  When Baldwin was approaching the podium where she was to be photographed, Baldwin abruptly moved her body away from the area where she was to be photographed.  When she did this she turned away from me and with her left arm, struck Deputy Morsch."

798.    Defendant King continued:  "Deputy Morsch immediately put Baldwin into a department approved control hold, placing her left arm behind her back.  Deputy Massey assisted Deputy Morsch placing Baldwin's right arm behind her back.  While both Deputies

---

Compel and Defendant SBDA was admonished before Judge Katrina West but continued to fail to produce said evidence.

PLAINTIFF'S SECOND AMENDED COMPLAINT

1   attempted to restrain Baldwin, she stiffened her body and continued to twisting her body and

2   head."

3        799.   Defendant King continued: "Baldwin was told several times to comply with

4   Deputies request t be photographed.  Due to Baldwin's assaultive behavior the Deputies

5   maintained control of Baldwin and attrmpted to get her photograph taken, however, Deputies

6   were unsuccessful."

7        800.   Defendant King continued: "After continued and repeated requests, explaining

8   to Baldwin that we had the right to positively identify her by fingerprints and take a recorded

9   photograph.  Baldwin continued to curse at Deputies, telling them she would not cooperate,

10  continued to demand a Lawyer.

11       801.   Defendant King continued:   "It was explained to Baldwin that that she could

12  not have a Lawyer at this time.  Baldwin already refused to sign a promise to appear citation or

    answer any booking questions."

13       802.   Defendant King continued: "After continued requests for Baldwin to cooperate

14  and calm down she refused, and Deputy Massey advised me Baldwin attempted to strike him

15  near the groin area with her knee.  At that time I had Baldwin approach the fingerprint

16  identification machine.  Baldwin's arms were allowed to remain free at that time, as she made

17  no furtive movement at that moment."

18       803.   Defendant King continued :  "I tried to explain once again to Baldwin, she did

19  not have a right to refuse to be fingerprinted and did not have the right to an Attorney during

20  this process.  I continued to explain that we had the right to identify her via fingerprints.

21       804.   Defendant King continued :  "When I took Baldwin's right hand in an attempt to

22  begin to fingerprint her she pulled her hand away, swinging her right hand at me barely

23  missing my face."

24       805.   Defendant King continued :  "At that time I deployed a 1-2 second burst of

25  Oleoresin Cap-Stun in the facial area of Baldwin.  Baldwin began to scream, she collapsed on

26  the floor in the Photograph and Fingerprint room."

27       806.   Defendant King continued: "Baldwin was again placed into handcuffs at that

28  time she was taken outside of the Big Bear Jail in open parking area.  Baldwin was

- 212 -

1    decontaminated with water and fresh air.  Baldwin continued to curse at Deputies and telling

2    them she would not cooperate."

3        807.    Defendant King continued:  "Baldwin was allowed access to continued water

4    and fresh air before being placed into her cell.  Baldwin was later transported to West Valley

5    Detention Center where the booking process was completed the following day.  At that time

6    Baldwin signed a citation to appear and was released, it is unknown if Baldwin continued any

7    assaultive behavior at that facility."

                                    ~ ~ ~ ~ ~

8                          NINTH CLAIM FOR RELIEF

9                      Suppression of Exculpatory Evidence

10                      in Violation of 42 U.S.C. §1983

11                                  ~ ~ ~ ~ ~

12        808.    Plaintiff realleges and incorporates herein by reference the allegations set forth

13   in paragraphs 1-9 of this Complaint.

14                                COUNT ONE

15        809.    On June 19, 2009, Plaintiff's property was unlawfully searched at and seized

16   from her Costa Mesa apartment, and never returned despite requests for same.  Defendants

17   named herein were prohibited from using this property against her in a criminal prosecution

18   pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle, nonetheless,

19   it was used on multiple occasions.  Plaintiff had no notice of this search and seizure,

20                                COUNT TWO

21        810.    On or about August 31, 2009, Plaintiff's property was unlawfully searched at

22   and seized from her Costa Mesa storage unit, and never returned.   Defendants named herein

23   were prohibited from using this property against her in a criminal prosecution pursuant to the

24   Exclusionary Rule and the "fruit of the poisonous tree" principle, nonetheless, it was used on

25   multiple occasions.

26                               COUNT THREE

27        811.    On or about February 25, 2010, Plaintiff's property was unlawfully searched at

28   and seized from her Big Bear City residence and never returned despite requests for same.

                                    - 213 -

1  Defendants named herein were prohibited from using this property against her in a criminal

2  prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle.

3  COUNT FOUR

4  812.  On October 8, 2009, Plaintiff's person was unlawfully seized from 613 Big

5  Bear Boulevard, Big Bear City, California on and falsely arrested and imprisoned.  Defendants

6  named herein did not have a warrant nor probable cause to arrest Plaintiff

7  COUNT FIVE

8  813.  On February 25, 2010, Plaintiff's person was unlawfully seized by Defendant

9  San Bernardino Sheriff's Department, from 1017 Mountainview, Big Bear City, California and

10  falsely arrested and imprisoned without probable cause.

11  COUNT SIX

12  814.  On February 25, 2010, Plaintiff's long-term dog companions were seized and

13  surrendered to the animal shelter by Defendant Crow who claimed he was the rightful owner

14  of said long-term dog companions.  Defendant Crow disclosed to Plaintiff the day prior to her

15  arrest that he had been in communications with Defendant SBDA.

16  COUNT SEVEN

17  815.  On October 28, 2009, Defendant SBDA, specifically, Defendant SBDA Robles

18  declared under penalty of perjury that the Allegedly, all of these criminal charges occurred on

19  the same date, October 8, 2009, and it states as such on the court record/docket.  However, the

20  dates stated on the Complaint for MSB906348  (except Count 1) were dated October 17, 2009.

21  Plaintiff had no contact with SBSD / BBSD personnel on October 17, 2009, and the Defendant

22  SBDA cannot produce any evidence to corroborate that said crimes occurred on this date.  This

23  fact, without further clarification, is enough to eliminate the efficacy of Counts 2, 3, 4 and 5,

24  dismissing them entirely.

25  a.  "COUNT 1:  On or about October 8, 2009, in the above named judicial

26  district, the crime of GIVING FALSE INFORMATION TO A POLICE OFFICER, in

27  violation of PENAL CODE SECTION 148.9(a), a misdemeanor, was committed by Erin Kelly

28  Baldwin, who did unlawfully falsely represent and identify himself/herself as another person

and as a fictitious person to a police officer, upon a lawful detention and arrest, in order to

- 214 -

1  evade the process of the court and to evade the proper identification of the person by the

2  Investigating Officer."

3          b.      "COUNT 2:  On or about October 17, 2009, in the above named judicial

4  district, the crime of RESIST, OBSTRUCT, DELAY OF PEACE OFFICER OR EMT, in

5  violation of PENAL CODE SECTION 148(a)(1), a misdemeanor, was committed by Erin

6  Kelly Baldwin, who did willfully and unlawfully resist, delay and obstruct Deputy Morsch

7  who was then and there a peace officer attempting to and discharging the duty of his/her office

8  and employment."

9          c.      "COUNT 3:  On or about October 17, 2009, in the above named judicial

10 district, the crime of BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL,

11 in violation of PENAL CODE SECTION 243(b), a misdemeanor, was committed by Erin

12 Kelly Baldwin, who did willfully and unlawfully use force and violence upon the person of

13 Deputy Massey when said defendant(s) Erin Kelly Baldwin, knew and reasonably should have

14 known that said person was Peace Officer then and there engaged in the performance of

   his/her duties."

15         d.      "COUNT 4:  On or about October 17, 2009, in the above named judicial

16 district, the crime of BATTERY UPON AN OFFICER AND EMERGENCY PERSONNEL,

17 in violation of PENAL CODE SECTION 243(b), a misdemeanor, was committed by Erin

18 Kelly Baldwin, who did willfully and unlawfully use force and violence upon the person of C

19 Morsch when said defendant(s) Erin Kelly Baldwin, knew and reasonably should have known

20 that said person was Peace Officer then and there engaged in the performance of his/her

21 duties."

22         e.      "COUNT 5:  On or about October 17, 2009, in the above named judicial

23 district, the crime of DISOBEYING COURT ORDER, in violation of PENAL CODE

24 SECTION 166(a)(4), a misdemeanor, was committed by Erin Kelly Baldwin, who did

25 unlawfully commit contempt of court by willful disobedience of a process and order lawfully

26 issued by a court, to wit, Restraining order." Plaintiff realleges and incorporates herein by

27 reference the allegations set forth in paragraphs 1-9 of this Complaint.

28

816.    The criminal charges stated, supra, stem from events that occurred on October 8-9, 2009, in connection with Plaintiff's false arrest, imprisonment, and beating in custody by five (5) male and one (1) female, Big Bear Sheriff deputies.  The People of the State of California v. Erin K. Baldwin, San Bernardino Superior Court Case No. MSB906348, was filed against Plaintiff by the San Bernardino District Attorney (Defendant SBDA), specifically Deputy DA Laura Robles (Defendant Robles) to eliminate or mitigate any liability for excessive force by police officers acting under color of state law.

817.    Defendant Robles has a history of intentional prosecutorial misconduct, most notoriously for the mistrial she caused in the 2006 case involving a Redlands police officer, Justin Jimenez accused of committing lewd acts from January 1997 to December 1998 on two girls, then aged 5 and 7, related to him through marriage. San Bernardino County Superior Court Judge Michael Welch declared a mistrial Febuary 14, 2006, after four days of testimony because Jimenez could no longer receive a fair trial.  He stated the reason was that San Bernardino County Deputy District Attorney Laura Robles had committed "intentional prosecutorial misconduct." Attorney John Barnett, defending Jimenez, said that Robles intentionally caused a mistrial because she wanted to retry a case gone bad.   The United States Supreme Court has ruled that a retrial would amount to double jeopardy, a violation of a defendant's Fifth Amendment rights.

### TENTH CLAIM FOR RELIEF

False Arrest Without Probable Cause

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

818.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-9 of this Complaint.

819.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 31, 2009 and released on September 10, 2009.

820.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 10, 2011 and released on August 18, 2011.

- 216 -

821.   Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on September 23, 2009.

822.   Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on October 17, 2009.

~ ~ ~ ~ ~

### ELEVENTH CLAIM FOR RELIEF

Making False Public Statements

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

823.   Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-822 of this Complaint.

824.   The Big Bear Sheriff's deputies made false public statements about Plaintiff in connection with her October 8-9, 2009 beating and burning in custody.

825.   To mitigate their liability for Plaintiff's injuries they spread false rumors about how Plaintiff's injuries were sustained.  Plaintiff was never placed in the general population at West Valley Detention Center.  However, the sheriff deputies started a rumor that Plaintiff has engaged in a fight with another female inmate and that was how she sustained her injuries.  In fact, the rumor was that it had all been caught on videotape.

826.   Big Bear is a very small town and Plaintiff was ostracized after she was beaten and burned in custody.   She couldn't get a job and everywhere she went, people looked at her and whispered.

~ ~ ~ ~ ~

### TWELFTH CLAIM FOR RELIEF

Imprisonment Without Probable Cause

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

827.   Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-826 of this Complaint.

- 217 -

828.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 31, 2009 and released on September 10, 2009.

829.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 10, 2011 and released on August 18, 2011.

830.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on September 23, 2009.

831.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on October 17, 2009.

~ ~ ~ ~ ~

<u>THIRTEENTH CLAIM FOR RELIEF</u>

Excessive Bail & Fines

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

832.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-831 of this Complaint.

833.    On March 10, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. FSB1000789;

834.    On March 18, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. MSB906348;

835.    On March 18, 2010, Plaintiff was subjected to excessive bail in connection with San Bernardino County Case No. MSB905837;

836.    On March 26, 2010, Plaintiff was subjected to excessive fines in connection with San Bernardino County Case No. MSB906348;

837.    On March 26, 2010, Plaintiff was subjected to excessive fines in connection with San Bernardino County Case No. MSB905837;

<u>COUNT ONE</u>

838.    On January 25, 2010,  San Bernardino Superior Court Judge Katrina West conducted an oral Faretta Motion *voir dire* and granted Plaintiff the right to self-representation in ***Criminal Case No. MSB906348***, and dismissed the San Bernardino Public Defender.

- 218 -

839. *Criminal Case No. MSB906348* comrpised five criminal charges filed against Plaintiff on October 28, 2009, to mitigate the county's liability for severely beating and burning Plaintiff in custody.

840. On February 25, 2010, Plaintff was falsely arrested by Defendant San Bernardino Sheriff's Department without probable cause and falsely imprisoned at West Valley Detention Center for Assault with a Deadly Weapon, San Bernardino Superior Court, Criminal Case No. FSB1000897.

841. This false arrest and imprisonment was premeditated:

a. to prevent Plaintiff from preparing for trial in *Criminal Case No. MSB906348*.

b. to prevent Plaintiff from filing a Pitchess Motion to reveal the contents of the personnel files of the Big Bear Sheriffs deputies that beat and burned her in custody on October 8-9, 2009;

c. to remove her from her home so that all her property and evidence against the sheriffs could be confiscated; and

d. to keep her in custody until she signed a plea bargain on *Criminal Case No. MSB906348* so the trial scheduled for April 11, 2010 would be vacated.

842. While in custody <u>only</u> on Criminal Case No. FSB1000897, San Bernardino District Attorney Defendants Spencer and Dixon **intentionally lied to the Court** stating that Plaintiff was <u>also in custody</u> on *Criminal Case No. MSB906348*.

843. They lied to raise Plantiff's bail amount from $50,000.00 to $500,000.00 without adding any charges or enhancements, to keep her from bailing out until they achieved their goal set forth in "d.," *supra*.

844. Plaintiff demanded a bail reduction but her San Bernardino Public Defender Jeffrey Lawrence said it could not be scheduled until March 18, 2010, ten days later.

845. While in custody <u>only</u> on Criminal Case No. FSB1000897, San Bernardino District Attorney Defendants Spencer and Dixon **also intentionally lied to the Court** stating Plaintiff had "waived time," on Criminal Case No. FSB1000897.

- 219 -

846.   However, Plaintiff had only "waived time" on Criminal Cases Nos. *MSB906348* and MSB905837, to allow her more time to prepare for trial.

847.   On March 18, 2010, Plaintiff attended a bail reduction hearing where she once again attempted to tell Judge Donna Garza-Gunnell, that she was <u>not</u> in custody on *Criminal Case No. MSB906348* and that she wished to speak in her own defense regarding the bail.

848.   Judge Garza-Gunnell not only denied her request but **set bail** on *Criminal Case No. MSB906348*, in the amount of $10,000.00.

849.   Judge Garza-Gunnell set the "preliminary hearing" on the <u>joined cases</u> for one month out during which time Plaintiff would remain in jail.

850.   When Plaintiff stated, "I adamantly object," she stated, "Too bad," and called the next case.

851.   Under the circumstances, any amount of bail would have been ezcessive.

<u>COUNT FOUR</u>

852.   On January 25, 2010,  San Bernardino Superior Court Judge Katrina West conducted an oral Faretta Motion voir dire and granted Plaintiff the right to self-representation in *Criminal Case No. MSB905837*, and dismissed the San Bernardino Public Defender.

853.   This was a case for battery that never occurred according to the police report dated September 17, 2009.  However, it strengthened Defendant SBDA's case in Criminal Case No. MSB906348, wherein Defendant SBDA filed charges against Plaintiff after she was beaten and burned by Big Bear Sheriffs in order to mitigate their liability.

854.   In fact, *Criminal Case No. MSB905837* wasn't even filed until January 25, 2010, four months after the alleged battery occurred.

855.   On February 25, 2010, Plaintff was falsely arrested by Defendant San Bernardino County Sheriff's Department without probable cause and falsely imprisoned at West Valley Detention Center for Assault with a Deadly Weapon, San Bernardino Superior Court, Criminal Case No. FSB1000897.

856.   This false arrest and imprisonment was premeditated:

        a.      to prevent Plaintiff from preparing for trial in Criminal Case No. MSB906348.

- 220 -

b.     to prevent Plaintiff from filing a Pitchess Motion to reveal the contents of the personnel files of the Big Bear Sheriffs deputies that beat and burned her in custody on October 8-9, 2009;

c.     to remove her from her home so that all her property and evidence against the sheriffs could be confiscated; and

d.     to keep her in custody until she signed a plea bargain on Criminal Case No. MSB906348 so the trial scheduled for April 11, 2010 would be vacated.

857.     While in custody only on Criminal Case No. FSB1000897, San Bernardino District Attorney Defendants Spencer and Dixon **intentionally lied to the Court** stating that Plaintiff was also in custody on ***Criminal Case No. MSB905837.***

858.     They lied to raise Plaintiff's bail amount from $50,000.00 to $500,000.00 without adding any charges or enhancements, to keep her from bailing out until they achieved their goal set forth in "d.," *supra.*

859.     Plaintiff demanded a bail reduction but her San Bernardino Public Defender Jeffrey Lawrence said it could not be scheduled until March 18, 2010, ten days later.

860.     While in custody only on Criminal Case No. FSB1000897, San Bernardino District Attorney Defendants Spencer and Dixon **also intentionally lied to the Court** stating Plaintiff had "waived time," on Criminal Case No. FSB1000897.

861.     However, Plaintiff had only "waived time" on Criminal Case No. Criminal Cases Nos. MSB906348 and ***MSB905837***, to allow her more time to prepare for trial.

862.     On March 18, 2010, Plaintiff attended a bail reduction hearing where she once again attempted to tell Judge Donna Garza-Gunnell, that she was not in custody on  Criminal Case No. MSB906348 and that she wished to speak in her own defense regarding the bail.

863.     Judge Garza-Gunnell not only denied her request but set bail on Criminal Case No. MSB906348, in the amount of $10,000.00.

864.     The Judge Garza-Gunnell set the "preliminary hearing" on the joined cases for one month out during which time Plaintiff would remain in jail.

865.     When Plaintiff stated, "I adamantly object," she stated, "Too bad," and called the next case.

1     866.    Under the circumstances, any amount of bail would have been eccessive.

2

3                        FOURTEENTH CLAIM FOR RELIEF

4                        False Imprisonment Without Probable Cause

5     867.    Plaintiff realleges and incorporates herein by reference the allegations set forth

6   in paragraphs 1-866 of this Complaint.

7                                    COUNT ONE

8              *The People of the State of California v. Erin K. Baldwin*

9          (San Bernardino County Superior Court, Criminal Case No. MSB906348)

10    868.    On October 14, 2009, Defendant Morsch stated:    "On 10/08/09, at

11  approximately 1805 hours, I engaged in a follow up investigation for a PC 653M, Annoy and

    Harassing Phone Calls or Electronic Means."

12    869.    Defendant Morsch continued:   "I contacted the victim in the PC 653M case

13  (refer to DR #060901539).[37] The victim gave me information regarding Suspect, Erin

14  Baldwin, stating that he believed that Baldwin was located at 613 Big Bear Blvd. [38]

15    870.    Defendant Morsch continued:  The PC 653M victim, Keith White, also had in

16  his possession a Restraining Order for Suspect Baldwin.  The Restraining Order had not yet

17  been served as Baldwin had no known address. [39]

18    871.    Defendant Morsch continued:   "I obtained the restraining order and informed

19  White that if I made contact with Baldwin I would serve her with the Restraining Order on the

20  behalf of him and his wife."[40]

21    872.    Defendant Morsch continued:   "White had given the physical description of

22  Baldwin on my prior contact with him, but today I confirmed with him her description; a white

23

24

-----

[37] The alleged "victim" was Defendant Keith D. White and Defendant Patricia A. White.

25  [38] How would Defendant K. White know where Plaintiff was at that exact moment so that Defendant Morsch could find her?

26  During this period of time Defendants K & P White filed multiple claims against Plaintiff stating that *she* was stalking and harassing *them*.

27  [39] The Big Bear Sheriffs had been to Plaintiff's home three times in the preceding six weeks and knew where she lived.
    However, the sheriffs wanted to stage this event in a public place at rush hour on Big Bear Boulevard.

28  [40] Defendant Morsch made contact with Plaintiff but never served a court order; the service report states that Defendant King
    served it early in the morning on October 9, 2009.

                                    - 222 -

female, approximately 5'08", 140 pounds with blonde hair and blue eyes.   With this information I went enroute to 613 Big Bear Blvd.

873.   Defendant Morsch continued:   "I arrived at 613 Big Bear Blvd. at approximately 1821 hours and observed a dark colored Lexus sedan in the driveway, facing out toward Big Bear Blvd. as if to exit." [41]

874.   Defendant Morsch continued:   "I pulled into the driveway, allowing enough room for the vehicle to exit should it need to.   As I pulled in I observed a blonde female, matching the description of Erin Baldwin sitting in the passenger seat of the Lexus."[42]

875.   Defendant Morsch continued:   The vehicle was running, with a male in the driver's seat, (later identified as Witness, Michael Mosotto).   The license plate of this vehicle was [...]

876.   Defendant Morsch continued:   "I exited my patrol vehicle and approached the passenger side of the Lexus.   I waved and motioned the female in the passenger seat, later identified as Erin Baldwin to roll down her window.   She seemed hesitant and said something to the driver that I could not hear and pointed out to toward the driveway.   I again motioned with my hand for her to roll her window down, which she did.   I asked her if she was Erin Baldwin and she replied "No."   I asked her what her name was and replied either "Kelly or Kathy".   I asked her in confirmation, "Kelly?" and she stated "Yes".[43]

877.   Defendant Morsch continued:   "I asked her what her last name was and she told me she didn't have to give me her last name.   I also asked her if she had any identification on her.   She said she didn't want to talk to me and didn't have to.   At this time I informed her I believed her to be Erin Baldwin, a suspect in a PC 653M case.   When I told her this, she stated she didn't know anything of a PC 653M case.   I informed her that I did not believe her and, in

---

[41] Plaintiff was having a conversation with Michael Masotto about her business consulting services. He was dropping her off after touring his hotel. Oddly during this conversation, Mr. Masotto decided that he should turn his vehicle facing the street but that Plaintiff should remain in the car and finish their conversation.

[42] The description was, "a white female, approximately 5'08", 140 pounds with blonde hair and blue eyes," how could he match that with a person from a distance sitting in a car at dusk?

[43] Plaintiff never said, "No."  Plaintiff's name *is* Kelly; it's her middle name which was printed on the papers Defendant Morsch was holding that Plaintiff pointed to when she said her name.  Plaintiff was hesitant because she was mortified that this was occurring in front of a prospective customer.  Later, Plaintiff's middle name printed on the citation was scratched off to conceal the fact that the arrest was without probable cause.

1  fact, did think she was Erin Baldwin and that I was conducting an investigation where in she

2  was a suspect.[44]

3      878.   Defendant Morsch continued:  "She stated she was leaving and motioned for

4  the driver to drive away.  I informed the driver not to drive away and explained the vehicle

5  was being detained. [45]

6      879.   Defendant Morsch continued:  "As I walked to the driver side of the vehicle, I

7  asked the driver to turn the vehicle off and I asked him for his identification.  Mosotto was

8  very cooperative and retrieved his identification.  As I began to get information from the driver

9  Baldwin exited the vehicle, running towards the building.  As I had informed the occupants

10  they were being detained, I began to tell her to stay in the vehicle, but she was already into the

11  building as the door was only a few yards away." [46]

12      880.   Defendant Morsch continued:  "I spoke to Mosotto, asking him if he knew who

13  Baldwin was and he stated he only knew her first name and had just met her at a Rotary Club

14  Meeting.  Mosotto said he was currently engaged in a business meeting with her and had not

15  met Baldwin prior to this day." [47]

16      881.   Defendant Morsch continued:  While speaking to Mosotto, a male and female,

17  later identified as John and Gail Elerding, exited the building being closely followed by

18  Suspect Baldwin.  I began to explain to Baldwin that she was being detained for the

19  investigation of a crime wherein she is the suspect."[48]

---

[44] Defendant Morsch's approach and demeanor are not apparent from this written report but he was menacing, rude, and highly inappropriate considering he was there to interview Plaintiff on whether she had made an annoying telephone call.  How could Plaintiff have known she was "a suspect in a PC 653M case," when Defendant Morsch claimed she had not been interviewed because her address was unknown?  Since she did not privy to these charges, she believed she was being harassed.

[45] Why would a non-suspect's car be detained?

[46] Plaintiff was at the business offices of T.J.'s Custom Woodworking whom she was also providing business consulting service, Plaintiff had asked Masotto to drop her off there.  Plaintiff wanted witnesses to these events since it appeared outrageous considering Plaintiff was merely a suspect, and the charge was merely making an annoying telephone call.

[47] That is false.  Plaintiff and Masotto had exchanged emails and he knew her name because he had asked her whether she was related "to the Baldwin brothers."  He had met Plaintiff at a Rotary Club meeting prior to that date, had communicated and scheduled a meeting.

[48] However, Defendant Morsch was very vague and strange and had not revealed any details other than,  Plaintiff "was being detained for the investigation of a crime wherein she is the suspect," and mentioned "653M(b)" which definition was unknown to Plaintiff.

882.   Defendant Morsch continued: "Baldwin became verbally agitated and upset and again began to walk away. [49]

883.   Defendant Morsch continued:  "This time, being in close proximity to her, I grabbed her left arm with my left hand, grasping onto the thick jacket she was wearing. Baldwin began to slip out of the jacket pulling away from me. I grabbed her other arm which had been freed from the jacket, Baldwin spun and struck me in the chest with her forearm, knocking my radio microphone from my chest and deactivating my personal recorder, located in my shirt pocket.  Baldwin began to resist as I attempted to place her into handcuffs." [50]

884.   Defendant Morsch continued:   "During this physical confrontation with Baldwin, (Wit.) John Elerding stated over and over for her to calm down, calling her, 'Erin.'"[51]

885.   Defendant Morsch continued:  "I made several attempts to place Baldwin into a department approved control hold which she would pull away and flail, attempting to kick me and anything around her; which Elerding's SUV which was parked in the driveway.  Once Baldwin was restrained via my handcuffs, I placed her into the rear seat of my patrol unit, where she continued to kick and head-butt the window multiple times."[52]

886.   Defendant Morsch continued:  "I explained to Elerding of my reason for contact with Baldwin, Elerding (Gail) said Baldwin came running into the building where Gail and her husband were, very upset, stating that she had refused to give her name and was going to lose her client.  Baldwin then told the Elerding's they needed [sic] go outside with her, which they did.   The Elerding's saw me outside and were witnesses to what transpired, including Baldwin's combative behavior in addition to Baldwin resisting and delaying my investigation.

887.   Defendant Morsch continued:   "Interview With Witness William Currano: Currano, who is a mechanic for Bear Mountain Ski Resort, happened to be driving by and

---

[49] Plaintiff stated, "What the hell is going on?"

[50] Defendant Morsch had still not identified why he was there, the nature of his investigation, and Plaintiff was justly concerned when he began to put her hands on her.  She screamed, "What are you doing?" when Defendant Morsch began to place the handcuffs on Plaintiff.  This fact is corroborated by the dispatch report in connection with this case.

[51] This is true as Plaintiff was crying hysterically, frightened and not even knowing why this was happening.

[52] Defendant Morsch placed Plaintiff in handcuffs, detained her in the back of a police vehicle, failed to express Plaintiff's Miranda Rights, and still Plaintiff did not know any details about Defendant Morsch's investigation.  Plaintiff asserts that Defendant Morsch purposely acted inappropriately to incite the type of behavior that a reasonable person would exhibit under the same circumstances in order to find a reason to falsely arrest and imprison her so that the beating, burning, and further retaliatory intimidation could occur.

PLAINTIFF'S SECOND AMENDED COMPLAINT

observed me attempting to restrain Baldwin and place her in handcuffs. Currano stopped his vehicle and offered his assistance, should I need it. Currano observed Baldwin's actions in addition to her combative and resistive behavior."

888.    Defendant Morsch continued: "Baldwin was initially a suspect who needed to be interviewed in a PC 653M case. My intentions were to contact Baldwin, get her side of the story with possibility of issuing her a citation for PC 653M.

889.    Defendant Morsch continued: "The details in the PC 653M case included Baldwin sending 20-30 plus e-mails to the White's in an attempt to annoy and harass them both at their residence and places of employment. Additionally, I had intention to serve Baldwin with the restraining order that had been issued by a Judge, protecting the White's from Baldwin.

890.    Defendant Morsch continued: "Because the female who was in the vehicle upon my arrival matched the description of Erin Baldwin, I reasonably believed her to be the suspect in my PC 653m case. Upon questioning she intentionally gave false information in an effort to evade proper identification by me, the investigating officer, in violation of PC 148.9 False Identification to a Peace Officer."

891.    Defendant Morsch continued: "As I attempted to detain Baldwin she willfully resisted and delayed me in the course of my investigative duties, a violation of PC 148(a)(1). In the aforementioned violations Baldwin was placed under arrest and transported to the Big Bear Jail.

892.    Defendant Morsch continued: "Attempted Booking Process: Once at the Big Bear Jail, Baldwin continued to resist and be non-cooperative, insisting she did not need to talk to me and wished to invoke her right to remain silent.

893.    Defendant Morsch continued: "Deputy Massey, Deputy King and I made multiple attempts to process Baldwin through the booking procedure. This procedure includes certain questions on the booking form that are ultimately inputted into the computer, which need to be answered by the arrestee in order for he or she to be processed jail [sic], and in this case, ultimately released on a citation. Baldwin continued to be uncooperative, refusing to answer any questions in relation to the booking process."

894.    Defendant Morsch continued:  "A citation for the violations of PC 148 (a)(1) and PC 148.9 was issued and filled out by me with the intention to cite release Baldwin from the Big Bear Jail, pending her signature of a promise to appear on or before the date of 12/09/09.

COUNT TWO

*The People of the State of California v. Erin K. Baldwin*

(San Bernardino Superior Court, Criminal Case No. FSB1000789)

895.    On February 25, 2010, Plaintiff was falsely arrested by Defendant San Bernardino Sheriff's Department without probable cause and falsely imprisoned at West Valley Detention Center for Assault with a Deadly Weapon, San Bernardino Superior Court, Criminal Case No. FSB1000897.

896.    This false arrest and imprisonment was premeditated:

a.    to prevent Plaintiff from preparing for trial in Criminal Case No. MSB906348.

b.    to prevent Plaintiff from filing a Pitchess Motion to reveal the contents of the personnel files of the Big Bear Sheriffs deputies that beat and burned her in custody on October 8-9, 2009;

c.    to remove her from her home so that all her property and evidence against the sheriffs could be confiscated; and

d.    to keep her in custody until she signed a plea bargain on Criminal Case No. MSB906348 so the trial scheduled for April 11, 2010 would be vacated.

~ ~ ~ ~ ~

FIFTEENTH (14th) CAUSE OF ACTION

Deprivation of Right to Petition

the Government for Redress of Grievances

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

- 227 -

897.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-896 of this Complaint.

### COUNT ONE

898.    March 17, 2011:  Judge Miller Refused to Recuse Himself From UDR Case, Plaintiff Filed Writ of Mandate Requesting Disqualification

### COUNT TWO

899.    March 21, 2011:  Judge Miller Refused to Recuse Himself From Parsa Case, Plaintiff Filed Writ of Mandate Requesting Disqualification

### COUNT THREE

900.    April 18, 2011:  Judge Miller Refused to Recuse Himself From Parsa Case, Plaintiff Filed Writ of Mandate Requesting Disqualification

### COUNT FOUR

901.    April 25, 2011:  Plaintiff Filed a Writ of Mandate & Motion for Emergency Stay of Proceedings in UDR Case

### COUNT FIVE

902.    On May 9, 2011, SACV-8:11-cv-00708-CJC-AN (Parsa)

### COUNT SIX

903.    On May 17, 2011, SACV-8:11-cv-00824-CJC-AN   (UDR)

### COUNT SEVEN

904.    On August 25, 2011, Case No.  5:11-CV-01300-DOC-SP

~ ~ ~ ~ ~

### SIXTEENTH CLAIM FOR RELIEF

Excessive Force

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

905.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-904 of this Complaint.

### COUNT ONE

*The People of the State of California v. Erin K. Baldwin*

- 228 -

(San Bernardino County Superior Court, Criminal Case No. MSB906348)

906.    Plaintiff was taken into the booking room with four male deputies at the Big Bear Sheriff Substation to photograph her.

907.    One male deputy stood behind Plaintiff and grabbed a bunch of her hair from the scalp and forced her head back and held it.

908.    One male deputy grabbed her chin and forced her head upwards and held it.

909.    One male deputy grabbed Plaintiff's hand from behind and twisted her arm.

910.    The other male deputy took several picture while they all grabbed Plaintiff, laughed, and mocked her.

911.    The one female deputy, Defendant Domingue, stood in the hallway and while Plaintiff screamed for help, asked Plaintiff, "Are you mental?"

912.    Then Defendant Domingue shouted, "Taser her, taser her!!" laughing and attempted to coerce one of the male deputies to take out his taser gun.

913.    The photographs were sent to West Valley Detention Center and one of the photographs was made into a badge. The badge was given to Plaintiff and she saw her red face clenched in pain.  The gloved hand on her chin was visible and the tips of the fingers of the hand that held her hair from the scalp was also visible.

914.    The female deputies at WVDC taunted Plaintiff and asked whether she was mental and needed to go into the holding cell with a straight jacket.

915.    They then took the badge back and said they were going to take "a more flattering" photo and Plaintiff wore that badge until she was released.

916.    After the photographs were taken Plaintiff was standing in front of a small metal podium and two of the male deputies slammed her face down onto the podium and she sustained a large bruise on her chin and the side of her face as well as numbing to her face and injuries to her ear and hearing that are ongoing.

917.    Then two male deputies held Plaintiff's arms and led her to the fingerprinting station which was also in the booking room.  They threatened Plaintiff if she didn't cooperate, they would break her arm.

- 229 -

918.    At that point one arm was released and a male deputy grabbed it and sprained her wrist (as documented on the hospital report).  He attempted to force Plaintiff to take finger prints.  Plaintiff could not resist at any point while in the booking room as there were four male deputies inside the booking room and one female in the hall at all times.

919.    After the fringerprinting, Plaintiff was turned around in the booking room and slammed up against the corner of the wall and told to get down on my knees and then lay on her stomach on the floor.

920.    Plaintiff attempted to tell the deputies that she could not lie like that on a hard floor because of a previous whiplash injury occurring in a car accident.

921.    When Plaintiff was on her knees, she felt a boot in her back and she fell face first onto the hard floor.

922.    The force of the boot caused Plaintiff injury to her ribs (as documented in the hospital report).

923.    Plaintiff heard one of the male deputy's laugh and say, "Get down on the floor like the dog that you are."

924.    Plaintiff was then dragged by her feet down the hallway while her head continuously banged against the hard floor and hit a corner of a wall causing several head contusions (as documented in the hospital report).

925.    While Plaintiff was being dragged her pants began falling down and the male deputies made sexual comments and whistling and cat-calling.  Plaintiffs boots fell off and they threw them in the trash.

926.    Plaintiff was then taken out behind the substation and she thought they were going to shoot her.

927.    Plaintiff was help by four male deputies as Defendant King approached her and got very close to her face and said, "We don't think you belong in Big Bear and believe you should go back down the hill to Orange County where you came from."

928.    Plaintiff looked him straight in the eye and said, "I'll go back down the hill just as soon as I see you go to prison."  At that point Defendant King drenched Plaintiff with a

liquid substance she believes was some form of pepper spray on her face, chest, arms, ears, and on all open skin surfaces (as documented in the hospital report).

929.    Plaintiff fell to the ground and screamed, then heard a deputy vomiting in the corner from the intensity of the chemicals and someone laughed and called him "a pussy."

930.    Blinded and screaming for emergency medical help, Plaintiff was taken back inside and literally thrown into another cell and collapsed on the floor.

931.    Plaintiff heard the water running and all the deputies laughing and mocking her. She felt like her skin was being peeled away from her body with excruciating pain.

932.    When the deputies left the cell, Plaintiff worked her way around the walls of the cell until she found the source of the water she had heard when she entered the cell, a small sink. She pulled herself up and stood in front of the sink for a very long time rinsing her face, arms and chest with cold water. In the process Plaintiff's clothing became drenched with water and she began to shake from the cold as it was October in Big Bear.

933.    Plaintiff became extremely nauseous and vomited in the sink and it seemed like she was in there for hours.

934.    Then the same deputies came back and took Plaintiff back to her original cell and pushed her inside and she fell and hit her head again.

935.    Plaintiff was shaking from the cold, yet her skin was still burning. Her vision was impaired and her ears were ringing.   She felt blood on her hand and arms where later she saw scratches and cuts.

936.    Plaintiff's clothes and socks were soaking wet with water and the sheriff deputies  refused to bring her a blanket.   She wrapped the bed mat around her to try to get warm but every 15 minutes or so a deputy would enter her cell and scream at her and kick the bed to scare her.

937.    Later, Plaintiff was told that all she had to do was "sign the citation and it would all be over," they would let her go home.   Plaintiff was in such a fog mentally and in such bad shape physically, that she wasn't really comprehending the conversation about the citation although she heard what they said.  She was scared to death emotionally.

938.    At some point during the early morning hours, two deputies came by and

- 231 -

1   threw the temporary restraining court order into her cell from Defendants K & P White and it

2   just sat there until the morning because she was too terrified to move and still had not regained

3   full use of her sight.

4       939.   Plaintiff heard someone say, "Keith's goin' love this."

5       940.   The court record states that Defendant King served the document on Plaintiff,

6   so Plaintiff claims that he was one of the two that came by her cell.

7       941.   In the morning Plaintiff was transported to West Valley Detention Center

8   barefoot in a bus with all men.  Her clothes were still wet, she was in a lot of pain, and still

9   very nauseous.

10       942.   When Plaintiff arrived at West Valley Detention Center, the nurse examined her

11   and urged Plaintiff to seek immediate emergency medical treatment, then made sure she was

12   released on her own recognizance.

13       943.   Prior to Plaintiff leaving West Valley Detention Center, one of the female

14   deputies remarked, "You know, you could have avoided all of this by simply signing the

15   citation," then laughed and shook her head.

16       944.   Plaintiff was never placed in the general population at West Valley Detention

17   Center.  However, the sheriff deputies started a rumor that Plaintiff has engaged in a fight with

18   another female inmate and that was how she sustained her injuries.  In fact, the rumor was that

19   it had all been caught on videotape.

20       945.   <u>Immunity Issues:</u>

21         a.   In Acosta v. San Francisco, 83 F3d, 1143, 1147 (9th Cir.), *cert. denied,*

22   519 U.S. 1009 (1996), the Ninth Circuit ruled in an excessive force case that, *"regardess of*

23   *who makes the ultimate decision as to qualified immunity, it is the jury, not the judge, that*

24   *must decided the "functional" or "historical" facts that underlie the determination."*  The court

25   again left open whether in these circumstances the immunity defense should be decided by the

26   judge or the jury."

27         b.   In Ortega v. O'Connor, 146 F3d, 1149, 1156 (9th Cir. 1998), the Court

28   held: *"Where facts material to the qualified immunity defense are in dispute, it is proper to*

*instruct the jury on the second prong of the qualified immunity defense, namely, whether a*
*reasonable official could have believed his conduct was lawful."*

~ ~ ~ ~ ~

<u>SEVENTEENTH CLAIM FOR RELIEF</u>

Failure to Provide Medical Treatment

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

946.     Plaintiff realleges and incorporates herein by reference the allegations set forth
in paragraphs 1-945 of this Complaint.

<u>COUNT ONE</u>

*The People of the State of California v. Erin K. Baldwin*

(San Bernardino County Superior Court, Criminal Case No. MSB906348)

947.     On October 8-9, 2009, Plaintiff was subjected to a brutal beating and burning at
the hand of five male Big Bear Sheriff's deputies.  Plaintiff screamed for medical attention and
they laughed at ther and stated, "You are so dramatic."

948.     On October 9, 2009, when Plaintiff was transferred from the Big Bear Sheriff
substation jail to West Valley Detention Center she saw a nurse who demanded that Plaintiff
be released on her own recognizance to seek emergency medical treatment.

949.     On October 10, 2009, Plaintiff sought medical treatment at the Emergency
Room of Bear Valley Community Hopital.  When the emergency room nurse took one look at
Plaintiff, she demanded to know, "Who did this to you?"  When she learned it was the Big
Bear Sheriffs, she contacted the Commanding Officer on Duty that day, Defendant Lane, and
sought to state a claim.  Defendant Lane's response was, "M'am, we were just doing our job."

950.     Plaintiff was treated by Dr. Michael Hartstein, Attending Physician who stated
to Plaintiff, "I have no doubt that you were beaten due to your injuries."

~ ~ ~ ~ ~

<u>EIGHTEENTH CLAIM FOR RELIEF</u>

**Unlawful Search & Seizure**

**in Violation of 42 U.S.C. §1983**

- 233 -

~ ~ ~ ~ ~

951.   Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-950 of this Complaint.

## COUNT ONE

### *UDR Villa Venetia Apartments, L.P. v. Erin K. Baldwin*

(Orange County Superior Court, Case No. 30-2009-00248999)

952.   On June 19, 2009, Plaintiff's property was unlawfully searched at and seized from her Costa Mesa apartment, and never returned despite requests for same.  Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle, nonetheless, it was used on multiple occasions.  Plaintiff had no notice of this search and seizure,

## COUNT TWO

### *Robert Abernethy v. Erin K. Baldwin*

(Orange County Superior Court, Case No. 30-2009-00276399)

953.   On or about August 31, 2009, Plaintiff's property was unlawfully searched at and seized from her Costa Mesa storage unit, and never returned.   Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle, nonetheless, it was used on multiple occasions.

## COUNT THREE

### *The People of the State of California v. Erin K. Baldwin*

(San Bernardino Superior Court, Case No. MSB906348)

954.   On October 8, 2009, Plaintiff's person was unlawfully seized from 613 Big Bear Boulevard, Big Bear City, California on and falsely arrested and imprisoned.  Defendants named herein did not have a warrant nor probable cause to arrest Plaintiff

## COUNT FOUR

### *The People of the State of California v. Erin K. Baldwin*

(San Bernardino Superior Court, Case No. FSB1000789)

955.    On or about February 25, 2010, Plaintiff's property was unlawfully searched at and seized from her Big Bear City residence and never returned despite requests for same. Defendants named herein were prohibited from using this property against her in a criminal prosecution pursuant to the Exclusionary Rule and the "fruit of the poisonous tree" principle.

<u>COUNT FIVE</u>

*The People of the State of California v. Erin K. Baldwin*

(San Bernardino Superior Court, Case No. FSB1000789)

956.    On February 25, 2010, Plaintiff's person was unlawfully seized by Defendant San Bernardino Sheriff's Department from 1017 Mountainview, Big Bear City, California and falsely arrested and imprisoned.

<u>COUNT SIX</u>

*The People of the State of California v. Erin K. Baldwin*

(San Bernardino Superior Court, Case No. FSB1000789)

957.    On February 25, 2010, Plaintiff's long-term dog companions were seized and surrendered to the animal shelter by Defendant Crow who claimed he was the rightful owner of said long-term dog companions.


<u>NINETEENTH CLAIM FOR RELIEF</u>

Warrantless Arrest

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

958.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-957 of this Complaint.

959.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 31, 2009 and released on September 10, 2009.

960.    Plaintiff was subjected to a civil bench warrant without probable cause issued on August 10, 2011 and released on August 18, 2011.

961.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on September 23, 2009.

- 235 -

962.    Plaintiff was subjected to a written and executed "Private Party Arrest Warrant," on October 17, 2009.

## TWENTIETH CLAIM FOR RELIEF

Right to Be Free of Self-Incrimination

Based on Fruit of the Poisonous Tree

in Violation of 42 U.S.C. §1983

~ ~ ~ ~ ~

963.    Plaintiff realleges and incorporates herein by reference the allegations set forth in paragraphs 1-962 of this Complaint.

## COUNT ONE

*Parsa Law Group, APC v. Bad Biz Finder, Erin Baldwin, et al.*

(Criminal Contempt Case)

(As to Defendants Miller, Schwarz, Kwast, Ospino, Campbell, Nelson,

Nguyen, Bates, Moorlach, and Ovitt)

964.    Plaintiff's right to be free of self-incrimination was violated by the defendants stated above beginning on June 8, 2009 through and including September 13, 2009.  Since Defendant OCPD serves "at the will" of Defendant OCBS, they are jointly and severably liable for all actions by Defendant OCPD.

965.    Plaintiff's property pertaining to the UDR Defamation Case was unlawfully and unconstitutionally seized by Defendant UDR on June 19, 2009; and by, at present, unknown parties on or about August 31, 2009, and February 25, 2010, placing Plaintiff in a significant disadvantage to defend a contempt action brought against Plaintiff in this case subsequent to said seizure.

966.    Defendant BKGG is the attorney of record for both Defendant PLG and UDR, therefore they knew that Defendant UDR had seized Plaintiff's property and that said action would place Plaintiff at a significant disadvantage to defend a contempt action.

967.    On June 8, 2009, Defendant Miller appointed Plaintiff a public defender from Defendant OCPD, namely Martin F. Schwarz *("Defendant Schwarz")* to represent her in a cause of action for civil contempt brought by Defendant PLG's lawyer, Defendant BKGG,

- 236 -

under California Code of Civil Procedure §1209, *et seq.* By any standards, this was highly unusual. In fact, Defendant OCPD later claimed it was the first time their office had ever handled a civil contempt proceeding. Plaintiff learned later that the contempt was criminal, not civil and that she had a right to a trial of her factual innocence. However, this never occurred because if it had, Plaintiff could have demanded that the injunction be set aside.

968.   Although Plaintiff did not know it at the time, Defendant Schwarz was appointed to protect the interests of Defendant Miller, not Plaintiff, since Defendant Miller knew he had taken a bribe in exchange for entering a permanent injunction against Plaintiff. Therefore, Defendant Schwarz did not have Plaintiff's best interests at heart at any time during his representation of her, evidenced by the following facts.

969.   Plaintiff's appointed counsel, Defendant Schwarz, refused to assist Plaintiff to recover her unlawfully seized property, nor would he agree to continue the contempt trial date until said property was returned. Plaintiff requested said continuance several times and Defendant Schwarz should have known that by refusing same, it was violating Plaintiff's constitutionally-protected right to be free of self-incrimination.

970.   On August 13, 2010, Plaintiff sent an email to Defendant Schwarz wherein she requested that he continue the trial date, obtain a court order for the return of her property (unlawfully seized on June 19, 2009 and February 25, 2010), and reserve enough time to incorporate all exculpatory evidence into her Reply to the contempt charges:

> *"I have thought through the strategy you presented to me on Wednesday. Since the strategy includes the possibility of further incarceration, I would like you to request a continuance of the September 13 trial date for 90 days from the date I receive all my property back from Big Bear and UDR.*
>
> *I am at a distinct disadvantage in defending my position without my evidence collected and confiscated since the beginning of this case. Please let me know when we can obtain court orders to release my property. Thank you for everything.*

971.   Defendant Schwarz responded to Plaintiff's email disagreeing with Plaintiff's request for a continuance to recover her missing documents amounting to exculpatory evidence vital to her defense.

- 237 -

972.    Defendant Schwarz informed Plaintiff that (a) she would have to *convince him she needed* the "missing documents" for her defense; and (b) that he couldn't help Plaintiff with the return of her property even though he was aware that the majority of the documents were seized in Orange County:

> *"I'm certainly open-minded on asking for a continuance, but as of right now, I disagree that a continuance would be in your best interest.  Here's why. If we go ahead with the hearing as scheduled, I believe we will catch opposing counsel by surprise and maximize our chances of success.  Why give them extra time to prepare arguments against our positions?*
>
> *That being said, I have an open mind, but you are going to have to convince me that your missing documents are critical to the defense of the contempt allegation.*
>
> *With respect to those documents, I cannot get those back for you.  You will need to obtain a court order from the judge in San Bernardino County, which I can't do.  I would keep bothering Canty and if he cannot help you, contact his supervisor."*

["Canty" was Plaintiff's public defender in San Bernardino that went to law school with Defendant OCPD Schwarz.]

973.    Plaintiff sent another email message to Defendant Schwarz wherein she clearly reiterated her request for a continuance in order to recover her exculpatory evidence contained in the missing documents seized on June 19, 2009 (in Costa Mesa, California) and February 25, 2010 (in Big Bear City, California).

> *"Would you please ask for a continuance at the same time you file your brief. You asked me to corroborate  the Declaration you're mailing me. I can't do that by memory; nor should I have to.  I want all my ducks in a row; particularly if my liberty is at stake."*

974.    In addition to aiding in the writing of the Reply Brief and aiding in her overall defense, Plaintiff needed these documents to complete a task requested by Defendant OCPD Schwarz.  During their telephone conversation on August 11, 2010, Defendant Schwarz requested that Plaintiff review the "Affidavit of Nicholas D. Myers, Esquire, of Facts Constituting Contempt," which he had mailed to Plaintiff.

975.    This "Affidavit" was nothing more than 324 pages of printed blog articles allegedly written by Plaintiff that allegedly contained "unprotected speech" statements upon which Defendant Miller relied to issue the Permanent Injunction in the case.

976.    On August 14, 2010, Plaintiff sent another email to Defendant Schwarz:

> *"I believe that if you inform Judge Miller in the Request for Continuance that the authorities and UDR have evidence belonging to me that is pertinent to this case, that Miller could and would intervene.*
> *I also believe that filing both documents at once strengthens, not diminishes our position.  May I have your thoughts?"*

977.    Plaintiff did not receive a response from Defendant Schwarz regarding her August 14, 2010 email, so she followed up:

> *"Good morning Martin:  I hope you had a nice weekend!  I'm a little confused about our call last week.  I thought we were going to discuss my "options" but we only discussed one strategy.  Did I miss something?  I must admit I was nervous, especially after you said I could go back to jail, but I don't recall any options presented.  Could you clear this up for me?  What are the other options?  Thank you!  Erin Baldwin"*

978.    Defendant Schwarz's response:

> *"I'm sorry if I was not clearer on the phone.  You have three options. The first is to fight the contempt allegations against you. Based on my review of your case and our conversations about the extraneous facts involved, my advice to you is to fight the allegations and I laid out my strategy for this in our phone call the other day.*

> *"The second option is to settle the case and the third option is to admit the allegations.  Based on our conversation, I believe you are not interested in the latter two options, nor would I advise you to pursue them.*

> ***"With respect to your personal property, understand that Judge Miller cannot issue a return of property order in a case over which he had no jurisdiction.   In other words, because the property was seized in San Bernardino County, by the San Bernardino County Sheriff in connection with a San Bernardino County case, only a San Bernardino County judge can sign the return of property order.***

> ***"With respect to a continuance, I understand the possibility of going back into custody is frightening.  However, I believe we will be giving up a significant tactical advantage if we continue the case.  I'm afraid that if we do in fact continue the case and lose this advantage that the odds of us prevailing could decrease significantly."***

979.    Response from Plaintiff that once again asked for a continuance until her property was recovered:

> "When I met you in court I was impressed by your confidence to my question, 'Will I be going back to jail?' to which you responded, 'Not on my watch.' I don't know what (if anything) has changed but I want much more specificity as to the possibility of incarceration.
>
> I am rebuilding my life, I have a job, my own apartment and am doing very well. I am not in the slightest bit interested in any strategy that includes the possibility of further incarceration.
>
> What do you mean in the below email by "settle the case"?
>
> **I would like to reiterate my request that you file a Request for Continuance in conjunction with the brief you are preparing to file this week. I'm not asking Judge Miller to get my property back; I just want it on the record that I have a serious impediment to my defense.  The best way to do that (out of county, as you acknowledge), is to file a Request for Continuance and cite the fact that I have no records to aid in my own defense as the reason for the continuance.**
>
> Why do you believe that "the odds of us prevailing could decrease significantly" if we continue the case?  Please be specific.  One would gather that if it came to light that Parsa's attorneys had potentially participated in the hiding or destruction of evidence, that would not bode well for their position.
>
> May I please review your brief and the request for continuance prior to your filing them.  Thank you, as always, for your assistance in this matter."

980.    Response from Defendant Schwarz:

> "Let me hit your points in the order you raised them,
>
> _Possibility of Incarceration:_  Understand that you are in the middle of contempt proceedings.  If you are in fact found in contempt, then the court may punish you with incarceration.
>
> I will do everything in my power to prevent that from happening.  More to the point, I believe that we have a strong case against the validity of the injunction.  We should prevail.
>
> **_If we do, the injunction will be found invalid_** and you will walk out the door with some degree of vindication.  That is why I recommend we go to trial on the case.  However, there are never any guarantees that the judge will see it my way.  That being the case, I am obligated to advise you of the potential

*consequences should we lose—so that you can make a fully informed decision about whether you want to fight the allegations.*

*When you say "I'm not the slightest bit interested in any strategy that includes the possibility of incarceration," does that mean you do not want to fight the contempt proceedings?  Based on our conversation, that doesn't sound like you.*

*Again, I believe we have a strong case and that we should win. However, the decision on whether to fight the allegations rests with you and I need to make sure you are fully advised before you make the decision.  Just to be clear—my recommendation is to fight the contempt allegation.*

*<u>Settlement</u>:  Settling the case is always an option.  I sent you an email a couple months ago with opposing counsel's demands for settlement.*

**<u>Continuance</u>:  In this proceeding, the plaintiff has the burden of proof.  That means we don't have to prove your innocence—Parsa must prove your guilt.  Again, I believe we have a good case that the injunction itself is illegal.  However, even if the judge disagrees with me on that issue, the Parsa will still have to prove that you violated the injunction.  I believe they will not be able to do that, but the last thing I want to do is give them time to put a case together, especially when I believe they will not be prepared to prove their case when we go back to court."**

*It sounds to me like you still have a lot of questions.  I'm certainly fine with emails, but it is such a limited medium.  Please consider calling me.  I'm happy to discuss any and all aspects of the case with you as often and for as long as you like.*

981.   On August 27, 2010, Plaintiff started questioning Defendant Schwarz via emails:

*"Don't I have the right to a trial before a jury of my peers?  Did you request this?  Can the judge decide on his own whether I go back to jail?  In light of past prejudice demonstrated for plaintiffs, wouldn't a jury be in my best interests?*

*"If the judge signed the court order and denied my motion to set it aside, don't you think he would be worried about the consequences to his reputation?  Couldn't that possibly color his decision?*

982.   Defendant OCPD Schwarz response to Plaintiff's email, *supra*::

*"Great question.  Contempt is punishable under both the Penal Code (§ 166) and the Code of Civil Procedure (§1209).  Contempt under the Penal Code is punishable as a misdemeanor with a maximum period of incarceration of 6 months, which gives you a right to a trial by jury.*

*There are different types of contempt under the Code of Civil Procedure, but the type you are being charged with is commonly called punitive contempt, which provides for a maximum period of incarnation of 5 days per act.*

*Unfortunately, you do not have the right to a trial by jury unless you are looking at a total maximum sentence of six months or more in custody."*

983.  Response from Plaintiff to email from Defendant OCPD Schwarz, *supra*:

*"So I could go back to jail for a period of up to 6 months based solely on the decision of a judge who knowingly signed a court order against me not once but twice (see UDR) that was unconstitutional, was prejudiced enough against me to consolidate 3 identical frivolous cases together then deny my preemptory challenge, and then denied  my motion to set aside said unconstitutional judgment after acknowledging prior restraint issues from the outset of the case, and knows my appeal against his bad calls was thrown out because I had no money?  Is that what you're saying?*

*I think we need a Plan B.  We need a strategy in case he rules to cover his rear end, don't you agree?  I want to know that no matter what, on September 13, I am not going to be sitting in a jail cell because a judge made a long line of errors he can't face.  Would you please respond specifically to this and speak to a Plan B to the worst case scenario (jail), i.e., community service, work release, credit for time served, house arrest.  What would you do if, on September 13, Miller threw me back in jail?"*

984.  On August 29, 2010, Defendant Schwarz responded:

*"Please re-read my last email.  I am not saying you could go to jail for up to six months!  What I am saying is that that the type of **civil contempt** you are facing caries a penalty of up to five days per contemptuous act.  **Because the OSC does not specify the number of acts alleged, it is unclear what the maximum period of incarceration would be.  The only reason I even mentioned six months in my email is because it answered your question about a jury trial.***

*I believe we will win.  Certainly, we should win.  While I only know Defendant Professor Miller by reputation, I do not believe he is evil and I am hopeful he will see things our way.  Frankly, if he does not, I will be shocked.  In the unlikely event that Defendant Professor Miller rules against us, I would argue that jail time is not warranted in your case.  If Miller were to disagree, I would ask for a stay of any jail time so that I could take a writ to the Court of Appeal seeking review of Miller's decision."*

985.  On August 31, 2010, Plaintiff sent another email to Defendant Schwarz:

*1.  When will you be filing the Trial Brief and serving it on Parsa's attorneys?*

- 242 -

> 2.   Will the "trial date" on September 13 be one day or more days?  I have to know for work.
> 3.   Is there a possibility the September 13 could be vacated as Miller stated that the attorneys could come back into court prior to that date with a settlement?
> 4.   Do you expect Parsa's attorneys to file an opposition to the Trial Brief?

986.   Response from Defendant Attorney Schwarz to Plaintiff's August 31, 2010 email, supra, regarding trial date:

> "I will file the trial brief as soon as the documents from the State Bar come in. They are already late, so I'm expecting that to happen any day now.  I suspect the trial will only take one day, but I cannot guarantee that.  <u>If everything works out the way I hope, Miller will rule that the injunction is unconstitutional and we will never address the issue of whether you actually violated its terms.</u> If that's the case, it shouldn't take more than a couple of hours.  September 13th will only be vacated if we agree with opposing counsel's demands and go court prior to that date.   Parsa's lawyers may or may not file something in response to my brief.  Based on the quality of their work thus far, I doubt they will.

987.   Response from Plaintiff to Defendant Attorney Schwarz to Plaintiff's August 31, 2010 email, supra, regarding deadline for trial brief:

> "Thank you.  Is there a deadline for the Trial Brief?"

988.   Response from Defendant Attorney Schwarz to Plaintiff's August 31, 2010 email, supra, regarding deadline for trial brief:

> "The statutes governing the rules of **<u>civil contempt</u>** (Code of Civil Procedure § 1209 et seq) do not provide timelines for the filing of briefs in contempt proceedings."

989.   On September 6, 2010, Plaintiff received the brief from Defendant Schwartz and the following message:

> "I've attached the brief.  Unfortunately, I'm not sure I have much insight into how to get your stuff back.  If the Sheriff's Department, doesn't have it, there's not much Canty can do about it.
>
> "If you haven't done so already, please go through the materials I sent you and be prepared to answer the question "Why do you believe that to be true" for each posting.  It will probably never come to that in court, but in the very unlikely event it does, you need to be able to answer that question.

- 243 -

1
2
3
4

> "If you can't answer that question for a particular posting because it was based on materials that have now been lost, that's acceptable so long as you can say that you wrote something in good faith reliance on a source you believed to be credible at the time (regardless of whether you now remember who or what the source was).

5

> "Don't freak out—I would be shocked if it came to that. But even if it does, it's not going to be difficult for you to do. I will guide you through it."

6    990.   On September 8, 2010, Plaintiff responded:

7

> "I'm not freaking out but I have a couple of thoughts:

8
9
10

> "Without my documents I cannot with certainty state anything. I thought we already had this discussion and this is why I was asking for a continuance until I got my documents back. I don't feel comfortable going by memory in a court of law where my answers are vitally important to my future.

11
12

> "Parsa's attorneys have everything at their disposal and I am at a huge disadvantage because I have nothing and they know that. It is incredibly unfair and inequitable and should not be allowed.

13
14

> "Also, you say: "If the Sheriff's Department, doesn't have it, there's not much Canty can do about it."

15
16

> "The problem is that no one will tell me whether the Sheriff's Department has my property or not! All Canty has told me is that nothing was entered into evidence which I knew before I was released from jail.

17
18
19

> "Let me make this dilemma clear -- Canty drafted a Stay Away Order that accompanied the Plea Bargain saying I could not contact my ex-housemate when I was released from jail and where my property was left. So, in Court I asked "If I can't contact my ex-housemate, how can I get my property back?"

20
21
22

> "Canty and the DA agreed I could contact the Sheriff once I am released to get my property back. I did this several times and the Sheriff won't respond to me. So, shouldn't Canty go back into court and get the judge to order the Sheriff to respond disclosing the whereabouts of my property?

23
24

> "Finally, Have you heard from Parsa's attorneys this week other than what you have already told me?"

25    991.   On September 9, 2010, Defendant Schwarz responded:

26
27

> "To answer your most immediate and pressing question—I believe, win or lose, you will walk out of the courtroom on Monday. I believe there is a good chance that Parsa's lawyers will not go forward on Monday.

28

- 244 -

> *"In the event they do go forward, we have a good chance of winning on the legal issues. If we should lose on the legal issues, we have a better chance than them of winning on the merits.*
>
> *"If we strike out on all of those counts and lose, I believe there is a good chance Defendant Professor Miller will stay any potential punishment pending review by the Court of Appeal. Now get some rest.*
>
> *"If we do actually get to the merits of whether or not the postings are defamatory—and assuming they can prove they are defamatory in their case in chief (which I doubt)—then I will simply have you testify that*
>
> *(1) you have reviewed all the postings in the materials I sent you; and*
>
> *(2) At the time you posted the materials you believed them to be true. You don't need your documents for that. In the event you are cross examined as to why you believed them to be true and you can't remember, you can simply explain what happened to your documents.*
>
> *"Remember, they need to prove malice—that you acted in reckless disregard for the truth or posted things you new to be false. If you had a sincere belief that the information was correct (whether it was or wasn't), they can't prove malice. You'll be fine—but I doubt it will ever get to that point.*
>
> *"On the issue you raise below, if the Sheriff never took possession of your property, the Judge can't order the Sheriff to look for it."*
>
> *"I also just spoke to Parsa's lawyer, a guy named Nick Myers. He clearly has no idea what he is doing. He told me he would get back to me late today or tomorrow to tell me if he will proceed."*

992.   Response from Plaintiff to September 8, 2010 email from Defendant Attorney Schwarz:

> *"From your experience, what it the likely outcome for Monday? Please tell me that I will not be going to jail on Monday. I can't sleep because of the fear."*

993.   Response from Defendant Attorney Schwarz to Plaintiff's September 8, 2010 email, supra:

> *"I just spoke to Nick Myers. He told me that if you remove any reference to **HIS FIRM** from the postings (it rarely appears as content and normally appears as a keyword), <u>they will withdraw the order to show cause on Monday</u>."*

994.   Plaintiff's response:

"So, if I understand correctly, we should move forward with confidence. My goal is to be free to write about anything I choose which I am guaranteed under the First Amendment. I have never written anything false, defamatory or tortious about anyone and Parsa's attorneys could never prove that even if they tried, which they didn't.

"Bottom line: I want the injunction released so I am free to write about the truth about James Parsa and Burkhalter, Kessler, Goodman & George's participation in scamming thousands of consumers. I want the judgment of $605,000 thrown out because more than anything, that hurts my future. And I want James Parsa and his attorneys held accountable for their despicable acts (I look to you for suggestions).

995.     On the day of the trial, September 13, 2009, Defendant Schwarz told Plaintiff that Defendant BKGG had made an offer. He told her that they admitted to knowing where Plaintiff's property was located and would agree to return it to her if she would not proceed with trial. Plaintiff proceeded with trial and contempt charges were dismissed.

COUNT TWO

*UDR, Inc. v. Erin Baldwin, Bad Biz Finder, et al.*

(Criminal Contempt Case)

(As to Defendants Miller, Schwarz, Kwast, Gragg, Nicolalde,

Wilkinson, Ospino, Campbell, Nelson, Nguyen, Bates, Moorlach, and Ovitt)

996.     Plaintiff's right to be free of self-incrimination has been violated by the defendants stated above beginning on February 1, 2011 through and including the present. Since Defendant OCPD serves "at the will" of Defendant OCBS, they are jointly and severably liable for all actions taken by Defendant OCPD.

997.     Plaintiff's property pertaining to the UDR Defamation Case was unlawfully and unconstitutionally seized by Defendant UDR on June 19, 2009; and by, at present, unknown parties on or about August 31, 2009, and February 25, 2010, placing Plaintiff in a significant disadvantage to defend a contempt action brought against Plaintiff in this case subsequent to said seizure.

998.     Defendant BKGG is the attorney of record for both Defendant PLG and UDR, therefore they knew that Defendant UDR had seized Plaintiff's property and that said action would place Plaintiff at a significant disadvantage to defend a contempt action.

- 246 -

999.   On February 1, 2011, Defendant Miller appointed Plaintiff a public defender from Defendant OCPD, namely Martin F. Schwarz *("Defendant Schwarz")* who later relinquished the case to Jennifer Nicolalde *("Defendant Nicolalde")* with a promise that he would remain actively involved.

1000.   Like the Parsa Contempt Case, Defendant Miller requested Defendant OCPD represent Plaintiff in a cause of action for civil contempt brought by Defendant UDR also represented by Defendant BKGG.   Again, Defendant Miller claimed that the contempt was civil, brought under California Code of Civil Procedure §1209, *et seq.*and again, it was extremely unusual to see a public defender in  the unlimited civil division of the Superior Court representing a *pro se* litigant in a defamation action.

1001.   Although Plaintiff did not know it at the time, Defendants Schwarz and Nicolalde were appointed to protect the interests of Defendant Miller, not Plaintiff, since Defendant Miller knew he had taken a bribe in exchange for entering a permanent injunction against Plaintiff in the UDR Defamation action, and he knew that the permanent injunction was unconstitutional.   Therefore, Defendants Schwarz and Nicolalde did not have Plaintiff's best interests at heart at any time during his representation of her as before in the Parsa Case.

1002.   This time, Plaintiff requested that Defendant OCPD and Nicolalde subpoena Defendant BKGG for production of Plaintiff's property since on September 13, 2009, theyhad admitted to Defendant Schwarz that they knew where Plaintiff's property was located.

1003.   Defendants OCPD and Nicolalde pretended to agree to do so but never did despite many requests.   Defendant Nicolalde, refused to assist Plaintiff to recover her unlawfully seized property, nor would she agree to continue the contempt trial date until said property was returned.   Plaintiff requested said continuance several times and Defendant Nicolalde should have known that by refusing same, it was violating Plaintiff's constitutionally-protected right to be free of self-incrimination.

COUNT THREE

1004.   On March 26, 2011, Plaintiff sent an email to Defendant Kwast, to wit:

*"In accordance with Penal Code section 1050, I want the OCPD to file a Request for Continuance of the April 19, 2011 trial date in the UDR case on the following grounds:*

- 247 -

"*Issue A:    On two separate occasions within seven months (June 19, 2009 and February 25, 2010),[53] my property and computers were illegally seized by UDR and James Parsa and never returned.  Said property and computers comprise material documents that constitute exculpatory evidence necessary to assert my affirmative defenses in the criminal contempt cases Parsa and UDR.*

"*For example, all my notes, references, cites, etc. upon which I relied to write the blog articles in question are in the possession of UDR and Parsa.  Without these documents, I cannot provide documentary evidence that the contents of the blog articles are true, therefore not defamatory.   UDR and Parsa intentionally and unlawfully seized my property and computers, and, as such, their actions also constitute spoliation of evidence.*

"*I want the OCPD to prepare and present to Defendant Professor Miller (or his successor) criminal subpoenas duces tecum to (1) James Parsa; (2) Parsa's partner, Alex Dastmalchi; (3) the custodian of records at UDR, Inc.; (4) the law firm, Burkhalter, Kessler, Goodman & George LLP ("BKGG") (counsel for both Parsa and UDR); (5) Eric J. Goodman, Esq. and David A. Berstein, Esq. (attorneys at BKGG who admitted knowledge of the taking of and the whereabouts of my property); as well as the law firm and lawyers that represented UDR at the time my property was confiscated, Todd A. Brisco, Esq. and Cynthia S. Poer, Esq., of Todd A. Brisco & Associates.*

"*I want the subpoena duces tecum to mandate that all my property and computers be deposited with the criminal court within five (5) business days of the date of the subpoena.  The Motion shall also include a statement stating that if the parties subpoenaed willfully and unlawfully disobey the subpoena duces tecum, that they will be sanctioned $5,000 per day until they comply.   If the documents are not turned over to the Court within the timeline stated above, I want the OCPD to bring a Motion to Compel compliance of the subpoena duces tecum including an inventory of all my personal property, documents in subpoenaed parties' possession and the whereabouts of my computers, data storage devices, original documents and any and all copies of the original documents.*

"*On June 19, 2009, UDR confiscated all my personal property and computer data storage devices, three days after unlawfully evicting me from my UDR apartment in retaliation for writing about UDR's illegal California residential lease agreements.  UDR claimed they were justified in confiscating my property stating it was "abandoned," even though the sheriff that evicted me told me I had ten (10) days to return to collect my property.  UDR packed the contents of my entire apartment and moved it to an offsite storage facility owned by UDR.*

"*Shortly thereafter, UDR sold my property to James Parsa.  I know that this sale took place because Parsa's attorneys disclosed the facts to Public*

---

[53] At that time, Plaintiff was not aware of the August 31, 2009 seizure.

*Defender, Martin Schwarz, minutes before the September 13, 2010 trial on contempt charges in The Parsa Defamation Case. Parsa's attorneys attempted to coerce me into not moving forward with the criminal contempt trial in exchange for the return of my property.*

*"Eric J. Goodman, Esq. and David A. Berstein, Esq. stated, "UDR confiscated Erin's property and we know where it is. We also know that it was sold to James Parsa to use as evidence against Erin." They further stated, "If Erin is willing to forego the contempt trial we are willing to return her property." I declined the offer and the contempt charges were dismissed. However, neither an Order of Acquittal nor a Certificate of Innocence was obtained by Martin Schwarz.*

*"On or about February 25, 2010, UDR and James Parsa (in collusion with the San Bernardino County Sheriffs Department) confiscated all my property and computers in connection with a false claim, false arrest and false imprisonment on February 25, 2010. The arrest was made in Big Bear, California and the warrant utilized to detain me was the bench warrant issued by Judge Miller in connection with my failure to appear at an OSC Re Contempt in The Parsa Defamation Case which was never served on me. I was falsely imprisoned for 35 days. While imprisoned, all my property and computers were seized by UDR and Parsa and not returned.*

*"I informed Martin Schwarz of these facts while he was preparing the Answer/Reply for The Parsa Defamation Case specifically when he asked me to provide him evidence that the blog articles were true, therefore not defamatory. I told him I could not do that until all my documents were returned and I asked him to help me do so. He replied that unless I could convince him that the property and computers confiscated would result in helping him to prove his case, he would not help me.*

*"Until such time as all my property and computers that were unlawfully seized by James Parsa and UDR, Inc. in Costa Mesa, California on June 19, 2009 and in Big Bear, California on or about February 25, 2010, proceeding to trial would place me in a distinct disadvantage and would be akin to intentionally depriving me of my constitutional rights to Brady material and other exculpatory evidence in support of my affirmative defenses. Plaintiff's property pertaining to the UDR Defamation Case was unlawfully and unconstitutionally seized by Defendant UDR on June 19, 2009; and by, at present, unknown parties on or about August 31, 2009, and February 25, 2010, placing Plaintiff in a significant disadvantage to defend a contempt action brought against Plaintiff in this case subsequent to said seizure."*

1005.   Defendants stated above failed to assist Plaintiff recover her property even though they had personal knowledge that Defendant BKGG had same.

1006.   This case is pending.

~ ~ ~ ~ ~

## TWENTY-FIRST CLAIM FOR RELIEF

Deprivation of Notice of Charges

in Violation of 42 U.S.C. §1983

(Protected Liberty Interest)

~ ~ ~ ~ ~

1007.   Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of contempt on August 31, 2009.

1008.   Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of contempt on November 10, 2009.

1009.   Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with crimes associated with MSB906348 on October 28, 2009.

1010.   Plaintiff was denied the right be informed of the nature and cause of the accusation when charged with the crime of battery on January 25, 2010.

1011.   Plaintiff was denied the right to be informed of the nature and cause of the accusation when charged with the crime of assault with a deadly weapon on February 25, 2010.

~ ~ ~ ~ ~

## TWENTY-SECOND CLAIM FOR RELIEF

Deprivation of Notice of Basis of Charges

in Violation of 42 U.S.C. §1983

(Protected Liberty Interest)

~ ~ ~ ~ ~

## COUNT ONE

*Parsa Law Group, APC v. Bad Biz Finder, Erin Baldwin, et al.*

Criminal Contempt Case

(Orange County Superior Court, Case No. 30-2009-00117752)

- 250 -